## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

BRIAN FISHER, ERIC LEE, JERRY VANDERBERG, and RACHEL WALKOWICZ, individually and on behalf of all others similarly situated,

        Plaintiffs,

      v.

FCA US LLC,

        Defendant.

Case No.:

## CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

JURISDICTION AND VENUE ........................................................4

PARTIES .............................................................................................5

    A.    Plaintiffs ................................................................................5

        1.    *Plaintiff Brian Fisher (California)* ...........................5

        2.    *Plaintiff Eric Lee (Ohio)* ........................................7

        3.    *Plaintiff Jerry Vanderberg (Tennessee)*...................9

        4.    *Plaintiff Rachel Walkowicz (Michigan)*...................12

    B.    Defendant ..............................................................................15

FACTUAL ALLEGATIONS..............................................................15

    A.    eTorque System Operation...................................................15

    B.    The eTorque Defect .............................................................19

    C.    FCA Has Long Known About the eTorque Defect, But Failed to Disclose It................................................................22

    D.    FCA Touted the Class Vehicles as Safe and Reliable Vehicles While Omitting the eTorque Defect. ................................43

    E.    FCA's Warranties .................................................................49

    F.    Tolling of the Applicable Statues of Limitation .................50

CLASS ACTION ALLEGATIONS ....................................................51

CLAIMS ...............................................................................................56

    A.    NATIONWIDE CLASS CLAIMS .....................................56

        FIRST CAUSE OF ACTION Breach of Written Warranty Under the Magnuson-Moss Warranty Act (By All Plaintiffs) ..........56

        SECOND CAUSE OF ACTION Fraudulent Concealment (By All Plaintiffs) .............................................................63

        THIRD CAUSE OF ACTION Breach of Express Warranty by Affirmation, Promise, Description, or Sample U.C.C. § 2-313 (By All Plaintiffs) .................................................66

# TABLE OF CONTENTS
## (continued)

Page

FOURTH CAUSE OF ACTION Breach of Implied
Warranty of Merchantability U.C.C. § 2-314 (By All
Plaintiffs) ...................................................................................69

FIFTH CAUSE OF ACTION Unjust Enrichment (By All
Plaintiffs) ...................................................................................72

B.   STATE CLASS CLAIMS .................................................................73

1.   CALIFORNIA ......................................................................73

SIXTH CAUSE OF ACTION Violation of California's
Unfair Competition Law Cal. Bus. & Prof. Code Sec. 17200,
*et seq.* (By Plaintiff Brain Fisher) ...............................................73

SEVENTH CAUSE OF ACTION Breach of Express
Warranty Pursuant to Song-Beverly Consumer Warranty
Act (By Plaintiff Brian Fisher) ....................................................76

EIGHTH CAUSE OF ACTION Breach of Express Warranty
by Affirmation, Promise, Description, or Sample Cal.
Comm. Code § 2313 (By Plaintiff Brian Fisher) ..........................79

NINTH CAUSE OF ACTION Breach of Implied Warranty
Under Song-Beverly Consumer Warranty Act (Plaintiff
Brian Fisher) ..............................................................................83

TENTH CAUSE OF ACTION Breach of Implied Warranty
of Merchantability (Plaintiff Brian Fisher) ...................................85

ELEVENTH CAUSE OF ACTION Fraud by Concealment
(Plaintiff Brian Fisher) ................................................................87

TWELFTH CAUSE OF ACTION Unjust Enrichment
(Plaintiff Brian Fisher) ................................................................91

2.   MICHIGAN .........................................................................92

THIRTEENTH CAUSE OF ACTION Violation of the
Michigan Consumer Protection Act Mich. Comp. Laws
§ 445.903, *et. seq.* (Plaintiff Rachel Walkowicz) ........................92

FOURTEENTH CAUSE OF ACTION Breach of Implied
Warranty of Merchantability Mich. Comp. Laws
§§ 440.2314 and 440.2862 (Plaintiff Rachel Walkowicz) ...............98

# TABLE OF CONTENTS
## (continued)

Page

FIFTEENTH CAUSE OF ACTION Breach of Express Warranty by Affirmation, Promise, Description, or Sample Mich. Comp. Laws §§ 440.2313 and 440.2860 (Plaintiff Rachel Walkowicz) ........................................................................ 102

SIXTEENTH CAUSE OF ACTION Unjust Enrichment (Plaintiff Rachel Walkowicz) ........................................................ 105

3.     OHIO .......................................................................................... 107

SEVENTEENTH CAUSE OF ACTION Violation of the Ohio Consumer Sales Practices Act Ohio Rev. Code § 1302.26 (Plaintiff Eric Lee) ............................................................ 107

EIGHTEENTH CAUSE OF ACTION Fraud by Concealment (Plaintiff Eric Lee) ................................................... 112

NINETEENTH CAUSE OF ACTION Breach of Express Warranty by Affirmation, Promise, Description, or Sample Ohio Rev. Code § 1302.26 (Plaintiff Eric Lee) ............................. 114

TWENTIETH CAUSE OF ACTION Tortious Breach of Implied Warranty (Plaintiff Eric Lee) ............................................ 118

TWENTY-FIRST CAUSE OF ACTION Unjust Enrichment (Plaintiff Eric Lee) .......................................................................... 119

TWENTY-SECOND CAUSE OF ACTION Negligent Design and Failure to Warn (Plaintiff Eric Lee) ............................ 120

4.     TENNESSEE ............................................................................. 122

TWENTY-THIRD CAUSE OF ACTION Violation of Tennessee's Consumer Protection Act ("TCPA") Tenn. Code Ann. § 47-18-101, *et seq*. (Plaintiff Jerry Vanderberg) ......... 122

TWENTY-FOURTH CAUSE OF ACTION Fraud by Concealment (Plaintiff Jerry Vanderberg) ..................................... 127

TWENTY-FIFTH CAUSE OF ACTION Breach of Express Warranty by Affirmation, Promise, Description, or Sample Tenn. Code § 47-2-313 (Plaintiff Jerry Vanderberg) ..................... 130

TWENTY-SIXTH CAUSE OF ACTION Breach of Implied Warranty Tenn. Code § 47-2-314 (Plaintiff Jerry Vanderberg) ........................................................................................ 133

**TABLE OF CONTENTS**
**(continued)**

**Page**

TWENTY-SEVENTH CAUSE OF ACTION Unjust
Enrichment (Plaintiff Jerry Vanderberg) .........................................136

REQUEST FOR RELIEF ...................................................................137

DEMAND FOR JURY TRIAL..........................................................138

Plaintiffs BRIAN FISHER, ERIC LEE, JERRY VANDERBERG, and

RACHEL WALKOWICZ ("Plaintiffs") bring this action against Defendant FCA

US LLC ("Defendant" or "FCA"), by and through their attorneys, individually and

on behalf of all others similarly situated (the "Class," as more fully defined below),

upon personal knowledge as to themselves and their own acts, and as to all other

matters upon information and belief and based upon investigation, alleging as

follows:

## **INTRODUCTION**

1.     This is a class action lawsuit brought by Plaintiffs individually and on

behalf of all others similarly situated who purchased or leased 2019-2022 Ram

1500 trucks and Jeep Wrangler vehicles equipped with eTorque ("Class

Vehicles").

2.     All Class Vehicles are equipped with eTorque, a "mild hybrid" system

designed, implemented, marketed, and sold by FCA that allegedly improves fuel

economy without sacrificing power, torque, and capability.

3.     However, eTorque is not like most hybrid systems and serves multiple

functions designed to lessen the load on the engine to make it more fuel efficient.

       a.     First, the Class Vehicles utilize an auto stop/start feature during

idle, which is controlled and powered by eTorque.

b.     Second, in certain driving conditions, such as accelerating from a complete stop, eTorque provides support to the crankshaft to boost acceleration.

c.     Third, eTorque generates battery energy from braking and shifting events to help charge the 48-volt battery.

d.     Fourth, the 48-volt battery charges the 12-volt battery to power the vehicles' accessories.

4.     However, the eTorque system suffers a defect that causes the vehicles' engines to turn off, shift the transmission to "Park," and/or apply the emergency brake, all spontaneously and without warning ("eTorque Defect" or "Defect," as further defined below). This action arises from FCA's failure, despite longstanding knowledge of a material design defect (and the inherent unreliability and danger of the Class Vehicles) to disclose the eTorque Defect to Plaintiffs and other Class members.

5.     FCA confirmed the existence of the eTorque Defect in two technical service bulletins ("TSB"s) issued to dealers on May 13, 2022 and July 6, 2022. However, these TSBs are limited to only 2022 Ram 1500 trucks with the 5.7L V8 HEMI and 2021 Ram 1500 trucks with the 5.7L V8 HEMI MDS VVT eTorque engine, excluding all other Class Vehicles.

6.     FCA has known about the eTorque Defect and the risks it poses since at least 2018, upon information and belief, based on its pre-sale testing, an increase

in eTorque Defect complaints submitted to the National Highway Traffic Safety Administration ("NHTSA"), and the correlating increase in warranty claims to FCA, as well as other sources. Still, FCA never disclosed the eTorque Defect to consumers; rather, it actively conceals it.

7.     Many owners and lessees of the Class Vehicles sought repairs for the eTorque Defect but were often denied because the dealership reported that they could not replicate the failure mode.

8.     FCA has taken no meaningful action to correct the root cause of the eTorque Defect in all Class Vehicles. Given FCA's knowledge of this concealed, safety-related design and/or manufacturing defect and its inability to repair it, FCA's attempt to limit the applicable warranties causes them to fail of the essential purpose.

9.     Despite consumer complaints, warranty claims, customer complaints submitted by dealers, pre-sale durability testing, NHTSA complaints, and its own internal records, FCA has not recalled the Class Vehicles to repair the eTorque Defect, nor has FCA extended the warranty of Class Vehicles. It has not offered customers a suitable repair or replacement, reimbursed consumers who incurred out-of-pocket expenses to repair the eTorque Defect, compensated consumers for the premium price they paid for the vehicles due to the undisclosed defect, or compensated consumers for the diminished value caused by the eTorque Defect.

10.     Had Plaintiffs and other Class members known about the eTorque Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them.

11.     As a result of FCA's unfair, deceptive, and/or fraudulent conduct,, Plaintiffs and other Class members have suffered injuries in fact, incurred damages, and have been otherwise harmed by FCA's conduct, including by paying a premium price for the vehicles due to the undisclosed defect, incurring costs associated with failures of their vehicles as a result of the eTorque Defect and incurring costs associated with attempting to repair it..

Accordingly, Plaintiffs bring this action, individually and on behalf of the other Class members, to redress FCA's common law violations; violations of the Magnuson-Moss Warranty Act; and violations of various states' consumer fraud and warranty statutes.

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs are citizens of different states than FCA.

13.     This Court has personal jurisdiction, including general personal jurisdiction, over FCA because FCA conducted and continues to conduct substantial business in this District, its corporate headquarters is located in this

District, and because it committed the acts and omissions complained of herein in this District, including marketing, selling, and leasing Class Vehicles in this District.

14.     Venue as to FCA is proper in this judicial district under 28 U.S.C § 1391 because Defendant sells a substantial number of automobiles in this District, has dealerships in this District, maintains its corporate headquarters within this District, and many of FCA's acts complained of herein occurred within this District, including the marketing and leasing of the Class Vehicles to Plaintiffs and other Class members in this District.

## PARTIES

### A.     Plaintiffs

#### 1.     *Plaintiff Brian Fisher (California)*

15.     Plaintiff Brian Fisher resides in Castaic, California.

16.     Mr. Fisher owns a 2021 Ram 1500 V8 with eTorque, which he purchased new on December 16, 2020 from Rydell Chrysler Dodge Jeep Ram in San Fernando, California.

17.     Mr. Fisher's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6RREJT6MN501476.

18.     Mr. Fisher purchased the Class Vehicle for his personal, family, or household use.

19.     Mr. Fisher expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Fisher's purchase of his Class Vehicle, Mr. Fisher was not warned of his vehicle's tendency to stall and turn off while driving.

20.     Since the date of purchase, Mr. Fisher has experienced six or more incidents of the Class Vehicle stalling while driving.

21.     On August 18, 2021, Mr. Fisher experienced one such incident. Mr. Fisher was driving the vehicle, when the vehicle suddenly stalled and turned off. The vehicle stopped moving altogether, and Mr. Fisher had the vehicle towed to Rydell Chrysler Dodge Jeep Ram.

22.     Upon inspection, the dealer reported that there was "no problem found at this time," no relevant bulletins, software updates, or Diagnostic Trouble Codes.

23.     On March 28, 2022, the eTorque Defect caused the Class Vehicle to stall again. Mr. Fisher was driving at a low speed and making a turn when the Class Vehicle suddenly stalled and turned off.

24.     Mr. Fisher brought the Class Vehicle to Rydell Chrysler Dodge Jeep Ram a second time.

25.     Again, the dealer reported that there was no problem found with the vehicle.

26.     Based on Mr. Fisher's experience with the vehicle stalling at least six times already and the nature of the Defect, Mr. Fisher is likely to suffer more stalling incidents.

27.     Had FCA disclosed the Defect, Mr. Fisher would not have purchased his Class Vehicle or would have paid significantly less for it.

28.     On February 9, 2023, Mr. Fisher, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

### 2.     *Plaintiff Eric Lee (Ohio)*

29.     Plaintiff Eric Lee resides in Columbus, Ohio.

30.     Mr. Lee owns a 2021 Ram 1500 5.7L Hemi V8 with eTorque, which he purchased new in January 2022 from Performance Dodge Jeep in Columbus, Ohio.

31.     Mr. Lee's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFRT7MN803564.

32.     Mr. Lee purchased the Class Vehicle for his personal, family, or household use.

33.     Mr. Lee expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to

Mr. Lee's purchase of his Class Vehicle, Mr. Lee was not warned of his vehicle's tendency to stall and turn off while driving.

34.     Mr. Lee first experienced a stalling incident in late January 2022, just weeks after purchasing his new Class Vehicle. There were only 200 miles on the vehicle at the time of the incident. Mr. Lee was taking a right turn when leaving his workplace when the Class Vehicle suddenly lost power and the parking brake turned on.  A message flashed on the dashboard, but Mr. Lee was startled and unable to read it.  While Mr. Lee did not get in an accident, he was frightened and upset because his vehicle was almost brand new.  Mr. Lee did not call the dealership at this time because he was unaware of the eTorque Defect and assumed this to be a singular event.

35.     On January 29, 2023, Mr. Lee was taking a right turn at a red light in the Class Vehicle when the vehicle suddenly stalled and the emergency brake turned on. A warning on the dashboard indicated that a safety lock was enabled. Mr. Lee pushed a button on his vehicle to reset the emergency brake. There were only 8,000 miles on the Class Vehicle at the time of this second stalling incident.

36.     Mr. Lee took his vehicle to Performance Dodge Jeep several days later after reading online about another alleged Ram 1500 stalling incident that had resulted in a traffic accident.

37.     The Service Advisor at the dealership informed Mr. Lee that a TSB had been issued related to the stalling issue (TSB 18-091-22 REV A) and advised installing a software update. Mr. Lee consented to the dealership installing the software update to his Class Vehicle. The dealership told Mr. Lee that they did not know if the software update was a permanent or temporary fix.

38.     Based on Mr. Lee's experience with the vehicle stalling on two occasions, and the dealership's statement that they were unaware if the software update is a permanent "fix" for the eTorque Defect, Mr. Lee is likely to suffer more stalling incidents.

39.     Had FCA disclosed the Defect, Mr. Lee would not have purchased his Class Vehicle or would have paid significantly less for it.

40.     On February 9, 2023, Mr. Lee, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

### 3.     *Plaintiff Jerry Vanderberg (Tennessee)*

41.     Plaintiff Jerry Vanderberg resides in Murfreesboro, Tennessee.

42.     Mr. Vanderberg owns a 2021 Ram 1500 5.7L with eTorque, which he purchased new on December 21, 2020 from Miracle Chrysler-Dodge-Jeep, Inc. in Gallatin, Tennessee.

43.     Mr. Vanderberg's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFFT1MN551038.

44.     Mr. Vanderberg purchased the Class Vehicle for his personal, family, or household use.

45.     Mr. Vanderberg expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Vanderberg's purchase of his Class Vehicle, Mr. Vanderberg was not warned of his vehicle's tendency to stall and turn off while driving.

46.     Since the date of purchase, Mr. Vanderberg has experienced multiple incidents where the Class Vehicle unexpectedly turns off and the emergency brake activates. These incidents all occurred with the vehicle mileage at or below 30,000 miles and within the vehicle's warranty period.

47.     For several of these incidents, the Class Vehicle would start back up within seconds, allowing Mr. Vanderberg to continue driving the vehicle. On other occasions, however, the truck stopped completely and Mr. Vanderberg experienced difficulties restarting the vehicle.

48.     On the morning of September 17, 2022, Mr. Vanderberg was driving in a turn lane with oncoming traffic headed towards him when the Class Vehicle suddenly stopped. Mr. Vanderberg's wife, who was also in the vehicle at the time,

was extremely frightened by the incident. Mr. Vanderberg was eventually able to restart the vehicle and pull it to the side of the road. He then uncoupled the battery cable and waited several minutes before heading straight home and canceling all appointments for the rest of the day.

49.    Upon arriving safely home, Mr. Vanderberg called Beaman Chrysler Dodge Jeep Ram FIAT in Murfreesboro, Tennessee. The call was not answered, and Mr. Vanderberg left a voicemail detailing the incident and providing Mr. Vanderberg's contact information. That evening, Mr. Vanderberg also emailed the dealership regarding the incident. The dealership never returned the call or the email.

50.    Despite reading about many other Class Vehicle owners who have experienced the Defect, Mr. Vanderberg never received a recall notice from FCA.

51.    Because FCA has not provided a recall notice or fix for Class members like Mr. Vanderberg, Mr. Vanderberg had to install an after-market auto-stop eliminator so that he could safely drive his vehicle. It is unclear whether the auto-stop eliminator installed by Mr. Vanderberg serves as a permanent fix to this issue.

52.    Thus, based on Mr. Vanderberg's experience with his vehicle stalling multiple times and the nature of the Defect, Mr. Vanderberg is likely to suffer more stalling incidents.

53.     Had FCA disclosed the Defect, Mr. Vanderberg would not have purchased his Class Vehicle or would have paid significantly less for it.

54.     On February 9, 2023, Mr. Vanderberg, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

### 4.     *Plaintiff Rachel Walkowicz (Michigan)*

55.     Plaintiff Rachel Walkowicz resides in Clinton Township, Michigan.

56.     Ms. Walkowicz leases a new 2021 Ram 1500 V8 with eTorque, which she began leasing on April 12, 2021 from Parkway Chrysler Dodge Jeep Ram in Clinton Township, Michigan.

57.     Ms. Walkowicz's Class Vehicle was manufactured, distributed, advertised, marketed, warranted, and leased by FCA, and bears the Vehicle Identification No. 1C6SRFFT6MN675421.

58.     Ms. Walkowicz leased the Class Vehicle for her personal, family, or household use.

59.     Ms. Walkowicz expected her Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Ms. Walkowicz's leasing of her Class Vehicle, Ms. Walkowicz was not warned of her vehicle's tendency to stall and turn off while driving.

60.     Ms. Walkowicz has experienced three or more incidents of her vehicle stalling while driving due to the eTorque Defect beginning in or about December 2022 with roughly 12,000 miles on the vehicle.

61.     In or about December 2022, Ms. Walkowicz was stopped at a red light in the Class Vehicle. When the light turned green, Ms. Walkowicz took her foot off the brake, and the vehicle suddenly stalled, shifted into park, and engaged the parking brake. Two messages appeared on the dashboard: one directed Ms. Walkowicz to press on the brake and push start (despite the ignition still begin in "Run"); and the other stated "Park Brake Auto Engaged + Push Switch to Release."

62.     Ms. Walkowicz recorded a video of what occurred and brought the Class Vehicle to Parkway Chrysler Dodge Jeep Ram. After reviewing the video and examining the vehicle, the dealership could not replicate the failure, could not find any relevant TSBs, and determined that there was "no problem found at this time." The dealership updated the vehicle's modules "as a precaution" despite being unable to identify the issue.

63.     Ms. Walkowicz also communicated with the dealership via text messaging regarding her concerns. The dealership stated that that there was "nothing current on this issue" in their "tech advisor forums" and that therefore,

nothing further could be done "until codes are set and or the issue is currently happening."

64.     On or about February 9, 2023, Ms. Walkowicz experienced another stalling incident. She brought the vehicle to Szott M-59 Dodge Ram in Highland, Michigan. Upon inspecting the vehicle, dealership found "no stored or active DTCs," and did nothing other than tighten a loose nut. The dealership could not verify that the stalling issue experienced by Ms. Walkowicz had been diagnosed or fixed.

65.     Based on Ms. Walkowicz's experience with the vehicle stalling on two occasions, and the dealership's inability to resolve the issue, Mr. Walkowicz is likely to suffer more stalling incidents.

66.     Ms. Walkowicz relies on her Class Vehicle daily as her primary mode of transportation for herself and her two children. Ms. Walkowicz fears that the vehicle will stall while driving her children and cause a traffic accident. Thus, Ms. Walkowicz no longer feels safe driving her Class Vehicle due to the risk the eTorque Defect poses to herself, her children, and other drivers around her.

67.     Had FCA disclosed the Defect, Ms. Walkowicz would not have leased her Class Vehicle or would have paid significantly less to lease it.

68.     On February 9, 2023, Ms. Walkowicz, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

**B.     Defendant**

69.     Defendant FCA is a Michigan limited liability company, with its principal office located in Auburn Hills, Michigan. FCA designs, tests, manufactures, distributes, warrants, sells, and leases various vehicles, including the Class Vehicles, under several prominent brand names, including Chrysler, Jeep, and Dodge in this District and throughout the United States. FCA designed, tested, marketed, manufactured, sold, and leased the Class Vehicles at issue in this case.

## FACTUAL ALLEGATIONS

70.     FCA designs, manufactures, markets, and sells millions of vehicles worldwide under the brand names, Dodge, Jeep, Chrysler, RAM, Fiat, and Maserati. FCA reported $101.32 billion of revenue in 2020 alone.

71.     FCA designed, manufactured, marketed, and sold hundreds of thousands of Class Vehicles nationwide, all of which are equipped with the same or substantially similar eTorque systems.

**A.     eTorque System Operation**

72.     The Class Vehicles are equipped with an internal combustion engine and the eTorque "mild hybrid" system.

73.     eTorque is intended to improve the Class Vehicles' fuel efficiency without comprising power, torque, and other capabilities.

74.     eTorque replaces a conventional alternator with a more robust motor/generator that is water cooled, rather than fan cooled.

75.     As the images below reflect, eTorque consists of a belt-driven generator/control module and a 48-volt lithium-ion battery pack the size of a suitcase that consists of a 3-kilowatt DC-to-DC converter that converts 48-volts to the standard 12-volts.



Figure 1: eTorque generator/control module



Figure 2: eTorque battery

76.     As the image below reflects, the generator/control module is mounted

to the engine in a typical alternator location and the 48-volt battery is located

behind the passenger seats in the rear cab.



Figure 3: Generator/control module and battery locations

77.    The eTorque system is belt-driven from the internal combustion engine's crankshaft. As the internal combustion engine cycles, the revolutions power the eTorque's generator.

78.    The eTorque system serves several functions. As explained by Brian Spohn, FCA's Assistant Chief Engineer for eTorque, Mild Hybrid Application, and Propulsion Systems, the first function of the eTorque is to control the Class Vehicles' auto stop/start function. The eTorque system is designed to improve the transition from engine stop to engine start when the driver releases the brake pedal from a stop. *See* Unofficial Transcript of FCA Employee Interviews, attached as Exhibit A.

79.    Second, the eTorque system supplements the combustion engine's motive power. In certain driving conditions, such as accelerations from a stop, the

eTorque generator's pulley driver belt spins the crankshaft to help increase or manage the vehicles' motive power until speeds are reached where the internal combustion engine can be the primary drive.

80.    Third, the eTorque system regenerates energy from braking and shifting events to charge and power the 48-volt battery. Since the eTorque system is driven by the crankshaft, eTorque can apply resistance to the crankshaft to add braking effects. While eTorque applies resistance to the crankshaft, it regenerates and converts the kinetic energy to electrical energy to charge the 48-volt battery.

81.    Fourth, the 48-volt battery charges the 12-volt battery, which powers the vehicles' accessories, such as the electronic ignition start, electronic parking brake, radio, climate control, and other auxiliary functions. All auxiliary functions are powered and managed through the eTorque system.

### B.    The eTorque Defect

82.    The eTorque system suffers from a dangerous defect, placing Plaintiffs and other Class members, as well as others on the road, at increased risk of severe injury or even death.

83.    On information and belief, the eTorque system's software or hardware components are not adequately designed to assure safe, reliable transportation. As a result, the Class Vehicles' engines unexpectedly turn off, the transmission shifts to "Park," and/or the emergency brake engages, all without any user input. The

eTorque Defect occurs in all driving conditions, whether the vehicle is in motion, stopped, or turning at an intersection.

84.     The defect strands Class members in all traffic conditions. The defect takes control of the Class Vehicle away from the driver, per voluminous complaints submitted to both NHTSA and online forums, both of which FCA monitors to track product performance.

85.     The eTorque Defect occurs in warranty, but is intermittent, and leads to denied repairs where the dealerships cannot replicate the problem.

86.     The intermittent nature of the eTorque Defect makes the Class Vehicles especially unreliable, unsafe, and unfit for their ordinary purpose.

87.     Plaintiffs and Class members purchased or leased their Class Vehicles for the purpose, and with the understanding, of providing safe, reliable transportation.

88.     A vehicle suffering from the eTorque Defect is unfit for its ordinary and intended purpose.

89.     The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles and renders them substantially less drivable, safe, useful, and valuable than they would be without the defect.

90.     As a result of the eTorque Defect, owners or lessors of Class Vehicles must either cease driving their vehicles (the purpose for which they purchased

them), or else risk a complete and total vehicle stall—and potentially causing or incurring serious bodily injury or property damage—every time they get behind the wheel.

91.     The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles and renders the Class Vehicles substantially less drivable, safe, useful, and valuable.

92.     On May 13, 2022, FCA confirmed the existence of the eTorque Defect when it issued TSB 08-093-22-A for a limited number of 2022 Ram 1500 trucks. See TSB 08-093-22-A, attached as Exhibit B. FCA noted that the customer may describe the "the AutoStart fails and the AutoPark engages" and that transmission converts to "Limp Mode." FCA offered a software update to the Hybrid Control Processor ("HCP") to the limited warranty 2022 trucks but excluded other Class Vehicles.

93.     FCA's May 3, 2022 TSB 18-091-22, which was revised on July 6, 2022 as TSB 18-091-22 REV. A, involves 2021 Ram 1500 trucks and also demonstrates FCA's awareness of the eTorque Defect. *See* TSB 18-091-22 REV. A, attached as Exhibit C**.** There, FCA noted that the driver may experience "an engine stall at low engine mileage and mostly low vehicle speeds" and/or that the "LED light in the Start/Stop button will not illuminate when pressed." FCA suggests "reprogramming the PCM with the latest available software."

94.     The purported "fixes" suggested by these TSBs do not remedy the root cause of the eTorque Defect .

95.     FCA has not released a TSB for all Class Vehicles to repair the eTorque Defect, despite other Class Vehicles being equipped with the same or substantially similar eTorque system and custom reporting the same failure mode with the same failure codes. FCA has not recalled or extended the warranty of Class Vehicles, or compensated Plaintiffs and Class members for their losses.

96.     Moreover, FCA's failure and inability to repair the eTorque Defect leaves the Class members to be substantially likely to, and they do, experience repeated failures and thus does not remedy the eTorque Defect.

97.     On information and belief, Mercedes and Audi have been using similar technologies in Europe without issue.

C.     **FCA Has Long Known About the eTorque Defect, But Failed to Disclose It**

98.     Consumer complaints made directly to FCA, NHTSA, and/or posted on public online vehicle owner forums; its own investigations; repair and replacement part sales data; and aggregate data from authorized-FCA dealerships put FCA on notice of the eTorque Defect.

99.     Pre-release design, engineering, manufacture, and testing of Class Vehicles provided FCA with comprehensive and exclusive knowledge about the eTorque Defect, particularly the functions, uses, and computability of the software,

wiring, connectors, and other components, including the expected conditions they may face.

100.   FCA knew or should have known about the eTorque Defect from the testing performed on the software and hardware components. Vehicle manufacturers, like FCA and its suppliers, perform various pre-production tests on new vehicle components including, but not limited to, Failure Modes and Effects Analyses ("FMEA").[1]

101.   FMEA tests assess methods or modes by which a particular component might fail. It examines the design of each component, the assembly of the part, and whether use in various manners would cause the part or system to fail. For example, in testing the systems at issue here, FMEA testing would explore, among other things, how and under what conditions the software or hardware components could fail, how likely failure was under different conditions, and how likely each condition tested was to occur.

102.   FCA and its suppliers also performed computer and real-world simulations of the systems, including in extreme conditions, to confirm they are meeting the design goals.

---

[1]   https://www.iatfglobaloversight.org/wp/wp-content/uploads/2020/08/FCA-US-LLC-CSR-IATF-16949-20200805-final.pdf (last visited June 16, 2022) (attached as Exhibit D).

103.   FCA and its suppliers performed these tests, and others, on the Class Vehicles and, if performed with due care, each of these tests demonstrated that the relevant systems or components in the Class Vehicles would lead to failure. In fact, Andrew Simmons, FCA's Powertrain Durability Test Management Engineer confirmed such in an online interview related to testing the eTorque system.

104.   FCA monitors customer complaints submitted to NHTSA. FCA knew or should have known about the eTorque Defect and its associated risks through the numerous consumer complaints filed with NHTSA as early as February 2019. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

105.   An example of complaints submitted to NHTSA reflecting the eTorque Defect are copied below[2]:

> 2021 Dodge Ram Hemi Etorque shuts down while driving. This has happened approximately a dozen times in the last year. On most occasions this has happened within the first 5 minutes of driving. On all but one occasion we were yielding and then pulling into an intersection and the truck shut off in the middle of the intersection. This caused vehicles that were driving at full speed to swerve from hitting us. The vehicle shut off, goes into park, and the emergency brake engages. A message appears on the dashboard indicating autopark engaged, In order to get moving again, we have to start the card, disengage the emergency brake, and put the car in drive. This is a DANGEROUS situation that will result in serious injury or worse. The very last incident the truck has been running a while. We stopped at a location and placed the truck in park. We never shut the motor off. A few minutes later, we put the car in drive and accelerated.

---

[2] All NHTSA complaints cited herein are verbatim copies of the complaints accessible on NHTSA's website. All typographical and grammatical errors are original.

Within the first 20 feet the vehicle shut off and came to a stop. Again, the vehicle automatically went into park and the E brake engaged. (2021 Ram 1500; January 20, 2023; NHTSA ID: 11502831).

4-5-22 Came to a full stopped at an intersection, and as I started making a right hand turn , engine just shut off then the beeping started. Stalled in the middle of a turn and oncoming traffic. while panicking and traffic coming i had to ........... Shifted to park started the truck then shifted to drive and the engine revved but not moving. Dash said The E brake had engaged. Shifted to park again pressed the e brake button the back to drive at which point people were swerving to avoid hitting me. I was almost in a sever accident due to this. I have a scheduled an appointment with a dealer on 4-12-2022. There was no indication of anything wrong with the truck......nothing...... it just shut off. This is a very serious issue that Chrysler needs to acknowledge. Someone is going to seriously be injured by this. I looked online to see if there was a recall for it, there was nothing but I did see plenty of other people that this has happened to so it is not just a one and done people. Chrysler has a serious issue they need to address. (2021 Ram 1500; April 5, 2022; NHTSA ID: 11459709).

The truck shut off while driving. Driving and taking turns between 5-15mph Truck just shuts down and engages the parking brake. I almost got hit 2 times. The truck is brand new with 4,000 mikes on it. The first time it happened I had 2,000 miles on it. After reading online this is a big problem and someone is going to be killed. This need ti be addressed. (2021 Ram 1500; February 16, 2022; NHTSA ID: 11452322).

Unknown Failure causing issue. Vehicle's Engine Shutoff while traveling down the road with no warning messages. Then message says to apply breaks and push "start", but it was in the "Run" and still coasting in Drive on the road. After it slowed to about 5-10 mph, the emergency break system engaged and the vehicle went to "Park" causing the vehicle to throw me forward in the seat and objects were thrown as if I had collided with something. My wrist was injured by this, but lucky I had no passengers or my dog with me. The local dealership is looking into it, but say there is nothing wrong. Upon doing some research, I see multiple people have stated this has happened to them as well. This is a significant risk to health and safety of vehicle occupants and other vehicles that may be traveling

near them when this happens. Depending on speed it occurs, the outcome could result in death. I did attempt to connect my on-board diagnostic/monitoring system and found that the manufacturer has it block so I cannot see any possible codes or sensor readings of the vehicle. Then they say nothing is wrong when you take it to them to scan. That is also unacceptable. (2021 Ram 1500; December 27, 2021; NHTSA ID: 11445062).

On Monday 11/29 around 5:30pm I was on the San Mateo Bridge (92) going eastbound with my children when the truck came too an abrupt stop and shut off! I was going about 65mph as it was the mid time for rush hour. Fortunately no one hit us from behind and I was able to kinda pull over into the emergency lane without going over the bridge and thankful the person behind also pulled over since he seen what happened and wanted to check on us. We did exchange information especially since Ram Customer Care and NHTSH doesn't seem to believe anyone about these problems since there hasn't been any recalls on this safety issue! This isn't the first incident I've had with this truck but so far was the most dangerous especially since my children were in the vehicle Yes I have been in touch with Ram Customer Care and nothing but ok take it back to the dealership uh no I'm done with that. It was already there twice for over a month period each time and they don't know what's going on since there is nothing that comes on the scan. When will something be done? When someone is injured or there's a fatality? (2021 Ram 1500; December 3, 2021; NHTSA ID: 11442601).

TL* THE CONTACT OWNS A 2019 RAM 1500. THE CONTACT STATED THAT THE VEHICLE STALLED MORE THAN TWICE WITHOUT WARNING. BENNY BOYD GONZALES CHRYSLER DODGE JEEP RAM (3698 US-183, GONZALES, TX 78629, (830) 445-4001) INDICATED THAT THE VEHICLE WOULD NEED TO REMAIN WITH THEM TO BE TEST DRIVEN BECAUSE A DIAGNOSTIC TROUBLE CODE WAS NOT LOCATED. A BUY BACK OFFER WAS STATED BY THE DEALER, BUT WAS NOT A REPAIR SOLUTION. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VIN WAS NOT AVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 130. *DT *TR (2019 Ram 1500; February 26, 2019; NHTSA IDL 11182495).

CROSSING A BUSY INTERSECTION, MY TRUCK STALLED IN THE MIDDLE OF THE INTERSECTION FOR NO APPARENT REASON. WAS EVENTUALLY ABLE TO RESTART IT, BUT STALLED AGAIN AFTER APPROXIMATELY TWO MINUTES. HAS BEEN AT COLE CHRYSLER SINCE 9/5/2019. DEALER SAYS IT MAY BE THE BATTERY ASSOCIATED WITH THE HYBRID SYSTEM. THAT PART HAS NOT BEEN AVAILABLE FOR TWO MONTHS, AND THERE IS NO ESTIMATED TIME IT WILL BE AVAILABLE. AFTER IT IS REPLACED, THERE MAY STILL BE ANOTHER PROBLEM. (2019 Ram 1500; October 31, 2019; NHTSA ID: 11277365).

WHILE DRIVING SLOWING DOWN TO MAKE A LEFT TURN TURN COMPLETELY TURNED OFF. WHILE STILL IN DRIVE WAS ABLE TO GET TO THE SIDE OFF THE ROAD EVERYTHING WAS STILL ON A.C. SHUT OFF BUT POWER WAS STILL ON. (2019 Ram 1500; April 30, 2020; NHTSA ID: 11322899).

THE CHECK ENGINE LIGHT HAS BEEN ON SEVERAL TIMES. I'VE DROPPED MY TRUCK OFF AT CROWN DODGE OF FAYETTEVILLE AND WAS TOLD ON TWO SEPARATE OCCASIONS THAT'S EVERYTHING WAS TAKEN CARE OF. TODAY 1 NOVEMBER 2020, I'VE PURCHASED A BRAND NEW $200 DURALAST PLATINUM BATTERY AND IT'S STILL BEING DRAINED BY SOME UNKNOWN ISSUE. I RECEIVED SOME HELP OUTSIDE OF THE DEALERSHIP AND RECEIVED THE ERROR CODE P1DR3. I TOLD TOLD THAT WAS A DEALERSHIP CODE AND I WOULD HAVE TO RETURN THE VEHICLE TO GET IT RESOLVED. THIS WILL BE THE THIRD TIME IN A MONTHS TIME I WOULD HAVE TO BE WITHOUT MY VEHICLE. THE FIRST TIME THIS IS HAPPENED I WAS DRIVING 40-45 MPH AND THE TRUCK COMPLETELY SHUT OFF! (2019 Ram 1500; November 1, 2020; NHTSA ID: 11372548).

TL* THE CONTACT OWNS A 2020 RAM 1500. THE CONTACT STATED THAT WHILE DRIVING, SHE SAW INDICATOR LIGHTS ON THE INSTRUMENT PANEL WHICH STATED THAT THE AUTO STOP AND START TORQUE SYSTEMS WERE UNAVAILABLE. THE ENGINE AND BATTERY WARNING LIGHTS WERE ILLUMINATED. THE ELECTRICAL SYSTEM

FAILED AND TRUCK SHUT-OFF. THE CONTACT PULLED THE VEHICLE OVER TO THE SIDE OF THE ROADWAY. THE CONTACT HAD THE VEHICLE TOWED TO STONE'S CHRYSLER DODGE JEEP RAM (615 S YELLOWSTONE HWY, REXBURG, ID 83440 208-497-5121). THE CONTACT WAS INFORMED THAT THE PART OF THE MOTOR GENERATOR UNIT TO FIX THE VEHICLE WAS ON BACKORDER AND THERE WAS NO ETA ON WHEN THE VEHICLE WOULD BE REPAIRED. THE MANUFACTURER WAS REVIEWING THE CASE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 850. (2020 Ram 1500; August 10, 2020; NHTSA ID: 11348433).

Vehicle engine shuts off unexpectedly while in operation. Can happen in any condition: idling, accelerating, cruising or coasting. If at a slow speed (less than 5mph) vehicle activates emergency breaking then shifts itself into park. Can happen WITH or WITHOUT "Auto Start/Stop" being activated (fuel saver). When emergency breaking enacted, I've almost been rear-ended by trailing car. This issue has been reported on driver forums. (2020 Ram 1500; July 11, 2021; NHTSA ID: 11424311).

On September 14, 2021 I was leaving work, started truck and backed out of parking spot. I had drove off and upon making a left turn the truck went into a stall, screen flashed "place vehicle in park before starting" and then immediately came back on, I did not come to full stop or have to hit the "start" button. I continued driving and the issue has not happened since. The vehicle had over 1/2 tank of gas (89), temperature was in the 90's (Florida) and has no engine modifications. This was concerning for a new vehicle so I looked further into this and discovered that has been happening quite a bit with this particular version of this truck (eTorque). If the vehicle had fully stalled while pulling into traffic, it could be very dangerous. The most troubling aspect is that no engine code or warning light came on regarding the issue. I'm not sure how a late model vehicle with this amount of technology can almost stall and leave no details of what caused the problem and alert the driver. (2020 Ram 1500; October 4, 2021; NHTSA ID: 11435403).

Operating the vehicle at 35mph on a standard city street in Tucson, Az - River Rd. The vehicle flashes a system failure warning and then

shuts off all power to the truck. This results in the transmission being thrown back into park and the driver having zero control over the vehicle. There are multiple online reports of this being fairly common on 2020/2021 Dodge Rams. The vehicle is being returned to the dealer, even if it is a minor issue it is a huge safety issue. I had zero control over the vehicle once the warning flashed. The abrupt loss of power and being thrown into a skid with no control is terrifying. Luckily there was no traffic. It is being returned and according to the dealership it will be investigated. Prior to that brief safety warning the truck had operated perfectly fine with no issues all day long with over 200miles logged for the day. (2020 Ram 1500; October 18, 2021; NHTSA ID: 11437114).

The contact owns a 2020 Ram 1500. The contact stated while moving from a complete stop, the vehicle stalled. The contact stated no warning light was illuminated. The vehicle was taken to a local dealer where it was diagnosed with needing the battery replaced. The battery was replaced however, the failure recurred. The manufacturer was informed of the failure but offered no assistance. The failure mileage was approximately 57,000. (2020 Ram 1500; November 4, 2021; NHTSA ID: 11439370).

At a speed of 45mph, my truck completely shut down. No power on anything. I was able to pull off the road and come to a stop; power brakes and steering were not operable. Once stopped, the truck would not start. "Push to Start" indicator on dash did come on, but the brake pedal was stiff and the push to start button did nothing. Got out of the truck, exterior door lock button was inoperable and both key fobs did nothing. Had to have the vehicle towed. (2020 Ram 1500; February 14, 2022; NHTSA ID; 11451981).

My truck randomly stalls. Sometimes from a stopping position, sometimes at slow speeds. I have taken it to the dealership and they keep saying they can not replicate the problem and they know nothing about this issue despite the fact if you google it, you will see forums full of people having the same issues and the dealerships giving them the same runaround. Today, I almost got broadsided because it completely died when I was pulling out. The other truck had to lock up their brakes and swerve to avoid hitting me in the drivers side which would have caused a major injury to myself. This truck is not safe to drive, yet the dealership keeps telling me I nothing they can do

and I am forced to continue to drive it. I know several people have reported this to your agency also, yet their still is no recall. (2020 Ram 1500; February 15, 2022; NHTSA ID: 11452006).

The contact owns a 2020 Ram 1500. The contact stated while driving approximately 25 MPH, the transmission erroneously shifted to the park(P) causing the vehicle to abruptly stop and independently turn off in the middle of the road. After restarting the vehicle, the vehicle operated normal; however, later the failure recurred with the check engine warning light illuminated. The contact stated that the check engine warning light remained illuminated. The cause of the failure was not yet determined. The local dealer was contacted and a service appointment was scheduled. The manufacturer was not yet contacted. The failure mileage was 47,767. (2020 Ram 1500; July 6, 2022; NHTSA ID: 11472557).

I PURCHASED MY 2021 RAM 1500 LIMITED NIGHT EDITION ON MARCH 11, 2021. IT WAS NEW. WITHIN 3 WEEKS AND LESS THAN 1,000 MILES OF DRIVING THE VEHICLE STALLED TWICE WHILE IN THE MIDDLE OF AN INTERSECTION. THE FUEL TANK WAS FULL AND THE ENGINE WAS WARM EACH TIME. THE FIRST TIME AROUND MARCH 17 I WAS ALONE IN THE CAR. I STOPPED AT A STOP SIGN AND THEN DEPRESSED THE GAS PEDAL AND AS I TURNED TO THE RIGHT THE CAR STALLED. NO ERROR MESSAGE CAME UP. I STOPPED THE CAR. TURNED THE GEAR SHIFT KNOB TO P AND PRESSED THE START/STOP BUTTON TWICE AND THE TRUCK STARTED BACK UP. 10 DAYS LATER WITH MY FAMILY IN THE CAR THE SAME THING HAPPENED. I WAS AT A STOP SIGN, THEN PRESSED ON THE GAS AND MADE A LEFT TURN THIS TIME AND THE CAR STALLED. AGAIN, FORTUNATELY NO ONE WAS COMING BECAUSE MY FAMILY AND I COULD HAVE BEEN SERIOUSLY INJURED OR KILLED BECAUSE WE WERE IN THE MIDDLE OF THE ROAD AND SOMEONE COULD HAVE T-BONED US. THE CAR HAS BEEN WITH THE DEALER FOR A WEEK AND THEY TELL ME THEY HAVE NOT BEEN ABLE TO DISCOVER ANYTHING. THERE WERE NO ERROR MESSAGES AND THEY HAVE NOT REPRODUCED THE PROBLEM. I AM WRITING TO PUT THIS ON THE RECORD IN CASE

ANYTHING HAPPENS TO US. (2021 Ram 1500; April 5, 2021; NHTSA ID: 11406417).

TL* THE CONTACT OWNS A 2021 RAM 1500. THE CONTACT STATED THAT WHILE DRIVING AT AN UNDISCLOSED SPEED, THE VEHICLE STALLED AND SHIFTED TO PARK INADVERTENTLY. THE CONTACT RESTARTED THE VEHICLE HOWEVER, THE VEHICLE WOULD NOT MOVE BECAUSE THE AUTOMATIC EMERGENCY BRAKING HAD ENGAGED INADVERTENTLY. THE VEHICLE WAS NOT DIAGNOSED NOR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND INFORMED THE CONTACT TO TAKE THE VEHICLE TO AN AUTHORIZED DEALER FOR ASSISTANCE. THE FAILURE MILEAGE WAS 2,850. Consumer stated battery was replaced. (2021 Ram 1500; April 19, 2021; NHTSA ID: 11412814).

DRIVING AT 35 MPH THE ENGINE JUST DIED AND THE TRUCK ENGAGE THE AUTO SHIFT PARKING CREATING A DANGEROUS CONDITION. SECOND TIME IN ABOUT 3 DAYS. THIS IS DRIVING ME NUTS. (2021 Ram 1500; April 22, 2021; NHTSA ID: 11413419).

TRUCK HAS STALLED TWICE PULLING INTO TRAFFIC. BOTH TIMES I HAVE BEEN TAKING A RIGHT TURN.SPEED WHEN IT HAPPENS AROUND 10 MPH. IT TELLS ME TO PUT MY CAR IN PARK AND TOUN ON THE ENGINE, THIS IS GOING TO GET SOMEONE KILLED. I HAVE BEEN LOOKING ONLINE AND OTHER PEOPLE ARE HAVING THESE ISSUES. (2021 Ram 1500; May 9, 2021; NHTSA ID: 11415725).

DRIVING VEHICLE ABOUT 2 MPH, TAKING A RIGHT TURN - VEHICLE STALLED OUT AND EMERGENCY BRAKE LIGHT CAME ON. WAS ABLE TO RESTART PTS IGNITION WITHOUT ISSUE, THEN DRIVE AGAIN. TRUCK HAS 600+ MILES CURRENT. FOUND OTHER RAM OWNERS ON 5THGENRAMS.COM FORUMS STATING THEY ARE EXPERIENCING SAME ISSUE, SO I AM CONCERNED. THIS HAPPENED ONCE, BUT OTHERS ARE SAYING IT HAS HAPPENED MULTIPLE TIMES TO THEM. (2021 Ram 1500; May 13, 2021; NHTSA ID: 11416441).

WAS DRIVING DOWN THE ROAD WHEN THE TRUCK
STALLED AND PROMPTED ME TO PUT IT INTO PARK TO
START. IT THEN AUTOMATICALLY WENT TO PARK
WITHOUT ME DOING ANYTHING AND APPLIED THE
PARKING BRAKE ON ITS OWN. (2021 Ram 1500; May 14, 2021;
NHTSA ID: 11416647).

Backed out of garage, rolled down driveway and turned left onto my
street. Drove about a tenth of a mile to the stop sign, pretty easy with
light gas since truck was still warming up. Rolled slowly (2-3) mph to
make a right turn lightly feathering the gas and 3/4 through the turn
pressed a little more on the gas and truck died. Just before it came to a
stop, the parking brake engaged and a message on screen said to place
vehicle in park. Engine started back up after I came to a stop and put it
in park. No codes or other messages displayed. If I was pulling on to a
busy street there would have been a very high chance that I would
have been hit. 2021 Ram 1500 hemi etorque with 800 miles on it.
(2021 Ram 1500; May 18, 2021; NHTSA ID: 11417697).

Making a right hand turn into school parking lot at 7:11 am this
morning the engine died, steering went stiff and emergence parking
break set. Almost caused a very serious accident with injury's to
multiple minors. Was moving 11 MPH with my foot on the brake into
the right turn, when I let off the brake the engine died. The cluster
screen told me to place the vehicle into park and release the
emergency brake. (2021 Ram 1500; May 24, 2021; NHTSA ID:
11418271).

I was turning right, going less than 5 MPH when the truck stopped
abruptly in the middle of the lane. A message came on the dash telling
me to switch the shifter to park. The emergency brake was engaged
automatically. I had only applied minimal accelerator and didn't have
my foot on the brake. After a few seconds, I was able to disengage the
parking brake and continue on my way. This was very dangerous as
there were people behind me that may not have noticed my abrupt
stop after turning. This puts the safety of myself and my children at
risk. (2021 Ram 1500; May 27, 2021; NHTSA ID: 11418807).

I started the truck and drove about a 1/4 mile in my neighborhood. I
never got over 20 mph. I approached a red stop light to turn right. I
stopped at the light to check for traffic. I then proceeded to turn right

and 1/2 way through the turn the truck shut off without warning and it automatically applied the emergency brake. Luckily there were no cars coming in the right hand lane else we could have been hit. I am taking it to the dealership tomorrow for inspection. The info screen notified me that the emergency brake had been applied and that the transmission had been autoset to park. It said to apply the brake to start the truck (it has push button start). I did so and the truck started. I disengaged the emergency brake and the truck then drove normally the rest of the trip. (2021 Ram 1500; June 13, 2021; NHTSA ID: 11420786).

While performing left hand turn, braked to make turn, truck slowed down and engine cut off and display indicated put in park, emergency brake engaged. Had to come to complete stop and put in park to start back up. Had to manually disengage parking brake. (2021 Ram 1500; September 30, 2021; NHTSA ID: 11435012).

I was turning right at 2-3 mph when the engine shut off, vehicle shifted to park, and electronic parking brake applied itself. I had to shift to Park and release the electronic parking brake to restart it. The truck had been parked for approximately 8 hours following a 26 mile drive. Outside air temperature was around 70 deg F. Truck has been in my possession for 8 days and has about 1100 miles on it. It is an eTorque engine. Fuel level was about 3/4 tank. The truck had been running for about 5 minutes and traveled about 1/4 mile. The truck is completely stock. (2021 Ram 1500; October 5, 2021; NHTSA ID: 11435642).

Vehicle stalled after stop at intersection. Engine shut off and auto shifted to park and applied the parking brake. (2021 Ram 1500; October 5, 2021; 11435556).

While traveling at approximately 15 mph I slowed to make a right hand turn. Truck was moving slowly enough, maybe 5-8 mph through the turn that I did not apply the accelerator, nor did I have any brake pressure applied to complete the turn. Before I could straighten the truck out of the turn, it stalled. Center screen stated to place vehicle in park before starting. The emergency brake applied itself and I had to place vehicle in park, release e-brake, and restart the vehicle. This has happened about 5 times now in the last 2 weeks, dealer says no recalls at this time, no problems can be found. I fear I am driving a very

unsafe vehicle that is less than 6mo old and has 5800 miles on it. (2021 Ram 1500; October 7, 2021; NHTSA ID: 11435863).

While slowing down to make a right turn and then trying to accelerate the vehicle stalled, turned itself off, put itself in park and applied the parking brake. This has happened twice now. The first time at approximately 4,000 miles and the second time just over 6,000 miles. This has been reported to the dealer, they flashed the PCM, but that obviously dod not correct the issue. (2021 Ram 1500; October 11, 2021; NHTSA ID: 11436251).

The contact owns a 2021 Ram 1500. The contact stated while driving approximately 5 MPH, the engine suddenly shut off and the message "Put in Park" was displayed on the dashboard. The vehicle continued to roll away before automatically switching to the park position causing the vehicle to abruptly stop. The cause of the failure was not yet determined. The manufacturer and local dealer were not notified of the failure. The failure mileage was 6,113. (November 3, 2021; 11439180).

While driving about 5mph approaching an intersection my ram shut off without warning, said "apply brake to start vehicle" and as I rolled through the intersection with zero control at about 2mph it set its parking brake by itself. I had to move my shifter to park, apply the brake, restart the truck, and turn off the parking brake IN THE MIDDLE OF AN INTERSECTION. Thank God it was a small subdivision intersection at night so there was no traffic or myself or someone else could have been hurt or killed. No dash warning lights, no remaining lights, no codes thrown, no issue after restarting, no reproducible codes found by the dealer. Only 1,000 miles on the truck. I'm terrified of this happening again, but haven't been able to replicate it myself or the dealer. It's not safe and I don't want to die as a result of this. It seems to be a major problem with the e-torque trucks based on forums. (2021 Ram 1500; November 4, 2021; 11439437).

My new truck has less than 500 miles on it, and it was just purchased new last month. This incident has happened to me twice so far on the mornings of 10/31/2021 and 11/7/2021. Making a slow left hand turn, the vehicle turned off and and stopped in the middle of the intersection. The vehicle emergency brake also automatically was set

when it stalled. The message on the dash said something like to restart, put foot on brake and push start button. This incident was very dangerous and could have resulted in an accident. I am lucky I was not hit in the intersection. In both cases, this occurred about a mile from my home and my initial trip of the day. Temperature outside was normal about 60 degrees. I have scheduled an appointment with the dealer for 11/9/2021. (2021 Ram 1500; November 8, 2021; NHTSA ID: 11439799).

This following has now happened twice, first time 9/7/21 - second time 11/12/21. While slowing from approximately 35-40 MPH to make a right hand turn the vehicle shuts off - auto braking engages - must restart the vehicle. As stated, this has now happened twice (truck has 10K miles) - vehicle shutting off in traffic and applying auto braking is highly dangerous and placing myself and my passengers at risk. (2021 Ram 1500; November 13, 2021; 11440322).

While rolling to a stop and turning (3) times and once while slowing for speed bumps my 2022 Dodge Rebel 5.7L V8 Hemi with E-Torque shut off, the emergency brake applied itself and it shifted itself to park. This happened while turning onto a busy street where a bad accident could have happened because of it. There were no warning or indicators prior to the truck shutting off by itself. It has been to the dealership twice with no fix. I have had it for three weeks. (2022 Ram 1500; December 7, 2021; NHTSA ID: 11442977).

I was pulling our from a stop sign to make a left turn when all of a sudden the engine shut down, emergency brake engaged and all engine power was lost. I would have been struck by cross traffic had there been any as I did not have the ability to maneuver the vehicle. The vehicle was able to be restarted and disengage the emergency brake but the engine light remains on. (2022 Ram 1500; January 4, 2022; NHTSA ID: 11446163).

After making a left turn into a lot at a low speed, the engine shut off and e brake applied itself. I was able to restart the vehicle and disengage the e brake. Check engine light was kit, as well as the battery light. Check engine light still on. (2022 Ram 1500; January 13, 2022; NHTSA ID: 11447285).

The truck has 647 miles on it and is brand new, I just bought it from the dealer. The truck had been idling in my driveway for a few minutes before I left home, I was in my neighborhood, driving 25-30 MPH maximum. I came to a stop sign, stopped and then proceeded to turn left, which takes me down a hill. Approximately 1-2 seconds into the turn, the engine shut off completely, several lights went on the dash and the truck was proceeding downhill until at some point the brakes locked up, pushing me forward into the steering wheel. If anyone was infront of me I did not have control of the truck! The truck brakes were locked and I had to mess around starting it to get them to unlock, the battery indicator was lit and the check engine light was on. I was able to get to the truck restarted and took it to a pool parking lot area and shut it off completely. I was able to get it started again, this time the battery indicator went out and the check engine light stayed on. I have been reading online and see that many,, many people with the RAM 1500, most notably the etorque engine version are having the engine shut off with no warning, some at much higher speeds. I took it to the dealer, the "flashed" the computer, but also said the are ordering and replacing the computer which sits atop the etorque engine device. This is VERY concerning, especially because I see this has happened to others, and has been doing so for several years. I wanted to report this as to me, it seems like a Serious Safety Concern! (2022 Ram 1500; February 19, 2022; NHTSA ID: 11453016).

Truck shut off when i was driving it. Left me stuck in the road blocking both lanes of traffic. Emergency brake self applied. Had a hard time re starting, battery light and check engine light came on. (2022 Ram 1500; March 3, 2022; NHTSA ID: 11455109).

Truck stalled 4 times in 2 months going less than 5 mph. When driving slow around a turn or at a stop sign, the truck stalls when I give it gas. The emergency brake is automatically engaged and I have to disengage it before I can start the truck. The check engine light and battery light came on. I took it to the dealership (Jerry Ulm) and they could not recreate the problem or see the error codes so they gave the truck back to me. It's happened 4 times since then. Please help, I have two small children. (2022 Ram 1500; June 17, 2022; NHTSA ID: 11469813).

Vehicle stalls randomly while driving and automatically applies the emergency brake. Stalling randomly and applying the emergency brake in the street/highway with traffic is dangerous and unsafe. This is our primary vehicle and the dealership has been unable to recreate the stalling. The vehicle has been to the dealership twice for the stalling but the problem is still unresolved. The stalling started randomly in March-April 2022. The dealership was notified and vehicle taken in for multiple services. Problem still not solved. (2022 Ram 1500; July 1, 2022; NHTSA ID; 11471989).

While pulling onto a busy roadway the engine of my 2022 Ram 1500 with e-torque shut off and the emergency brake applied itself at about 10mph. This was accompanied by a check engine light and low battery voltage light. After the sudden stop I was almost rear ended by another truck on the road behind me. Seems to be a known issue with these trucks. (2022 Ram 1500; August 14, 2022; NHTSA ID: 11479260).

The contact owns a 2022 Ram 1500. The contact stated that immediately after leaving a stop light and making a left turn into a blind corner, the vehicle suddenly lost motive power and activated the braking system causing the vehicle to abruptly stop in an intersection. During the failure an approaching vehicle had to swerve to avoid a collision with the vehicle. The cause of the failure was not determined. The manufacturer and local dealer were notified of the failure. The VIN was not available. The failure mileage was 1,100. (2022 Ram 1500; August 23, 2022; NHTSA ID: 11480685).

2022 Ram 1500 Vehicle with approximately 9000 miles, has stalled now twice while driving at speeds of 25 to 35 miles per hour and soon after shifts into park, and then will not start. One was on a busy street that caused risk of near accident, another was in neighborhood. Vehicle was towed after first stall, but dealership only saw stall on computer but did not have any codes or repairs identified. Vehicle also would not start on more than one occasion. Dealership cannot get in to service for 3 to 4 weeks. (2022 Ram 1500; October 19, 2022; NHTSA ID: 11489914).

VEHICLE SHUT OFF WHILE DRIVING WITH NO WARNING. WOULD NOT RESTART. MANY WARNING LIGHTS. WAS TRAVELING IN THE PASSING LANE MOVING AT ABOUT

70MPH WHEN VEHICLE TURNED OFF. ALL EXTERIOR
LIGHTING WENT OUT AT NIGHT. AND I HAD TO COAST
AND WAIT FOR A TOW ON THE SIDE OF THE ROAD. (2019
Jeep Wrangler; NHTSA ID: 11289075; December 14, 2019).

THREE WEEKS AFTER I BOUGHT THIS BRAND NEW JEEP,
THE CHECK ENGINE LIGHT CAME ON. THE ETC AND
BATTERY WARNING LIGHTS CAME ON TOO. THE ENGINE
WAS OFF TWICE ON THE ROAD. THE POWER STEERING
LOST POWER SEVERAL TIMES. (2019 Jeep Wrangler; NHTSA
ID: 11292410; January 1, 2020).

2019 Jeep Wrangler Sahara Unlimited---while driving the vehicle on a
city street, without any warning, all of the dash lights and any/all
warnings lights started to flash. Within 200 feet of this occurring, the
vehicle lost power, including ability to control the steering, and the
car came to an immediate stop. During this shut down instance, I was
able to vigorously hold the steering wheel to guide the car to the side
of the road, avoiding the traffic that came. After the car shut down, the
dash lights and windshield wipers were still going off. It still had
electrical power. It would not start back up. I had to have it towed to
the dealership. It is currently being looked at by the local dealership.
05-29-22. (2019 Jeep Wrangler; NHTSA ID: 11466575; May 29,
2022).

The contact owns a 2020 Jeep Wrangler. The contact stated that while
driving at an undetermined speed, the vehicle stalled. While using the
Stop/Start feature, the vehicle stalled while in drive. The vehicle was
restarted. The contact stated that several unknown warning lights were
illuminated. The vehicle was taken to the local dealer, who informed
her that the battery would have potentially exploded if she had
continued to drive the vehicle. The mechanic noticed that the battery
was smoking. The vehicle was diagnosed and the contact was
informed that the batteries needed to be replaced. The vehicle was not
repaired. The manufacturer was notified about the failure but no
additional assistance was provided. The failure mileage was
approximately 45,000. (2020 Jeep Wrangler; NHTSA ID: 11487949;
October 5, 2022).

VEHICLE INTERMITTENTLY DOES NOT TURN BACK ON
AFTER ENGINE SHUTS OFF DURING NORMAL ELECTRONIC

START SYSTEM OPERATION. ENGINE SHUTS OFF WHEN
NEARLY AND AT A STOP. WHEN RELEASING THE BRAKE
PEDAL, THE ENGINE DOES NOT TURN BACK ON. THERE
HAVE BEEN THREE OCCURRENCES AS FOLLOWS:
OCCURRENCE 1 6/27/2020: EXITING THE THRUWAY AND
NEARLY AT A COMPLETE STOP AT A LIGHT AT EXIT WHEN
THE ENGINE SHUT OFF DUE TO ESS SYSTEM. UPON
RELEASING THE BRAKE TO BEGIN DRIVING, THE ENGINE
FAILED TO TURN ON. OPERATOR WAS PUSHING GAS
PEDAL TO GO, THE ENGINE REMAINED OFF. REMEDY WAS
TO TAP THE BRAKE AGAIN IN WHICH THE ENGINE TURNED
ON AND WAS ABLE TO MOVE. OCCURRENCE 2 7/13/2020:
CAME TO A STOP IN TRAFFIC ON A STREET. ENGINE SHUT
OFF DUE TO ESS SYSTEM AS DESIGNED. UPON RELEASING
THE BRAKE, THE ENGINE DID NOT RESTART. OPERATOR
PUSHING GAS PEDAL MULTIPLE TIMES AND ENGINE STILL
DID NOT TURN BACK ON, SITTING 'DEAD' IN THE MIDDLE
OF TRAFFIC. ATTEMPTING TO PUSH THE PUSH START
BUTTON DID NOT TURN VEHICLE BACK ON. REMEDY
AGAIN WAS TO PUSH BRAKE PEDAL AGAIN AND ENGINE
TURNED ON. OCCURRENCE 3 AUGUST 2,2020: OPERATOR IN
TRAFFIC, CAME TO A COMPLETE STOP. RELEASED BRAKE
PEDAL TO BEGIN MOVING. ENGINE DID NOT TURN BACK
ON, AND SHIFTER 'D' SYMBOL BEGAN FLASHING. TAPPING
BRAKE PEDAL WOULD NOT RESTART VEHICLE.
DASHBOARD STATED 'SHIFT TO P TO PARK', TO PLACE
VEHICLE IN PARK POSITION. PLACED VEHICLE INTO PARK,
HAD TO RESTART ENGINE BY PUSHING START BUTTON.
ENGINE TURNED ON AND WAS ABLE TO MOVE. I HAVE A
VIDEO SHOWING THE THIRD OCCURRENCE, HOWEVER
THIS SUBMISSION ONLY ALLOWS PICTURE FORMAT SO
TOOK SNAPSHOTS OF CODE. SENT VIDEO TO FCA, HAVE
MULTIPLE RECORDED VISITS TO DEALER TO FIND ISSUE,
NO ROOT CAUSE DETERMINED AT THIS POINT. REQUESTED
REFUND/REPLACEMENT. (2020 Jeep Wrangler; NHTSA ID:
11354335; (September 11, 2020).

My vehicle is still at the Jeep dealership service center being repaired,
but so far, the reported issue includes a "shorted" fuse block. As I was
driving the vehicle, I was approaching a red light when my vehicle

abruptly halted. The cars behind & near me were forced to go around to avoid hitting my vehicle. The dashboard initially flashed the message "safety mode" or something similar, the check engine light came on, the brakes locked, & the power steering & windows ceased to function. While I waited for the police, I tried to restart the vehicle many times, in hopes of getting it into neutral and/or getting it off of the roadway - nothing worked. The vehicle then began to flash the message "Service Electronic Stability Control." The DOTD serviceman & the tow truck driver were unable to get the vehicle into neutral manually, so it had to be dragged using chains. Once the vehicle was towed to the Jeep dealership (Covington, LA), I was first told that the battery had a voltage of 0. After replacing the battery, I was told that the fuse block was shorted. The representative explained the fuse block's purpose, & further explained that because mine shorted, the battery was unable to communicate with the rest of the vehicle, like the alternator & the PCM, on how much voltage was coming out of the system - i.e., since my computer shorted, the vehicle did not know that the battery was dead. Thus, when the battery killed abruptly while driving, the vehicle basically panicked & went into "safe mode" (limp mode) & locked up the entire machine. I asked repeatedly how this happens and how it can be avoided in the future, and while dancing around many indirect answers, the rep stated that my fuse block in this instance basically caused a complete electronic failure of the vehicle. I am an attorney & I have spoken with experts who suggest that this issue should be investigated. It is a serious hazard & a defect for one glitched part to kill the entire machine while driving. (2020 Jeep Wrangler; NHTSA ID: 11482306; August 31, 2022).

I was driving vehicle on HWY 610 in Houston, Texas at approximately 55-60 MPH. Suddenly, vehicle simply stopped working in the middle of driving. Everything on my dash was reading zero. Car were swearing to avoid hitting me. I also had a baby in the backseat of my vehicle. Suddenly, the dash started to read place car in park, Service Charging System. The P at my gear shift was flashing rapidly. I was able to slowly and dangerously coast to the emergency lane. Where I was able to turn the vehicle off. This is a very dangerous situation. At this point, Jeep has no idea what the problem is an this is very frustrating. (2021 Jeep Wrangler; NHTSA ID: 11427635; August 3, 2021).

The vehicle gave a Service Hybrid Electric System error and disabled the engine at approximately 60 mph when traveling in E-Save mode, with <1% battery, and half a tank of gasoline. After navigating the vehicle to the side of the road, it came to a hard stop at about 5-8 mph. After 10 minutes, the vehicle restarted in Hybrid mode as was able to operate without error until reaching our destination. Weather conditions were clear at 85 degrees. Issues occurred on a two-lane byway. No injuries, other damage, or police reports at this time. The vehicle will be delivered for service for recreation and diagnosis of the issue. Issue occurred with approximately 246 miles, direct from the dealership upon delivery. The vehicle has no aftermarket accessories. (2021 Jeep Wrangler; NHTSA ID: 11424263; July 11, 2021).

The car flashed a red icon and displayed a message saying power was lost and telling us to pull over safely and put the car on park. We were in the middle lane on the New Jersey Turnpike and people were driving around us at 80mph, and the car would not accelerate. We were able to pull over and restart the car and it worked as if nothing happened. I got an email on the UConnect system saying there was a charging issue, and then a second email saying I should get the car serviced. I took it to the dealership this morning and am waiting on a diagnosis. (2021 Keep Wrangler; NHTSA ID: 11428380; August 13, 2021).

Vehicle shut down in middle of road. All lights on dash came on and vehicle became disabled. It repeated it self two more times that week and i finally had it towed to dealer. (2021 Jeep Wrangler; NHTSA ID: 11429535; August 18, 2021).

Driving 25 to 30mph, car completely died and the D on the gear shift started blinking. Unable to get to side of road due to traffic. My husband and I were at risk of being rear ended as the car died without any warning. There was also a large CLUNK sound when it died. (2022 Jeep Wrangler; NHTSA ID: 11465657; May 22, 2022).

The car has twice come to almost a complete stop while driving as if it lost power with a close to full charge and plenty of gas. Car goes into a blinking D mode and has to be put in park and restarted. Happen in daily traffic very dangerous! (2022 Jeep Wrangler; NHTSA ID: 11482528; September 2, 2022).

While driving my vehicle shut off and steering wheel locked up making the vehicle inoperable. Thankfully I was close to home on a side street. I restarted the vehicle and a "please service charging system error" displayed along with a red turtle error light. The vehicle would not travel more than 5mph. I had to park it and have my husband come look at it. It's scary to think this could have easily happened on a busy highway. Being a hybrid vehicle it was fully charged from the night before. (2022 Jeep Wrangler; NHTSA ID: 11494991; November 26, 2022).

106.   The above complaints are a sample of complaints posted on NHTSA's website and believed to be reflected in FCA's internal documents.

107.   FCA also knew about the eTorque Defect from its warranty data. Per the TREAD Act, FCA tracks vehicle diagnoses and repairs from dealership technicians in a single, aggregated database.[3] FCA employs persons who monitor the database for repair trends, and engineering and management staff review such trends in regular meetings. For every one complaint filed with NHTSA, FCA likely receives hundreds or thousands of related warranty claims.[4] Accordingly, FCA has

---

[3] https://www.autosafety.org/wp-content/uploads/import/TREAD%20Fact%20Sheet%2011.24.14.pdf (attached as Exhibit E).

[4]   *See, e.g.*,   https://www.reuters.com/article/autos-ford-defect/u-s-nhtsa-probes-725000-ford-vehicles-for-engine-flaw-idUSL1N0BP51Y20130225 (123 NHTSA complaints, 27,505 warranty claims) (attached as Exhibit F); https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V406-1555.PDF (3 field reports, 1,061 warranty claims) (attached as Exhibit G); https://static.nhtsa.gov/odi/rcl/2020/RCLRPT-20V475-1719.PDF (six field reports, 1,020 warranty claims) (attached as Exhibit H).

likely received thousands of the eTorque Defect warranty claims, starting in late 2018 or early 2019.

108.   Despite FCA's knowledge of the serious safety risks the eTorque Defect causes in the Class Vehicles, it has not disclosed the eTorque Defect or provided an adequate repair to all Class Vehicles.

### D.   FCA Touted the Class Vehicles as Safe and Reliable Vehicles While Omitting the eTorque Defect.

109.   FCA knowingly marketed and sold/leased the Class Vehicles with the eTorque Defect, while willfully omitting and concealing the true inferior quality and substandard performance of the Class Vehicles.

110.   FCA directly markets, for its benefit, the Class Vehicles to consumers via extensive nationwide multimedia advertising campaigns on television, the internet, billboards, print, mailings, social media, and other mass media, which impart a universal and pervasive marketing message: safe and reliable family vehicles.

111.   For example, in the sales brochure for the 2019 Ram 1500, FCA stated the 2019 Ram 1500 makes "no compromise" and touted the dependability and reliability of the eTorque, stating that the "Legend Evolves":





112.   Similarly, in its sales brochure for the 2020 Ram 1500, FCA touts the truck's ability to generate more power than other trucks, "like taking off from a dead stop":

**FORMIDABLE V6 POWER—FURTHER BOOSTED BY eTORQUE TECHNOLOGY.**

This is Pentastar™ power: dual, independent cam phasing. High torque over a broad rpm range—nearly 90 percent of peak torque is available from 1,800 to 6,400 rpm. A high 10.2:1 compression ratio. Now combine that with a Class-Exclusive V6 eTorque mild-hybrid powertrain³: a belt starter-generator system and a 48-volt lithium-ion battery pack to enable stop/start technology, regenerative braking and electronic power boost.

In every way, it's a winning combination for Ram 1500, giving you more torque when you most need it—like taking off from a dead stop or pulling a boat out of the water—and it's why it's standard on select 2020 Ram 1500 models.

113.   In its 2021 Ram 1500 sales brochure, FCA states "there's never been another Ram truck like this" and touts the "unsurpassed" capabilities of the eTorque system:



-45-



114.    The 2020 Ram 1500 sales brochure makes similar statements on the

dependability and reliability of the eTorque system:



115.    FCA marketed the Class Vehicles as durable and reliable trucks for

years.

116.   Although FCA markets the Class Vehicles as durable and reliable trucks, in the field, the Class Vehicles fail to meet that promise. Instead, FCA omits the true natures of the Class Vehicles and the fact that the Class Vehicles suffer from the eTorque Defect. FCA has never disclosed the eTorque Defect to Plaintiffs or the other Class members.

117.   Plaintiffs and the other Class members were exposed to FCA's pervasive and long term marketing campaign touting the supposed quality and reliability of the Class Vehicles.

118.   Plaintiffs and the other Class members, as any reasonable consumer would, justifiably made their decisions to purchase or lease their Class Vehicles based, in material part, on FCA's misleading marketing, including affirmations of fact, promises, and representation, which also omitted any disclosure of the eTorque Defect.

119.   FCA has actively concealed the eTorque Defect throughout the Class period despite its pervasive knowledge. Specifically, FCA has:

a.      Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the eTorque Defect;

b.      Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' suffered the eTorque Defect, were defective, and not fit for their intended purposes;

c.      Failed to disclose, and actively concealed, the fact that the Class Vehicles suffered the eTorque Defect and were defective, despite that FCA learned of the eTorque Defect as early as 2019 or before, and certainly well before Plaintiffs and the other Class members purchased or leased their Class Vehicles; and

d.      Failed to disclose, and actively concealed, the existence and pervasiveness of the eTorque Defect even when Class members directly asked about it during communications with FCA, FCA dealerships, and FCA service centers.

120.   FCA also creates or approves much, if not all, of the marketing materials provided by an FCA-authorized dealership to consumers prior to or at the time of purchase. FCA, through its dealers and those marketing materials, could have disclosed the eTorque Defect and the true nature of the Class Vehicles, but it failed to do so. As a result of FCA's omissions of material facts at the point of sale, Plaintiffs and Class members have overpaid for their vehicles.

### E.   FCA's Warranties

121.   FCA issued a Limited Vehicle Warranty for the Class Vehicles. FCA issued its Limited Vehicle Warranty for the benefit of Plaintiffs and the other Class members, and for the purpose of persuading Plaintiffs and the other Class members to purchase the Class Vehicles.

122.   The Limited Vehicle Warranty states, in part:

> The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones.[5]

123.   The Limited Vehicle Warranty lasts for 36 months or 36,000 miles, whichever occurs first.[6]

124.   The Powertrain Limited Warranty covers all parts and labor needed to repair a powertrain component and lasts for up to five years or 60,000 miles, whichever occurs first.

125.   The generator/control unit and the 48-volt battery are covered by the Federal Emission Warranty for 8 years or 80,000 miles, whichever occurs first.

126.   FCA instructs vehicle owners and lessees to take their vehicles to a certified dealership for the warranty repairs. Many owners and lessees have

---

[5]      https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Ram/2019/1500_DT/9706.pdf (attached as Exhibit I).

[6] *Id*.

presented Class Vehicles to FCA-certified dealerships with complaints arising from the eTorque Defect and have been denied free repair.

127.   FCA has evaded its warranty obligations by (1) failing to tell consumers that the Class Vehicles are defective and (2) refusing to perform repairs to correct the eTorque Defect.

128.   Moreover, FCA's warranty fails of its essential purpose because the company has failed to offer an effective and permanent repair for the eTorque Defect. Rather, FCA simply replaces one defective part with an equally defective part and fails to correct and/or properly diagnose the underlying cause.

129.   FCA has notice of its breaches based on its actual and exclusive knowledge of the defect.

130.   Moreover, FCA's failure to effectively repair the eTorque Defect makes any notice requirement futile.

### F.   Tolling of the Applicable Statues of Limitation

131.   FCA's knowing and active concealment and denial of the facts alleged herein act to toll any applicable statute(s) of limitations. Plaintiffs and the other Class members could not have reasonably discovered the eTorque Defect within the time period of any applicable statute of limitations.

132.    In addition, even after Plaintiffs and other Class members contacted FCA and/or its authorized dealers seeking repair of the eTorque Defect, FCA and/or its dealers repeatedly and consistently denied a defect and offered no repair.

133.    FCA has had, and continues to have, a duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Class Vehicles, including the facts that the Class Vehicles require costly repairs, pose safety concerns, and have a diminished resale value. As a result of FCA's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

134.    Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), on behalf of the following classes:

**The Nationwide Class**

All purchasers or lessees a Class Vehicle.

**The California Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of California.

**The Ohio Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Ohio.

**The Michigan Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Michigan.

**The Tennessee Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Tennessee.

135.   Excluded from the Classes are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definition.

136.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

137.   This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

138.   **Numerosity (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that their individual joinder is impracticable. FCA sold hundreds of thousands of Class Vehicles across the United States. The number and identity of Class members can be obtained through business records regularly maintained by Defendant, its employees and agents, and

state agencies. Members of the Class can be notified of the pending action by e-mail and mail, supplemented by published notice, if necessary.

139.   **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3))** – There are questions of law and fact common to the Class. These questions predominate over any questions only affecting individual Class members. The common legal and factual issues include, but are not limited to:

a.   whether Defendant engaged in the conduct alleged herein;

b.   whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.   whether Defendant designed, manufactured, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States knowing about the eTorque Defect;

d.   when Defendant learned of the eTorque Defect;

e.   whether Defendant concealed the eTorque Defect from consumers;

f.   whether FCA failed to disclose or omitted the eTorque Defect;

g.   whether the eTorque Defect is material;

h.   whether the class vehicles are merchantable;

i.     whether FCA honored its warranty;

j.     whether Plaintiff and other Class members have been harmed by the fraud alleged herein;

k.     whether Plaintiff and the other Class members overpaid for their Class Vehicles;

l.     whether Plaintiff and the other Class members are entitled to damages or other relief; and

m.     whether Plaintiffs and the other Class members are entitled to equitable relief in the form of rescission of the purchase agreement or other injunctive relief and, if so, in what amount.

140.   **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiffs' claims are typical of the claims of each of the other Class member of. Plaintiffs, like all other Class members, have sustained damages arising from FCA's conduct as alleged herein. Plaintiffs and the other Class members were and are similarly or identically harmed by FCA's unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct.

141.   **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiffs will fairly and adequately represent and protect the interests of the other Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material

conflicts between Plaintiffs' claims and those of the other Class members that

would make class certification inappropriate. Counsel for the Class will vigorously

assert all Class members' claims.

142. **Superiority (Federal Rule of Civil Procedure 23(b)(3))** – This suit

may be maintained as a class action under Federal Rule of Civil Procedure

23(b)(3), because questions of law and fact common to the Class predominate over

the questions affecting only individual Class members and a class action is

superior to other available means for the fair and efficient adjudication of this

dispute. The damages suffered by individual Class members are small compared to

the burden and expense of individual prosecution of the complex and extensive

litigation needed to address Defendant's conduct. Further, it would be virtually

impossible for Class members to individually redress effectively the wrongs done

to them. Even if Class members themselves could afford such individual litigation,

the court system could not. In addition, individualized litigation increases the delay

and expense to all parties and to the court system resulting from complex legal and

factual issues of the case. Individualized litigation also presents a potential for

inconsistent or contradictory judgments. By contrast, the class action device

presents far fewer management difficulties; allows the hearing of claims which

might otherwise go unaddressed because of the relative expense of bringing

individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

143.   **Issues Class:** Alternatively, Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the above-defined classes for some or all the issues identified in the commonality and predominance section, above, as well as other issues which may be later identified.

## CLAIMS

### A.   NATIONWIDE CLASS CLAIMS

### FIRST CAUSE OF ACTION
**Breach of Written Warranty Under the Magnuson-Moss Warranty Act
(By All Plaintiffs)**

144.   Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

145.   Plaintiffs bring this cause of action individually and on behalf of the other members of the Nationwide Class.

146.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

147.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

148.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons

entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

149.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

150.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

151.   FCA's warranties are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

152.   FCA breached the express warranties by:

a.   Providing a 3 year/36,000 mile New Vehicle Limited Warranty with the purchase or lease of all new Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b.   Selling and leasing Class Vehicles with the Defect, and which thus were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c.   Refusing and/or failing to honor the express warranties by effectively repairing eTorque Defect free of charge and within a reasonable time.

153.   FCA provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, FCA warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

154.   FCA breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share common design defects in that they are equipped with eTorque systems that cause the vehicle to suddenly stall during normal use and operation. FCA has admitted that the Class Vehicles are defective in issuing certain TSBs, but the suggested fix in the TSBs are woefully insufficient to fully address the Defect.

155.   In its capacity as a warrantor, as FCA had knowledge of the inherent defects in the Class Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

156.   The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from FCA

157.   The limitations on the warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. FCA failed to disclose these defects to Plaintiffs and the other Class members. Thus, FCA's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

158.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

159.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure

until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

160.   Furthermore, affording either FCA an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

161.   Moreover, FCA received reasonable notice of Plaintiffs' nationwide breach of warranty claims no later than February 9, 2023, when Plaintiffs mailed a notice letter to FCA. *See* Notice Letter, Exhibit J.

162.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

163.   As a direct and proximate cause of FCA's breach of the written warranties, Plaintiff and the other Class members sustained damages and other losses in an amount to be determined at trial. FCA's conduct damaged Plaintiff and the other Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorneys' fees, and/or other relief as deemed appropriate.

164.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

165.   Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Plaintiffs also seek available declaratory relief.

Based on FCA's continuing failures to fix the known defects, Plaintiffs seek declarations that:

a.      The Class Vehicles are defective in that their eTorque system causes the vehicles to unexpectedly stall while driving. The eTorque Defect may not manifest until after the warranty provided by FCA has expired. The eTorque Defect is material and requires disclosure to all Class Members.

b.      All Class Members are to be provided the best practicable notice of the Defect, which cost shall be borne by FCA.

c.      Because the Class Vehicles have the eTorque Defect, and because FCA knew of this Defect before the time of sale or lease, the FCA warranty is insufficient to remediate the defects know by FCA to exist. Therefore FCA's existing warranty, limited to three years or 36,000 miles, is invalid, and, as such that limitation is unenforceable. FCA shall provide notice to all persons covered by that warranty of the removal of this time limitation.

d.      FCA shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the eTorque Defect in the Class Vehicles.

e.      FCA shall establish a repair program and protocol to be communicated to Class members, which will require FCA to inspect, upon request,

a Class member's vehicle to determine whether the eTorque Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

166.   Plaintiffs also request, as a form of equitable monetary relief, repayment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the eTorque Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the repair process.

167.   The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for FCA's conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by FCA, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## SECOND CAUSE OF ACTION
### Fraudulent Concealment
### (By All Plaintiffs)

168.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

169.   This claim is brought individually and on behalf of the Nationwide Class for fraudulent concealment.

170.   FCA concealed and suppressed material facts concerning the Class Vehicles.

171.   As described above, FCA made material omissions and affirmative misrepresentations regarding the Class Vehicles.

172.   FCA knew these representations were false when made.

173.   The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles were subject to stalling due to the eTorque Defect.

174.   FCA had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to unexpected stalling while driving, because Plaintiffs relied on FCA's representations that the vehicles they were purchasing and retaining were safe and free from defects.

175.   The aforementioned concealment was material, because if it had been disclosed Plaintiffs would not have bought, leased, or retained their vehicles.

176.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. FCA intentionally made the false statements

-64-

in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

177.   Plaintiffs relied on FCA's reputation-along with their failure to disclose the Defect and FCA's affirmative assurances that their vehicles were safe and reliable and other similar false statements – in purchasing, leasing or retaining the Class Vehicles.

178.   However, FCA concealed and suppressed material facts concerning the culture of FCA – a culture that emphasized cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

179.   Further, FCA had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to FCA who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff and the Classes. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

## THIRD CAUSE OF ACTION
### Breach of Express Warranty by Affirmation,
### Promise, Description, or Sample
### U.C.C. § 2-313
### (By All Plaintiffs)

180.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

181.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

182.   Plaintiffs assert claims for breach of express warranties by affirmation, promise, description, or sample under U.C.C. § 2-313, which has been adopted by and is materially the same under the laws of each state (except Louisiana), the District of Columbia, and Puerto Rico, or which can be sorted into a small number of groups containing materially identical elements.

183.   FCA is and was at all relevant times a merchant as defined by U.C.C. § 2-104

184.   The Class Vehicles are and were at all relevant times goods as defined by U.C.C. § 2-105.

185.   U.C.C. § 2-313 states that a merchant creates an express warranty by making to the buyer "[a]ny affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain" and "any description of the goods which is made part of the basis of the bargain."

186.   Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA. At all relevant times, FCA was the merchant, manufacturer, marketer, warrantor, and/or seller of the Class Vehicles.

187.   FCA made affirmations of fact including that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop." These affirmations of fact became part of the basis of the bargain and thus created an express warranty that the Class Vehicles conformed to FCA's affirmations of fact.

188.   The Class Vehicles, however, are not durable, reliable, and dependable; instead, the eTorque Defect in reality causes the vehicles to suddenly stall, shift to "Park," and/or engage the parking brake during normal operation. Thus, FCA breached its express warranty because the Class Vehicles did not conform to FCA's affirmations of fact.

189.   FCA was provided notice of these issues through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; and early consumer complaints made

directly to FCA, collected by NHTSA ODI, and/or posted on public online vehicle owner forums.

190.   Plaintiffs, for themselves and on behalf of the proposed Classes, provided notice to FCA of its breaches, although affording FCA a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because FCA had actual knowledge of and concealed that the Class Vehicles did not conform to its affirmations of fact.

191.   As a direct and proximate result of FCA's breach of the express warranty, Plaintiffs and members of the Nationwide Class suffered monetary damage at the point of sale or lease in an amount measured either by 1) the full purchase or lease price (because they would not have bought at all but-for FCA's material misrepresentations), or 2) the monetary difference between the actual value of the Class Vehicle at the time of purchase and what its value would have been if FCA's representations had been true.

192.   Plaintiffs and members of the National Class are excused from performance of any warranty obligations as a result of FCA's intentional misconduct described herein, and any such obligations are unconscionable and therefore void as a matter of law.

## FOURTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### U.C.C. § 2-314
### (By All Plaintiffs)

193.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

194.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

195.   Plaintiffs assert claims for breach of implied warranty of merchantability under U.C.C. § 2-314, which has been adopted by and is materially the same under the laws of each state, the District of Columbia, and Puerto Rico or which can be sorted into a small number of groups containing materially identical elements.

196.   FCA is and was at all relevant times a merchant as defined by U.C.C. § 2-104

197.   The Class Vehicles are and were at all relevant times goods as defined by U.C.C. § 2-105.

198.   The U.C.C. states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." U.C.C. § 2-314(1).

199.   The U.C.C. states that "goods to be merchantable must … conform to the promises or affirmations of fact made on the container or label if any." U.C.C. § 2-314(2)(f).

200.   Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA. At all relevant times, FCA was the merchant, manufacturer, marketer, warrantor, and/or seller of the Class Vehicles.

201.   FCA made affirmations of fact including that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop." These affirmations created an implied warranty that the Class Vehicles conformed to FCA's affirmations of fact. The Class Vehicles, however, are not durable, reliable, or dependable; instead, the eTorque Defect in reality causes the vehicles to suddenly stall, shift to "Park," and/or engage the parking brake during normal operation. Thus, FCA breached its implied warranty because the Class Vehicles did not conform to FCA's affirmations of fact.

202.   FCA cannot disclaim its implied warranty as it knowingly sold Class Vehicles that did not conform to FCA's affirmations of fact.

203.   FCA was provided notice of these issues through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; and early consumer complaints made directly to FCA, collected by NHTSA ODI, and/or posted on public online vehicle owner forums.

204.   Plaintiffs, for themselves and on behalf of the proposed Classes, provided notice to FCA of its breaches, although affording FCA a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed that the eTorque Defect.

205.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Class members suffered monetary damage at the point of sale or lease in an amount measured either by 1) the full purchase or lease price (because they would not have bought or leased at all but-for FCA's material misrepresentations), or 2) the monetary difference between the actual value of the Class Vehicle at the time of purchase and what its value would have been if FCA's representations had been true.

206.   Plaintiffs and members of the National Class are excused from performance of any warranty obligations as a result of FCA's intentional misconduct described herein, and any such obligations are unconscionable and therefore void as a matter of law.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (By All Plaintiffs)

207.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

208.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

209.   Plaintiffs assert claims under the law of unjust enrichment of the fifty states, the District of Columbia, and Puerto Rico, which are materially the same, or which can be sorted into a small number of groups containing materially identical elements.

210.   FCA made affirmative representations to Plaintiffs and Nationwide Class Members that that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

211.   FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

212.   Plaintiffs and the members of the Nationwide Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which

they would have paid less money, had they known that the vehicles possessed the eTorque Defect, contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

213.   FCA was unjustly enriched at the expense of and to the detriment of Plaintiffs and Nationwide Class members, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiffs and the Nationwide Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

214.   Plaintiffs and members of the Nationwide Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

        **B.**      **STATE CLASS CLAIMS**

            **1.**      **CALIFORNIA**

**SIXTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code Sec. 17200, *et seq.***
**(By Plaintiff Brain Fisher)**

215.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

216.   Plaintiff Brian Fisher brings this claim on behalf of himself and the California Class.

217.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." FCA engaged in conduct that violated each of this statute's three prongs.

218.   FCA committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, et seq., by systematically breaching its warranty obligations and by violating the Song-Beverly Consumer Warranty Act as alleged above and below.

219.   FCA committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., because the acts and practices described herein, including but not limited to FCA's failure to provide an effective remedy to fix the eTorque Defect, were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members. FCA's acts and practices were additionally unfair because the harm to Plaintiffs and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, FCA's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

220.   FCA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., when it concealed the existence and nature of the eTorque Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were safe and reliable when, in fact, they are not. The eTorque Defect is central to Class Vehicles' functioning because a properly functioning eTorque system is necessary to maintain the vehicle's engine functionality. FCA's representations and active concealment of the Defect are likely to mislead the public with regard to the true defective nature of the Class Vehicles.

221.   FCA's unfair or deceptive acts or practices occurred repeatedly in the course of FCA's trade or business, and were likely to mislead a substantial portion of the purchasing public.

222.   Plaintiff relied on FCA's material representations and nondisclosures, and would not have purchased/leased, or would have paid less for, the Class Vehicles had they known the truth.

223.   As a direct and proximate result of FCA's unfair, unlawful, and deceptive practices, Plaintiff has lost money.

224.   Plaintiff and Class Members seek an order enjoining FCA from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

## SEVENTH CAUSE OF ACTION
### Breach of Express Warranty Pursuant to Song-Beverly Consumer Warranty Act
### (By Plaintiff Brian Fisher)

225. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

226. Plaintiff Brian Fisher this claim on behalf of himself and the California Class.

227. The Class Vehicles are "consumer goods" under Cal. Civ. Code § 1791(a).

228. FCA is and was at all relevant times a "manufacturer" and seller of the Class Vehicles under Cal. Civ. Code § 1791(j); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Cal. Civ. Code § 1791(i).

229. Plaintiff and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

230. FCA expressly warranted the Class Vehicles against defects including the eTorque Defect, as described above, within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2.

231. As described above, the eTorque system in the Class Vehicles is defective. The eTorque Defect substantially impairs the use, value, and safety of

-76-

the Class Vehicles to reasonable consumers, including Plaintiff and Class
Members.

232.   FCA knew of the eTorque Defect when it expressly warranted the
Class Vehicles, wrongfully and fraudulently concealed material facts regarding the
Defect, failed to inform Class Members that the Class Vehicles had the Defect, and
induced Plaintiff and Class Members to purchase or lease the Class Vehicles under
false and/or fraudulent pretenses.

233.   FCA is obligated, under the terms of its express warranties and
pursuant to Cal. Civ. Code §§ 1793.2 and 1795.4, to effectively and within a
reasonable time repair the defective vehicles at no cost to Plaintiff and Class
Members.

234.   FCA breached its express warranties by supplying the Class Vehicles
to Plaintiff and Class Members with the eTorque Defect and by failing to provide
repairs within a reasonable time.

235.   FCA breached its express warranties by failing to repair the Class
Vehicles under warranty and by failing to provide to Plaintiffs or Class Members,
as a warranty replacement, a product that conforms to the qualities and
characteristics that it promised when it sold the Class Vehicles to Plaintiff and
Class Members.

236.   As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of its express written warranties from various sources, including Plaintiff.

237.   Plaintiff has given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

238.   Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

239.   Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Plaintiff and Class Members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

240.   Accordingly, recovery by the Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

241.   Any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unenforceable and void pursuant to Cal. Civ. Code § 1790.1.

242.   As a direct and proximate result of FCA's breach of its express warranties, Plaintiff and Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

243.   Pursuant to Cal. Civ. Code § 1794 and 1795.4, Plaintiffs and Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**Breach of Express Warranty by Affirmation, Promise, Description, or Sample**
**Cal. Comm. Code § 2313**
**(By Plaintiff Brian Fisher)**

244.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

245.   Plaintiff Brian Fisher brings this claim on behalf of himself and the California Class.

246.   The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

247.   FCA is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, inter alia, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles, under, inter alia, Cal. Com. Code § 10103(a)(16).

248.   Plaintiff and Class Members are "buyers" or "lessees" within the meaning of, inter alia, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

249. Plaintiff and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

250. Cal. Comm. Code § 2313 states that a merchant creates an express warranty by making to the buyer "[a]ny affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain" and "any description of the goods which is made part of the basis of the bargain."

251. FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of, inter alia, Cal. Com. Code §§ 2313, 2316, 10210, and 10214.

252. As described above, the eTorque system in the Class Vehicles is defective. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

253. FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiffs and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

254.   FCA is obligated, under the terms of its express warranties, to effectively repair the eTorque Defect within a reasonable time for Plaintiffs and Class Members.

255.   FCA breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

256.   FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to Plaintiff and Class Members.

257.   As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiff.

258.   Plaintiff has given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

259.   Affording FCA any further opportunity to cure its breach of written warranties is unnecessary and futile here.

260.   Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to

make Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

261.   Accordingly, recovery by the Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

262.   In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

263.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

264.   Plaintiff and Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## NINTH CAUSE OF ACTION
**Breach of Implied Warranty Under Song-Beverly Consumer Warranty Act**
**(Plaintiff Brian Fisher)**

265.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

266.   Plaintiff Brian Fisher brings this claim on behalf of himself and the California Class.

267.   FCA's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

268.   FCA is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

269.   Plaintiff and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

270.   FCA impliedly warranted to Plaintiff and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792.

271.   FCA impliedly warranted to Plaintiffs and Class Members that it would repair or replace any defective products, including the defective eTorque system.

272.   The propensity of the eTorque Defect to cause the vehicles to stall renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

273.   The eTorque Defect is latent and was present at the time of sale/lease, and therefore the Vehicles were not merchantable at the time of sale/lease.

274.   The Class Vehicles do not conform to the promises or affirmations of fact made by FCA in its promotional materials and vehicle owner manuals in that the eTorque Defect makes it such that the engine does not "optimize[] performance" or "drivability."

275.   In violation of Cal. Civ. Code § 1791.1(a), FCA breached its implied warranty by selling/leasing Class Vehicles that were defective and refusing to effectively replace and/or repair the defective vehicles.

276.   The eTorque Defect has deprived Plaintiff and Class Members of the benefit of their bargain, and have caused the Class Vehicles to depreciate in value.

277.   Any attempt by FCA to limit or disclaim the implied warranties in a manner that would exclude coverage of the eTorque Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

278.   As a result of FCA's breach of its implied warranties, Plaintiff and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and

equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

## TENTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### (Plaintiff Brian Fisher)

279.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

280.   Plaintiff Brian Fisher brings this claim on behalf of himself and the California Class.

281.   The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

282.   FCA is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, inter alia, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles, under, inter alia, Cal. Com. Code § 10103(a)(16).

283.   Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, inter alia, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

284.   When it sold or leased its Class Vehicles, FCA extended an implied warranty to Class Members that the subject Vehicles were merchantable and fit for

the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

285. Plaintiff and other Class Members who purchased or leased a Class Vehicle directly from FCA are entitled to the benefit of their bargain: a nondefective Vehicle that does not stall while driving due to the eTorque Defect.

286. Likewise, Plaintiff and other Class Members who purchased or leased a FCA Certified Pre-Owned Class Vehicle are entitled to the benefit of their bargain: a nondefective Vehicle that does not stall while driving due to the eTorque Defect.

287. Class Members who purchased new Class Vehicles from FCA-affiliated dealerships and Certified Pre-Owned Class Vehicles are the intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for the purposes of their implied warranty claims.

288. FCA breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

289. The eTorque Defect is latent and was present at the time of sale/lease, and therefore the Vehicles were not merchantable at the time of sale/lease.

290. Had the eTorque Defect that existed at the time of sale been known, the Class Vehicles could not have been sold or leased, or could not have been sold or leased at the same price.

291. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### Fraud by Concealment
### (Plaintiff Brian Fisher)

292. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

293. Plaintiff Brian Fisher brings this claim on behalf of himself and the California Class.

294. FCA concealed and suppressed material facts concerning the quality of the Class Vehicles, and the eTorque systems in the Class Vehicles.

295. FCA concealed and suppressed material facts concerning the serious Defect causing Class Vehicles to turn off, shift to "Park," and/or spontaneously activate the emergency brake while driving. Upon information and belief, the Defect lies in the eTorque system of the Class Vehicles. FCA knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles and FCA failed to disclose and/or denied the existence of the Defect prior to Plaintiff's and Class Members' purchase of their Class Vehicles. FCA further failed to disclose and/or denied the existence

the Defect when Plaintiff and Class Members complained of their Vehicle's failure.

296.   FCA did so to boost confidence in its vehicles and falsely assure purchasers and lessees of FCA vehicles that the Class Vehicles were world class, comfortable, warranted, and reliable vehicles and concealed the information in order to prevent harm to FCA and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

297.   These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiff and Class Members' decisions to purchase or lease the Class Vehicles.

298.   FCA had a duty to disclose the eTorque Defect in the Class Vehicles because it was known and/or accessible only to FCA; FCA had superior knowledge and access to the facts; and FCA knew the facts were not known to or reasonably discoverable by Plaintiff and Class Members.

299.   FCA also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or

incomplete without the disclosure of the additional facts set forth above regarding their actual quality, comfort, and usability.

300.   Even when faced with complaints regarding the Defect, FCA misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the eTorque Defect was complained of to FCA.

301.   The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiff and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

302.   FCA actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of Plaintiff and Class Members.

303.   On information and belief, FCA has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding defects that exist in FCA vehicles.

304.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiff and Class Members' actions were justified. FCA was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

305.   Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the eTorque Defect that FCA failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

306.   Accordingly, FCA is liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

307.   FCA's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## TWELFTH CAUSE OF ACTION
### Unjust Enrichment
### (Plaintiff Brian Fisher)

308.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

309.   Plaintiff asserts this Count on behalf of himself and the California Class.

310.   FCA made affirmative representations to Plaintiffs and California Class Members that that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

311.   FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

312.   Plaintiff and the members of the California Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the eTorque Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

313.    FCA was unjustly enriched at the expense of and to the detriment of Plaintiff and California Class, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the California Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

314.    Plaintiff and members of the California Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

### 2.    MICHIGAN

**THIRTEENTH CAUSE OF ACTION**
**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws § 445.903, *et. seq.***
**(Plaintiff Rachel Walkowicz)**

315.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

316.    Plaintiff Rachel Walkowicz brings this claim on behalf of herself and the Michigan Class.

317.    Michigan Class Members were "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

318. At all relevant times hereto, FCA was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

319. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.…" Mich. Comp. Laws § 445.903(1). FCA engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have… characteristics… that they do not have.…;" "(e) Representing that goods or services are of a particular standard… if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangerous eTorque Defect in the Class Vehicles, FCA participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

320.   In the course of its business, FCA willfully failed to disclose and actively concealed the dangerous eTorque Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles. FCA is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Michigan CPA.

321.   As alleged above, FCA knew of the eTorque Defect, and the Michigan Class was deceived by FCA's omissions into believing the Class Vehicles were safe. The true information could not have reasonably been known by the consumer.

322.   FCA knew or should have known that their conduct violated the Michigan CPA.

323.   As alleged above, FCA made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

324.   FCA engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. FCA deliberately withheld the information about the propensity for the

Class Vehicles to spontaneously stall, shift to "Park," and/or activate the emergency brake to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

325.   From its inception in 2009, FCA has known of the eTorque Defect that exists in millions of Class Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs, FCA concealed the Defect and allowed unsuspecting purchasers to continue to buy the Class Vehicles and allowed all defective Vehicle owners to continue driving dangerous vehicles.

326.   FCA owed the Michigan Class an independent duty to disclose the defective nature of Class Vehicles, including the eTorque Defect, because FCA:

      a.    Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

      b.    Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign that they designed to hide the eTorque Defect from Plaintiffs; and/or

      c.    Made incomplete representations about the safety and reliability of Class Vehicles generally, and the eTorque Defect in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

327.   FCA's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Michigan Class, about the true safety and reliability of Class Vehicles. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Michigan Class.

328.   The propensity of the Class Vehicles failing during ordinary operation due to the eTorque Defect was material to the Michigan Class. Had the Michigan Class known that their vehicles had these serious safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

329.   The Michigan Class suffered ascertainable losses caused by FCA's failure to disclose material information. The Michigan Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, the value of their Class Vehicles has diminished now that the eTorque issues in the Class Vehicles have come to light, and the Michigan Class owns vehicles that are defective and unsafe.

330.   The Michigan Class has been damaged by FCA's misrepresentations, concealment, and non-disclosure of the eTorque Defect in the Class Vehicles, as

they are now holding vehicles whose value has greatly diminished because of FCA's failure to timely disclose and remedy the serious defects.

331.   Michigan Class Members were—and continue to be—at risk of irreparable injury as a result of the respective Companies' acts and omissions in violation of the Michigan CPA, and these violations present a continuing risk to the Michigan Class as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

332.   The repairs instituted by FCA, if any, have not been adequate.

333.   As a direct and proximate result of FCA's violations of the Michigan CPA, the Michigan Class has suffered injury-in-fact and/or actual damage.

334.   The Michigan Class seeks injunctive relief to enjoin FCA from continuing its unfair and deceptive acts; monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Michigan Class Member; reasonable attorneys' fees; declaratory relief in the nature of a judicial determination of whether each Company's conduct violated the Michigan Statute, the just total amount of penalties to be assessed against each thereunder, and the formula and procedure for fair and equitable allocation of statutory penalties among the Michigan Class; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

335.   The Michigan Class also seeks punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. FCA intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Michigan Class Members, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting flaws in the Class Vehicles it repeatedly promised Michigan Class Members were safe. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**FOURTEENTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**Mich. Comp. Laws §§ 440.2314 and 440.2862**
**(Plaintiff Rachel Walkowicz)**

336.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

337.   Plaintiff Rachel Walkowicz brings this claim on behalf of herself and the Michigan Class.

338.   FCA was at all relevant times a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

339.   With respect to leases, FCA was at all relevant times a lessor of motor vehicles within the meaning of Mich. Comp. Laws § 440.2803(1)(p).

340.    Under Mich. Comp. Laws § 440.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Michigan Class members purchased their Class Vehicles.

341.    These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles are inherently defective in that they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation.

342.    Through the express warranties FCA issues every purchaser of a new Class Vehicle, FCA attempts to impose durational limits on the implied warranty of merchantability.  FCA, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.  Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

343.    The limitations on the warranties, including the durational limits FCA attempts to impose on the implied warranty of merchantability, are substantively unconscionable. FCA knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to

disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, FCA's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

344.    FCA was provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Michigan Class before or within a reasonable amount of time after allegations of vehicle defects became public.  In addition, Plaintiff directly notified FCA of its breach and sought repairs for her local dealership necessitated by the Defect, and provided FCA with further written notice of its breach by letter delivered to FCA on February 9, 2023.

345.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, the Michigan Class has been damaged in an amount to be proven at trial.

346.    Plaintiffs also seek available declaratory relief. Based on FCA's continuing failures to fix the known defects, Plaintiffs seek declarations that:

a.    The Class Vehicles are defective in that they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation. The eTorque Defect may not manifest until after the warranty

provided by FCA has expired. The eTorque Defect is material and requires
disclosure to all Class Members.

b.      All Class Members are to be provided the best practicable
notice of the defect, which cost shall be borne by FCA.

c.      Because the Class Vehicles have the eTorque Defect, and
because FCA knew of this Defect before the time of sale or lease, the FCA
warranty is insufficient to remediate the defects know by FCA to exist. Therefore
FCA's existing warranty, limited to three years or 36,000 miles, is invalid, and, as
such that limitation is unenforceable. FCA shall provide notice to all persons
covered by that warranty of the removal of this time limitation.

d.      FCA shall re-audit and reassess all prior warranty claims,
including claims previously denied in whole or in part, where the denial was based
on warranty or on other grounds, of claims related to the eTorque Defect in the
Class Vehicles.

347.   FCA shall establish a repair program and protocol to be
communicated to class members, which will require FCA to inspect, upon request,
a class member's vehicle to determine whether the eTorque Defect is manifest. Any
disputes over coverage shall be adjudicated by a Special Master appointed by the
Court and/or agreed to by the parties.

## FIFTEENTH CAUSE OF ACTION
### Breach of Express Warranty by Affirmation, Promise, Description, or Sample
### Mich. Comp. Laws §§ 440.2313 and 440.2860
### (Plaintiff Rachel Walkowicz)

348.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

349.   Plaintiff Rachel Walkowicz brings this claim on behalf of herself and the Michigan Class.

350.   FCA was at all relevant times a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2104(1).

351.   With respect to leases, FCA was at all relevant times a lessor of motor vehicles under Mich. Comp. Laws § 2803(1)(p).

352.   The Class Vehicles were at all relevant times goods within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

353.   Plaintiff and Michigan Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

354.   FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of Mich. Comp. Laws §§ 440.2313 and 440.2860.

355.   Plaintiff and the Michigan Class Members reasonably relied on FCA's express warranties concerning the eTorque system when purchasing or leasing the Class Vehicles.

356.   As described above, the Class Vehicles are defective. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Michigan Class Members.

357.   FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Michigan Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Michigan Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

358.   FCA is obligated, under the terms of its express warranties, to effectively repair and/or replace the Class Vehicles within a reasonable time for Plaintiff and Michigan Class Members.

359.   FCA breached its express warranties by supplying the Class Vehicles to Plaintiff and Michigan Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

360.   FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiff or Michigan Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to them.

361.   As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiff and other Michigan Class Members.

362.   Plaintiff and other Michigan Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

363.   Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

364.   Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Michigan Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

365.   Accordingly, recovery by the Michigan Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

366.   In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's

concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

367.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Michigan Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

368.   Plaintiff and Michigan Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

### SIXTEENTH CAUSE OF ACTION
**Unjust Enrichment**
**(Plaintiff Rachel Walkowicz)**

369.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

370.   Plaintiff asserts this Count on behalf of herself and the Michigan Class.

371.   FCA made affirmative representations to Plaintiff and Michigan Class Members include that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

372.   FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

373.   Plaintiff and the members of the Michigan Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the eTorque Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

374.   FCA was unjustly enriched at the expense of and to the detriment of Plaintiff and Michigan Class, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the Michigan Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

375.   Plaintiff and members of the Michigan Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

3.    **OHIO**

**SEVENTEENTH CAUSE OF ACTION**
**Violation of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code § 1302.26**
**(Plaintiff Eric Lee)**

376.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

377.    Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

378.    Ohio Class Members were "person[s]" within the meaning of Ohio Rev. Code § 1345.01(B).

379.    At all relevant times hereto, FCA was a "supplier" engaged in a "consumer transaction" within the meaning of Ohio Rev. Code § 1345.01(A) and (C).

380.    The Ohio Consumer Sales Practices Act ("Ohio CSPA") prohibits a supplier from engaging in any "unfair or deceptive act or practice in connection with a consumer transaction" Ohio Rev. Code § 1345.02(A).

381.    FCA engaged in unfair or deceptive acts or practices prohibited by the Ohio CSPA, including by representing: "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;" "(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model,

if it is not;" and "(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not[.]" Ohio Rev. Code § 1345.02(A). By failing to disclose and actively concealing the dangerous eTorque Defect in the Class Vehicles, FCA participated in unfair and deceptive acts that violated the Ohio CSPA.

382.   In the course of its business, FCA willfully failed to disclose and actively concealed the dangerous eTorque Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles. FCA is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Ohio CSPA.

383.   As alleged above, FCA knew of the eTorque Defect, and the Ohio Class was deceived by FCA's omissions into believing the Class Vehicles were safe. The true information could not have reasonably been known by the consumer.

384.   FCA knew or should have known that its conduct violated the Ohio CSPA.

385.   As alleged above, FCA made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

386.   FCA engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. FCA deliberately withheld the information about the propensity for the Class Vehicles to spontaneously stall, shift to "Park," and/or activate the emergency brake in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

387.   From its inception in 2009, FCA has known of the eTorque Defect that exists in millions of Class Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, FCA concealed the Defect and its tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Class Vehicles and allowed all defective Vehicle owners to continue driving highly dangerous vehicles.

388.   FCA owed the Ohio Class an independent duty to disclose the defective nature of Class Vehicles, including the eTorque Defect, because FCA:

a.   Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

b. Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign that they designed to hide the eTorque Defect from Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of Class Vehicles generally, and the eTorque Defect in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

389. FCA's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Ohio Class, about the true safety and reliability of Class Vehicles. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Ohio Class.

390. The propensity of the Class Vehicles failing during ordinary operation due to the eTorque Defect was material to the Ohio Class. Had the Ohio Class known that their vehicles had these serious safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

391. The Ohio Class suffered ascertainable losses caused by FCA's failure to disclose material information. The Ohio Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and

failure to remedy the serious safety defect, the value of their Class Vehicles has diminished now that the eTorque issues in the Class Vehicles have come to light, and the Ohio Class owns vehicles that are defective and unsafe.

392. The Ohio Class has been damaged by FCA's misrepresentations, concealment, and non-disclosure of the eTorque Defect in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of FCA's failure to timely disclose and remedy the serious defects.

393. Ohio Class Members were—and continue to be—at risk of irreparable injury as a result of the respective Companies' acts and omissions in violation of the Ohio CSPA, and these violations present a continuing risk to the Ohio Class as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

394. The repairs instituted by FCA, if any, have not been adequate.

395. As a direct and proximate result of FCA's violations of the Ohio CSPA, the Ohio Class has suffered injury-in-fact and/or actual damage.

396. The Ohio Class seeks injunctive relief to enjoin FCA from continuing its unfair and deceptive acts; monetary relief against FCA measured as (a) actual damages for each Class Member in an amount to be determined at trial and (b) an amount not exceeding five thousand dollars in noneconomic damages for each Class Member; reasonable attorneys' fees; declaratory relief in the nature of a

judicial determination of whether FCA's conduct violated the Ohio CSPA, the just

total amount of penalties to be assessed against each thereunder, and the formula

and procedure for fair and equitable allocation of statutory penalties among the

Ohio Class; and any other just and proper relief available under the Ohio CSPA.

397.   The Ohio Class also seeks punitive damages against FCA because it

carried out despicable conduct that demonstrates actual malice or aggravated or

egregious fraud. FCA intentionally and willfully misrepresented the safety and

reliability of Class Vehicles, placed Ohio Class Members at risk of bodily injury

when operating their Class Vehicles, deceived Ohio Class Members, and concealed

material facts that only it knew, all to avoid the expense and public relations

nightmare of correcting flaws in the Class Vehicles it repeatedly promised Ohio

Class Members were safe. FCA's unlawful conduct constitutes malice, oppression,

and fraud warranting punitive damages.

**EIGHTEENTH CAUSE OF ACTION**
**Fraud by Concealment**
**(Plaintiff Eric Lee)**

398.   Plaintiff incorporates by reference all allegations of the preceding

paragraphs as though fully set forth herein.

399.   Plaintiff Brian Fisher brings this claim on behalf of himself and the

Ohio Class.

400. As described above, FCA made material omissions and affirmative misrepresentations regarding the Class Vehicles.

401. FCA knew these representations were false when made.

402. The vehicles purchased or leased by the Ohio Class were, in fact, defective, unsafe and unreliable, because they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation.

403. FCA had a duty to disclose that these vehicles were defective, unsafe and unreliable in that they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation, because the Ohio Class relied on FCA's representations that the vehicles they were purchasing and retaining were safe and free from defects.

404. The aforementioned concealment was material, because if it had been disclosed the Ohio Class would not have bought, leased or retained their vehicles or would have paid less for them.

405. The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. FCA knew or recklessly disregarded that their representations were false because they knew that people had experienced problems and failures, including vehicles being prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation, as

the result of the eTorque Defect. FCA intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

406. The Ohio Class relied on FCA's reputation—along with their failure to disclose the eTorque Defect and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

407. As a result of their reliance, the Ohio Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

408. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Ohio Class. The Ohio Class are therefore entitled to an award of punitive damages.

## NINETEENTH CAUSE OF ACTION
**Breach of Express Warranty by Affirmation, Promise, Description, or Sample**
**Ohio Rev. Code § 1302.26**
**(Plaintiff Eric Lee)**

409. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

410. Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

411.   FCA was at all relevant times a seller with respect to motor vehicles within the meaning of Ohio Rev. Code § 1302.1(A)(4).

412.   The Class Vehicles were at all relevant times goods within the meaning of Ohio Rev. Code § 1302.1(A)(8).

413.   Plaintiff and Ohio Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

414.   FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of Ohio Rev. Code § 1302.26(A).

415.   Plaintiff and the Ohio Class Members reasonably relied on FCA's express warranties concerning the eTorque system when purchasing or leasing the Class Vehicles.

416.   As described above, the Class Vehicles are defective. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Ohio Class Members.

417.   FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Ohio Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Ohio Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

418. FCA is obligated, under the terms of its express warranties, to effectively repair and/or replace the Class Vehicles within a reasonable time for Plaintiff and Ohio Class Members.

419. FCA breached its express warranties by supplying the Class Vehicles to Plaintiff and Ohio Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

420. FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiff or Ohio Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to them.

421. As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiff and other Ohio Class Members.

422. Plaintiff and other Ohio Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

423. Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

424.   Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Ohio Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

425.   Accordingly, recovery by the Ohio Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

426.   In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

427.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Ohio Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

428.   Plaintiff and Ohio Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## TWENTIETH CAUSE OF ACTION
### Tortious Breach of Implied Warranty
### (Plaintiff Eric Lee)

429.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

430.   Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

431.   FCA impliedly warranted that its Class Vehicles were of good and merchantable quality—fit and safe for their ordinary intended use.

432.   The eTorque Defect existed in the Class Vehicles manufactured, distributed, and/or sold by FCA to middlemen who then resold the Class Vehicles to Plaintiff and the other members of the Ohio Class; the eTorque Defect existed at the time the Class Vehicles were sold to Plaintiff and the other members of the Ohio Class; and the eTorque Defect was the direct and proximate cause of injury to Plaintiff and the other members of the Ohio Class.

433.   The eTorque Defect—which makes the Class Vehicles prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake while driving—render FCA's Class Vehicles unfit for their intended purpose (being a safe and reliable means of transportation), and not of merchantable quality.

434.   As a direct and proximate result of FCA's warranty breach, Plaintiff and the other members of the Ohio Class were caused to suffer loss attributable to

the decreased value of the Class Vehicle itself, and consequential damages—losses

sustained by the purchase of the defective product—and the Ohio Plaintiff and the

other members of the Ohio Class will have to spend monies to repair and/or

replace their Class Vehicles.

**TWENTY-FIRST CAUSE OF ACTION**
**Unjust Enrichment**
**(Plaintiff Eric Lee)**

435.   Plaintiff hereby incorporates by reference the allegations contained in

the preceding paragraphs of this Complaint.

436.   Plaintiff asserts this Count on behalf of himself and the Ohio Class.

437.   FCA made affirmative representations to Plaintiff and Ohio Class

Members that that its Class Vehicles were durable, reliable, and dependable; that

the eTorque system possesses "unsurpassed" capabilities; and that the eTorque

system generates power "like taking off from a dead stop."

438.   FCA knew that the Class Vehicles were not durable, reliable, or

dependable due to the eTorque Defect, which makes the Class Vehicles prone to

spontaneously stall, shift to "Park," and/or engage the emergency brake during

normal operation.

439.   Plaintiff and the members of the Ohio Class purchased or leased Class

Vehicles that they would otherwise have not purchased, or for which they would

have paid less money, had they known that the vehicles possessed the eTorque

-119-

Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

440.   FCA was unjustly enriched at the expense of and to the detriment of Plaintiff and Ohio Class, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the Ohio Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

441.   Plaintiff and members of the Ohio Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

## TWENTY-SECOND CAUSE OF ACTION
### Negligent Design and Failure to Warn
### (Plaintiff Eric Lee)

442.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

443.   Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

444.   FCA knew that Plaintiff and the other members of the Ohio Class were members of a foreseeable class of persons who were and are at risk of suffering serious inconvenience and expense solely because of the eTorque Defect.

445.   The eTorque Defect poses a danger to drivers of Class Vehicles, who are subject to their vehicle spontaneously stalling, shifting to "Park," and/or activating the emergency brake during normal operation.

446.   At the time FCA manufactured, distributed, and/or sold the Class Vehicles, it owed a non-delegable duty to persons like Plaintiff and the other members of the Ohio Class to exercise ordinary and reasonable care to properly design the Class Vehicles, and it owes a continuing duty to warn about the Defect and to repair and/or recall its defective Class Vehicles.

447.   FCA had a pre-sale duty to warn potential purchasers that the Class Vehicles carried with them greater risks than an ordinary consumer would expect when using the Class Vehicles in their intended or reasonably-foreseeable manner due to the eTorque Defect.

448.   Any benefits of the Class Vehicles' eTorque system are outweighed by the risks inherent in the Class Vehicles' design.

449.   FCA failed to use appropriate design, engineering, and parts in manufacturing the Class Vehicles, and in other respects, FCA breached its duties by being wantonly reckless, careless, and negligent.

450.    As a direct and proximate result of FCA's wanton recklessness, carelessness, and negligence, Plaintiff and the other members of the Ohio Class were caused to suffer damages and losses-and Plaintiff and the other members of the Ohio Class will have to spend money to repair and/or replace the defective Class Vehicles.

451.    Plaintiff and the other members of the Ohio Class have not committed any contributory negligence.

### 4.    TENNESSEE

### TWENTY-THIRD CAUSE OF ACTION
**Violation of Tennessee's Consumer Protection Act ("TCPA")**
**Tenn. Code Ann. § 47-18-101,** *et seq.*
**(Plaintiff Jerry Vanderberg)**

452.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

453.    Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

454.    FCA is a "person" as defined by the TCPA. Tenn. Code Ann. § 47-18-103(13).

455.    Plaintiff and Class Members are "consumers" within the meaning of the TCPA. Tenn. Code Ann. § 47-18-103(2).

456.   The purchases and leases of Class Vehicles by Plaintiff and Class Members constitute "consumer transactions" as defined by the TCPA. Tenn. Code Ann. § 47-18-103(19).

457.   The Class Vehicles constitute "goods" or "services" as defined by the TCPA. Tenn. Code Ann. §§ 47-18-103(7) and (18).

458.   Plaintiff and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the TCPA. Tenn. Code Ann. § 47-18-103(7).

459.   FCA's representations, active concealment, failures to disclose, and omissions regarding the Class Vehicles violated the TCPA in the following ways:

   a.   FCA misrepresented that the Class Vehicles had characteristics, benefits, or uses that they did not have (Tenn. Code Ann. § 47-18-104(5));

   b.   FCA misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Tenn. Code Ann. § 47-18-104(7));

   c.   FCA advertised the Class Vehicles with an intent not to sell/lease them as advertised (Tenn. Code Ann. § 47-18-104(9)); and

   d.   FCA misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Tenn. Code Ann. § 47-18-104(19)).

460.   FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused ascertainable economic harm to purchasers and lessees of the Class Vehicles.

461.   FCA knew before the sale or lease of the Class Vehicles, that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, would fail repeatedly, and were not suitable for their intended use.

462.   FCA had exclusive knowledge of material facts concerning the existence of the eTorque Defect in its Class Vehicles. Furthermore, FCA actively concealed the Defect from consumers by denying the existence of the Defect to Class Members who contacted FCA about failures relating to the eTorque Defect and failing to provide an effective remedy for the eTorque Defect within a reasonable time under warranty (thereby causing FCA's warranty to fail of its essential purpose).

463.   FCA was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the eTorque Defect, because:

a.   FCA was in a superior position to know the true state of facts about the eTorque Defect in the Class Vehicles;

b.       Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the eTorque Defect until, at the earliest, the manifestation of the Defect; and

c.       FCA knew that Plaintiff and Class Members could not reasonably have been expected to learn or discover the eTorque Defect prior to its manifestation.

464.   In failing to disclose the defective nature of the Class Vehicles, FCA knowingly and intentionally concealed material facts and breached its duty not to do so.

465.   The facts concealed or not disclosed by FCA to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the eTorque Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and other Class Members known that the Class Vehicles had the eTorque Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

466.   Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain the eTorque Defect. It is a reasonable and objective consumer expectation for consumers to expect that their vehicle would not spontaneously turn off, shift to "Park," and/or activate the emergency brake.

467.   As a result of FCA's misconduct, Plaintiffs and Class Members have been harmed and have suffered ascertainable damages in that the Class Vehicles are defective in that they spontaneously turn off, shift to "Park," and/or activate the emergency brake due to the eTorque Defect, causing inconvenience and serious safety hazards, and causing Class Members to spend money, even when the Vehicle was still under warranty, to attempt to remedy the Defect.

468.   As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer ascertainable damages in that they have a defective Vehicle and they have experienced and may continue to experience their Class Vehicles failing to function due to the eTorque Defect, for which there is no effective fix.

469.   Accordingly, Plaintiffs seek an order enjoining FCA's unfair or deceptive acts or practices and equitable relief under Tenn. Code Ann. § 47-18-109(b), compensatory and monetary damages under Tenn. Code Ann. § 47-18-109(a)(1), treble damages for knowing and willful violations under Tenn. Code Ann. § 47-18-109(a)(3), attorneys' fees under Tenn. Code Ann. § 47-18-109(e)(1), and any other relief to which Plaintiff and Class Members are entitled under the TCPA.

470.   Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, unambiguously authorizes

any plaintiff, in any federal civil proceeding, to maintain a class action if the Rule 23's prerequisites are met. The prohibition of class actions in TCPA sections 47-18-109(a)(1) and 47-18-109(g) is procedural, not substantive, and so directly conflicts with a federal rule of procedure: Rule 23. Therefore Rule 23 controls here pursuant to the Rules Enabling Act, 28 U.S.C. § 2072; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); and *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Moreover, by their express terms, sections 47-18-109(a)(1) and 47-18-109(g) apply only to claims for damages, and therefore do not preclude class actions for claims for injunctive relief under the TCPA.

## TWENTY-FOURTH CAUSE OF ACTION
### Fraud by Concealment
### (Plaintiff Jerry Vanderberg)

471.　Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

472.　Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

473.　FCA had a duty to disclose the eTorque Defect in the Class Vehicles because, under Tennessee law, even in the absence of a special relationship, a seller must:

　　　　a.　　disclose enough information to prevent its statements from being misleading;

-127-

      b.    disclose any condition or defect that it knows or should know about that renders the product defective or dangerous; and

      c.    disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself.

474. FCA concealed and suppressed material facts concerning the serious Defect causing Class Vehicles to spontaneously turn off, shift to "Park," and/or activate the emergency brake. Upon information and belief, the Defect relates to the eTorque system of the Class Vehicles. FCA knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles.

475. FCA did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of FCA vehicles that the Class Vehicles were world class, comfortable, warranted, and reliable vehicles and concealed the information in order to prevent harm to FCA and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

476. These omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the omissions played a

significant role in Plaintiff and Class Members' decisions to purchase or lease the Class Vehicles.

477.   FCA further failed to disclose and/or denied the existence the Defect when Plaintiff and Class Members complained of the eTorque Defect. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the eTorque Defect was complained of to FCA.

478.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiff and Class Members' actions were justified. FCA was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

479.   Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the eTorque Defect that FCA failed to disclose. Moreover, some Class Members paid for repairs. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

## TWENTY-FIFTH CAUSE OF ACTION
**Breach of Express Warranty by Affirmation, Promise, Description, or Sample
Tenn. Code § 47-2-313
(Plaintiff Jerry Vanderberg)**

480.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

481.   Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

482.   FCA is and was at all relevant times a merchant as defined by Tenn. Code § 47-2-104.

483.   The Class Vehicles are and were at all relevant times goods as defined by Tenn. Code § 47-2-105.

484.   Tenn. Code § 47-2-313 states that a merchant creates an express warranty by making to the buyer "[a]ny affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain" and "any description of the goods which is made part of the basis of the bargain."

485.   Plaintiff and Tennessee Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

486.   FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of Tenn. Code § 47-2-313. FCA made affirmations of fact that the Class Vehicles were durable, reliable, and

dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

487. Plaintiff and the Tennessee Class Members reasonably relied on FCA's express warranties concerning the eTorque system when purchasing or leasing the Class Vehicles.

488. As described above, the Class Vehicles are defective and render FCA's express warranties false. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Tennessee Class Members.

489. FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Tennessee Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Tennessee Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

490. FCA is obligated, under the terms of its express warranties, to effectively repair and/or replace the Class Vehicles within a reasonable time for Plaintiff and Tennessee Class Members.

491. FCA breached its express warranties by supplying the Class Vehicles to Plaintiff and Tennessee Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

492.    FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiff or Tennessee Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to them.

493.    As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiff and other Tennessee Class Members.

494.    Plaintiff and other Tennessee Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

495.    Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

496.    Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Tennessee Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

497.    Accordingly, recovery by the Tennessee Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

498.   In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

499.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Tennessee Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

500.   Plaintiff and Tennessee Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

**TWENTY-SIXTH CAUSE OF ACTION**
**Breach of Implied Warranty**
**Tenn. Code § 47-2-314**
**(Plaintiff Jerry Vanderberg)**

501.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

502.   Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

503.   FCA is and was at all relevant times a merchant as defined by Tenn. Code § 47-2-104.

504.   The Class Vehicles are and were at all relevant times goods as defined by Tenn. Code § 47-2-105.

505.   A warranty that the Class Vehicles were in merchantable condition is implied by law pursuant to Tenn. Code. § 47-2-314.

506.   Tennessee law states that "goods to be merchantable must … be fit for the ordinary purposes for which such goods are used … and conform to the promises or affirmations of fact made on the container or label if any." Tenn. Code. §§ 47-2-314(2)(c) and (f).

507.   The Class Vehicles are not fit for the ordinary purposes for which they are used. The ordinary purpose of a Class Vehicle is safe and reliable transportation. Due to the eTorque Defect, however, the Class Vehicles are not fit for their ordinary purpose because the vehicles are prone to spontaneously stall, shift to "Park," and/or activate the emergency brake.

508.   FCA made affirmations of fact that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop." These affirmations created an implied warranty that the Class Vehicles conformed to such affirmations of fact. The Class Vehicles, however, are not

-134-

durable, reliable, or dependable, and instead are prone to spontaneous stalling due to the eTorque Defect. Thus, FCA breached its implied warranty because the Class Vehicles do not conform to FCA's affirmations of fact.

509.   FCA cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous Class Vehicles.

510.   As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of implied warranties from various sources, including Plaintiff and other Tennessee Class Members.

511.   Plaintiff and other Tennessee Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

512.   Affording FCA any further opportunity to cure their breach of implied warranties is unnecessary and futile here.

513.   As a direct and proximate result of FCA's breach of implied warranties, Plaintiff and Tennessee Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

514.   Plaintiff and Tennessee Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## TWENTY-SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (Plaintiff Jerry Vanderberg)

515.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

516.   Plaintiff asserts this Count on behalf of himself and the Tennessee Class.

517.   FCA made affirmative representations to Plaintiff and Tennessee Class Members that that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

518.   FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

519.   Plaintiff and the members of the Tennessee Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the eTorque Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

520.   FCA was unjustly enriched at the expense of and to the detriment of Plaintiff and Tennessee Class, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the Tennessee Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

521.   Plaintiff and members of the Tennessee Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against FCA, as follows:

A.   Certification of the proposed Nationwide and State Classes, including appointment of the named Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.   Restitution, including, at the election of Class members, recovery of the purchase price of their Class Vehicles, or the overpayment or diminution in value of their vehicles;

C.     Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.     An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: February 17, 2023                    Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, Michigan 48307
Telephone: 248-841-2200
epm@millerlawpc.com
dal@millerlawpc.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
J. Mitch Williams
Dylan T. Martin
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street

Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@beasleyallen.com
Mitch.Williams@Beasleyallen.com
Dylan.Martin@BeasleyAllen.com

Mark P. Chalos
Hannah Lazarz
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 2nd Ave S, Suite 1640
Nashville, TN  37201-2379
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com

Patrick Newsom
**NEWSOM LAW PLC**
40 Music Square East
Nashville, TN 37203
(615) 251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the
Proposed Classes*

2749452.6