## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BRIAN FISHER, ARIANNA RICO, ERIC LEE, JERRY VANDERBERG, RACHEL WALKOWICZ, DANIELLA LOPEZ-HALL, TENNYSON JAMES, STEPHEN EDGCOMBE, ADAM CARTABIANO, ROBERT COLE, JAMES BLYTH, and WILLIAM SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>      v.<br><br>FCA US LLC,<br><br>Defendant. | Case No.: 23-cv-10426-MFL-EAS |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

JURISDICTION AND VENUE ..........................................................5

PARTIES.............................................................................................6

    A.    Plaintiffs ................................................................................6

          1.    *Plaintiff Brian Fisher (California)* ............................6

          2.    *Plaintiff Arianna Rico (California)*............................8

          3.    *Plaintiff Eric Lee (Ohio)* .........................................9

          4.    *Plaintiff Jerry Vanderberg (Tennessee)*...................11

          5.    *Plaintiff Rachel Walkowicz (Michigan)*...................14

          6.    *Plaintiff Daniella Lopez-Hall (Texas)* .....................16

          7.    *Plaintiff Tennyson James (Georgia)* ........................19

          8.    *Plaintiff Stephen Edgcombe (Michigan)*..................21

          9.    *Plaintiff Adam Cartabiano (Florida)*.......................22

          10.    *Plaintiff James Blyth (Florida)* ...............................24

          11.    *Plaintiff Robert Cole (Florida)* ...............................26

          12.    *Plaintiff William Smith (Pennsylvania and Florida)* .............27

    B.    Defendant .............................................................................30

FACTUAL ALLEGATIONS ...............................................................30

    A.    eTorque System Operation...................................................31

    B.    The eTorque Defect..............................................................34

    C.    FCA Has Long Known About the eTorque Defect, But Failed to Disclose It........................................................................39

    D.    FCA Touted the Class Vehicles as Safe and Reliable Vehicles While Omitting the eTorque Defect.....................................60

    E.    FCA's Warranties.................................................................66

    F.    Tolling of the Applicable Statues of Limitation ..................67

CLASS ACTION ALLEGATIONS .....................................................68

CLAIMS...............................................................................................74

# TABLE OF CONTENTS
## (continued)

**Page**

A.    NATIONWIDE CLASS CLAIMS ....................................................74

FIRST CAUSE OF ACTION Breach of Written Warranty
Under the Magnuson-Moss Warranty Act (By All Plaintiffs)...........74

SECOND CAUSE OF ACTION Fraudulent Concealment
(By All Plaintiffs)....................................................................................81

THIRD CAUSE OF ACTION Breach of Express Warranty
by Affirmation, Promise, Description, or Sample U.C.C.
§ 2-313 (By All Plaintiffs) .................................................................83

FOURTH CAUSE OF ACTION Breach of Implied
Warranty of Merchantability U.C.C. § 2-314 (By All
Plaintiffs) ...............................................................................................86

FIFTH CAUSE OF ACTION Unjust Enrichment (By All
Plaintiffs) ...............................................................................................89

B.    STATE CLASS CLAIMS.................................................................91

1.    CALIFORNIA .........................................................................91

SIXTH CAUSE OF ACTION Violation of California's
Unfair Competition Law Cal. Bus. & Prof. Code Sec. 17200,
*et seq.* (Plaintiffs Brain Fisher and Arianna Rico) ............................91

SEVENTH CAUSE OF ACTION Breach of Express
Warranty Pursuant to Song-Beverly Consumer Warranty
Act (By Plaintiff Brian Fisher and Arianna Rico) .............................93

EIGHTH CAUSE OF ACTION Breach of Express Warranty
by Affirmation, Promise, Description, or Sample Cal.
Comm. Code § 2313 (By Plaintiffs Brian Fisher and Arianna
Rico) ......................................................................................................96

NINTH CAUSE OF ACTION Breach of Implied Warranty
Under Song-Beverly Consumer Warranty Act (Plaintiff
Brian Fisher and Arianna Rico) .......................................................100

TENTH CAUSE OF ACTION Breach of Implied Warranty
of Merchantability (Plaintiffs Brian Fisher and Arianna
Rico) ....................................................................................................102

ELEVENTH CAUSE OF ACTION Fraud by Concealment
(Plaintiffs Brian Fisher and Arianna Rico) .....................................104

# TABLE OF CONTENTS
## (continued)

**Page**

TWELFTH CAUSE OF ACTION Unjust Enrichment (Plaintiffs Brian Fisher and Arianna Rico) ......................................108

THIRTEENTH CAUSE OF ACTION Violation of California Consumer Legal Remedies Act ("CLRA") (Plaintiff Brian Fisher) ........................................................................110

2. FLORIDA ........................................................................114

FOURTEENTH CAUSE OF ACTION Violation of the Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.201, *et seq.* (Plaintiffs Adam Cartabiano, James Blyth, Robert Cole, and William Smith)..........................................114

FIFTEENTH CAUSE OF ACTION Breach of Express Warranty F.S.A. §§ 672.313 and 680.21 (Plaintiffs Adam Cartabiano, James Blyth, Robert Cole, and William Smith) ...........119

SIXTEENTH CAUSE OF ACTION Breach of Implied Warranty of Merchantability F.S.A. §§ 672.314 and 680.212 (Plaintiffs Adam Cartabiano, James Blyth, Robert Cole, and William Smith) ....................................................................123

3. GEORGIA........................................................................124

SEVENTEENTH CAUSE OF ACTION Violations of Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, et seq. (Plaintiff Tennyson James) ..............................124

EIGHTEENTH CAUSE OF ACTION Violations of Georgia Fair Business Practices Act O.C.G.A. § 10-1-390, *et seq.* (Plaintiff Tennyson James).............................................................129

NINETEENTH CAUSE OF ACTION Breach of Express Warranty Ga. Code Ann. §§ 11-2-313 and 11-2A-210 (Plaintiff Tennyson James).............................................................134

TWENTIETH CAUSE OF ACTION Breach of Implied Warranty of Merchantability Ga. Code Ann. §§ 11-2-314 and 11-2A-212 (Plaintiff Tennyson James) .....................................137

4. MICHIGAN ........................................................................138

# TABLE OF CONTENTS
## (continued)

**Page**

TWENTY-FIRST CAUSE OF ACTION Violation of the Michigan Consumer Protection Act Mich. Comp. Laws § 445.903, *et. seq.* (Plaintiffs Rachel Walkowicz and Stephen Edgcombe)..................................................................138

TWENTY-SECOND CAUSE OF ACTION Breach of Implied Warranty of Merchantability Mich. Comp. Laws §§ 440.2314 and 440.2862 (Plaintiffs Rachel Walkowicz and Stephen Edgcombe)...................................................144

TWENTY-THIRD CAUSE OF ACTION Breach of Express Warranty by Affirmation, Promise, Description, or Sample Mich. Comp. Laws §§ 440.2313 and 440.2860 (Plaintiffs Rachel Walkowicz and Stephen Edgcombe) ...................................147

TWENTY-FOURTH CAUSE OF ACTION Unjust Enrichment (Plaintiffs Rachel Walkowicz and Stephen Edgcombe)..................................................................151

5.      OHIO.................................................................152

TWENTY-FIFTH CAUSE OF ACTION Violation of the Ohio Consumer Sales Practices Act Ohio Rev. Code § 1302.26 (Plaintiff Eric Lee) .......................................152

TWENTY-SIXTH CAUSE OF ACTION Fraud by Concealment (Plaintiff Eric Lee) ....................................159

TWENTY-SEVENTH CAUSE OF ACTION Breach of Express Warranty by Affirmation, Promise, Description, or Sample Ohio Rev. Code § 1302.26 (Plaintiff Eric Lee) ..................161

TWENTY-EIGHTH CAUSE OF ACTION Tortious Breach of Implied Warranty (Plaintiff Eric Lee) ........................................164

TWENTY-NINTH CAUSE OF ACTION Unjust Enrichment (Plaintiff Eric Lee)....................................................166

THIRTIETH CAUSE OF ACTION Negligent Design and Failure to Warn (Plaintiff Eric Lee)................................................167

6.      TENNESSEE .................................................................169

THIRTY-FIRST CAUSE OF ACTION Violation of Tennessee's Consumer Protection Act ("TCPA") Tenn. Code Ann. § 47-18-101, *et seq*. (Plaintiff Jerry Vanderberg).........169

# TABLE OF CONTENTS
## (continued)

**Page**

THIRTY-SECOND CAUSE OF ACTION Fraud by Concealment (Plaintiff Jerry Vanderberg) ........................................174

THIRTY-THIRD CAUSE OF ACTION Breach of Express Warranty by Affirmation, Promise, Description, or Sample Tenn. Code § 47-2-313 (Plaintiff Jerry Vanderberg) ........................177

THIRTY-FOURTH CAUSE OF ACTION Breach of Implied Warranty Tenn. Code § 47-2-314 (Plaintiff Jerry Vanderberg) ..................................................................................180

THIRTY-FIFTH CAUSE OF ACTION Unjust Enrichment (Plaintiff Jerry Vanderberg) ............................................................183

7.     TEXAS ..................................................................................184

THIRTY-SIXTH CAUSE OF ACTION Breach of Express Warranty Tex. Bus. & Com. Code §§ 2.313 and 2A.210 (Plaintiff Daniella Lopez-Hall) ........................................................184

THIRTY-SEVENTH CAUSE OF ACTION Breach of Implied Warranty of Merchantability Tex. Bus. & Com. Code §§ 2.314 and 2A.212 (Plaintiff Daniella Lopez-Hall) ............187

8.     PENNSYLVANIA ................................................................189

THIRTY-EIGHTH CAUSE OF ACTION Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1 *et seq.* (Plaintiff William Smith) ..........................................................................................189

THIRTY-NINTH CAUSE OF ACTION Breach of Express Warranty 13. Pa. Cons. Stat. §§ 2313 and 2A210 (Plaintiff William Smith) ..................................................................................193

FORTIETH CAUSE OF ACTION Breach of Implied Warranty of Merchantability 13. Pa. Cons. Stat. §§ 2314 and 2A212 (Plaintiff William Smith) ..................................................196

REQUEST FOR RELIEF ....................................................................198

DEMAND FOR JURY TRIAL ...........................................................198

Plaintiffs BRIAN FISHER, ARIANNA RICO, ERIC LEE, JERRY VANDERBERG, RACHEL WALKOWICZ, DANIELLA LOPEZ-HALL, TENNYSON JAMES, STEPHEN EDGCOMBE, ADAM CARTABIANO, ROBERT COLE, JAMES BLYTH, and WILLIAM SMITH ("Plaintiffs") bring this action against Defendant FCA US LLC ("Defendant" or "FCA"), by and through their attorneys, individually and on behalf of all others similarly situated (the "Class," as more fully defined below), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief and based upon investigation, alleging as follows:

## INTRODUCTION

1. This is a class action lawsuit brought by Plaintiffs individually and on behalf of all others similarly situated who purchased or leased 2019-2023 Ram 1500 trucks and Jeep Wrangler and 2022 Jeep Wagoneer vehicles equipped with eTorque ("Class Vehicles"), which suffer from an undisclosed defect that causes the vehicles' engines to turn off, shift the transmission to "Park," and/or apply the emergency brake, all spontaneously and without warning

2. All Class Vehicles are equipped with eTorque, a "mild hybrid" system designed, implemented, marketed, and sold by FCA that allegedly improves fuel economy without sacrificing power, torque, and capability.

-1-

3. eTorque is not like most hybrid systems and serves multiple functions designed to lessen the load on the engine to make it more fuel efficient.

a. First, the Class Vehicles utilize an auto stop/start feature during idle, which is controlled and powered by eTorque.

b. Second, in certain driving conditions, such as accelerating from a complete stop, eTorque provides support to the crankshaft to boost acceleration.

c. Third, eTorque generates battery energy from braking and shifting events to help charge the 48-volt battery.

d. Fourth, the 48-volt battery charges the 12-volt battery to power the vehicles' accessories.

4. However, the eTorque system suffers a defect that causes the vehicles' engines to turn off, shift the transmission to "Park," and/or apply the emergency brake, all spontaneously and without warning ("eTorque Defect" or "Defect," as further defined below). This action arises from FCA's failure, despite longstanding knowledge of a material design defect (and the inherent unreliability and danger of the Class Vehicles) to disclose the eTorque Defect to Plaintiffs and other Class members.

5. FCA confirmed the existence of the eTorque Defect in two technical service bulletins ("TSB"s) issued to dealers on May 13, 2022 and July 6, 2022. However, these TSBs are limited to only 2022 Ram 1500 trucks with the 5.7L V8

HEMI and 2021 Ram 1500 trucks with the 5.7L V8 HEMI MDS VVT eTorque engine, excluding all other Class Vehicles.

6. FCA has known about the eTorque Defect and the risks it poses since at least 2018, upon information and belief, based on its pre-sale testing, an increase in eTorque Defect complaints submitted to the National Highway Traffic Safety Administration ("NHTSA"), and the correlating increase in warranty claims to FCA, as well as other sources. Still, FCA never disclosed the eTorque Defect to consumers; rather, it actively conceals it.

7. Many owners and lessees of the Class Vehicles sought repairs for the eTorque Defect but were often denied because the dealership reported that they could not replicate the failure mode.

8. On April 13, 2023, FCA issued Recall 23V-265 ("Recall"), admitting the existence of the eTorque Defect and blaming it on a rich fuel condition. *See* Exhibit A, 23V-265 Part 573 Safety Recall Report. The Recall covers 131,700 model year 2021 Ram 1500 eTorque trucks, but it omits all other Class Vehicles. Moreover, as further alleged below, the testing from Plaintiffs' automotive consultant indicates the rich running condition identified by FCA is not the root cause of the eTorque Defect.

9. To date, FCA has taken no meaningful action to correct the root cause of the eTorque Defect in all Class Vehicles. Given FCA's knowledge of this

concealed, safety-related design and/or manufacturing defect and its inability to repair it, FCA's attempt to limit the applicable warranties causes them to fail of the essential purpose.

10.     Despite consumer complaints, warranty claims, customer complaints submitted by dealers, pre-sale durability testing, NHTSA complaints, and its own internal records, FCA has not issued a complete and adequate recall the Class Vehicles to repair the eTorque Defect, nor has FCA extended the warranty of Class Vehicles. It has not offered customers a suitable repair or replacement, reimbursed consumers who incurred out-of-pocket expenses to repair the eTorque Defect, compensated consumers for the premium price they paid for the vehicles due to the undisclosed defect, or compensated consumers for the diminished value caused by the eTorque Defect.

11.     Had Plaintiffs and other Class members known about the eTorque Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them.

12.     As a result of FCA's unfair, deceptive, and/or fraudulent conduct,, Plaintiffs and other Class members have suffered injuries in fact, incurred damages, and have been otherwise harmed by FCA's conduct, including by paying a premium price for the vehicles due to the undisclosed defect, incurring costs

associated with failures of their vehicles as a result of the eTorque Defect and incurring costs associated with attempting to repair it.

13. Accordingly, Plaintiffs bring this action, individually and on behalf of the other Class members, to redress FCA's common law violations; violations of the Magnuson-Moss Warranty Act; and violations of various states' consumer fraud and warranty statutes.

## JURISDICTION AND VENUE

14. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs are citizens of different states than FCA.

15. This Court has personal jurisdiction, including general personal jurisdiction, over FCA because FCA conducted and continues to conduct substantial business in this District, its corporate headquarters is located in this District, and because it committed the acts and omissions complained of herein in this District, including marketing, selling, and leasing Class Vehicles in this District.

16. Venue as to FCA is proper in this judicial district under 28 U.S.C § 1391 because Defendant sells a substantial number of automobiles in this District, has dealerships in this District, maintains its corporate headquarters within this District, and many of FCA's acts complained of herein occurred within this

-5-

District, including the marketing and leasing of the Class Vehicles to Plaintiffs and other Class members in this District.

## PARTIES

### A.    Plaintiffs

#### 1.    *Plaintiff Brian Fisher (California)*

17.    Plaintiff Brian Fisher resides in Castaic, California.

18.    Mr. Fisher owns a 2021 Ram 1500 V8 with eTorque, which he purchased new on December 16, 2020 from Rydell Chrysler Dodge Jeep Ram in San Fernando, California.

19.    Mr. Fisher's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6RREJT6MN501476.

20.    Mr. Fisher purchased the Class Vehicle for his personal, family, or household use.

21.    Mr. Fisher expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Fisher's purchase of his Class Vehicle, Mr. Fisher was not warned of his vehicle's tendency to stall and turn off while driving.

22.    Since the date of purchase, Mr. Fisher has experienced six or more incidents of the Class Vehicle stalling while driving.

-6-

23. On August 18, 2021, Mr. Fisher experienced one such incident. Mr. Fisher was driving the vehicle, when the vehicle suddenly stalled and turned off. The vehicle stopped moving altogether, and Mr. Fisher had the vehicle towed to Rydell Chrysler Dodge Jeep Ram.

24. Upon inspection, the dealer reported that there was "no problem found at this time," no relevant bulletins, software updates, or Diagnostic Trouble Codes.

25. On March 28, 2022, the eTorque Defect caused the Class Vehicle to stall again. Mr. Fisher was driving at a low speed and making a turn when the Class Vehicle suddenly stalled and turned off.

26. Mr. Fisher brought the Class Vehicle to Rydell Chrysler Dodge Jeep Ram a second time.

27. Again, the dealer reported that there was no problem found with the vehicle.

28. Based on Mr. Fisher's experience with the vehicle stalling at least six times already and the nature of the Defect, Mr. Fisher is likely to suffer more stalling incidents.

29. Had FCA disclosed the Defect, Mr. Fisher would not have purchased his Class Vehicle or would have paid significantly less for it.

30.     On February 9, 2023, Mr. Fisher, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

## 2.     *Plaintiff Arianna Rico (California)*

31.     Plaintiff Arianna Rico resides in Camarillo, California.

32.     Ms. Rico began leasing her new 2021 Ram 1500 5.7L V8 Hemi with eTorque in September 2021 from Crown Dodge in Ventura, California.

33.     Ms. Rico's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFKT4MN824348.

34.     Ms. Rico leased the Class Vehicle for her personal, family, or household use.

35.     Ms. Rico expected her Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Ms. Rico's leasing of her Class Vehicle, Ms. Rico was not warned of her vehicle's tendency to stall and turn off while driving.

36.     Ms. Rico experienced her first stalling incident in approximately September 2022.  She was slowing down to take a right turn when the vehicle suddenly shut off.  Her kids were in the vehicle with her at the time, and she describes feeling traumatized by the experience.

37.     Ms. Rico experienced her vehicle stalling two additional times, both times with her husband also in the vehicle.  She feared that she would be rear-ended when the vehicle suddenly stalled.

38.     Ms. Rico presented her vehicle to Crown Dodge in November 2022, where she described the stalling incident and stated that she felt unsafe driving the vehicle.  The dealership performed TSB 18-091-22, but Ms. Rico still fears that the stalling will continue to occur.

39.     Had FCA disclosed the Defect, Ms. Rico would not have leased her Class Vehicle or would have paid significantly less for it.

### 3.     *Plaintiff Eric Lee (Ohio)*

40.     Plaintiff Eric Lee resides in Columbus, Ohio.

41.     Mr. Lee owns a 2021 Ram 1500 5.7L Hemi V8 with eTorque, which he purchased new in January 2022 from Performance Dodge Jeep in Columbus, Ohio.

42.     Mr. Lee's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFRT7MN803564.

43.     Mr. Lee purchased the Class Vehicle for his personal, family, or household use.

44. Mr. Lee expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Lee's purchase of his Class Vehicle, Mr. Lee was not warned of his vehicle's tendency to stall and turn off while driving.

45. Mr. Lee first experienced a stalling incident in late January 2022, just weeks after purchasing his new Class Vehicle. There were only 200 miles on the vehicle at the time of the incident. Mr. Lee was taking a right turn when leaving his workplace when the Class Vehicle suddenly lost power and the parking brake turned on. A message flashed on the dashboard, but Mr. Lee was startled and unable to read it. While Mr. Lee did not get in an accident, he was frightened and upset because his vehicle was almost brand new. Mr. Lee did not call the dealership at this time because he was unaware of the eTorque Defect and assumed this to be a singular event.

46. On January 29, 2023, Mr. Lee was taking a right turn at a red light in the Class Vehicle when the vehicle suddenly stalled and the emergency brake turned on. A warning on the dashboard indicated that a safety lock was enabled. Mr. Lee pushed a button on his vehicle to reset the emergency brake. There were only 8,000 miles on the Class Vehicle at the time of this second stalling incident.

-10-

47.     Mr. Lee later presented his vehicle to Performance Dodge Jeep several days later after reading online about another alleged Ram 1500 stalling incident that had resulted in a traffic accident.

48.     The Service Advisor at the dealership informed Mr. Lee that a TSB had been issued related to the stalling issue (TSB 18-091-22 REV A) and advised installing a software update. Mr. Lee consented to the dealership installing the software update to his Class Vehicle. The dealership could not confirm to Mr. Lee if the software update was a permanent fix.

49.     Based on Mr. Lee's experience with the vehicle stalling on two occasions, and the dealership's statement that they were unaware if the software update is a permanent "fix" for the eTorque Defect, Mr. Lee is likely to suffer more stalling incidents.

50.     Had FCA disclosed the Defect, Mr. Lee would not have purchased his Class Vehicle or would have paid significantly less for it.

51.     On February 9, 2023, Mr. Lee, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

### 4.     *Plaintiff Jerry Vanderberg (Tennessee)*

52.     Plaintiff Jerry Vanderberg resides in Murfreesboro, Tennessee.

53.     Mr. Vanderberg owns a 2021 Ram 1500 5.7L with eTorque, which he purchased new on December 21, 2020 from Miracle Chrysler-Dodge-Jeep, Inc. in Gallatin, Tennessee.

54.     Mr. Vanderberg's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFFT1MN551038.

55.     Mr. Vanderberg purchased the Class Vehicle for his personal, family, or household use.

56.     Mr. Vanderberg expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Vanderberg's purchase of his Class Vehicle, Mr. Vanderberg was not warned of his vehicle's tendency to stall and turn off while driving.

57.     Since the date of purchase, Mr. Vanderberg has experienced multiple incidents where the Class Vehicle unexpectedly turns off and the emergency brake activates. These incidents all occurred with the vehicle mileage at or below 30,000 miles and within the vehicle's warranty period.

58.     For several of these incidents, the Class Vehicle would start back up within seconds, allowing Mr. Vanderberg to continue driving the vehicle. On other occasions, however, the truck stopped completely and Mr. Vanderberg experienced difficulties restarting the vehicle.

59.     On the morning of September 17, 2022, Mr. Vanderberg was driving in a turn lane with oncoming traffic headed towards him when the Class Vehicle suddenly stopped. Mr. Vanderberg's wife, who was also in the vehicle at the time, was extremely frightened by the incident. Mr. Vanderberg was eventually able to restart the vehicle and pull it to the side of the road. He then uncoupled the battery cable and waited several minutes before heading straight home and canceling all appointments for the rest of the day.

60.     Upon arriving safely home, Mr. Vanderberg called Beaman Chrysler Dodge Jeep Ram FIAT in Murfreesboro, Tennessee. The call was not answered, and Mr. Vanderberg left a voicemail detailing the incident and providing Mr. Vanderberg's contact information. That evening, Mr. Vanderberg also emailed the dealership regarding the incident. The dealership never returned the call or the email.

61.     Despite reading about many other Class Vehicle owners who have experienced the Defect, Mr. Vanderberg never received a recall notice from FCA.

62.     Thus, based on Mr. Vanderberg's experience with his vehicle stalling multiple times and the nature of the Defect, Mr. Vanderberg is likely to suffer more stalling incidents.

63.     Had FCA disclosed the Defect, Mr. Vanderberg would not have purchased his Class Vehicle or would have paid significantly less for it.

-13-

64. On February 9, 2023, Mr. Vanderberg, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

**5.** *Plaintiff Rachel Walkowicz (Michigan)*

65. Plaintiff Rachel Walkowicz resides in Clinton Township, Michigan.

66. Ms. Walkowicz leases a new 2021 Ram 1500 V8 with eTorque, which she began leasing on April 12, 2021 from Parkway Chrysler Dodge Jeep Ram in Clinton Township, Michigan.

67. Ms. Walkowicz's Class Vehicle was manufactured, distributed, advertised, marketed, warranted, and leased by FCA, and bears the Vehicle Identification No. 1C6SRFFT6MN675421.

68. Ms. Walkowicz leased the Class Vehicle for her personal, family, or household use.

69. Ms. Walkowicz expected her Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Ms. Walkowicz's leasing of her Class Vehicle, Ms. Walkowicz was not warned of her vehicle's tendency to stall and turn off while driving.

70. Ms. Walkowicz has experienced three or more incidents of her vehicle stalling while driving due to the eTorque Defect beginning in or about December 2022 with roughly 12,000 miles on the vehicle.

71.     In or about December 2022, Ms. Walkowicz was stopped at a red light in the Class Vehicle. When the light turned green, Ms. Walkowicz took her foot off the brake, and the vehicle suddenly stalled, shifted into park, and engaged the parking brake. Two messages appeared on the dashboard: one directed Ms. Walkowicz to press on the brake and push start (despite the ignition still begin in "Run"); and the other stated "Park Brake Auto Engaged + Push Switch to Release."

72.     Ms. Walkowicz recorded a video of what occurred and presented her vehicle to Parkway Chrysler Dodge Jeep Ram. After reviewing the video and examining the vehicle, the dealership could not replicate the failure, could not find any relevant TSBs, and determined that there was "no problem found at this time." The dealership updated the vehicle's modules "as a precaution" despite being unable to identify the issue.

73.     Ms. Walkowicz also communicated with the dealership via text messaging regarding her concerns. The dealership stated that that there was "nothing current on this issue" in their "tech advisor forums" and that therefore, nothing further could be done "until codes are set and or the issue is currently happening."

74.     On or about February 9, 2023, Ms. Walkowicz experienced another stalling incident. She presented the vehicle to Szott M-59 Dodge Ram in Highland,

Michigan. Upon inspecting the vehicle, the dealership found "no stored or active DTCs," and did nothing other than tighten a loose nut. The dealership could not verify that the stalling issue experienced by Ms. Walkowicz had been diagnosed or fixed.

75.     Based on Ms. Walkowicz's experience with the vehicle stalling on two occasions, and the dealership's inability to resolve the issue, Mr. Walkowicz is likely to suffer more stalling incidents.

76.     Ms. Walkowicz relies on her Class Vehicle daily as her primary mode of transportation for herself and her two children. Ms. Walkowicz fears that the vehicle will stall while driving her children and cause a traffic accident. Thus, Ms. Walkowicz no longer feels safe driving her Class Vehicle due to the risk the eTorque Defect poses to herself, her children, and other drivers around her.

77.     Had FCA disclosed the Defect, Ms. Walkowicz would not have leased her Class Vehicle or would have paid significantly less to lease it.

78.     On February 9, 2023, Ms. Walkowicz, through counsel, sent a notice letter on behalf of himself and all other Class members to FCA requesting relief and repair of the Defect.

### 6.     *Plaintiff Daniella Lopez-Hall (Texas)*

79.     Plaintiff Daniella Lopez-Hall resides in Fort Sam Houston, Texas.

-16-

80.     Ms. Lopez-Hall owns a 2022 Ram 1500 5.7L Hemi V8 with eTorque, which she purchased new in December 2022 from Lithia Chrysler Jeep Dodge of Corpus Christi in Corpus Christi, Texas.

81.     Ms. Lopez-Hall's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFFT7NN459305.

82.     Ms. Lopez-Hall purchased the Class Vehicle for her personal, family, or household use.

83.     Ms. Lopez-Hall expected her Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Ms. Lopez-Hall's purchase of her Class Vehicle, Ms. Lopez-Hall was not warned of her vehicle's tendency to stall and turn off while driving.

84.     Ms. Lopez-Hall first began experiencing stalling incidents with her Class Vehicle when the Vehicle had only 6,000 miles on it.  Ms. Lopez-Hall was driving her Class Vehicle when the service engine light suddenly turned on, the "auto on/off" disabled, and then the vehicle became stuck in first gear with no ability to accelerate or slow down past a certain slow speed.  This happened on multiple separate occasions.

85.     On one occasion, Ms. Lopez-Hall was driving at approximately 45 mph with her husband and son in the vehicle when a stalling incident occurred and

-17-

the vehicle lost power just as she was merging on to the freeway.  In order to avoid a catastrophic accident, she had to "inch" her way to the next exit with no shoulder on the freeway to safely stop.  This experience was terrifying for Ms. Lopez-Hall, who feared that she and her family would be hit by fast-moving traffic as she navigated the vehicle to a safe location.

86.    On or about April 24, 2023, after having experienced four stalling incidents, Ms. Lopez-Hall presented her Class Vehicle to the dealership.  She was told that everything in the vehicle was functioning properly.  There were no explanations given as to why her vehicle was stalling, and she was informed that there were no relevant recalls.

87.    Despite experiencing additional stalling incidents, Ms. Lopez-Hall has not returned to her dealership because she was told that they could not do anything to help her unless her "check engine light" was illuminated.  Because the stalling incidents and illumination of the "check engine light" are unpredictable, this makes it difficult for Ms. Lopez-Hall to be able to rely on her dealership to diagnose and address the issues with her vehicle.

88.    With Ms. Lopez-Hall experiencing repeated instances of her vehicle stalling and the dealership's inability to address this issue, Ms. Lopez-Hall is likely to suffer more stalling incidents.

-18-

89.     Had FCA disclosed the Defect, Ms. Lopez-Hall would not have purchased her Class Vehicle or would have paid significantly less for it.

### 7.     *Plaintiff Tennyson James (Georgia)*

90.     Plaintiff Tennyson James resides in Gainesville, Georgia.

91.     Mr. James purchased his 2022 Ram 1500 3.6L V6 with eTorque new off the showroom floor in September 2022 from Troncalli Chrysler Dodge Jeep Ram in Cumming, Georgia.

92.     Mr. James's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6RRFFG6NN245732.

93.     Mr. James purchased the Class Vehicle for his personal, family, or household use.

94.     Mr. James expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. James's purchase of his Class Vehicle, Mr. James was not warned of his vehicle's tendency to stall and turn off while driving.

95.     Mr. James began experiencing stalling incidents almost immediately after purchasing the vehicle.  Mr. James's vehicle had only roughly 1,000 miles on it when the first stalling incident occurred.  He presented the vehicle to Troncalli

Chrysler Dodge Jeep Ram, but was told there was nothing that could be done because no error codes were displaying.

96.     The vehicle now has roughly 18,000 miles on it, and the stalling issues continue to recur.  Mr. James typically experiences these stalling incidents with his Class Vehicle when at stoplights or when driving up hills.

97.     One incident occurred when Mr. James was stopped at a red light. The auto-park function engaged, and the vehicle shut down.

98.     On another occasion, Mr. James was driving on the highway at roughly 55 mph when his Class Vehicle stalled.  The vehicle shut off, and Mr. James had to "coast" until he could safely resume operating the vehicle.

99.     Mr. James presented his Class Vehicle to the dealership a second time in or about March 2023.  He was told that no one else had reported experiencing this stalling issue, and the dealership noted that his concern could not be reproduced.

100.    Because Defendant has not offered Mr. James a fix for his Class Vehicle's repeated stalling issue, Mr. Jones is likely to suffer more stalling incidents.

101.    Had FCA disclosed the Defect, Mr. James would not have purchased his Class Vehicle or would have paid significantly less for it.

### 8. *Plaintiff Stephen Edgcombe (Michigan)*

102.  Plaintiff Stephen Edgcombe is a former RAM Service Manager who resides in Bancroft, Michigan.

103.  Mr. Edgcombe began leasing his new 2022 Ram 1500 5.7L Hemi V8 with eTorque in 2022 from Randy Wise Chrysler Dodge Jeep Ram of Durand in Durhand, Michigan.

104.  Mr. Edgcombe's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFFT9NN385126.

105.  Mr. Edgcombe leased the Class Vehicle for his personal, family, or household use.

106.  Mr. Edgcombe expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Edgcombe's lease of his Class Vehicle, Mr. Edgcombe was not warned of his vehicle's tendency to stall and turn off while driving.

107.  Within a few months of leasing the vehicle, Mr. Edgcombe experienced his first stalling incident while slowing to cross railroad tracks.  Mr. Edgcombe was driving slowly across the railroad tracks when the engine suddenly stalled, multiple dashboard lights turned on, the vehicle shifted into park, and the

parking brake engaged.  He was stalled in the middle of the road, and feels fortunate that he did not experience an accident.

108.   After experiencing two additional similar stalling incidents, Mr. Edgcombe presented his Class Vehicle to Randy Wise Chrysler Dodge Jeep Ram of Durand to address a separate issue.  He asked the service writer about the stalling issue, but was told that RAM does not have a solution for the issue yet.  It was documented that the dealership was "unable to duplicate" Mr. Edgcombe's concern regarding his vehicle stalling.

109.   Because Defendant has not offered Mr. Edgcombe a fix for his Class Vehicle's repeated stalling issue, Mr. Edgcombe is likely to suffer more stalling incidents.

110.   Had FCA disclosed the Defect, Mr. Edgcombe would not have leased his Class Vehicle or would have paid significantly less to lease it.

### 9. *Plaintiff Adam Cartabiano (Florida)*

111.   Plaintiff Adam Cartabiano resides in Palmetto, Florida.

112.   Mr. Cartabiano purchased his new 2021 Ram 1500 5.7L V8 HEMI with eTorque in March 2021 from Jerry Ulm Chrysler Dodge Jeep in Tampa, Florida.

113. Mr. Cartabiano's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFLT5MN645962.

114. Mr. Cartabiano purchased the Class Vehicle for his personal, family, or household use.

115. Mr. Cartabiano expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Cartabiano's purchase of his Class Vehicle, Mr. Cartabiano was not warned of his vehicle's tendency to stall and turn off while driving.

116. The first time Mr. Cartabiano experienced a stalling incident, the car suddenly turned off and the emergency brake activated.  At roughly 26,000 miles on the vehicle, Mr. Cartabiano and/or his fiancé had experienced four or more stalling incidents with the Class Vehicle.  One such incident occurred while Mr. Cartabiano was in the middle of an intersection.

117. Mr. Cartabiano presented the vehicle to the Firkins Auto Groupon or about May 18, 2023 for an oil change, and raised the stalling issue.  He was told that the issue could be caused by the transmission control module which needed to be "re-flashed." The service department "re-flashed" his vehicle.

118. It has only been a matter of weeks since this update was performed, and Mr. Cartabiano is not aware that this fixed the stalling issue, particularly

because he works from home and does not drive his vehicle often.  Mr. Cartabiano is thus at risk of suffering more stalling incidents.

119.   Had FCA disclosed the Defect, Mr. Cartabiano would not have purchased his Class Vehicle or would have paid significantly less for it.

### 10.   *Plaintiff James Blyth (Florida)*

120.   Plaintiff James Blyth resides in Citrus Springs, Florida.

121.   Mr. Blyth purchased his 2021 Ram 1500 5.7L HEMI with eTorque as a Certified Used Ram vehicle in December 2022 from Ferman Chrysler Jeep Dodge in Lutz, Florida. Mr. Blyth's Class Vehicle had roughly 13,000 miles on it at the time of purchase, and currently has roughly 18,000 miles on it.

122.   Mr. Blyth's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C64MN784430.

123.   Mr. Blyth purchased the Class Vehicle for his personal, family, or household use.

124.   Mr. Blyth expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Blyth's purchase of his Class Vehicle, Mr. Blyth was not warned of his vehicle's tendency to stall and turn off while driving.

-24-

125.    Mr. Blyth began experiencing stalling issues shortly after the purchase of his vehicle. When the Class Vehicle stalls, it enters emergency parking mode. Mr. Blyth then has to disengage the emergency parking brake, then restart the vehicle.  Mr. Blyth considers this to be a major safety hazard, particularly when pulling his camper with his Class Vehicle.

126.    When Mr. Blyth presented his vehicle to Jenkins Ford of Crystal River in roughly March 2023, following three separate stalling incidents, the representative drove the vehicle for 20 miles and did not see any codes or lights on the dashboard.  They informed Mr. Blyth that there was no visible issue, and that there was nothing they could do.

127.    Mr. Blyth also called the corporate FCA number, and was not given any information regarding a solution to his stalling issue.

128.    On or about May 5, 2023, Mr. Blyth received a recall notice letter in the mail from FCA regarding Recall 23V-265.  *See* Exhibit B, Recall Letter.  The notice letter states that "FCA US LCC has decided that a defect, which relates to motor vehicle safety, exists in certain 2021 RAM 1500 vehicles equipped with the 5.7L eTorque engine" and emphasizes that "[i]t is extremely important to take steps now to repair your vehicle to ensure the safety of you and your passengers." The letter warns of the possibility of the vehicle's engine shutting down, which

"may result in an unexpected loss of motive power while driving, which can cause a vehicle crash without prior warning."

129. On or about May 11, 2023, Mr. Blyth took his Class Vehicle to Jenkins Dodge in Crystal River, FL to have this recall performed in accordance with the letter. The dealership performed the relevant "37A Recall" reprogramming to his Class Vehicle.

130. Yet, Mr. Blyth has experienced two additional stalling incidents after this purported "fix" was performed on his Class Vehicle in mid May 2023. Mr. Blyth is thus likely to experience more stalling incidents.

131. Had FCA disclosed the Defect, Mr. Blyth would not have purchased his Class Vehicle or would have paid significantly less for it.

### 11. *Plaintiff Robert Cole (Florida)*

132. Plaintiff Robert Cole resides in Titusville, Florida.

133. Mr. Cole purchased his new 2023 Ram 1500 3.6L Pentastar V6 with eTorque in April 2023 from Arrigo Chrysler Dodge Jeep RAM West Palm Beach in West Palm Beach, Florida.

134. Mr. Cole's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. [INSERT VIN].

-26-

135. Mr. Cole purchased the Class Vehicle for his personal, family, or household use.

136. Mr. Cole expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Cole's purchase of his Class Vehicle, Mr. Cole was not warned of his vehicle's tendency to stall and turn off while driving.

137. Mr. Cole experienced his first stalling incident approximately two weeks after purchasing the vehicle, when the vehicle had only roughly 600 miles on it.  Mr. Cole was driving in traffic when the vehicle suddenly stalled and shifted to park.

138. Mr. Cole thus presented the vehicle to Arrigo Dodge.  After the vehicle was at the dealership for two days, Mr. Cole was informed that they could not find anything wrong with the vehicle, and returned the vehicle with no repairs made.

139. Because the dealership was unable to address and repair the Defect in Mr. Cole's vehicle, Mr. Cole is likely to experience more stalling incidents.

140. Had FCA disclosed the Defect, Mr. Cole would not have purchased his Class Vehicle or would have paid significantly less for it.

### 12. *Plaintiff William Smith (Pennsylvania and Florida)*

141. Plaintiff William Smith resides in New Smyrna Beach, Florida.

142. Mr. Smith purchased a new 2021 Ram 1500 5.7L V8 HEMI with eTorque ("2021 Class Vehicle") in November 2020 from Napleton Ellwood City Chrysler Dodge Jeep RAM in Ellwood City, Pennslvania.

143. Mr. Smith's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFFT0MN540046.

144. Mr. Smith purchased the Class Vehicle for his personal, family, or household use.

145. Mr. Smith expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Smith's purchase of his Class Vehicle, Mr. Smith was not warned of his vehicle's tendency to stall and turn off while driving.

146. Mr. Smith experienced his first stalling incident in approximately March 2023. Mr. Smith was taking a turn when suddenly the vehicle stalled and the electronic parking brake engaged.

147. On or about March 23, 2023, Mr. Smith presented the Class Vehicle to New Smyrna Chrysler Jeep Dodge Ram in New Smyrna Beach, Florida to report the repeated stalling episodes. The dealership "reflashed" the vehicle per TSB 18-091-22.

148. Because Mr. Smith no longer felt safe driving the 2021 Class Vehicle due to the stalling defect, he traded in the 2021 Class Vehicle for a 2023 Ram 1500 5.7L V8 HEMI with eTorque ("2023 Class Vehicle") at New Smyrna Chrysler Jeep Dodge Ram on April 24, 2023.

149. Mr. Smith's 2023 Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by FCA, and bears the Vehicle Identification No. 1C6SRFFT1PN517539.

150. Mr. Smith purchased the Class Vehicle for his personal, family, or household use.

151. Mr. Smith expected his Class Vehicle to be of good and merchantable quality and not defective. Despite FCA's knowledge of the eTorque Defect prior to Mr. Smith's purchase of his Class Vehicle, Mr. Smith was not warned of his vehicle's tendency to stall and turn off while driving.

152. Mr. Smith was dismayed to find that his 2023 Class Vehicle also suffered from the eTorque Defect.  In early June 2023, Mr. Smith was driving the 2023 Class Vehicle when the vehicle suddenly shut off and engaged the parking brake.

153. Mr. Smith thus presented the vehicle to New Smyrna Chrysler Jeep Dodge Ram.  The dealership was "unable to recreate [Mr. Smith's] concern."

154.   Because the dealership was unable to address and repair the Defect in Mr. Smith's 2023 Class Vehicle, Mr. Smith is likely to experience more stalling incidents.

155.   Had FCA disclosed the Defect, Mr. Smith would not have purchased his 2021 Class Vehicle or would have paid significantly less for it, and would not have purchased his 2023 Class Vehicle or would have paid significantly less for it.

## B.   **Defendant**

156.   Defendant FCA is a Michigan limited liability company, with its principal office located in Auburn Hills, Michigan. FCA designs, tests, manufactures, distributes, warrants, sells, and leases various vehicles, including the Class Vehicles, under several prominent brand names, including Chrysler, Jeep, and Dodge in this District and throughout the United States. FCA designed, tested, marketed, manufactured, sold, and leased the Class Vehicles at issue in this case.

## FACTUAL ALLEGATIONS

157.   FCA designs, manufactures, markets, and sells millions of vehicles worldwide under the brand names, Dodge, Jeep, Chrysler, RAM, Fiat, and Maserati. FCA reported $101.32 billion of revenue in 2020 alone.

158.   FCA designed, manufactured, marketed, and sold hundreds of thousands of Class Vehicles nationwide, all of which are equipped with the same or substantially similar eTorque systems.

## A.  eTorque System Operation

159.  The Class Vehicles are equipped with an internal combustion engine and the eTorque "mild hybrid" system.

160.  eTorque is intended to improve the Class Vehicles' fuel efficiency without comprising power, torque, and other capabilities.

161.  eTorque replaces a conventional alternator with a more robust motor/generator that is water cooled, rather than fan cooled.

162.  As the images below reflect, eTorque consists of a belt-driven generator/control module and a 48-volt lithium-ion battery pack the size of a suitcase that consists of a 3-kilowatt DC-to-DC converter that converts 48-volts to the standard 12-volts.



Figure 1: eTorque generator/control module



Figure 2: eTorque battery

163.   As the image below reflects, the generator/control module is mounted

to the engine in a typical alternator location and the 48-volt battery is located

behind the passenger seats in the rear cab.



Figure 3: Generator/control module and battery locations

164.   The eTorque system is belt-driven from the internal combustion engine's crankshaft. As the internal combustion engine cycles, the revolutions power the eTorque's generator.

165.   The eTorque system serves several functions. As explained by Brian Spohn, FCA's Assistant Chief Engineer for eTorque, Mild Hybrid Application, and Propulsion Systems, the first function of the eTorque is to control the Class Vehicles' auto stop/start function. The eTorque system is designed to improve the transition from engine stop to engine start when the driver releases the brake pedal from a stop. *See* Unofficial Transcript of FCA Employee Interviews, attached as Exhibit C.

166.   Second, the eTorque system supplements the combustion engine's motive power. In certain driving conditions, such as accelerations from a stop, the

-33-

eTorque generator's pulley driver belt spins the crankshaft to help increase or manage the vehicles' motive power until speeds are reached where the internal combustion engine can be the primary drive.

167. Third, the eTorque system regenerates energy from braking and shifting events to charge and power the 48-volt battery. Since the eTorque system is driven by the crankshaft, eTorque can apply resistance to the crankshaft to add braking effects. While eTorque applies resistance to the crankshaft, it regenerates and converts the kinetic energy to electrical energy to charge the 48-volt battery.

168. Fourth, the 48-volt battery charges the 12-volt battery, which powers the vehicles' accessories, such as the electronic ignition start, electronic parking brake, radio, climate control, and other auxiliary functions. All auxiliary functions are powered and managed through the eTorque system.

### B.    The eTorque Defect

169. The eTorque system suffers from a dangerous defect, placing Plaintiffs and other Class members, as well as others on the road, at increased risk of severe injury or even death.

170. On information and belief, the eTorque system's software or hardware components are not adequately designed to assure safe, reliable transportation. As a result, the Class Vehicles' engines unexpectedly turn off, the transmission shifts to "Park," and/or the emergency brake engages, all without any user input. The

eTorque Defect occurs in all driving conditions, whether the vehicle is in motion, stopped, or turning at an intersection.

171. The defect strands Class members in all traffic conditions. The defect takes control of the Class Vehicle away from the driver, per voluminous complaints submitted to both NHTSA and online forums, both of which FCA monitors to track product performance.

172. The eTorque Defect occurs in warranty, but is intermittent, and leads to denied repairs where the dealerships cannot replicate the problem.

173. The intermittent nature of the eTorque Defect makes the Class Vehicles especially unreliable, unsafe, and unfit for their ordinary purpose.

174. Plaintiffs and Class members purchased or leased their Class Vehicles for the purpose, and with the understanding, of providing safe, reliable transportation.

175. A vehicle suffering from the eTorque Defect is unfit for its ordinary and intended purpose.

176. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles and renders them substantially less drivable, safe, useful, and valuable than they would be without the defect.

177. As a result of the eTorque Defect, owners or lessors of Class Vehicles must either cease driving their vehicles (the purpose for which they purchased

them), or else risk a complete and total vehicle stall—and potentially causing or incurring serious bodily injury or property damage—every time they get behind the wheel.

178.   The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles and renders the Class Vehicles substantially less drivable, safe, useful, and valuable.

179.   On May 13, 2022, FCA confirmed the existence of the eTorque Defect when it issued TSB 08-093-22-A for a limited number of 2022 Ram 1500 trucks. See TSB 08-093-22-A, attached as Exhibit D. FCA noted that the customer may describe the "the AutoStart fails and the AutoPark engages" and that transmission converts to "Limp Mode." FCA offered a software update to the Hybrid Control Processor ("HCP") to the limited warranty 2022 trucks but excluded other Class Vehicles.

180.   FCA's May 3, 2022 TSB 18-091-22, which was revised on July 6, 2022 as TSB 18-091-22 REV. A, involves 2021 Ram 1500 trucks and also demonstrates FCA's awareness of the eTorque Defect. *See* TSB 18-091-22 REV. A, attached as Exhibit E. There, FCA noted that the driver may experience "an engine stall at low engine mileage and mostly low vehicle speeds" and/or that the "LED light in the Start/Stop button will not illuminate when pressed." FCA suggests "reprogramming the PCM with the latest available software."

181.   The purported "fixes" suggested by these TSBs do not remedy the root cause of the eTorque Defect.

182.   FCA has not released a TSB for all Class Vehicles to repair the eTorque Defect, despite other Class Vehicles being equipped with the same or substantially similar eTorque system and custom reporting the same failure mode with the same failure codes.

183.   On April 13, 2023, FCA issued a limited, inadequate Recall. The Recall covers 131,700 model year 2021 Ram 1500 trucks with the eTorque system, and FCA says 100% of the trucks included in the recall suffer from the defect. Ex. A. As the root cause, FCA identified a rich fuel condition, admitting "[s]ome 2021 MY Ram 1500 vehicles equipped with the 5.7L eTorque engine may experience an engine shut down caused by an over rich fuel condition under certain operating conditions." Ex. A.

184.   FCA confirmed the seriousness of the eTorque Defect, admitting the eTorque Defect can "cause a vehicle crash without prior warning." *Id*. In fact, FCA admitted it is aware of at least one crash related to the eTorque Defect. *Id*.

185.   Despite the seriousness and scope of the eTorque Defect, FCA issued an inadequate Recall.

186.   First, the scope of the Recall is inadequate, as it fails to include all Class Vehicles with the same or substantially similar eTorque system. Omitting

-37-

these additional vehicles leaves them without a remedy, for which they bargained, and at increased risk for serious injury.

187. Second, the root cause of the eTorque Defect is not a rich fuel condition, as claimed by FCA in its Recall. A rich fuel condition means more fuel than is required is injected into the combustion chamber, misbalancing the air/fuel mixture. Plaintiffs' independent automotive consultant examined a 2021 Ram 1500 eTorque that is included the Recall, but which has not yet had the Recall repair performed. The vehicle tested also has a history of stalls related to the eTorque Defect.

188. If the vehicle were running rich, there would be traces on the spark plugs. Plaintiffs' independent automotive consultant removed and examined multiple spark plugs, but there were no indications of a rich fuel condition. Instead, the spark plugs were heat tarnished, indicating it runs lean, not rich. There were similarly no traces of a rich running condition within the combustion chamber.

189. To be sure, Plaintiffs' independent automotive consultant also simulated a rich running condition, by injecting fuel directly into the intake while driving. The rich fuel condition was simulated in various driving conditions that were most common in the NHTSA complaints, but no stalls occurred.

190. There were anomalous 48V battery readings during the testing, though. The vehicle tested is no more than two years old and the 48V battery is

warranted for up to eight years, but the 48V battery life is already approximately 61%. The 48V battery would randomly drop to 0%, sometimes zeroing-out multiple times within 30 seconds. Moreover, the eTorque system does not recharge the 48V battery under constant driving conditions, it only recharges the 48V battery when the brake pedal is applied. When driving on the highway, the 48V's battery life dropped from approximately 60% to 47% within 12 minutes.

191.   Mr. Blyth's post-recall experiences also indicate the Recall is inadequate, as he has experienced additional failures following the repair.

192.   FCA's failure and inability to repair the eTorque Defect leaves the Class members to be substantially likely to, and they do, experience repeated failures and thus does not remedy the eTorque Defect.

193.   Not only does the Recall fail to include *all* Class Vehicles and offer a truthful and adequate repair, but it does not compensate Plaintiffs' and Class members for the diminished value of their Class Vehicles.

194.   On information and belief, Mercedes and Audi have been using similar technologies in Europe without issue.

**C.**   **FCA Has Long Known About the eTorque Defect, But Failed to Disclose It**

195.   Consumer complaints made directly to FCA, NHTSA, and/or posted on public online vehicle owner forums; its own investigations; repair and

replacement part sales data; and aggregate data from authorized-FCA dealerships put FCA on notice of the eTorque Defect.

196.   Pre-release design, engineering, manufacture, and testing of Class Vehicles provided FCA with comprehensive and exclusive knowledge about the eTorque Defect, particularly the functions, uses, and computability of the software, wiring, connectors, and other components, including the expected conditions they may face.

197.   FCA knew or should have known about the eTorque Defect from the testing performed on the software and hardware components. Vehicle manufacturers, like FCA and its suppliers, perform various pre-production tests on new vehicle components including, but not limited to, Failure Modes and Effects Analyses ("FMEA").[1]

198.   FMEA tests assess methods or modes by which a particular component might fail. It examines the design of each component, the assembly of the part, and whether use in various manners would cause the part or system to fail. For example, in testing the systems at issue here, FMEA testing would explore, among other things, how and under what conditions the software or hardware

---

[1]   https://www.iatfglobaloversight.org/wp/wp-content/uploads/2020/08/FCA-US-LLC-CSR-IATF-16949-20200805-final.pdf (last visited June 16, 2022) (attached as Exhibit F).

components could fail, how likely failure was under different conditions, and how likely each condition tested was to occur.

199. FCA and its suppliers also performed computer and real-world simulations of the systems, including in extreme conditions, to confirm they are meeting the design goals.

200. FCA and its suppliers performed these tests, and others, on the Class Vehicles and, if performed with due care, each of these tests demonstrated that the relevant systems or components in the Class Vehicles would lead to failure. In fact, Andrew Simmons, FCA's Powertrain Durability Test Management Engineer confirmed such in an online interview related to testing the eTorque system.

201. FCA monitors customer complaints submitted to NHTSA. FCA knew or should have known about the eTorque Defect and its associated risks through the numerous consumer complaints filed with NHTSA as early as February 2019. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

202. An example of complaints submitted to NHTSA reflecting the eTorque Defect are copied below[2]:

> 2021 Dodge Ram Hemi Etorque shuts down while driving. This has happened approximately a dozen times in the last year. On most occasions this has happened within the first 5 minutes of driving. On all but one occasion we were yielding and then pulling into an

---

[2] All NHTSA complaints cited herein are verbatim copies of the complaints accessible on NHTSA's website. All typographical and grammatical errors are original.

intersection and the truck shut off in the middle of the intersection. This caused vehicles that were driving at full speed to swerve from hitting us. The vehicle shut off, goes into park, and the emergency brake engages. A message appears on the dashboard indicating autopark engaged, In order to get moving again, we have to start the card, disengage the emergency brake, and put the car in drive. This is a DANGEROUS situation that will result in serious injury or worse. The very last incident the truck has been running a while. We stopped at a location and placed the truck in park. We never shut the motor off. A few minutes later, we put the car in drive and accelerated. Within the first 20 feet the vehicle shut off and came to a stop. Again, the vehicle automatically went into park and the E brake engaged. (2021 Ram 1500; January 20, 2023; NHTSA ID: 11502831).

4-5-22 Came to a full stopped at an intersection, and as I started making a right hand turn , engine just shut off then the beeping started. Stalled in the middle of a turn and oncoming traffic. while panicking and traffic coming i had to ........... Shifted to park started the truck then shifted to drive and the engine revved but not moving. Dash said The E brake had engaged. Shifted to park again pressed the e brake button the back to drive at which point people were swerving to avoid hitting me. I was almost in a sever accident due to this. I have a scheduled an appointment with a dealer on 4-12-2022. There was no indication of anything wrong with the truck......nothing...... it just shut off. This is a very serious issue that Chrysler needs to acknowledge. Someone is going to seriously be injured by this. I looked online to see if there was a recall for it, there was nothing but I did see plenty of other people that this has happened to so it is not just a one and done people. Chrysler has a serious issue they need to address. (2021 Ram 1500; April 5, 2022; NHTSA ID: 11459709).

The truck shut off while driving. Driving and taking turns between 5-15mph Truck just shuts down and engages the parking brake. I almost got hit 2 times. The truck is brand new with 4,000 mikes on it. The first time it happened I had 2,000 miles on it. After reading online this is a big problem and someone is going to be killed. This need ti be addressed. (2021 Ram 1500; February 16, 2022; NHTSA ID: 11452322).

Unknown Failure causing issue. Vehicle's Engine Shutoff while traveling down the road with no warning messages. Then message

says to apply breaks and push "start", but it was in the "Run" and still coasting in Drive on the road. After it slowed to about 5-10 mph, the emergency break system engaged and the vehicle went to "Park" causing the vehicle to throw me forward in the seat and objects were thrown as if I had collided with something. My wrist was injured by this, but lucky I had no passengers or my dog with me. The local dealership is looking into it, but say there is nothing wrong. Upon doing some research, I see multiple people have stated this has happened to them as well. This is a significant risk to health and safety of vehicle occupants and other vehicles that may be traveling near them when this happens. Depending on speed it occurs, the outcome could result in death. I did attempt to connect my on-board diagnostic/monitoring system and found that the manufacturer has it block so I cannot see any possible codes or sensor readings of the vehicle. Then they say nothing is wrong when you take it to them to scan. That is also unacceptable. (2021 Ram 1500; December 27, 2021; NHTSA ID: 11445062).

On Monday 11/29 around 5:30pm I was on the San Mateo Bridge (92) going eastbound with my children when the truck came too an abrupt stop and shut off! I was going about 65mph as it was the mid time for rush hour. Fortunately no one hit us from behind and I was able to kinda pull over into the emergency lane without going over the bridge and thankful the person behind also pulled over since he seen what happened and wanted to check on us. We did exchange information especially since Ram Customer Care and NHTSH doesn't seem to believe anyone about these problems since there hasn't been any recalls on this safety issue! This isn't the first incident I've had with this truck but so far was the most dangerous especially since my children were in the vehicle Yes I have been in touch with Ram Customer Care and nothing but ok take it back to the dealership uh no I'm done with that. It was already there twice for over a month period each time and they don't know what's going on since there is nothing that comes on the scan. When will something be done? When someone is injured or there's a fatality? (2021 Ram 1500; December 3, 2021; NHTSA ID: 11442601).

TL* THE CONTACT OWNS A 2019 RAM 1500. THE CONTACT STATED THAT THE VEHICLE STALLED MORE THAN TWICE WITHOUT WARNING. BENNY BOYD GONZALES CHRYSLER

DODGE JEEP RAM (3698 US-183, GONZALES, TX 78629, (830) 445-4001) INDICATED THAT THE VEHICLE WOULD NEED TO REMAIN WITH THEM TO BE TEST DRIVEN BECAUSE A DIAGNOSTIC TROUBLE CODE WAS NOT LOCATED. A BUY BACK OFFER WAS STATED BY THE DEALER, BUT WAS NOT A REPAIR SOLUTION. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VIN WAS NOT AVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 130. *DT *TR (2019 Ram 1500; February 26, 2019; NHTSA IDL 11182495).

CROSSING A BUSY INTERSECTION, MY TRUCK STALLED IN THE MIDDLE OF THE INTERSECTION FOR NO APPARENT REASON. WAS EVENTUALLY ABLE TO RESTART IT, BUT STALLED AGAIN AFTER APPROXIMATELY TWO MINUTES. HAS BEEN AT COLE CHRYSLER SINCE 9/5/2019. DEALER SAYS IT MAY BE THE BATTERY ASSOCIATED WITH THE HYBRID SYSTEM. THAT PART HAS NOT BEEN AVAILABLE FOR TWO MONTHS, AND THERE IS NO ESTIMATED TIME IT WILL BE AVAILABLE. AFTER IT IS REPLACED, THERE MAY STILL BE ANOTHER PROBLEM. (2019 Ram 1500; October 31, 2019; NHTSA ID: 11277365).

WHILE DRIVING SLOWING DOWN TO MAKE A LEFT TURN TURN COMPLETELY TURNED OFF. WHILE STILL IN DRIVE WAS ABLE TO GET TO THE SIDE OFF THE ROAD EVERYTHING WAS STILL ON A.C. SHUT OFF BUT POWER WAS STILL ON. (2019 Ram 1500; April 30, 2020; NHTSA ID: 11322899).

THE CHECK ENGINE LIGHT HAS BEEN ON SEVERAL TIMES. I'VE DROPPED MY TRUCK OFF AT CROWN DODGE OF FAYETTEVILLE AND WAS TOLD ON TWO SEPARATE OCCASIONS THAT'S EVERYTHING WAS TAKEN CARE OF. TODAY 1 NOVEMBER 2020, I'VE PURCHASED A BRAND NEW $200 DURALAST PLATINUM BATTERY AND IT'S STILL BEING DRAINED BY SOME UNKNOWN ISSUE. I RECEIVED SOME HELP OUTSIDE OF THE DEALERSHIP AND RECEIVED THE ERROR CODE P1DR3. I TOLD TOLD THAT WAS A DEALERSHIP CODE AND I WOULD HAVE TO RETURN THE VEHICLE TO GET IT RESOLVED. THIS WILL BE THE THIRD

TIME IN A MONTHS TIME I WOULD HAVE TO BE WITHOUT MY VEHICLE. THE FIRST TIME THIS IS HAPPENED I WAS DRIVING 40-45 MPH AND THE TRUCK COMPLETELY SHUT OFF! (2019 Ram 1500; November 1, 2020; NHTSA ID: 11372548).

TL* THE CONTACT OWNS A 2020 RAM 1500. THE CONTACT STATED THAT WHILE DRIVING, SHE SAW INDICATOR LIGHTS ON THE INSTRUMENT PANEL WHICH STATED THAT THE AUTO STOP AND START TORQUE SYSTEMS WERE UNAVAILABLE. THE ENGINE AND BATTERY WARNING LIGHTS WERE ILLUMINATED. THE ELECTRICAL SYSTEM FAILED AND TRUCK SHUT-OFF. THE CONTACT PULLED THE VEHICLE OVER TO THE SIDE OF THE ROADWAY. THE CONTACT HAD THE VEHICLE TOWED TO STONE'S CHRYSLER DODGE JEEP RAM (615 S YELLOWSTONE HWY, REXBURG, ID 83440 208-497-5121). THE CONTACT WAS INFORMED THAT THE PART OF THE MOTOR GENERATOR UNIT TO FIX THE VEHICLE WAS ON BACKORDER AND THERE WAS NO ETA ON WHEN THE VEHICLE WOULD BE REPAIRED. THE MANUFACTURER WAS REVIEWING THE CASE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 850. (2020 Ram 1500; August 10, 2020; NHTSA ID: 11348433).

Vehicle engine shuts off unexpectedly while in operation. Can happen in any condition: idling, accelerating, cruising or coasting. If at a slow speed (less than 5mph) vehicle activates emergency breaking then shifts itself into park. Can happen WITH or WITHOUT "Auto Start/Stop" being activated (fuel saver). When emergency breaking enacted, I've almost been rear-ended by trailing car. This issue has been reported on driver forums. (2020 Ram 1500; July 11, 2021; NHTSA ID: 11424311).

On September 14, 2021 I was leaving work, started truck and backed out of parking spot. I had drove off and upon making a left turn the truck went into a stall, screen flashed "place vehicle in park before starting" and then immediately came back on, I did not come to full stop or have to hit the "start" button. I continued driving and the issue has not happened since. The vehicle had over 1/2 tank of gas (89), temperature was in the 90's (Florida) and has no engine modifications. This was concerning for a new vehicle so I looked further into this

and discovered that has been happening quite a bit with this particular version of this truck (eTorque). If the vehicle had fully stalled while pulling into traffic, it could be very dangerous. The most troubling aspect is that no engine code or warning light came on regarding the issue. I'm not sure how a late model vehicle with this amount of technology can almost stall and leave no details of what caused the problem and alert the driver. (2020 Ram 1500; October 4, 2021; NHTSA ID: 11435403).

Operating the vehicle at 35mph on a standard city street in Tucson, Az - River Rd. The vehicle flashes a system failure warning and then shuts off all power to the truck. This results in the transmission being thrown back into park and the driver having zero control over the vehicle. There are multiple online reports of this being fairly common on 2020/2021 Dodge Rams. The vehicle is being returned to the dealer, even if it is a minor issue it is a huge safety issue. I had zero control over the vehicle once the warning flashed. The abrupt loss of power and being thrown into a skid with no control is terrifying. Luckily there was no traffic. It is being returned and according to the dealership it will be investigated. Prior to that brief safety warning the truck had operated perfectly fine with no issues all day long with over 200miles logged for the day. (2020 Ram 1500; October 18, 2021; NHTSA ID: 11437114).

The contact owns a 2020 Ram 1500. The contact stated while moving from a complete stop, the vehicle stalled. The contact stated no warning light was illuminated. The vehicle was taken to a local dealer where it was diagnosed with needing the battery replaced. The battery was replaced however, the failure recurred. The manufacturer was informed of the failure but offered no assistance. The failure mileage was approximately 57,000. (2020 Ram 1500; November 4, 2021; NHTSA ID: 11439370).

At a speed of 45mph, my truck completely shut down. No power on anything. I was able to pull off the road and come to a stop; power brakes and steering were not operable. Once stopped, the truck would not start. "Push to Start" indicator on dash did come on, but the brake pedal was stiff and the push to start button did nothing. Got out of the truck, exterior door lock button was inoperable and both key fobs did nothing. Had to have the vehicle towed. (2020 Ram 1500; February 14, 2022; NHTSA ID; 11451981).

My truck randomly stalls. Sometimes from a stopping position, sometimes at slow speeds. I have taken it to the dealership and they keep saying they can not replicate the problem and they know nothing about this issue despite the fact if you google it, you will see forums full of people having the same issues and the dealerships giving them the same runaround. Today, I almost got broadsided because it completely died when I was pulling out. The other truck had to lock up their brakes and swerve to avoid hitting me in the drivers side which would have caused a major injury to myself. This truck is not safe to drive, yet the dealership keeps telling me I nothing they can do and I am forced to continue to drive it. I know several people have reported this to your agency also, yet their still is no recall. (2020 Ram 1500; February 15, 2022; NHTSA ID: 11452006).

The contact owns a 2020 Ram 1500. The contact stated while driving approximately 25 MPH, the transmission erroneously shifted to the park(P) causing the vehicle to abruptly stop and independently turn off in the middle of the road. After restarting the vehicle, the vehicle operated normal; however, later the failure recurred with the check engine warning light illuminated. The contact stated that the check engine warning light remained illuminated. The cause of the failure was not yet determined. The local dealer was contacted and a service appointment was scheduled. The manufacturer was not yet contacted. The failure mileage was 47,767. (2020 Ram 1500; July 6, 2022; NHTSA ID: 11472557).

I PURCHASED MY 2021 RAM 1500 LIMITED NIGHT EDITION ON MARCH 11, 2021. IT WAS NEW. WITHIN 3 WEEKS AND LESS THAN 1,000 MILES OF DRIVING THE VEHICLE STALLED TWICE WHILE IN THE MIDDLE OF AN INTERSECTION. THE FUEL TANK WAS FULL AND THE ENGINE WAS WARM EACH TIME. THE FIRST TIME AROUND MARCH 17 I WAS ALONE IN THE CAR. I STOPPED AT A STOP SIGN AND THEN DEPRESSED THE GAS PEDAL AND AS I TURNED TO THE RIGHT THE CAR STALLED. NO ERROR MESSAGE CAME UP. I STOPPED THE CAR. TURNED THE GEAR SHIFT KNOB TO P AND PRESSED THE START/STOP BUTTON TWICE AND THE TRUCK STARTED BACK UP. 10 DAYS LATER WITH MY FAMILY IN THE CAR THE SAME THING HAPPENED. I WAS AT A STOP SIGN, THEN PRESSED

-47-

ON THE GAS AND MADE A LEFT TURN THIS TIME AND THE CAR STALLED. AGAIN, FORTUNATELY NO ONE WAS COMING BECAUSE MY FAMILY AND I COULD HAVE BEEN SERIOUSLY INJURED OR KILLED BECAUSE WE WERE IN THE MIDDLE OF THE ROAD AND SOMEONE COULD HAVE T-BONED US. THE CAR HAS BEEN WITH THE DEALER FOR A WEEK AND THEY TELL ME THEY HAVE NOT BEEN ABLE TO DISCOVER ANYTHING. THERE WERE NO ERROR MESSAGES AND THEY HAVE NOT REPRODUCED THE PROBLEM. I AM WRITING TO PUT THIS ON THE RECORD IN CASE ANYTHING HAPPENS TO US. (2021 Ram 1500; April 5, 2021; NHTSA ID: 11406417).

TL* THE CONTACT OWNS A 2021 RAM 1500. THE CONTACT STATED THAT WHILE DRIVING AT AN UNDISCLOSED SPEED, THE VEHICLE STALLED AND SHIFTED TO PARK INADVERTENTLY. THE CONTACT RESTARTED THE VEHICLE HOWEVER, THE VEHICLE WOULD NOT MOVE BECAUSE THE AUTOMATIC EMERGENCY BRAKING HAD ENGAGED INADVERTENTLY. THE VEHICLE WAS NOT DIAGNOSED NOR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND INFORMED THE CONTACT TO TAKE THE VEHICLE TO AN AUTHORIZED DEALER FOR ASSISTANCE. THE FAILURE MILEAGE WAS 2,850. Consumer stated battery was replaced. (2021 Ram 1500; April 19, 2021; NHTSA ID: 11412814).

DRIVING AT 35 MPH THE ENGINE JUST DIED AND THE TRUCK ENGAGE THE AUTO SHIFT PARKING CREATING A DANGEROUS CONDITION. SECOND TIME IN ABOUT 3 DAYS. THIS IS DRIVING ME NUTS. (2021 Ram 1500; April 22, 2021; NHTSA ID: 11413419).

TRUCK HAS STALLED TWICE PULLING INTO TRAFFIC. BOTH TIMES I HAVE BEEN TAKING A RIGHT TURN.SPEED WHEN IT HAPPENS AROUND 10 MPH. IT TELLS ME TO PUT MY CAR IN PARK AND TOUN ON THE ENGINE, THIS IS GOING TO GET SOMEONE KILLED. I HAVE BEEN LOOKING ONLINE AND OTHER PEOPLE ARE HAVING THESE ISSUES. (2021 Ram 1500; May 9, 2021; NHTSA ID: 11415725).

-48-

DRIVING VEHICLE ABOUT 2 MPH, TAKING A RIGHT TURN - VEHICLE STALLED OUT AND EMERGENCY BRAKE LIGHT CAME ON. WAS ABLE TO RESTART PTS IGNITION WITHOUT ISSUE, THEN DRIVE AGAIN. TRUCK HAS 600+ MILES CURRENT. FOUND OTHER RAM OWNERS ON 5THGENRAMS.COM FORUMS STATING THEY ARE EXPERIENCING SAME ISSUE, SO I AM CONCERNED. THIS HAPPENED ONCE, BUT OTHERS ARE SAYING IT HAS HAPPENED MULTIPLE TIMES TO THEM. (2021 Ram 1500; May 13, 2021; NHTSA ID: 11416441).

WAS DRIVING DOWN THE ROAD WHEN THE TRUCK STALLED AND PROMPTED ME TO PUT IT INTO PARK TO START. IT THEN AUTOMATICALLY WENT TO PARK WITHOUT ME DOING ANYTHING AND APPLIED THE PARKING BRAKE ON ITS OWN. (2021 Ram 1500; May 14, 2021; NHTSA ID: 11416647).

Backed out of garage, rolled down driveway and turned left onto my street. Drove about a tenth of a mile to the stop sign, pretty easy with light gas since truck was still warming up. Rolled slowly (2-3) mph to make a right turn lightly feathering the gas and 3/4 through the turn pressed a little more on the gas and truck died. Just before it came to a stop, the parking brake engaged and a message on screen said to place vehicle in park. Engine started back up after I came to a stop and put it in park. No codes or other messages displayed. If I was pulling on to a busy street there would have been a very high chance that I would have been hit. 2021 Ram 1500 hemi etorque with 800 miles on it. (2021 Ram 1500; May 18, 2021; NHTSA ID: 11417697).

Making a right hand turn into school parking lot at 7:11 am this morning the engine died, steering went stiff and emergence parking break set. Almost caused a very serious accident with injury's to multiple minors. Was moving 11 MPH with my foot on the brake into the right turn, when I let off the brake the engine died. The cluster screen told me to place the vehicle into park and release the emergency brake. (2021 Ram 1500; May 24, 2021; NHTSA ID: 11418271).

I was turning right, going less than 5 MPH when the truck stopped abruptly in the middle of the lane. A message came on the dash telling

me to switch the shifter to park. The emergency brake was engaged automatically. I had only applied minimal accelerator and didn't have my foot on the brake. After a few seconds, I was able to disengage the parking brake and continue on my way. This was very dangerous as there were people behind me that may not have noticed my abrupt stop after turning. This puts the safety of myself and my children at risk. (2021 Ram 1500; May 27, 2021; NHTSA ID: 11418807).

I started the truck and drove about a 1/4 mile in my neighborhood. I never got over 20 mph. I approached a red stop light to turn right. I stopped at the light to check for traffic. I then proceeded to turn right and 1/2 way through the turn the truck shut off without warning and it automatically applied the emergency brake. Luckily there were no cars coming in the right hand lane else we could have been hit. I am taking it to the dealership tomorrow for inspection. The info screen notified me that the emergency brake had been applied and that the transmission had been autoset to park. It said to apply the brake to start the truck (it has push button start). I did so and the truck started. I disengaged the emergency brake and the truck then drove normally the rest of the trip. (2021 Ram 1500; June 13, 2021; NHTSA ID: 11420786).

While performing left hand turn, braked to make turn, truck slowed down and engine cut off and display indicated put in park, emergency brake engaged. Had to come to complete stop and put in park to start back up. Had to manually disengage parking brake. (2021 Ram 1500; September 30, 2021; NHTSA ID: 11435012).

I was turning right at 2-3 mph when the engine shut off, vehicle shifted to park, and electronic parking brake applied itself. I had to shift to Park and release the electronic parking brake to restart it. The truck had been parked for approximately 8 hours following a 26 mile drive. Outside air temperature was around 70 deg F. Truck has been in my possession for 8 days and has about 1100 miles on it. It is an eTorque engine. Fuel level was about 3/4 tank. The truck had been running for about 5 minutes and traveled about 1/4 mile. The truck is completely stock. (2021 Ram 1500; October 5, 2021; NHTSA ID: 11435642).

-50-

Vehicle stalled after stop at intersection. Engine shut off and auto shifted to park and applied the parking brake. (2021 Ram 1500; October 5, 2021; 11435556).

While traveling at approximately 15 mph I slowed to make a right hand turn. Truck was moving slowly enough, maybe 5-8 mph through the turn that I did not apply the accelerator, nor did I have any brake pressure applied to complete the turn. Before I could straighten the truck out of the turn, it stalled. Center screen stated to place vehicle in park before starting. The emergency brake applied itself and I had to place vehicle in park, release e-brake, and restart the vehicle. This has happened about 5 times now in the last 2 weeks, dealer says no recalls at this time, no problems can be found. I fear I am driving a very unsafe vehicle that is less than 6mo old and has 5800 miles on it. (2021 Ram 1500; October 7, 2021; NHTSA ID: 11435863).

While slowing down to make a right turn and then trying to accelerate the vehicle stalled, turned itself off, put itself in park and applied the parking brake. This has happened twice now. The first time at approximately 4,000 miles and the second time just over 6,000 miles. This has been reported to the dealer, they flashed the PCM, but that obviously dod not correct the issue. (2021 Ram 1500; October 11, 2021; NHTSA ID: 11436251).

The contact owns a 2021 Ram 1500. The contact stated while driving approximately 5 MPH, the engine suddenly shut off and the message "Put in Park" was displayed on the dashboard. The vehicle continued to roll away before automatically switching to the park position causing the vehicle to abruptly stop. The cause of the failure was not yet determined. The manufacturer and local dealer were not notified of the failure. The failure mileage was 6,113. (November 3, 2021; 11439180).

While driving about 5mph approaching an intersection my ram shut off without warning, said "apply brake to start vehicle" and as I rolled through the intersection with zero control at about 2mph it set its parking brake by itself. I had to move my shifter to park, apply the brake, restart the truck, and turn off the parking brake IN THE MIDDLE OF AN INTERSECTION. Thank God it was a small subdivision intersection at night so there was no traffic or myself or someone else could have been hurt or killed. No dash warning lights,

no remaining lights, no codes thrown, no issue after restarting, no reproducible codes found by the dealer. Only 1,000 miles on the truck. I'm terrified of this happening again, but haven't been able to replicate it myself or the dealer. It's not safe and I don't want to die as a result of this. It seems to be a major problem with the e-torque trucks based on forums. (2021 Ram 1500; November 4, 2021; 11439437).

My new truck has less than 500 miles on it, and it was just purchased new last month. This incident has happened to me twice so far on the mornings of 10/31/2021 and 11/7/2021. Making a slow left hand turn, the vehicle turned off and and stopped in the middle of the intersection. The vehicle emergency brake also automatically was set when it stalled. The message on the dash said something like to restart, put foot on brake and push start button. This incident was very dangerous and could have resulted in an accident. I am lucky I was not hit in the intersection. In both cases, this occurred about a mile from my home and my initial trip of the day. Temperature outside was normal about 60 degrees. I have scheduled an appointment with the dealer for 11/9/2021. (2021 Ram 1500; November 8, 2021; NHTSA ID: 11439799).

This following has now happened twice, first time 9/7/21- second time 11/12/21. While slowing from approximately 35-40 MPH to make a right hand turn the vehicle shuts off - auto braking engages - must restart the vehicle. As stated, this has now happened twice (truck has 10K miles) - vehicle shutting off in traffic and applying auto braking is highly dangerous and placing myself and my passengers at risk. (2021 Ram 1500; November 13, 2021; 11440322).

While rolling to a stop and turning (3) times and once while slowing for speed bumps my 2022 Dodge Rebel 5.7L V8 Hemi with E-Torque shut off, the emergency brake applied itself and it shifted itself to park. This happened while turning onto a busy street where a bad accident could have happened because of it. There were no warning or indicators prior to the truck shutting off by itself. It has been to the dealership twice with no fix. I have had it for three weeks. (2022 Ram 1500; December 7, 2021; NHTSA ID: 11442977).

I was pulling our from a stop sign to make a left turn when all of a sudden the engine shut down, emergency brake engaged and all

-52-

engine power was lost. I would have been struck by cross traffic had there been any as I did not have the ability to maneuver the vehicle. The vehicle was able to be restarted and disengage the emergency brake but the engine light remains on. (2022 Ram 1500; January 4, 2022; NHTSA ID: 11446163).

After making a left turn into a lot at a low speed, the engine shut off and e brake applied itself. I was able to restart the vehicle and disengage the e brake. Check engine light was kit, as well as the battery light. Check engine light still on. (2022 Ram 1500; January 13, 2022; NHTSA ID: 11447285).

The truck has 647 miles on it and is brand new, I just bought it from the dealer. The truck had been idling in my driveway for a few minutes before I left home, I was in my neighborhood, driving 25-30 MPH maximum. I came to a stop sign, stopped and then proceeded to turn left, which takes me down a hill. Approximately 1-2 seconds into the turn, the engine shut off completely, several lights went on the dash and the truck was proceeding downhill until at some point the brakes locked up, pushing me forward into the steering wheel. If anyone was infront of me I did not have control of the truck! The truck brakes were locked and I had to mess around starting it to get them to unlock, the battery indicator was lit and the check engine light was on. I was able to get to the truck restarted and took it to a pool parking lot area and shut it off completely. I was able to get it started again, this time the battery indicator went out and the check engine light stayed on. I have been reading online and see that many,, many people with the RAM 1500, most notably the etorque engine version are having the engine shut off with no warning, some at much higher speeds. I took it to the dealer, the "flashed" the computer, but also said the are ordering and replacing the computer which sits atop the etorque engine device. This is VERY concerning, especially because I see this has happened to others, and has been doing so for several years. I wanted to report this as to me, it seems like a Serious Safety Concern! (2022 Ram 1500; February 19, 2022; NHTSA ID: 11453016).

Truck shut off when i was driving it. Left me stuck in the road blocking both lanes of traffic. Emergency brake self applied. Had a hard time re starting, battery light and check engine light came on. (2022 Ram 1500; March 3, 2022; NHTSA ID: 11455109).

-53-

Truck stalled 4 times in 2 months going less than 5 mph. When driving slow around a turn or at a stop sign, the truck stalls when I give it gas. The emergency brake is automatically engaged and I have to disengage it before I can start the truck. The check engine light and battery light came on. I took it to the dealership (Jerry Ulm) and they could not recreate the problem or see the error codes so they gave the truck back to me. It's happened 4 times since then. Please help, I have two small children. (2022 Ram 1500; June 17, 2022; NHTSA ID: 11469813).

Vehicle stalls randomly while driving and automatically applies the emergency brake. Stalling randomly and applying the emergency brake in the street/highway with traffic is dangerous and unsafe. This is our primary vehicle and the dealership has been unable to recreate the stalling. The vehicle has been to the dealership twice for the stalling but the problem is still unresolved. The stalling started randomly in March-April 2022. The dealership was notified and vehicle taken in for multiple services. Problem still not solved. (2022 Ram 1500; July 1, 2022; NHTSA ID; 11471989).

While pulling onto a busy roadway the engine of my 2022 Ram 1500 with e-torque shut off and the emergency brake applied itself at about 10mph. This was accompanied by a check engine light and low battery voltage light. After the sudden stop I was almost rear ended by another truck on the road behind me. Seems to be a known issue with these trucks. (2022 Ram 1500; August 14, 2022; NHTSA ID: 11479260).

The contact owns a 2022 Ram 1500. The contact stated that immediately after leaving a stop light and making a left turn into a blind corner, the vehicle suddenly lost motive power and activated the braking system causing the vehicle to abruptly stop in an intersection. During the failure an approaching vehicle had to swerve to avoid a collision with the vehicle. The cause of the failure was not determined. The manufacturer and local dealer were notified of the failure. The VIN was not available. The failure mileage was 1,100. (2022 Ram 1500; August 23, 2022; NHTSA ID: 11480685).

2022 Ram 1500 Vehicle with approximately 9000 miles, has stalled now twice while driving at speeds of 25 to 35 miles per hour and soon after shifts into park, and then will not start. One was on a busy street

that caused risk of near accident, another was in neighborhood. Vehicle was towed after first stall, but dealership only saw stall on computer but did not have any codes or repairs identified. Vehicle also would not start on more than one occasion. Dealership cannot get in to service for 3 to 4 weeks. (2022 Ram 1500; October 19, 2022; NHTSA ID: 11489914).

VEHICLE SHUT OFF WHILE DRIVING WITH NO WARNING. WOULD NOT RESTART. MANY WARNING LIGHTS. WAS TRAVELING IN THE PASSING LANE MOVING AT ABOUT 70MPH WHEN VEHICLE TURNED OFF. ALL EXTERIOR LIGHTING WENT OUT AT NIGHT. AND I HAD TO COAST AND WAIT FOR A TOW ON THE SIDE OF THE ROAD. (2019 Jeep Wrangler; NHTSA ID: 11289075; December 14, 2019).

THREE WEEKS AFTER I BOUGHT THIS BRAND NEW JEEP, THE CHECK ENGINE LIGHT CAME ON. THE ETC AND BATTERY WARNING LIGHTS CAME ON TOO. THE ENGINE WAS OFF TWICE ON THE ROAD. THE POWER STEERING LOST POWER SEVERAL TIMES. (2019 Jeep Wrangler; NHTSA ID: 11292410; January 1, 2020).

2019 Jeep Wrangler Sahara Unlimited---while driving the vehicle on a city street, without any warning, all of the dash lights and any/all warnings lights started to flash. Within 200 feet of this occurring, the vehicle lost power, including ability to control the steering, and the car came to an immediate stop. During this shut down instance, I was able to vigorously hold the steering wheel to guide the car to the side of the road, avoiding the traffic that came. After the car shut down, the dash lights and windshield wipers were still going off. It still had electrical power. It would not start back up. I had to have it towed to the dealership. It is currently being looked at by the local dealership. 05-29-22. (2019 Jeep Wrangler; NHTSA ID: 11466575; May 29, 2022).

The contact owns a 2020 Jeep Wrangler. The contact stated that while driving at an undetermined speed, the vehicle stalled. While using the Stop/Start feature, the vehicle stalled while in drive. The vehicle was restarted. The contact stated that several unknown warning lights were illuminated. The vehicle was taken to the local dealer, who informed her that the battery would have potentially exploded if she had

-55-

continued to drive the vehicle. The mechanic noticed that the battery was smoking. The vehicle was diagnosed and the contact was informed that the batteries needed to be replaced. The vehicle was not repaired. The manufacturer was notified about the failure but no additional assistance was provided. The failure mileage was approximately 45,000. (2020 Jeep Wrangler; NHTSA ID: 11487949; October 5, 2022).

VEHICLE INTERMITTENTLY DOES NOT TURN BACK ON AFTER ENGINE SHUTS OFF DURING NORMAL ELECTRONIC START SYSTEM OPERATION. ENGINE SHUTS OFF WHEN NEARLY AND AT A STOP. WHEN RELEASING THE BRAKE PEDAL, THE ENGINE DOES NOT TURN BACK ON. THERE HAVE BEEN THREE OCCURRENCES AS FOLLOWS: OCCURRENCE 1 6/27/2020: EXITING THE THRUWAY AND NEARLY AT A COMPLETE STOP AT A LIGHT AT EXIT WHEN THE ENGINE SHUT OFF DUE TO ESS SYSTEM. UPON RELEASING THE BRAKE TO BEGIN DRIVING, THE ENGINE FAILED TO TURN ON. OPERATOR WAS PUSHING GAS PEDAL TO GO, THE ENGINE REMAINED OFF. REMEDY WAS TO TAP THE BRAKE AGAIN IN WHICH THE ENGINE TURNED ON AND WAS ABLE TO MOVE. OCCURRENCE 2 7/13/2020: CAME TO A STOP IN TRAFFIC ON A STREET. ENGINE SHUT OFF DUE TO ESS SYSTEM AS DESIGNED. UPON RELEASING THE BRAKE, THE ENGINE DID NOT RESTART. OPERATOR PUSHING GAS PEDAL MULTIPLE TIMES AND ENGINE STILL DID NOT TURN BACK ON, SITTING 'DEAD' IN THE MIDDLE OF TRAFFIC. ATTEMPTING TO PUSH THE PUSH START BUTTON DID NOT TURN VEHICLE BACK ON. REMEDY AGAIN WAS TO PUSH BRAKE PEDAL AGAIN AND ENGINE TURNED ON. OCCURRENCE 3 AUGUST 2,2020: OPERATOR IN TRAFFIC, CAME TO A COMPLETE STOP. RELEASED BRAKE PEDAL TO BEGIN MOVING. ENGINE DID NOT TURN BACK ON, AND SHIFTER 'D' SYMBOL BEGAN FLASHING. TAPPING BRAKE PEDAL WOULD NOT RESTART VEHICLE. DASHBOARD STATED 'SHIFT TO P TO PARK', TO PLACE VEHICLE IN PARK POSITION. PLACED VEHICLE INTO PARK, HAD TO RESTART ENGINE BY PUSHING START BUTTON. ENGINE TURNED ON AND WAS ABLE TO MOVE. I HAVE A VIDEO SHOWING THE THIRD OCCURRENCE, HOWEVER

-56-

THIS SUBMISSION ONLY ALLOWS PICTURE FORMAT SO TOOK SNAPSHOTS OF CODE. SENT VIDEO TO FCA, HAVE MULTIPLE RECORDED VISITS TO DEALER TO FIND ISSUE, NO ROOT CAUSE DETERMINED AT THIS POINT. REQUESTED REFUND/REPLACEMENT. (2020 Jeep Wrangler; NHTSA ID: 11354335; (September 11, 2020).

My vehicle is still at the Jeep dealership service center being repaired, but so far, the reported issue includes a "shorted" fuse block. As I was driving the vehicle, I was approaching a red light when my vehicle abruptly halted. The cars behind & near me were forced to go around to avoid hitting my vehicle. The dashboard initially flashed the message "safety mode" or something similar, the check engine light came on, the brakes locked, & the power steering & windows ceased to function. While I waited for the police, I tried to restart the vehicle many times, in hopes of getting it into neutral and/or getting it off of the roadway - nothing worked. The vehicle then began to flash the message "Service Electronic Stability Control." The DOTD serviceman & the tow truck driver were unable to get the vehicle into neutral manually, so it had to be dragged using chains. Once the vehicle was towed to the Jeep dealership (Covington, LA), I was first told that the battery had a voltage of 0. After replacing the battery, I was told that the fuse block was shorted. The representative explained the fuse block's purpose, & further explained that because mine shorted, the battery was unable to communicate with the rest of the vehicle, like the alternator & the PCM, on how much voltage was coming out of the system - i.e., since my computer shorted, the vehicle did not know that the battery was dead. Thus, when the battery killed abruptly while driving, the vehicle basically panicked & went into "safe mode" (limp mode) & locked up the entire machine. I asked repeatedly how this happens and how it can be avoided in the future, and while dancing around many indirect answers, the rep stated that my fuse block in this instance basically caused a complete electronic failure of the vehicle. I am an attorney & I have spoken with experts who suggest that this issue should be investigated. It is a serious hazard & a defect for one glitched part to kill the entire machine while driving. (2020 Jeep Wrangler; NHTSA ID: 11482306; August 31, 2022).

I was driving vehicle on HWY 610 in Houston, Texas at approximately 55-60 MPH. Suddenly, vehicle simply stopped working in the middle of driving. Everything on my dash was reading zero. Car were swearing to avoid hitting me. I also had a baby in the backseat of my vehicle. Suddenly, the dash started to read place car in park, Service Charging System. The P at my gear shift was flashing rapidly. I was able to slowly and dangerously coast to the emergency lane. Where I was able to turn the vehicle off. This is a very dangerous situation. At this point, Jeep has no idea what the problem is an this is very frustrating. (2021 Jeep Wrangler; NHTSA ID: 11427635; August 3, 2021).

The vehicle gave a Service Hybrid Electric System error and disabled the engine at approximately 60 mph when traveling in E-Save mode, with <1% battery, and half a tank of gasoline. After navigating the vehicle to the side of the road, it came to a hard stop at about 5-8 mph. After 10 minutes, the vehicle restarted in Hybrid mode as was able to operate without error until reaching our destination. Weather conditions were clear at 85 degrees. Issues occurred on a two-lane byway. No injuries, other damage, or police reports at this time. The vehicle will be delivered for service for recreation and diagnosis of the issue. Issue occurred with approximately 246 miles, direct from the dealership upon delivery. The vehicle has no aftermarket accessories. (2021 Jeep Wrangler; NHTSA ID: 11424263; July 11, 2021).

The car flashed a red icon and displayed a message saying power was lost and telling us to pull over safely and put the car on park. We were in the middle lane on the New Jersey Turnpike and people were driving around us at 80mph, and the car would not accelerate. We were able to pull over and restart the car and it worked as if nothing happened. I got an email on the UConnect system saying there was a charging issue, and then a second email saying I should get the car serviced. I took it to the dealership this morning and am waiting on a diagnosis. (2021 Keep Wrangler; NHTSA ID: 11428380; August 13, 2021).

Vehicle shut down in middle of road. All lights on dash came on and vehicle became disabled. It repeated it self two more times that week and i finally had it towed to dealer. (2021 Jeep Wrangler; NHTSA ID: 11429535; August 18, 2021).

Driving 25 to 30mph, car completely died and the D on the gear shift started blinking. Unable to get to side of road due to traffic. My husband and I were at risk of being rear ended as the car died without any warning. There was also a large CLUNK sound when it died. (2022 Jeep Wrangler; NHTSA ID: 11465657; May 22, 2022).

The car has twice come to almost a complete stop while driving as if it lost power with a close to full charge and plenty of gas. Car goes into a blinking D mode and has to be put in park and restarted. Happen in daily traffic very dangerous! (2022 Jeep Wrangler; NHTSA ID: 11482528; September 2, 2022).

While driving my vehicle shut off and steering wheel locked up making the vehicle inoperable. Thankfully I was close to home on a side street. I restarted the vehicle and a "please service charging system error" displayed along with a red turtle error light. The vehicle would not travel more than 5mph. I had to park it and have my husband come look at it. It's scary to think this could have easily happened on a busy highway. Being a hybrid vehicle it was fully charged from the night before. (2022 Jeep Wrangler; NHTSA ID: 11494991; November 26, 2022).

203.   The above complaints are a sample of complaints posted on NHTSA's website and believed to be reflected in FCA's internal documents.

204.   FCA also knew about the eTorque Defect from its warranty data. Per the TREAD Act, FCA tracks vehicle diagnoses and repairs from dealership technicians in a single, aggregated database.[3] FCA employs persons who monitor the database for repair trends, and engineering and management staff review such trends in regular meetings. For every one complaint filed with NHTSA, FCA likely

---

[3]https://www.autosafety.org/wp-content/uploads/import/TREAD%20Fact%20Sheet%2011.24.14.pdf (attached as Exhibit G).

receives hundreds or thousands of related warranty claims.[4] Accordingly, FCA has likely received thousands of the eTorque Defect warranty claims, starting in late 2018 or early 2019. FCA admitted it started receiving warranty claims and customer complaints in at least 2020. Ex A.

205.   Despite FCA's knowledge of the serious safety risks the eTorque Defect causes in the Class Vehicles, it has not disclosed the eTorque Defect or provided an adequate repair to all Class Vehicles.

**D.     FCA Touted the Class Vehicles as Safe and Reliable Vehicles While Omitting the eTorque Defect.**

206.   FCA knowingly marketed and sold/leased the Class Vehicles with the eTorque Defect, while willfully omitting and concealing the true inferior quality and substandard performance of the Class Vehicles.

207.   FCA directly markets, for its benefit, the Class Vehicles to consumers via extensive nationwide multimedia advertising campaigns on television, the internet, billboards, print, mailings, social media, and other mass media, which

---

[4]   *See, e.g.*, https://www.reuters.com/article/autos-ford-defect/u-s-nhtsa-probes-725000-ford-vehicles-for-engine-flaw-idUSL1N0BP51Y20130225 (123 NHTSA complaints, 27,505 warranty claims) (attached as Exhibit H); https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V406-1555.PDF (3 field reports, 1,061 warranty claims) (attached as Exhibit I); https://static.nhtsa.gov/odi/rcl/2020/RCLRPT-20V475-1719.PDF (six field reports, 1,020 warranty claims) (attached as Exhibit J).

impart a universal and pervasive marketing message: safe and reliable family vehicles.

208.   For example, in the sales brochure for the 2019 Ram 1500, FCA stated the 2019 Ram 1500 makes "no compromise" and touted the dependability and reliability of the eTorque, stating that the "Legend Evolves":





209.    Similarly, in its sales brochure for the 2020 Ram 1500, FCA touts the

truck's ability to generate more power than other trucks, "like taking off from a

dead stop":

**FORMIDABLE V6 POWER—FURTHER BOOSTED BY eTORQUE TECHNOLOGY.**
This is Pentastar™ power: dual, independent cam phasing. High torque over a broad
rpm range—nearly 90 percent of peak torque is available from 1,800 to 6,400 rpm. A
high 10.2:1 compression ratio. Now combine that with a Class-Exclusive V6 eTorque
mild-hybrid powertrain³: a belt starter-generator system and a 48-volt lithium-ion
battery pack to enable stop/start technology, regenerative braking and electronic
power boost.

In every way, it's a winning combination for Ram 1500, giving you more torque when
you most need it—like taking off from a dead stop or pulling a boat out of the water—
and it's why it's standard on select 2020 Ram 1500 models.

210.    In its 2021 Ram 1500 sales brochure, FCA states "there's never been

another Ram truck like this" and touts the "unsurpassed" capabilities of the

eTorque system:



**THE NEW STANDARD-BEARER**
There's never been another Ram truck like this—the new 702-hp 2021 Ram 1500 TRX.
Engineered for sandstorming madness and backed by the legendary Ram reputation
for ruggedness.



211.   The 2020 Ram 1500 sales brochure makes similar statements on the dependability and reliability of the eTorque system:



212.   FCA marketed the Class Vehicles as durable and reliable trucks for years.

213.   Although FCA markets the Class Vehicles as durable and reliable trucks, in the field, the Class Vehicles fail to meet that promise. Instead, FCA omits the true natures of the Class Vehicles and the fact that the Class Vehicles suffer from the eTorque Defect. FCA has never disclosed the eTorque Defect to Plaintiffs or the other Class members.

214.   Plaintiffs and the other Class members were exposed to FCA's pervasive and long term marketing campaign touting the supposed quality and reliability of the Class Vehicles.

215.   Plaintiffs and the other Class members, as any reasonable consumer would, justifiably made their decisions to purchase or lease their Class Vehicles based, in material part, on FCA's misleading marketing, including affirmations of fact, promises, and representation, which also omitted any disclosure of the eTorque Defect.

216.   FCA has actively concealed the eTorque Defect throughout the Class period despite its pervasive knowledge. Specifically, FCA has:

a.      Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the eTorque Defect;

-64-

b.      Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' suffered the eTorque Defect, were defective, and not fit for their intended purposes;

c.      Failed to disclose, and actively concealed, the fact that the Class Vehicles suffered the eTorque Defect and were defective, despite that FCA learned of the eTorque Defect as early as 2019 or before, and certainly well before Plaintiffs and the other Class members purchased or leased their Class Vehicles; and

d.      Failed to disclose, and actively concealed, the existence and pervasiveness of the eTorque Defect even when Class members directly asked about it during communications with FCA, FCA dealerships, and FCA service centers.

217.   FCA also creates or approves much, if not all, of the marketing materials provided by an FCA-authorized dealership to consumers prior to or at the time of purchase. FCA, through its dealers and those marketing materials, could have disclosed the eTorque Defect and the true nature of the Class Vehicles, but it failed to do so. As a result of FCA's omissions of material facts at the point of sale, Plaintiffs and Class members have overpaid for their vehicles.

E.      **FCA's Warranties**

218.    FCA issued a Limited Vehicle Warranty for the Class Vehicles. FCA issued its Limited Vehicle Warranty for the benefit of Plaintiffs and the other Class members, and for the purpose of persuading Plaintiffs and the other Class members to purchase the Class Vehicles.

219.    The Limited Vehicle Warranty states, in part:

The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones.[5]

220.    The Limited Vehicle Warranty lasts for 36 months or 36,000 miles, whichever occurs first.[6]

221.    The Powertrain Limited Warranty covers all parts and labor needed to repair a powertrain component and lasts for up to five years or 60,000 miles, whichever occurs first.

222.    The generator/control unit and the 48-volt battery are covered by the Federal Emission Warranty for 8 years or 80,000 miles, whichever occurs first.

223.    FCA instructs vehicle owners and lessees to take their vehicles to a certified dealership for the warranty repairs. Many owners and lessees have

---

[5]      https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Ram/2019/1500_DT/9706.pdf (attached as Exhibit K).

[6] *Id*.

presented Class Vehicles to FCA-certified dealerships with complaints arising from the eTorque Defect and have been denied free repair.

224.    FCA has evaded its warranty obligations by (1) failing to tell consumers that the Class Vehicles are defective and (2) refusing to perform repairs and/or failing to timely issue adequate repairs to correct the eTorque Defect.

225.    Moreover, FCA's warranty fails of its essential purpose because the company has failed to offer an effective and permanent repair for the eTorque Defect. Rather, FCA simply replaces one defective part with an equally defective part and fails to correct and/or properly diagnose the underlying cause.

226.    FCA has notice of its breaches based on its actual and exclusive knowledge of the defect.

227.    Moreover, FCA's failure to effectively repair the eTorque Defect makes any notice requirement futile.

**F.      Tolling of the Applicable Statues of Limitation**

228.    FCA's knowing and active concealment and denial of the facts alleged herein act to toll any applicable statute(s) of limitations. Plaintiffs and the other Class members could not have reasonably discovered the eTorque Defect within the time period of any applicable statute of limitations.

229.   In addition, even after Plaintiffs and other Class members contacted FCA and/or its authorized dealers seeking repair of the eTorque Defect, FCA and/or its dealers repeatedly and consistently denied a defect and offered no repair.

230.   FCA has had, and continues to have, a duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Class Vehicles, including the facts that the Class Vehicles require costly repairs, pose safety concerns, and have a diminished resale value. As a result of FCA's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

231.   Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), on behalf of the following classes:

### The Nationwide Class

All purchasers or lessees a Class Vehicle.

### The California Class

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of California.

### The Ohio Class

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Ohio.

**The Michigan Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Michigan.

**The Tennessee Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Tennessee.

**The Florida Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Florida.

**The Texas Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Texas.

**The Georgia Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Georgia.

**The Pennsylvania Class**

All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Pennsylvania.

232. Excluded from the Classes are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definition.

233. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-

wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

234. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

235. **Numerosity (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that their individual joinder is impracticable. FCA sold hundreds of thousands of Class Vehicles across the United States. The number and identity of Class members can be obtained through business records regularly maintained by Defendant, its employees and agents, and state agencies. Members of the Class can be notified of the pending action by e-mail and mail, supplemented by published notice, if necessary.

236. **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3))** – There are questions of law and fact common to the Class. These questions predominate over any questions only affecting individual Class members. The common legal and factual issues include, but are not limited to:

      a.    whether Defendant engaged in the conduct alleged herein;

b.     whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.     whether Defendant designed, manufactured, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States knowing about the eTorque Defect;

d.     when Defendant learned of the eTorque Defect;

e.     whether Defendant concealed the eTorque Defect from consumers;

f.     whether FCA failed to disclose or omitted the eTorque Defect;

g.     whether the eTorque Defect is material;

h.     whether the class vehicles are merchantable;

i.     whether FCA honored its warranty;

j.     whether Plaintiff and other Class members have been harmed by the fraud aElleged herein;

k.     whether Plaintiff and the other Class members overpaid for their Class Vehicles;

l.     whether Plaintiff and the other Class members are entitled to damages or other relief; and

-71-

m.     whether Plaintiffs and the other Class members are entitled to equitable relief in the form of rescission of the purchase agreement or other injunctive relief and, if so, in what amount.

237.   **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiffs' claims are typical of the claims of each of the other Class member of. Plaintiffs, like all other Class members, have sustained damages arising from FCA's conduct as alleged herein. Plaintiffs and the other Class members were and are similarly or identically harmed by FCA's unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct.

238.   **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiffs will fairly and adequately represent and protect the interests of the other Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between Plaintiffs' claims and those of the other Class members that would make class certification inappropriate. Counsel for the Class will vigorously assert all Class members' claims.

239.   **Superiority (Federal Rule of Civil Procedure 23(b)(3))** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Class predominate over the questions affecting only individual Class members and a class action is

superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct. Further, it would be virtually impossible for Class members to individually redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

240. **Issues Class:** Alternatively, Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the above-defined classes for some or all the issues identified in the commonality and predominance section, above, as well as other issues which may be later identified.

-73-

241. **Injunctive Relief**: Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of the above-defined classes for injunctive relief as outlined herein.

## CLAIMS

### A. NATIONWIDE CLASS CLAIMS

**FIRST CAUSE OF ACTION**
**Breach of Written Warranty Under the Magnuson-Moss Warranty Act**
**(By All Plaintiffs)**

242. Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

243. Plaintiffs bring this cause of action individually and on behalf of the other members of the Nationwide Class.

244. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

245. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

246. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

247. FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

-74-

248.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

249.   FCA's warranties are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

250.   FCA breached the express warranties by:

a.      Providing a 3 year/36,000 mile New Vehicle Limited Warranty with the purchase or lease of all new Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b.      Selling and leasing Class Vehicles with the Defect, and which thus were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c.      Refusing and/or failing to honor the express warranties by effectively repairing eTorque Defect free of charge and within a reasonable time.

251.   FCA provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, FCA warranted that the Class Vehicles were fit for their ordinary

purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

252.   FCA breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share common design defects in that they are equipped with eTorque systems that cause the vehicle to suddenly stall during normal use and operation. FCA has admitted that the Class Vehicles are defective in issuing certain TSBs, but the suggested fix in the TSBs are woefully insufficient to fully address the Defect.

253.   In its capacity as a warrantor, as FCA had knowledge of the inherent defects in the Class Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

254.   The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from FCA

-76-

255. The limitations on the warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. FCA failed to disclose these defects to Plaintiffs and the other Class members. Thus, FCA's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

256. Plaintiffs and each of the other Class members have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

257. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

258. Furthermore, affording either FCA an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not

-77-

knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

259.   Moreover, FCA received reasonable notice of Plaintiffs' nationwide breach of warranty claims no later than February 9, 2023, when Plaintiffs mailed a notice letter to FCA. *See* Notice Letter, Exhibit L.

260.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

261.   As a direct and proximate cause of FCA's breach of the written warranties, Plaintiff and the other Class members sustained damages and other losses in an amount to be determined at trial. FCA's conduct damaged Plaintiff and the other Class members, who are entitled to recover actual damages,

consequential damages, specific performance, diminution in value, and costs, including statutory attorneys' fees, and/or other relief as deemed appropriate.

262.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

263.   Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Plaintiffs also seek available declaratory relief. Based on FCA's continuing failures to fix the known defects, Plaintiffs seek declarations that:

a.      The Class Vehicles are defective in that their eTorque system causes the vehicles to unexpectedly stall while driving. The eTorque Defect may

not manifest until after the warranty provided by FCA has expired. The eTorque Defect is material and requires disclosure to all Class Members.

b. All Class Members are to be provided the best practicable notice of the Defect, which cost shall be borne by FCA.

c. Because the Class Vehicles have the eTorque Defect, and because FCA knew of this Defect before the time of sale or lease, the FCA warranty is insufficient to remediate the defects know by FCA to exist. Therefore FCA's existing warranty, limited to three years or 36,000 miles, is invalid, and, as such that limitation is unenforceable. FCA shall provide notice to all persons covered by that warranty of the removal of this time limitation.

d. FCA shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the eTorque Defect in the Class Vehicles.

e. FCA shall establish a repair program and protocol to be communicated to Class members, which will require FCA to inspect, upon request, a Class member's vehicle to determine whether the eTorque Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

-80-

264. Plaintiffs also request, as a form of equitable monetary relief, repayment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the eTorque Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the repair process.

265. The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for FCA's conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by FCA, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## SECOND CAUSE OF ACTION
### Fraudulent Concealment
### (By All Plaintiffs)

266. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

267. This claim is brought individually and on behalf of the Nationwide Class for fraudulent concealment.

268. FCA concealed and suppressed material facts concerning the Class Vehicles.

-81-

269. As described above, FCA made material omissions and affirmative misrepresentations regarding the Class Vehicles.

270. FCA knew these representations were false when made.

271. The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles were subject to stalling due to the eTorque Defect.

272. FCA had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to unexpected stalling while driving, because Plaintiffs relied on FCA's representations that the vehicles they were purchasing and retaining were safe and free from defects.

273. The aforementioned concealment was material, because if it had been disclosed Plaintiffs would not have bought, leased, or retained their vehicles.

274. The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. FCA intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

275. Plaintiffs relied on FCA's reputation-along with their failure to disclose the Defect and FCA's affirmative assurances that their vehicles were safe

and reliable and other similar false statements – in purchasing, leasing or retaining the Class Vehicles.

276. However, FCA concealed and suppressed material facts concerning the culture of FCA – a culture that emphasized cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

277. Further, FCA had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to FCA who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff and the Classes. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

**THIRD CAUSE OF ACTION**
**Breach of Express Warranty by Affirmation,**
**Promise, Description, or Sample**
**U.C.C. § 2-313**
**(By All Plaintiffs)**

278. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

279. Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

280.   Plaintiffs assert claims for breach of express warranties by affirmation, promise, description, or sample under U.C.C. § 2-313, which has been adopted by and is materially the same under the laws of each state (except Louisiana), the District of Columbia, and Puerto Rico, or which can be sorted into a small number of groups containing materially identical elements.

281.   FCA is and was at all relevant times a merchant as defined by U.C.C. § 2-104

282.   The Class Vehicles are and were at all relevant times goods as defined by U.C.C. § 2-105.

283.   U.C.C. § 2-313 states that a merchant creates an express warranty by making to the buyer "[a]ny affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain" and "any description of the goods which is made part of the basis of the bargain."

284.   Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA. At all relevant times, FCA was the merchant, manufacturer, marketer, warrantor, and/or seller of the Class Vehicles.

285.   FCA made affirmations of fact including that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses

"unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop." These affirmations of fact became part of the basis of the bargain and thus created an express warranty that the Class Vehicles conformed to FCA's affirmations of fact.

286. The Class Vehicles, however, are not durable, reliable, and dependable; instead, the eTorque Defect in reality causes the vehicles to suddenly stall, shift to "Park," and/or engage the parking brake during normal operation. Thus, FCA breached its express warranty because the Class Vehicles did not conform to FCA's affirmations of fact.

287. FCA was provided notice of these issues through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; and early consumer complaints made directly to FCA, collected by NHTSA ODI, and/or posted on public online vehicle owner forums.

288. Plaintiffs, for themselves and on behalf of the proposed Classes, provided notice to FCA of its breaches, although affording FCA a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because FCA had actual knowledge of and concealed that the Class Vehicles did not conform to its affirmations of fact.

289.   As a direct and proximate result of FCA's breach of the express warranty, Plaintiffs and members of the Nationwide Class suffered monetary damage at the point of sale or lease in an amount measured either by 1) the full purchase or lease price (because they would not have bought at all but-for FCA's material misrepresentations), or 2) the monetary difference between the actual value of the Class Vehicle at the time of purchase and what its value would have been if FCA's representations had been true.

290.   Plaintiffs and members of the National Class are excused from performance of any warranty obligations as a result of FCA's intentional misconduct described herein, and any such obligations are unconscionable and therefore void as a matter of law.

## FOURTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### U.C.C. § 2-314
### (By All Plaintiffs)

291.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

292.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

293.   Plaintiffs assert claims for breach of implied warranty of merchantability under U.C.C. § 2-314, which has been adopted by and is materially the same under the laws of each state, the District of Columbia, and

Puerto Rico or which can be sorted into a small number of groups containing materially identical elements.

294. FCA is and was at all relevant times a merchant as defined by U.C.C. § 2-104

295. The Class Vehicles are and were at all relevant times goods as defined by U.C.C. § 2-105.

296. The U.C.C. states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." U.C.C. § 2-314(1).

297. The U.C.C. states that "goods to be merchantable must … conform to the promises or affirmations of fact made on the container or label if any." U.C.C. § 2-314(2)(f).

298. Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA. At all relevant times, FCA was the merchant, manufacturer, marketer, warrantor, and/or seller of the Class Vehicles.

299. FCA made affirmations of fact including that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like

taking off from a dead stop." These affirmations created an implied warranty that the Class Vehicles conformed to FCA's affirmations of fact. The Class Vehicles, however, are not durable, reliable, or dependable; instead, the eTorque Defect in reality causes the vehicles to suddenly stall, shift to "Park," and/or engage the parking brake during normal operation. Thus, FCA breached its implied warranty because the Class Vehicles did not conform to FCA's affirmations of fact.

300.   FCA cannot disclaim its implied warranty as it knowingly sold Class Vehicles that did not conform to FCA's affirmations of fact.

301.   FCA was provided notice of these issues through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; and early consumer complaints made directly to FCA, collected by NHTSA ODI, and/or posted on public online vehicle owner forums.

302.   Plaintiffs, for themselves and on behalf of the proposed Classes, provided notice to FCA of its breaches, although affording FCA a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because FCA has known of and concealed that the eTorque Defect.

303.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Class members suffered monetary damage at the point of sale or lease in an amount measured either by 1) the full

purchase or lease price (because they would not have bought or leased at all but-for FCA's material misrepresentations), or 2) the monetary difference between the actual value of the Class Vehicle at the time of purchase and what its value would have been if FCA's representations had been true.

304. Plaintiffs and members of the National Class are excused from performance of any warranty obligations as a result of FCA's intentional misconduct described herein, and any such obligations are unconscionable and therefore void as a matter of law.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (By All Plaintiffs)

305. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

306. Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

307. Plaintiffs assert claims under the law of unjust enrichment of the fifty states, the District of Columbia, and Puerto Rico, which are materially the same, or which can be sorted into a small number of groups containing materially identical elements.

308. FCA made affirmative representations to Plaintiffs and Nationwide Class Members that that its Class Vehicles were durable, reliable, and dependable;

-89-

that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

309. FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

310. Plaintiffs and the members of the Nationwide Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the eTorque Defect, contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

311. FCA was unjustly enriched at the expense of and to the detriment of Plaintiffs and Nationwide Class members, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiffs and the Nationwide Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

312. Plaintiffs and members of the Nationwide Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

## B.    STATE CLASS CLAIMS

### 1.    CALIFORNIA

**SIXTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code Sec. 17200, *et seq.***
**(Plaintiffs Brain Fisher and Arianna Rico)**

313. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

314. Plaintiffs Brian Fisher and Arianna Rico bring this claim on behalf of themselves and the California Class.

315. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." FCA engaged in conduct that violated each of this statute's three prongs.

316. FCA committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, et seq., by systematically breaching its warranty obligations and by violating the Song-Beverly Consumer Warranty Act as alleged above and below.

-91-

317.   FCA committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., because the acts and practices described herein, including but not limited to FCA's failure to provide an effective remedy to fix the eTorque Defect, were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members. FCA's acts and practices were additionally unfair because the harm to Plaintiffs and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, FCA's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

318.   FCA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., when it concealed the existence and nature of the eTorque Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were safe and reliable when, in fact, they are not. The eTorque Defect is central to Class Vehicles' functioning because a properly functioning eTorque system is necessary to maintain the vehicle's engine functionality. FCA's representations and active concealment of the Defect are likely to mislead the public with regard to the true defective nature of the Class Vehicles.

319. FCA's unfair or deceptive acts or practices occurred repeatedly in the course of FCA's trade or business, and were likely to mislead a substantial portion of the purchasing public.

320. Plaintiffs relied on FCA's material representations and nondisclosures, and would not have purchased/leased, or would have paid less for, the Class Vehicles had they known the truth.

321. As a direct and proximate result of FCA's unfair, unlawful, and deceptive practices, Plaintiffs have lost money.

322. Plaintiffs and Class Members seek an order enjoining FCA from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

## SEVENTH CAUSE OF ACTION
### Breach of Express Warranty Pursuant to Song-Beverly Consumer Warranty Act
### (By Plaintiff Brian Fisher and Arianna Rico)

323. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

324. Plaintiffs Brian Fisher and Arianna Rico bring this claim on behalf of themselves and the California Class.

325. The Class Vehicles are "consumer goods" under Cal. Civ. Code § 1791(a).

326. FCA is and was at all relevant times a "manufacturer" and seller of the Class Vehicles under Cal. Civ. Code § 1791(j); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Cal. Civ. Code § 1791(i).

327. Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

328. FCA expressly warranted the Class Vehicles against defects including the eTorque Defect, as described above, within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2.

329. As described above, the eTorque system in the Class Vehicles is defective. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

330. FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles, wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiffs and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

331. FCA is obligated, under the terms of its express warranties and pursuant to Cal. Civ. Code §§ 1793.2 and 1795.4, to effectively and within a reasonable time repair the defective vehicles at no cost to Plaintiffs and Class Members.

332. FCA breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

333. FCA breached its express warranties by failing to repair the Class Vehicles under warranty and by failing to provide to Plaintiffs or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to Plaintiffs and Class Members.

334. As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of its express written warranties from various sources, including Plaintiffs.

335. Plaintiffs have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

336. Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

Case 2:23-cv-10426-MFL-EAS   ECF No. 20, PageID.486   Filed 06/13/23   Page 102 of 206

337. Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

338. Accordingly, recovery by the Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

339. Any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unenforceable and void pursuant to Cal. Civ. Code § 1790.1.

340. As a direct and proximate result of FCA's breach of its express warranties, Plaintiffs and Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

341. Pursuant to Cal. Civ. Code § 1794 and 1795.4, Plaintiffs and Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**Breach of Express Warranty by Affirmation, Promise, Description, or Sample**
**Cal. Comm. Code § 2313**
**(By Plaintiffs Brian Fisher and Arianna Rico)**

342. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

-96-

343. Plaintiffs Brian Fisher and Arianna Rico bring this claim on behalf of themselves and the California Class.

344. The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

345. FCA is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, inter alia, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles, under, inter alia, Cal. Com. Code § 10103(a)(16).

346. Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, inter alia, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

347. Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

348. Cal. Comm. Code § 2313 states that a merchant creates an express warranty by making to the buyer "[a]ny affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain" and "any description of the goods which is made part of the basis of the bargain."

349. FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of, inter alia, Cal. Com. Code §§ 2313, 2316, 10210, and 10214.

350. As described above, the eTorque system in the Class Vehicles is defective. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

351. FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiffs and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

352. FCA is obligated, under the terms of its express warranties, to effectively repair the eTorque Defect within a reasonable time for Plaintiffs and Class Members.

353. FCA breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

354. FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiffs or Class Members, as a warranty

replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to Plaintiffs and Class Members.

355. As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiffs.

356. Plaintiffs have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

357. Affording FCA any further opportunity to cure its breach of written warranties is unnecessary and futile here.

358. Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

359. Accordingly, recovery by the Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

360. In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's

-99-

concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

361. As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

362. Plaintiffs and Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## NINTH CAUSE OF ACTION
**Breach of Implied Warranty Under Song-Beverly Consumer Warranty Act**
**(Plaintiff Brian Fisher and Arianna Rico)**

363. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

364. Plaintiffs Brian Fisher and Arianna Rico bring this claim on behalf of themselves and the California Class.

365. FCA's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

366. FCA is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

367.    Plaintiffs and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

368.    FCA impliedly warranted to Plaintiffs and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792.

369.    FCA impliedly warranted to Plaintiffs and Class Members that it would repair or replace any defective products, including the defective eTorque system.

370.    The propensity of the eTorque Defect to cause the vehicles to stall renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

371.    The eTorque Defect is latent and was present at the time of sale/lease, and therefore the Vehicles were not merchantable at the time of sale/lease.

372.    The Class Vehicles do not conform to the promises or affirmations of fact made by FCA in its promotional materials and vehicle owner manuals in that the eTorque Defect makes it such that the engine does not "optimize[] performance" or "drivability."

373. In violation of Cal. Civ. Code § 1791.1(a), FCA breached its implied warranty by selling/leasing Class Vehicles that were defective and refusing to effectively replace and/or repair the defective vehicles.

374. The eTorque Defect has deprived Plaintiffs and Class Members of the benefit of their bargain, and have caused the Class Vehicles to depreciate in value.

375. Any attempt by FCA to limit or disclaim the implied warranties in a manner that would exclude coverage of the eTorque Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

376. As a result of FCA's breach of its implied warranties, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

## TENTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### (Plaintiffs Brian Fisher and Arianna Rico)

377. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

378. Plaintiffs Brian Fisher and Arianna Rico bring this claim on behalf of themselves and the California Class.

379. The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

380. FCA is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, inter alia, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles, under, inter alia, Cal. Com. Code § 10103(a)(16).

381. Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, inter alia, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

382. When it sold or leased its Class Vehicles, FCA extended an implied warranty to Class Members that the subject Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

383. Plaintiffs and other Class Members who purchased or leased a Class Vehicle directly from FCA are entitled to the benefit of their bargain: a nondefective Vehicle that does not stall while driving due to the eTorque Defect.

384. Likewise, Plaintiffs and other Class Members who purchased or leased a FCA Certified Pre-Owned Class Vehicle are entitled to the benefit of their bargain: a nondefective Vehicle that does not stall while driving due to the eTorque Defect.

-103-

385. Class Members who purchased new Class Vehicles from FCA-affiliated dealerships and Certified Pre-Owned Class Vehicles are the intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for the purposes of their implied warranty claims.

386. FCA breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

387. The eTorque Defect is latent and was present at the time of sale/lease, and therefore the Vehicles were not merchantable at the time of sale/lease.

388. Had the eTorque Defect that existed at the time of sale been known, the Class Vehicles could not have been sold or leased, or could not have been sold or leased at the same price.

389. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### Fraud by Concealment
### (Plaintiffs Brian Fisher and Arianna Rico)

390. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

391. Plaintiffs Brian Fisher and Arianna Rico bring this claim on behalf of themselves and the California Class.

392.   FCA concealed and suppressed material facts concerning the quality of the Class Vehicles, and the eTorque systems in the Class Vehicles.

393.   FCA concealed and suppressed material facts concerning the serious Defect causing Class Vehicles to turn off, shift to "Park," and/or spontaneously activate the emergency brake while driving. Upon information and belief, the Defect lies in the eTorque system of the Class Vehicles. FCA knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles and FCA failed to disclose and/or denied the existence of the Defect prior to Plaintiffs' and Class Members' purchase of their Class Vehicles. FCA further failed to disclose and/or denied the existence the Defect when Plaintiffs and Class Members complained of their Vehicle's failure.

394.   FCA did so to boost confidence in its vehicles and falsely assure purchasers and lessees of FCA vehicles that the Class Vehicles were world class, comfortable, warranted, and reliable vehicles and concealed the information in order to prevent harm to FCA and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

395.   These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and

-105-

because the representations and omissions played a significant role in Plaintiffs' and Class Members' decisions to purchase or lease the Class Vehicles.

396. FCA had a duty to disclose the eTorque Defect in the Class Vehicles because it was known and/or accessible only to FCA; FCA had superior knowledge and access to the facts; and FCA knew the facts were not known to or reasonably discoverable by Plaintiffs and Class Members.

397. FCA also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, comfort, and usability.

398. Even when faced with complaints regarding the Defect, FCA misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the eTorque Defect was complained of to FCA.

399. The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated

by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

400. FCA actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of Plaintiffs and Class Members.

401. On information and belief, FCA has still not made full and adequate disclosure and continues to defraud Plaintiffss and Class Members and conceal material information regarding defects that exist in FCA vehicles.

402. Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiffs and Class Members' actions were justified. FCA was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

403. Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the eTorque Defect that FCA failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed

Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

404. Accordingly, FCA is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

405. FCA's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich FCA. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### TWELFTH CAUSE OF ACTION
**Unjust Enrichment**
**(Plaintiffs Brian Fisher and Arianna Rico)**

406. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

407. Plaintiffs assert this Count on behalf of themselves and the California Class.

408. FCA made affirmative representations to Plaintiffs and California Class Members that that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

409.  FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

410.  Plaintiffs and the members of the California Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the eTorque Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

411.  FCA was unjustly enriched at the expense of and to the detriment of Plaintiff and California Class, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the California Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

412.  Plaintiffs and members of the California Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

## THIRTEENTH CAUSE OF ACTION
### Violation of California Consumer Legal Remedies Act ("CLRA")
### (Plaintiff Brian Fisher)

413.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

414.   Plaintiff asserts this Count on behalf of himself and the California Class.

415.   FCA is a "person" as defined by the CLRA. Cal. Civ. Code 149. Plaintiff and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

416.   The purchases and leases of Class Vehicles and the warranties by Plaintiff and Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

417.   The Class Vehicles and the warranties constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code §1761(a) and (b).

418.   Plaintiff and Class Members purchased or leased the Class Vehicles and the warranties primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

419.   FCA's misrepresentations, active concealment, failures to disclose, and omissions regarding the Class Vehicles and the warranties violated the CLRA in the following ways:

-110-

a.      FCA misrepresented that the Class Vehicles and the warranties had characteristics, benefits, or uses that they did not have (Cal. Civ. 18Code § 1770(a)(5));

b.      FCA misrepresented that the Class Vehicles and the warranties were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

c.      FCA advertised the Class Vehicles and the warranties with an intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

d.      FCA misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not 26(Cal. Civ. Code § 1770(a)(14)); and

e.      FCA misrepresented that the Class Vehicles and the warranties were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

420.   FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to purchasers and lessees of the Class Vehicles.

421.   FCA knew before the sale or lease of the Class Vehicles that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect,

which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

422. FCA had exclusive knowledge of material facts concerning the existence of the eTorque Defect in its Class Vehicles. Furthermore, FCA actively concealed the Defect from consumers by denying the existence of the Defect to Class Members who contacted FCA and its dealerships about the stalling issue, failing to offer any temporary "fixes" under warranty, and failing to offer Class Members a permanent solution to the eTorque Defect.

423. FCA was under a duty to Plaintiff and Class Members to disclose the defective nature of the eTorque System Defect, as well as the associated costs that would have to be expended in order to attempt to address the Defect, because:

a. FCA was in a superior position to know the true state of facts about the eTorque Defect in the Class Vehicles;

b. Plaintiff and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the eTorque Defect until, at the earliest, the manifestation of the Defect; and

c. FCA knew that Plaintiff and Class Members could not reasonably have been expected to learn or discover the eTorque Defect prior to its manifestation.

-112-

424. The facts concealed or not disclosed by FCA to Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the eTorque Defect to be an impairment to the driveability and useability of the Class Vehicle, as Plaintiff and Class Members did.

425. Had Plaintiff and other Class Members known that the Class Vehicles had the eTorque Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

426. Plaintiff and Class Members are reasonable consumers who did not expect their Class Vehicles to contain the eTorque Defect. It is a reasonable and objective consumer expectation that one's vehicle will not suddenly stall, shift to "Park," or engage the emergency brake while driving.

427. As a result of FCA's misconduct, Plaintiff and Class Members have been harmed and have suffered actual damages in that the Class Vehicles contain the eTorque Defect which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

428. As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer

-113-

actual damages in that they have a vehicle that spontaneously stalls while driving: a defect for which there is no permanent fix.

429. Plaintiff and the Class are entitled to equitable relief.

430. FCA received proper notice of its alleged violations of the CLRA pursuant to Cal. Civ. Code § 1782(a), via a letter sent to FCA and its registered service agent on February 9, 2023, on behalf of Plaintiff Brian Fisher and all others similarly situated. FCA failed to provide the appropriate relief for its violation of the CLRA within 30 days of the date of the notification letter. *See* Ex. L, Notice Letter.

431. Thus, pursuant to Cal. Civ. Code §§ 1780(a), 1780(e), and 1782(a), Plaintiffs seek, in addition to equitable relief, actual damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper.

## 2.     FLORIDA

### FOURTEENTH CAUSE OF ACTION
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq.***
**(Plaintiffs Adam Cartabiano, James Blyth, Robert Cole, and William Smith)**

432. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

433. Plaintiffs bring this cause of action on behalf of themselves and the Florida Class.

-114-

434.    Plaintiffs are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

435.    FCA is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

436.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).  FCA participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

437.    In the course of their business, FCA failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles due to the eTorque Defect as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

438.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

439.    FCA knew of the eTorque Defect prior to the sale/lease of the Class Vehicles. FCA failed to disclose and actively concealed facts including that the

-115-

Class Vehicles have the tendency to unexpectedly stall, lose power, and/or engage the emergency brake.

440. By failing to disclose and by actively concealing the eTorque Defect in the Class Vehicles, FCA engaged in unfair or deceptive business practices in violation of the FDUTPA. FCA deliberately withheld the information about the propensity of the Class Vehicles to stall in order to ensure that consumers would purchase the Class Vehicles.

441. In the course of FCA's business, it willfully failed to disclose and actively concealed the eTorque Defect discussed above. FCA compounded the deception by repeatedly asserting that the Class Vehicles did not contain the eTorque Defect and were not prone to stalling.

442. FCA's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true quality, reliability and comfort of Class Vehicles, the quality of FCA's brands, and the true value of the Class Vehicles.

443. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and Class Members.

-116-

444.   FCA knew or should have known that its conduct violated the FDUTPA.

445.   As alleged above, FCA made material statements about the quality and reliability of the Class Vehicles that were either false or misleading.  FCA's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as being durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

446.   To protect its profits and to avoid remediation costs and public relations problems, FCA concealed the dangers and risks posed by the Class Vehicles and their symptoms and consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving defective vehicles that pose a risk of danger while driving due to their propensity to stall.

447.   FCA owed Plaintiffs a duty to disclose the true safety, performance and reliability of the Class Vehicles because FCA:

> (a)   Possessed exclusive knowledge of the eTorque Defect;
>
> (b)   Intentionally concealed the foregoing from Plaintiffs; and/or

(c)     Made incomplete representations about the safety, performance and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

448.   Because FCA fraudulently concealed the eTorque Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished. In addition, the presence of Defect in the Class Vehicles makes them less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

449.   Plaintiffs and Class Members suffered ascertainable loss caused by FCA's misrepresentations and its failure to disclose material information.  Had they been aware of the eTorque Defect that existed in the Class Vehicles, and FCA's complete disregard for safety, performance, and reliability, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of FCA's misconduct.

450.   FCA's conduct as described herein is unethical, oppressive, or unscrupulous in that FCA often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints about stalling issues in Class Vehicles were made to them.

-118-

451.   Plaintiffs and Class Members risk irreparable injury as a result of FCA's acts and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs, Class Members, as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

452.   As a direct and proximate result of FCA's violations of the FDUTPA, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damage.

453.   Plaintiffs and Class Members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

454.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**FIFTEENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**F.S.A. §§ 672.313 and 680.21**
**(Plaintiffs Adam Cartabiano, James Blyth, Robert Cole, and William Smith)**

455.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

456.   Plaintiffs bring this cause of action on behalf of themselves and the Florida Class.

-119-

457. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

458. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

459. The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

460. In connection with the purchase or lease of each one of its new vehicles, FCA provided the warranties described above.

461. FCA also made numerous representations, descriptions, and promises to Plaintiffs and Class Members regarding the performance and realiability of their vehicles; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

462. FCA's warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

463. Despite the existence of warranties, FCA failed to inform Plaintiffs and Class Members that the Class Vehicles were defective and were prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

464. FCA breached the express warranty promising to repair and correct FCA's defect in materials and workmanship. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

465. Affording FCA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

466. Furthermore, the written warranty promising to repair and correct FCA's defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Florida State Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

467. Accordingly, recovery by Plaintiffs and Class Members is not restricted to the limited warranty promising to repair and correct FCA's defect in materials and workmanship, and they seek all remedies as allowed by law.

468. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Class Vehicles, it knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and Class Members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

-121-

469.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting FCA's defect in materials and workmanship as incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and Class Members' remedies would be insufficient to make them whole.

470.    Finally, because of FCA's breach of warranty as set forth herein, Plaintiffs and Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

471.    FCA was provided reasonable notice of these issues by way of a letter sent by Plaintiffs as well as the regulators' investigations.

472.    As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and Class Members have been damaged in an amount to be determined at trial.

-122-

## SIXTEENTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### F.S.A. §§ 672.314 and 680.212
### (Plaintiffs Adam Cartabiano, James Blyth, Robert Cole, and William Smith)

473.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

474.   Plaintiffs bring this cause of action on behalf of themselves and the Florida Class.

475.   FCA is and was at all relevant times "merchant[s]" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

476.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

477.   The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

478.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to F.S.A. §§ 672.314 and 680.212.

479.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles are inherently defective in that they

-123-

are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation.

480. FCA was provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Texas Class before or within a reasonable amount of time after allegations of vehicle defects became public. In addition, Plaintiffs Cartabiano and Blyth directly sought repairs from their local dealership necessitated by the Defect.

481. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Florida Class Members have been damaged in an amount to be proven at trial.

### 3.   **GEORGIA**

**SEVENTEENTH CAUSE OF ACTION**
**Violations of Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, et seq.**
**(Plaintiff Tennyson James)**

482. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

483. Plaintiff brings this cause of action on behalf of himself and the Georgia Class.

-124-

484. FCA, Plaintiff, and Class Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). O.C.G.A. § 10-1-371(5).

485. The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similar creates a likelihood of confusion or misunderstanding," and "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-372.

486. By failing to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members, FCA engaged in deceptive trade practices in violation of the Georgia UDTPA, because FCA represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade (i.e. state-of-the-art, extraordinary durability and longevity, overachieve, outperform, and overdeliver, etc.) when they were of another. *See* O.C.G.A. §§ 10-1-372(5), (7), (9).

487. FCA advertised the Class Vehicles with the intent not to sell them as advertised, in violation of O.C.G.A. § 10-1-372(12).

488. FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm on owners and purchasers of the Class Vehicles.

489. FCA knew before the sale or lease of the Class Vehicles that the Class Vehicles suffered from an inherent defect that causes them to stall unexpectedly and were not suitable for their intended use.

490. FCA had exclusive knowledge of material facts concerning the existence of the eTorque Defect in its Class Vehicles. Furthermore, FCA actively concealed this Defect from consumers by denying the existence of the Defect to Class Members who contacted FCA about their vehicle stalling.

491. FCA was under a duty to Plaintiff and Class Members to disclose the eTorque Defect because, inter alia:

a. FCA was in a superior position to know the true state of facts about the eTorque Defect in the Class Vehicles;

b. Plaintiff and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the eTorque Defect until, at the earliest, the first instance of their vehicle stalling; and

c. FCA knew that Plaintiff and Class Members could not reasonably have been expected to learn or discover the eTorque Defect prior to its manifestation.

492. Despite possessing information to the contrary, FCA failed to disclose and actively concealed the Defect while continuing to market the Class Vehicles as world-class and reliable. The deception made reasonable consumers believe that Class Vehicles were of high quality and designed and made by a company that stood behind its vehicles once they were on the road.

493. FCA knew or should have known that its conduct violated the Georgia UDTPA.

494. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause and remedy of the stalling issue, FCA knowingly and intentionally concealed material facts and breached its duty not to do so.

495. The facts FCA concealed from Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the eTorque Defect to be an undesirable quality, as Plaintiff and Class Members did. Had Plaintiffs and Class

-127-

Members known that the Class Vehicles had the eTorque Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for them.

496. Plaintiff, like all objectively reasonable consumers, did not expect the eTorque System in their vehicle to cause his vehicle to suffer unexpected stalling episodes.

497. As a result of FCA's misconduct, Plaintiff and Class Members have been harmed and suffered actual damages in that the Class Vehicles repeatedly stall while driving due to the eTorque Defect, causing inconvenience and creating unsafe driving conditions.

498. As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages in that they have experienced and may continue to experience their Class Vehicles stalling.

499. FCA's violations present a continuing risk to Plaintiff and to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

500. As a direct and proximate result of FCA's violations of the Georgia UDTPA, Plaintiff and Class Members have suffered injury-in-fact and/or actual damage.

501. Plaintiff seeks an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

**EIGHTEENTH CAUSE OF ACTION**
**Violations of Georgia Fair Business Practices Act**
**O.C.G.A. § 10-1-390, *et seq.***
**(Plaintiff Tennyson James)**

502. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

503. Plaintiff brings this claim on behalf of himself and the Georgia Class.

504. FCA is a "person" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA"). O.C.G.A. § 10-1-392(a)(24).

505. Plaintiff and Class Members are "consumers" within the meaning of the Georgia FBPA. O.C.G.A. § 10-1-392(a)(6).

506. The purchase or lease of Class Vehicles by Plaintiff and Class Members constituted "consumer transactions" as defined by the Georgia FBPA. O.C.G.A. § 10-1-392(a)(10).

507. The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, O.C.G.A. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or

-129-

services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," *id.* §§ 10-1-393(b)(5), (7) & (9).

508. By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Class Members, FCA violated the Georgia FBPA, because FCA represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade (*i.e.* durable, reliable, dependable, eTorque system with "unsurpassed" capabilities, etc.) when they were of another. *See* O.C.G.A. §§ 10-1-393(b)(5) & (7).

509. FCA advertised the Class Vehicles (*i.e.* durable, reliable, dependable, eTorque system with "unsurpassed" capabilities, etc.) with the intent not to sell them as advertised, in violation of § 10-1-393(b)(9).

510. FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

511. FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to

spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

512. FCA had exclusive knowledge of material facts concerning the existence of the eTorque Defect in its Class Vehicles. Furthermore, FCA actively concealed the Defect from consumers by denying the existence of the Defect to Class Members who contacted FCA about failures relating to the eTorque Defect and failing to provide an effective remedy for the eTorque Defect.

513. FCA was under a duty to Plaintiff and Class Members to disclose the eTorque Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Defect, because:

    a. FCA was in a superior position to know the true state of facts about the eTorque Defect in the Class Vehicles;

    b. Plaintiff and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the eTorque Defect until, at the earliest, the first instance of a stalling incident; and

    c. FCA knew that Plaintiff and Class Members could not reasonably have been expected to learn of or discover the eTorque Defect prior to its manifestation.

514. FCA knew or should have known that its conduct violated the Georgia FBPA.

515. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause and remedy of the eTorque Defect, FCA knowingly and intentionally concealed material facts and breached its duty not to do so.

516. The facts FCA concealed from Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the eTorue Defect to be an undesirable quality, as Plaintiff and Class Members did. Had Plaintiff and Class Members known that the Class Vehicles had the eTorque Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for them.

517. Plaintiff and Class Members, like all objectively reasonable consumers, did not expect their vehicles to be prone to spontaneously stalling, shifting to "Park," and/or activating the emergency brake during normal operation.

518. As a result of FCA's misconduct, Plaintiff and Class Members have been harmed and suffered actual damages.

519. As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience stalling

-132-

incidents, for which there is no permanent fix, and for which they must pay out of pocket.

520. FCA's violations present a continuing risk to Plaintiff and to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

521. Plaintiff and Class Members are entitled to equitable relief.

522. FCA received notice of its alleged violations of the Georgia FBPA sufficient to satisfy O.C.G.A. § 10-1-399(b) when Plaintiff presented his Class Vehicle to the dealership on two occasions to report the manifestations of the eTorque Defect. FCA was also provided notice through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; and early consumer complaints made directly to FCA, collected by NHTSA ODI, and/or posted on public online vehicle owner forums. Providing FCA an additional written notice of their breach pursuant to O.C.G.A. § 10-1-399(b) would be unnecessary and futile here.

523. Thus, pursuant to O.C.G.A. § 10-1-399, Plaintiff and the Class seek, in addition to equitable relief, actual and statutory damages, attorneys' fees and expenses, treble damages, as permitted under the Georgia FBPA and applicable law.

## NINETEENTH CAUSE OF ACTION
### Breach of Express Warranty
### Ga. Code Ann. §§ 11-2-313 and 11-2A-210
### (Plaintiff Tennyson James)

524. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

525. Plaintiff brings this cause of action on behalf of himself and the Georgia Class.

526. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

527. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

528. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

529. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express warranty as described above.

530. FCA also made numerous representations, descriptions, and promises to Plaintiff and Georgia Class Members regarding the performance and reliability of their vehicles; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

531. Despite the existence of warranties, FCA failed to inform Plaintiffs and Georgia State Class members that the Class Vehicles were defective and were prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

532. FCA breached the express warranty promising to repair and correct FCA's defect in materials and workmanship. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

533. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

534. Furthermore, the written warranty promising to repair and correct FCA's defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Georgia State Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

535. Accordingly, recovery by Plaintiff and Georgia State Class members is not restricted to the written warranty promising to repair and correct FCA's defect in materials and workmanship, and they seek all remedies as allowed by law.

536. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, FCA has wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and Georgia State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

537. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting FCA's defect in materials and workmanship as incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and Georgia Class Members' remedies would be insufficient to make them whole.

538. Finally, because of FCA's breach of warranty as set forth herein, Plaintiff and the Georgia Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

539. FCA was provided notice of the Defect through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins;

repair data; replacement part sales data; and early consumer complaints made directly to FCA, collected by NHTSA ODI, and/or posted on public online vehicle owner forums. FCA also has notice of its breaches based on its actual and exclusive knowledge of the Defect.

540. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Class Members have been damaged in an amount to be determined at trial.

### TWENTIETH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability
### Ga. Code Ann. §§ 11-2-314 and 11-2A-212
### (Plaintiff Tennyson James)

541. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

542. Plaintiff brings this cause of action on behalf of himself and the Georgia Class.

543. Georgia law states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." O.C.G.A. § 11-2-314.

544. FCA is a merchant with respect to the goods which it sold to Plaintiff and Class Members.

545. The goods that FCA provided to Plaintiff and Class Members were unmerchantable at the time they were sold. Specifically, the Class Vehicles

-137-

contained the eTorque System Defect, rendering them not fit for ordinary use as automobiles, not able to pass without objection, not of fair average quality and not conforming with promises and affirmations made.

546. FCA's failure to provide merchantable vehicles was a breach of the implied warranty of merchantability, and Plaintiff and the other Class Members were damaged in an amount to be proven at trial.

### 4. MICHIGAN

**TWENTY-FIRST CAUSE OF ACTION**
**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws § 445.903, *et. seq.***
**(Plaintiffs Rachel Walkowicz and Stephen Edgcombe)**

547. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

548. Plaintiffs Rachel Walkowicz and Stephen Edgcombe bring this claim on behalf of herself and the Michigan Class.

549. Michigan Class Members were "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

550. At all relevant times hereto, FCA was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

551. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce...." Mich. Comp. Laws § 445.903(1). FCA engaged in

unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have… characteristics… that they do not have.…;" "(e) Representing that goods or services are of a particular standard… if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangerous eTorque Defect in the Class Vehicles, FCA participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

552.   In the course of its business, FCA willfully failed to disclose and actively concealed the dangerous eTorque Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles. FCA is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Michigan CPA.

553. As alleged above, FCA knew of the eTorque Defect, and the Michigan Class was deceived by FCA's omissions into believing the Class Vehicles were safe. The true information could not have reasonably been known by the consumer.

554. FCA knew or should have known that their conduct violated the Michigan CPA.

555. As alleged above, FCA made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

556. FCA engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. FCA deliberately withheld the information about the propensity for the Class Vehicles to spontaneously stall, shift to "Park," and/or activate the emergency brake to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

557. From its inception in 2009, FCA has known of the eTorque Defect that exists in millions of Class Vehicles sold in the United States. But, to protect its

-140-

profits and to avoid remediation costs, FCA concealed the Defect and allowed unsuspecting purchasers to continue to buy the Class Vehicles and allowed all defective Vehicle owners to continue driving dangerous vehicles.

558. FCA owed Plaintiffs and the Michigan Class an independent duty to disclose the defective nature of Class Vehicles, including the eTorque Defect, because FCA:

a. Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

b. Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign that they designed to hide the eTorque Defect from Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of Class Vehicles generally, and the eTorque Defect in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

559. FCA's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Michigan Class, about the true safety and reliability of Class Vehicles. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Michigan Class.

560.   The propensity of the Class Vehicles failing during ordinary operation due to the eTorque Defect was material to the Michigan Class. Had the Michigan Class known that their vehicles had these serious safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

561.   The Michigan Class suffered ascertainable losses caused by FCA's failure to disclose material information. The Michigan Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, the value of their Class Vehicles has diminished now that the eTorque issues in the Class Vehicles have come to light, and the Michigan Class owns or leases vehicles that are defective and unsafe.

562.   The Michigan Class has been damaged by FCA's misrepresentations, concealment, and non-disclosure of the eTorque Defect in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of FCA's failure to timely disclose and remedy the serious defects.

563.   Michigan Class Members were—and continue to be—at risk of irreparable injury as a result of the respective Companies' acts and omissions in violation of the Michigan CPA, and these violations present a continuing risk to

the Michigan Class as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

564. The repairs instituted by FCA, if any, have not been adequate.

565. As a direct and proximate result of FCA's violations of the Michigan CPA, the Michigan Class has suffered injury-in-fact and/or actual damage.

566. The Michigan Class seeks injunctive relief to enjoin FCA from continuing its unfair and deceptive acts; monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Michigan Class Member; reasonable attorneys' fees; declaratory relief in the nature of a judicial determination of whether each Company's conduct violated the Michigan Statute, the just total amount of penalties to be assessed against each thereunder, and the formula and procedure for fair and equitable allocation of statutory penalties among the Michigan Class; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

567. The Michigan Class also seeks punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. FCA intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Michigan Class Members, and concealed material facts that only it knew, all to avoid the expense and public

-143-

relations nightmare of correcting flaws in the Class Vehicles it repeatedly promised

Michigan Class Members were safe. FCA's unlawful conduct constitutes malice,

oppression, and fraud warranting punitive damages.

### TWENTY-SECOND CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability**
**Mich. Comp. Laws §§ 440.2314 and 440.2862**
**(Plaintiffs Rachel Walkowicz and Stephen Edgcombe)**

568.    Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

569.    Plaintiffs Rachel Walkowicz and Stephen Edgcombe bring this claim

on behalf of themselves and the Michigan Class.

570.    FCA was at all relevant times a merchant with respect to motor

vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

571.    With respect to leases, FCA was at all relevant times a lessor of motor

vehicles within the meaning of Mich. Comp. Laws § 440.2803(1)(p).

572.    Under Mich. Comp. Laws § 440.2314, a warranty that the Class

Vehicles were in merchantable condition was implied by law in the transactions

when Michigan Class members purchased their Class Vehicles.

573.    These vehicles, when sold and at all times thereafter, were not

merchantable and are not fit for the ordinary purpose of providing safe and reliable

transportation. Specifically, the Class Vehicles are inherently defective in that they

are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation.

574. Through the express warranties FCA issues every purchaser of a new Class Vehicle, FCA attempts to impose durational limits on the implied warranty of merchantability. FCA, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties. Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

575. The limitations on the warranties, including the durational limits FCA attempts to impose on the implied warranty of merchantability, are substantively unconscionable. FCA knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, FCA's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

576. FCA was provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and

-145-

communications sent by the Michigan Class before or within a reasonable amount of time after allegations of vehicle defects became public. In addition, Plaintiff Walkowicz directly notified FCA of its breach and sought repairs for her local dealership necessitated by the Defect, and provided FCA with further written notice of its breach by letter delivered to FCA on February 9, 2023. Plaintiff Edgcombe reported this issue to his dealership.

577. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, the Michigan Class has been damaged in an amount to be proven at trial.

578. Plaintiffs also seek available declaratory relief. Based on FCA's continuing failures to fix the known defects, Plaintiffs seek declarations that:

a. The Class Vehicles are defective in that they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation. The eTorque Defect may not manifest until after the warranty provided by FCA has expired. The eTorque Defect is material and requires disclosure to all Class Members.

b. All Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by FCA.

c. Because the Class Vehicles have the eTorque Defect, and because FCA knew of this Defect before the time of sale or lease, the FCA

-146-

warranty is insufficient to remediate the defects know by FCA to exist. Therefore

FCA's existing warranty, limited to three years or 36,000 miles, is invalid, and, as

such that limitation is unenforceable. FCA shall provide notice to all persons

covered by that warranty of the removal of this time limitation.

d.      FCA shall re-audit and reassess all prior warranty claims,

including claims previously denied in whole or in part, where the denial was based

on warranty or on other grounds, of claims related to the eTorque Defect in the

Class Vehicles.

579.   FCA shall establish a repair program and protocol to be

communicated to class members, which will require FCA to inspect, upon request,

a class member's vehicle to determine whether the eTorque Defect is manifest. Any

disputes over coverage shall be adjudicated by a Special Master appointed by the

Court and/or agreed to by the parties.

**TWENTY-THIRD CAUSE OF ACTION**
**Breach of Express Warranty by Affirmation, Promise, Description, or Sample**
**Mich. Comp. Laws §§ 440.2313 and 440.2860**
**(Plaintiffs Rachel Walkowicz and Stephen Edgcombe)**

580.   Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

581.   Plaintiffs Rachel Walkowicz and Stephen Edgcombe bring this claim

on behalf of themselves and the Michigan Class.

-147-

582. FCA was at all relevant times a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2104(1).

583. With respect to leases, FCA was at all relevant times a lessor of motor vehicles under Mich. Comp. Laws § 2803(1)(p).

584. The Class Vehicles were at all relevant times goods within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

585. Plaintiffs and Michigan Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

586. FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of Mich. Comp. Laws §§ 440.2313 and 440.2860.

587. Plaintiffs and the Michigan Class Members reasonably relied on FCA's express warranties concerning the eTorque system when purchasing or leasing the Class Vehicles.

588. As described above, the Class Vehicles are defective. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Michigan Class Members.

589. FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Michigan Class Members that the Class

-148-

Vehicles had the Defect, and induced Plaintiffs and Michigan Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

590.    FCA is obligated, under the terms of its express warranties, to effectively repair and/or replace the Class Vehicles within a reasonable time for Plaintiffs and Michigan Class Members.

591.    FCA breached its express warranties by supplying the Class Vehicles to Plaintiffs and Michigan Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

592.    FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiffs or Michigan Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to them.

593.    As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiffs and other Michigan Class Members.

594.    Plaintiffs and other Michigan Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

595. Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

596. Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Michigan Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

597. Accordingly, recovery by the Michigan Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

598. In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

599. As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and Michigan Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

600. Plaintiffs and Michigan Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## TWENTY-FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (Plaintiffs Rachel Walkowicz and Stephen Edgcombe)

601. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

602. Plaintiffs assert this Count on behalf of themselves and the Michigan Class.

603. FCA made affirmative representations to Plaintiffs and Michigan Class Members include that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

604. FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

605. Plaintiffs and the members of the Michigan Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the

-151-

eTorque Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

606. FCA was unjustly enriched at the expense of and to the detriment of Plaintiffs and Michigan Class, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiffs and the Michigan Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

607. Plaintiffs and members of the Michigan Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

### 5. OHIO

**TWENTY-FIFTH CAUSE OF ACTION**
**Violation of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code § 1302.26**
**(Plaintiff Eric Lee)**

608. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

609. Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

-152-

610. Ohio Class Members were "person[s]" within the meaning of Ohio Rev. Code § 1345.01(B).

611. At all relevant times hereto, FCA was a "supplier" engaged in a "consumer transaction" within the meaning of Ohio Rev. Code § 1345.01(A) and (C).

612. The Ohio Consumer Sales Practices Act ("Ohio CSPA") prohibits a supplier from engaging in any "unfair or deceptive act or practice in connection with a consumer transaction" Ohio Rev. Code § 1345.02(A).

613. FCA engaged in unfair or deceptive acts or practices prohibited by the Ohio CSPA, including by representing: "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;" "(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;" and "(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not[.]" Ohio Rev. Code § 1345.02(A). By failing to disclose and actively concealing the dangerous eTorque Defect in the Class Vehicles, FCA participated in unfair and deceptive acts that violated the Ohio CSPA.

614. In the course of its business, FCA willfully failed to disclose and actively concealed the dangerous eTorque Defect in the Class Vehicles as

-153-

described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles. FCA is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Ohio CSPA.

615.   As alleged above, FCA knew of the eTorque Defect, and the Ohio Class was deceived by FCA's omissions into believing the Class Vehicles were safe. The true information could not have reasonably been known by the consumer.

616.   FCA knew or should have known that its conduct violated the Ohio CSPA.

617.   As alleged above, FCA made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

618.   FCA engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. FCA deliberately withheld the information about the propensity for the Class Vehicles to spontaneously stall, shift to "Park," and/or activate the emergency brake in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

-154-

619. From its inception in 2009, FCA has known of the eTorque Defect that exists in millions of Class Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, FCA concealed the Defect and its tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Class Vehicles and allowed all defective Vehicle owners to continue driving highly dangerous vehicles.

620. FCA owed the Ohio Class an independent duty to disclose the defective nature of Class Vehicles, including the eTorque Defect, because FCA:

      a.     Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

      b.     Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign that they designed to hide the eTorque Defect from Plaintiffs; and/or

      c.     Made incomplete representations about the safety and reliability of Class Vehicles generally, and the eTorque Defect in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

621. FCA's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Ohio Class, about the true safety and reliability of Class Vehicles. FCA intentionally and knowingly misrepresented

material facts regarding the Class Vehicles with an intent to mislead the Ohio Class.

622.   The propensity of the Class Vehicles failing during ordinary operation due to the eTorque Defect was material to the Ohio Class. Had the Ohio Class known that their vehicles had these serious safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

623.   The Ohio Class suffered ascertainable losses caused by FCA's failure to disclose material information. The Ohio Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, the value of their Class Vehicles has diminished now that the eTorque issues in the Class Vehicles have come to light, and the Ohio Class owns vehicles that are defective and unsafe.

624.   The Ohio Class has been damaged by FCA's misrepresentations, concealment, and non-disclosure of the eTorque Defect in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of FCA's failure to timely disclose and remedy the serious defects.

625.   Ohio Class Members were—and continue to be—at risk of irreparable injury as a result of the respective Companies' acts and omissions in violation of the Ohio CSPA, and these violations present a continuing risk to the Ohio Class as

well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

626. The repairs instituted by FCA, if any, have not been adequate.

627. As a direct and proximate result of FCA's violations of the Ohio CSPA, the Ohio Class has suffered injury-in-fact and/or actual damage.

628. The Ohio Class seeks injunctive relief to enjoin FCA from continuing its unfair and deceptive acts; monetary relief against FCA measured as (a) actual damages for each Class Member in an amount to be determined at trial and (b) an amount not exceeding five thousand dollars in noneconomic damages for each Class Member; reasonable attorneys' fees; declaratory relief in the nature of a judicial determination of whether FCA's conduct violated the Ohio CSPA, the just total amount of penalties to be assessed against each thereunder, and the formula and procedure for fair and equitable allocation of statutory penalties among the Ohio Class; and any other just and proper relief available under the Ohio CSPA.

629. The Ohio Class also seeks punitive damages against FCA because it carried out despicable conduct that demonstrates actual malice or aggravated or egregious fraud. FCA intentionally and willfully misrepresented the safety and reliability of Class Vehicles, placed Ohio Class Members at risk of bodily injury when operating their Class Vehicles, deceived Ohio Class Members, and concealed material facts that only it knew, all to avoid the expense and public relations

-157-

nightmare of correcting flaws in the Class Vehicles it repeatedly promised Ohio Class Members were safe. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

630. The Ohio Attorney General made available for public inspection prior state court decisions which held that the acts and omissions of FCA as detailed in this Complaint, including, but not limited to, the failure to honor both its implied and express warranties; and the concealment and/or non-disclosure of a substantial defect, constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

     a.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

     b.    *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

     c.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

     d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

     e.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

     f.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g.  *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h.  *Brown v. Spears* (OPIF #10000403);

i.  *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j.  *Mosley v. Performance Mitsubishi AKA Automanage* (OPIF #10001326); and

k.  *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

## TWENTY-SIXTH CAUSE OF ACTION
### Fraud by Concealment
### (Plaintiff Eric Lee)

631.  Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

632.  Plaintiff Brian Fisher brings this claim on behalf of himself and the Ohio Class.

633.  As described above, FCA made material omissions and affirmative misrepresentations regarding the Class Vehicles.

634.  FCA knew these representations were false when made.

635.  The vehicles purchased or leased by the Ohio Class were, in fact, defective, unsafe and unreliable, because they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation.

636.   FCA had a duty to disclose that these vehicles were defective, unsafe and unreliable in that they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation, because the Ohio Class relied on FCA's representations that the vehicles they were purchasing and retaining were safe and free from defects.

637.   The aforementioned concealment was material, because if it had been disclosed the Ohio Class would not have bought, leased or retained their vehicles or would have paid less for them.

638.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. FCA knew or recklessly disregarded that their representations were false because they knew that people had experienced problems and failures, including vehicles being prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation, as the result of the eTorque Defect. FCA intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

639.   The Ohio Class relied on FCA's reputation—along with their failure to disclose the eTorque Defect and FCA's affirmative assurance that its vehicles

were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

640. As a result of their reliance, the Ohio Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

641. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Ohio Class. The Ohio Class are therefore entitled to an award of punitive damages.

## TWENTY-SEVENTH CAUSE OF ACTION
**Breach of Express Warranty by Affirmation, Promise, Description, or Sample
Ohio Rev. Code § 1302.26
(Plaintiff Eric Lee)**

642. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

643. Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

644. FCA was at all relevant times a seller with respect to motor vehicles within the meaning of Ohio Rev. Code § 1302.1(A)(4).

645. The Class Vehicles were at all relevant times goods within the meaning of Ohio Rev. Code § 1302.1(A)(8).

646. Plaintiff and Ohio Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

647. FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of Ohio Rev. Code § 1302.26(A).

648. Plaintiff and the Ohio Class Members reasonably relied on FCA's express warranties concerning the eTorque system when purchasing or leasing the Class Vehicles.

649. As described above, the Class Vehicles are defective. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Ohio Class Members.

650. FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Ohio Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Ohio Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

651. FCA is obligated, under the terms of its express warranties, to effectively repair and/or replace the Class Vehicles within a reasonable time for Plaintiff and Ohio Class Members.

652. FCA breached its express warranties by supplying the Class Vehicles to Plaintiff and Ohio Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

653. FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiff or Ohio Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to them.

654. As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiff and other Ohio Class Members.

655. Plaintiff and other Ohio Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

656. Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

657. Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Ohio Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

658.   Accordingly, recovery by the Ohio Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

659.   In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

660.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Ohio Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

661.   Plaintiff and Ohio Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

### TWENTY-EIGHTH CAUSE OF ACTION
**Tortious Breach of Implied Warranty**
**(Plaintiff Eric Lee)**

662.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

-164-

663. Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

664. FCA impliedly warranted that its Class Vehicles were of good and merchantable quality—fit and safe for their ordinary intended use.

665. The eTorque Defect existed in the Class Vehicles manufactured, distributed, and/or sold by FCA to middlemen who then resold the Class Vehicles to Plaintiff and the other members of the Ohio Class; the eTorque Defect existed at the time the Class Vehicles were sold to Plaintiff and the other members of the Ohio Class; and the eTorque Defect was the direct and proximate cause of injury to Plaintiff and the other members of the Ohio Class.

666. The eTorque Defect—which makes the Class Vehicles prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake while driving—render FCA's Class Vehicles unfit for their intended purpose (being a safe and reliable means of transportation), and not of merchantable quality.

667. As a direct and proximate result of FCA's warranty breach, Plaintiff and the other members of the Ohio Class were caused to suffer loss attributable to the decreased value of the Class Vehicle itself, and consequential damages—losses sustained by the purchase of the defective product—and the Ohio Plaintiff and the other members of the Ohio Class will have to spend monies to repair and/or replace their Class Vehicles.

-165-

## TWENTY-NINTH CAUSE OF ACTION
### Unjust Enrichment
### (Plaintiff Eric Lee)

668.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

669.   Plaintiff asserts this Count on behalf of himself and the Ohio Class.

670.   FCA made affirmative representations to Plaintiff and Ohio Class Members that that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

671.   FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

672.   Plaintiff and the members of the Ohio Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the eTorque Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

673.   FCA was unjustly enriched at the expense of and to the detriment of Plaintiff and Ohio Class, who unknowingly paid money and overpaid for the Class

-166-

Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the Ohio Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

674.   Plaintiff and members of the Ohio Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

### THIRTIETH CAUSE OF ACTION
### Negligent Design and Failure to Warn
### (Plaintiff Eric Lee)

675.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

676.   Plaintiff Eric Lee brings this claim on behalf of himself and the Ohio Class.

677.   FCA knew that Plaintiff and the other members of the Ohio Class were members of a foreseeable class of persons who were and are at risk of suffering serious inconvenience and expense solely because of the eTorque Defect.

678.   The eTorque Defect poses a danger to drivers of Class Vehicles, who are subject to their vehicle spontaneously stalling, shifting to "Park," and/or activating the emergency brake during normal operation.

-167-

679.   At the time FCA manufactured, distributed, and/or sold the Class Vehicles, it owed a non-delegable duty to persons like Plaintiff and the other members of the Ohio Class to exercise ordinary and reasonable care to properly design the Class Vehicles, and it owes a continuing duty to warn about the Defect and to repair and/or recall its defective Class Vehicles.

680.   FCA had a pre-sale duty to warn potential purchasers that the Class Vehicles carried with them greater risks than an ordinary consumer would expect when using the Class Vehicles in their intended or reasonably-foreseeable manner due to the eTorque Defect.

681.   Any benefits of the Class Vehicles' eTorque system are outweighed by the risks inherent in the Class Vehicles' design.

682.   FCA failed to use appropriate design, engineering, and parts in manufacturing the Class Vehicles, and in other respects, FCA breached its duties by being wantonly reckless, careless, and negligent.

683.   As a direct and proximate result of FCA's wanton recklessness, carelessness, and negligence, Plaintiff and the other members of the Ohio Class were caused to suffer damages and losses-and Plaintiff and the other members of the Ohio Class will have to spend money to repair and/or replace the defective Class Vehicles.

684.   Plaintiff and the other members of the Ohio Class have not committed any contributory negligence.

### 6.   TENNESSEE

### THIRTY-FIRST CAUSE OF ACTION
**Violation of Tennessee's Consumer Protection Act ("TCPA")**
**Tenn. Code Ann. § 47-18-101, *et seq*.**
**(Plaintiff Jerry Vanderberg)**

685.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

686.   Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

687.   FCA is a "person" as defined by the TCPA. Tenn. Code Ann. § 47-18-103(13).

688.   Plaintiff and Class Members are "consumers" within the meaning of the TCPA. Tenn. Code Ann. § 47-18-103(2).

689.   The purchases and leases of Class Vehicles by Plaintiff and Class Members constitute "consumer transactions" as defined by the TCPA. Tenn. Code Ann. § 47-18-103(19).

690.   The Class Vehicles constitute "goods" or "services" as defined by the TCPA. Tenn. Code Ann. §§ 47-18-103(7) and (18).

691. Plaintiff and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the TCPA. Tenn. Code Ann. § 47-18-103(7).

692. FCA's representations, active concealment, failures to disclose, and omissions regarding the Class Vehicles violated the TCPA in the following ways:

a. FCA misrepresented that the Class Vehicles had characteristics, benefits, or uses that they did not have (Tenn. Code Ann. § 47-18-104(5));

b. FCA misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Tenn. Code Ann. § 47-18-104(7));

c. FCA advertised the Class Vehicles with an intent not to sell/lease them as advertised (Tenn. Code Ann. § 47-18-104(9)); and

d. FCA misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Tenn. Code Ann. § 47-18-104(19)).

693. FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused ascertainable economic harm to purchasers and lessees of the Class Vehicles.

-170-

694. FCA knew before the sale or lease of the Class Vehicles, that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, would fail repeatedly, and were not suitable for their intended use.

695. FCA had exclusive knowledge of material facts concerning the existence of the eTorque Defect in its Class Vehicles. Furthermore, FCA actively concealed the Defect from consumers by denying the existence of the Defect to Class Members who contacted FCA about failures relating to the eTorque Defect and failing to provide an effective remedy for the eTorque Defect within a reasonable time under warranty (thereby causing FCA's warranty to fail of its essential purpose).

696. FCA was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the eTorque Defect, because:

     a. FCA was in a superior position to know the true state of facts about the eTorque Defect in the Class Vehicles;

     b. Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the eTorque Defect until, at the earliest, the manifestation of the Defect; and

-171-

c.      FCA knew that Plaintiff and Class Members could not reasonably have been expected to learn or discover the eTorque Defect prior to its manifestation.

697.   In failing to disclose the defective nature of the Class Vehicles, FCA knowingly and intentionally concealed material facts and breached its duty not to do so.

698.   The facts concealed or not disclosed by FCA to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the eTorque Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and other Class Members known that the Class Vehicles had the eTorque Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

699.   Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain the eTorque Defect. It is a reasonable and objective consumer expectation for consumers to expect that their vehicle would not spontaneously turn off, shift to "Park," and/or activate the emergency brake.

700.   As a result of FCA's misconduct, Plaintiffs and Class Members have been harmed and have suffered ascertainable damages in that the Class Vehicles are defective in that they spontaneously turn off, shift to "Park," and/or activate the

-172-

emergency brake due to the eTorque Defect, causing inconvenience and serious safety hazards, and causing Class Members to spend money, even when the Vehicle was still under warranty, to attempt to remedy the Defect.

701. As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer ascertainable damages in that they have a defective Vehicle and they have experienced and may continue to experience their Class Vehicles failing to function due to the eTorque Defect, for which there is no effective fix.

702. Accordingly, Plaintiffs seek an order enjoining FCA's unfair or deceptive acts or practices and equitable relief under Tenn. Code Ann. § 47-18-109(b), compensatory and monetary damages under Tenn. Code Ann. § 47-18-109(a)(1), treble damages for knowing and willful violations under Tenn. Code Ann. § 47-18-109(a)(3), attorneys' fees under Tenn. Code Ann. § 47-18-109(e)(1), and any other relief to which Plaintiff and Class Members are entitled under the TCPA.

703. Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, unambiguously authorizes any plaintiff, in any federal civil proceeding, to maintain a class action if the Rule 23's prerequisites are met. The prohibition of class actions in TCPA sections 47-18-109(a)(1) and 47-18-109(g) is procedural, not substantive, and so directly

-173-

conflicts with a federal rule of procedure: Rule 23. Therefore Rule 23 controls here pursuant to the Rules Enabling Act, 28 U.S.C. § 2072; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); and *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Moreover, by their express terms, sections 47-18-109(a)(1) and 47-18-109(g) apply only to claims for damages, and therefore do not preclude class actions for claims for injunctive relief under the TCPA.

### THIRTY-SECOND CAUSE OF ACTION
**Fraud by Concealment**
**(Plaintiff Jerry Vanderberg)**

704. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

705. Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

706. FCA had a duty to disclose the eTorque Defect in the Class Vehicles because, under Tennessee law, even in the absence of a special relationship, a seller must:

    a. disclose enough information to prevent its statements from being misleading;

    b. disclose any condition or defect that it knows or should know about that renders the product defective or dangerous; and

-174-

c.  disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself.

707. FCA concealed and suppressed material facts concerning the serious Defect causing Class Vehicles to spontaneously turn off, shift to "Park," and/or activate the emergency brake. Upon information and belief, the Defect relates to the eTorque system of the Class Vehicles. FCA knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles.

708. FCA did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of FCA vehicles that the Class Vehicles were world class, comfortable, warranted, and reliable vehicles and concealed the information in order to prevent harm to FCA and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

709. These omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the omissions played a significant role in Plaintiff and Class Members' decisions to purchase or lease the Class Vehicles.

710.   FCA further failed to disclose and/or denied the existence the Defect when Plaintiff and Class Members complained of the eTorque Defect. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the eTorque Defect was complained of to FCA.

711.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiff and Class Members' actions were justified. FCA was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

712.   Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the eTorque Defect that FCA failed to disclose. Moreover, some Class Members paid for repairs. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

**THIRTY-THIRD CAUSE OF ACTION**
**Breach of Express Warranty by Affirmation, Promise, Description, or Sample**
**Tenn. Code § 47-2-313**
**(Plaintiff Jerry Vanderberg)**

713. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

714. Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

715. FCA is and was at all relevant times a merchant as defined by Tenn. Code § 47-2-104.

716. The Class Vehicles are and were at all relevant times goods as defined by Tenn. Code § 47-2-105.

717. Tenn. Code § 47-2-313 states that a merchant creates an express warranty by making to the buyer "[a]ny affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain" and "any description of the goods which is made part of the basis of the bargain."

718. Plaintiff and Tennessee Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by FCA.

719. FCA expressly warranted the Class Vehicles against defects, including the eTorque Defect, within the meaning of Tenn. Code § 47-2-313. FCA made affirmations of fact that the Class Vehicles were durable, reliable, and

dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

720. Plaintiff and the Tennessee Class Members reasonably relied on FCA's express warranties concerning the eTorque system when purchasing or leasing the Class Vehicles.

721. As described above, the Class Vehicles are defective and render FCA's express warranties false. The eTorque Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Tennessee Class Members.

722. FCA knew of the eTorque Defect when it expressly warranted the Class Vehicles and failed to inform Tennessee Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Tennessee Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

723. FCA is obligated, under the terms of its express warranties, to effectively repair and/or replace the Class Vehicles within a reasonable time for Plaintiff and Tennessee Class Members.

724. FCA breached its express warranties by supplying the Class Vehicles to Plaintiff and Tennessee Class Members with the eTorque Defect and by failing to provide repairs within a reasonable time.

725.   FCA breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiff or Tennessee Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to them.

726.   As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiff and other Tennessee Class Members.

727.   Plaintiff and other Tennessee Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

728.   Affording FCA any further opportunity to cure their breach of written warranties is unnecessary and futile here.

729.   Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Tennessee Class Members whole and because FCA has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

730.   Accordingly, recovery by the Tennessee Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

731. In its capacity as a warrantor, and by the conduct described herein, any attempt by FCA to limit or disclaim the express warranties in a manner that would exclude coverage of the eTorque Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by FCA's concealment of material facts. Thus any such effort by FCA to disclaim, or otherwise limit, its liability for the eTorque Defect is null and void.

732. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Tennessee Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

733. Plaintiff and Tennessee Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

**THIRTY-FOURTH CAUSE OF ACTION**
**Breach of Implied Warranty**
**Tenn. Code § 47-2-314**
**(Plaintiff Jerry Vanderberg)**

734. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

735. Plaintiff Jerry Vanderberg brings this claim on behalf of himself and the Tennessee Class.

-180-

736.   FCA is and was at all relevant times a merchant as defined by Tenn. Code § 47-2-104.

737.   The Class Vehicles are and were at all relevant times goods as defined by Tenn. Code § 47-2-105.

738.   A warranty that the Class Vehicles were in merchantable condition is implied by law pursuant to Tenn. Code. § 47-2-314.

739.   Tennessee law states that "goods to be merchantable must … be fit for the ordinary purposes for which such goods are used … and conform to the promises or affirmations of fact made on the container or label if any." Tenn. Code. §§ 47-2-314(2)(c) and (f).

740.   The Class Vehicles are not fit for the ordinary purposes for which they are used. The ordinary purpose of a Class Vehicle is safe and reliable transportation. Due to the eTorque Defect, however, the Class Vehicles are not fit for their ordinary purpose because the vehicles are prone to spontaneously stall, shift to "Park," and/or activate the emergency brake.

741.   FCA made affirmations of fact that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop." These affirmations created an implied warranty that the Class Vehicles conformed to such affirmations of fact. The Class Vehicles, however, are not

durable, reliable, or dependable, and instead are prone to spontaneous stalling due to the eTorque Defect. Thus, FCA breached its implied warranty because the Class Vehicles do not conform to FCA's affirmations of fact.

742. FCA cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous Class Vehicles.

743. As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of implied warranties from various sources, including Plaintiff and other Tennessee Class Members.

744. Plaintiff and other Tennessee Class Members have given FCA a reasonable opportunity to cure its failures with respect to its warranties, and FCA has failed to do so.

745. Affording FCA any further opportunity to cure their breach of implied warranties is unnecessary and futile here.

746. As a direct and proximate result of FCA's breach of implied warranties, Plaintiff and Tennessee Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

747. Plaintiff and Tennessee Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## THIRTY-FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (Plaintiff Jerry Vanderberg)

748. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

749. Plaintiff asserts this Count on behalf of himself and the Tennessee Class.

750. FCA made affirmative representations to Plaintiff and Tennessee Class Members that that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop."

751. FCA knew that the Class Vehicles were not durable, reliable, or dependable due to the eTorque Defect, which makes the Class Vehicles prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

752. Plaintiff and the members of the Tennessee Class purchased or leased Class Vehicles that they would otherwise have not purchased, or for which they would have paid less money, had they known that the vehicles possessed the eTorque Defect contrary to FCA's representations about the durability, reliability, and dependability of the vehicles.

753.   FCA was unjustly enriched at the expense of and to the detriment of Plaintiff and Tennessee Class, who unknowingly paid money and overpaid for the Class Vehicles that were falsely marketed. FCA was also unjustly enriched because it made material misrepresentations and failed to disclose material facts and Plaintiff and the Tennessee Class members would have otherwise not bought or leased the Class Vehicles or would have paid less for them absent FCA's affirmative misrepresentations and material omissions.

754.   Plaintiff and members of the Tennessee Class therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of FCA's profits.

### 7.      TEXAS

**THIRTY-SIXTH CAUSE OF ACTION**
**Breach of Express Warranty**
**Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
**(Plaintiff Daniella Lopez-Hall)**

755.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

756.   Plaintiff Daniella Lopez-Hall brings this cause of action on behalf of herself and the Texas Class.

757.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

-184-

758.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

759.   FCA made affirmations of fact including that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed" capabilities; and that the eTorque system generates power "like taking off from a dead stop." These affirmations of fact became part of the basis of the bargain and thus created an express warranty that the Class Vehicles conformed to FCA's affirmations of fact.

760.   FCA's warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

761.   Despite the existence of warranties, FCA failed to inform Class Members that the Class Vehicles are not durable, reliable, and dependable; instead, the eTorque Defect in reality causes the vehicles to suddenly stall, shift to "Park," and/or engage the parking brake during normal operation. Thus, FCA breached its express warranty because the Class Vehicles did not conform to FCA's affirmations of fact.

762.   FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' Defect.

-185-

763. FCA was provided notice of these issues through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; and early consumer complaints made directly to FCA, collected by NHTSA ODI, and/or posted on public online vehicle owner forums.

764. Affording FCA a reasonable opportunity to cure their breach of express warranties would be unnecessary and futile here.

765. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Class Members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

766. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting the eTorque Defect as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Texas Class Members' remedies would be insufficient to make them whole.

767. Finally, because of FCA's breach of warranty as set forth herein, Class embers assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

768. As a direct and proximate result of FCA's breach of express warranties, Texas Class Members have been damaged in an amount to be determined at trial.

**THIRTY-SEVENTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
**(Plaintiff Daniella Lopez-Hall)**

769. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

770. Plaintiff Daniella Lopez-Hall brings this cause of action on behalf of herself and the Texas Class.

771. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "seller" of motor vehicles under § 2.103(a)(4).

772. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

773.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

774.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

775.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles are inherently defective in that they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation.

776.   FCA was provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent by the Texas Class before or within a reasonable amount of time after allegations of vehicle defects became public.  In addition, Plaintiff Lopez-Hall directly sought repairs from her local dealership necessitated by the Defect.

777.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Texas Class Members have been damaged in an amount to be proven at trial.

-188-

**8.      PENNSYLVANIA**

**THIRTY-EIGHTH CAUSE OF ACTION**
**Violations of the Pennsylvania Unfair Trade Practices and Consumer**
**Protection Law**
**73 P.S. § 201-1** *et seq.*
**(Plaintiff William Smith)**

778.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

779.   Plaintiff William Smith brings this cause of action on behalf of himself and the Pennsylvania Class.

780.   Plaintiff, FCA, and the Pennsylvania Class are "persons" within the meaning of 73 P.S. § 201-2(2).

781.   FCA engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

782.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201 3.

783.   In the course of its business, FCA concealed and suppressed material facts concerning the Class Vehicles by willfully failing to disclose and actively concealing the dangerous eTorque Defect in the Class Vehicles as described herein. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

-189-

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

784.   Plaintiff and Class Members had no way of discerning that FCA's representations were false and misleading because FCA possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles; intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign that they designed to hide the eTorque Defect from Plaintiffs; and/or made incomplete representations about the safety and reliability of Class Vehicles generally, and the eTorque Defect in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

785.   FCA thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

786. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Class Members.

787. FCA knew or should have known that its conduct violated the Pennsylvania UTPA.

788. FCA owed Plaintiff and Class Members a duty to disclose the defective nature of Class Vehicles, including the eTorque Defect, because FCA:

    a.     Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

    b.     Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign that they designed to hide the eTorque Defect from Plaintiffs; and/or

    c.     Made incomplete representations about the safety and reliability of Class Vehicles generally, and the eTorque Defect in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

789. FCA's concealment of the eTorque Defect was material to Plaintiff and Class Members.

790. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Class Members, about

-191-

the eTorque defect, the quality of the FCA's brands, and the true value of the Class Vehicles.

791. FCA's violations present a continuing risk to the Class as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

792. Plaintiff and Class Members suffered ascertainable losses and actual damages as a direct and proximate result of FCA's misrepresentations and concealment of and failure to disclose material information. FCA had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA. All owners of Class Vehicles suffered ascertainable loss as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

793. As a direct and proximate result of FCA's violations of the Pennsylvania UTPA, Plaintiff and Class Members have suffered injury-in-fact and/or actual damage.

794. Pursuant to 73 P.S. § 201-9.2(a), Plaintiff and Class Members seek an order enjoining FCA's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

**THIRTY-NINTH CAUSE OF ACTION**
**Breach of Express Warranty**
**13. Pa. Cons. Stat. §§ 2313 and 2A210**
**(Plaintiff William Smith)**

795. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

796. Plaintiff William Smith brings this cause of action on behalf of himself and the Pennsylvania Class.

797. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "seller" of motor vehicles under § 2103(a).

798. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

799. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

800. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express warranty as described above.

801. FCA also made numerous representations, descriptions, and promises to Pennsylvania Class Members regarding the performance and reliability of their vehicles.

802. For example, FCA claimed that its Class Vehicles were durable, reliable, and dependable; that the eTorque system possesses "unsurpassed"

capabilities; and that the eTorque system generates power "like taking off from a dead stop."

803.   FCA's warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

804.   Despite the existence of warranties, FCA failed to inform Plaintiffs and Class Members that the Class Vehicles were defective and were prone to spontaneously stall, shift to "Park," and/or engage the emergency brake during normal operation.

805.   FCA breached the express warranty promising to repair and correct FCA's defect in materials and workmanship. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

806.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

807.   Furthermore, any warranty promising to repair and correct FCA's defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Class Members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

-194-

808. Accordingly, recovery by Plaintiff and Class Members is not restricted to the warranty promising to repair and correct FCA's defect in materials and workmanship, and they seek all remedies as allowed by law.

809. Also, as alleged in more detail herein, at the time FCA warranted and sold or leased the Class Vehicles, it knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, FCA had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiff and Class Members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

810. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting FCA's defect in materials and workmanship as many incidental and consequential damages have already been suffered because of FCA's fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Class Members' remedies would be insufficient to make them whole.

811. Finally, because of FCA's breach of warranty as set forth herein, Pennsylvania Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or

lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

812.   As more fully detailed above, FCA was provided with appropriate notice and has been on notice of the Defect and of its breach of warranties from various sources, including Plaintiff and other Pennsylvania Class Members.

813.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and Class Members have been damaged in an amount to be determined at trial.

**FORTIETH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**13. Pa. Cons. Stat. §§ 2314 and 2A212**
**(Plaintiff William Smith)**

814.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

815.   Plaintiff William Smith brings this cause of action on behalf of himself and the Pennsylvania Class.

816.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

817.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

-196-

818.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

819.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

820.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which vehicles are used: providing safe and reliable transportation. Specifically, the Class Vehicles are inherently defective in that they are prone to spontaneously turn off, shift to "Park," and/or activate the emergency brake during normal operation.

821.   FCA was provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and communications sent before or within a reasonable amount of time after allegations of vehicle defects became public.  In addition, Plaintiff Smith directly sought repairs from his local dealership necessitated by the Defect.

822.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Pennsylvania State Class members have been damaged in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against FCA, as follows:

A.    Certification of the proposed Nationwide and State Classes, including appointment of the named Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    Restitution, including, at the election of Class members, recovery of the purchase price of their Class Vehicles, or the overpayment or diminution in value of their vehicles;

C.    Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

E.    An award of costs and attorneys' fees; and

F.    Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

-198-

Dated: June 13, 2023

Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, Michigan 48307
Telephone: 248-841-2200
epm@millerlawpc.com
dal@millerlawpc.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
J. Mitch Williams
Dylan T. Martin
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@beasleyallen.com
Mitch.Williams@Beasleyallen.com
Dylan.Martin@BeasleyAllen.com

Mark P. Chalos
Hannah Lazarz
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Ave S, Suite 1640
Nashville, TN  37201-2379
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com

Patrick Newsom
**NEWSOM LAW PLC**
40 Music Square East

-199-

Nashville, TN 37203
(615) 251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the*
*Proposed Classes*