UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION

**BRIAN FISHER, et al.,**

                         Plaintiff,

-v-                                      Case No. 23-10426

**FCA US LLC,**

                         Defendant.
_____/

                         **MOTION HEARING**

           BEFORE THE HONORABLE **MATTHEW F. LEITMAN**
                   United States District Judge
              Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
                         Detroit, Michigan
                         December 12, 2023

APPEARANCES:

FOR THE PLAINTIFF:    **Hannah Lazarz**
                      **Mark P. Chalos**
                      Lieff, Cabraser, Heimann & Bernstein
                      222 2nd Avenue, South
                      Suite 1640
                      Nashville, TN 37201

                      **Dennis A. Lienhardt**
                      The Miller Law Firm, P.C.
                      950 W. University Drive
                      Suite 300
                      Rochester, MI 48307

                      **H. Clay Barnett, III**
                      **James Mitchell Williams**
                      Beasley Allen Law Firm
                      218 Commerce Street
                      Montgomery, AL 36104

FOR THE DEFENDANT:    **Stephen A. D'Aunoy**
                      Thompson Coburn LLP
                      One US Bank Plaza
                      Saint Louis, MO 63101

**Ian Kennedy Edwards**
Klein Thomas Lee & Fresard
101 West Big Beaver Rd
Suite 1400
Troy, MI 48084

<u>To Obtain a Certified Transcript Contact:</u>
Shacara V. Mapp, CSR-9305, RMR, FCRR, CRR
www.transcriptorders.com

<u>TABLE OF CONTENTS</u>

<u>MATTER</u>                                                          <u>PAGE</u>

MOTION HEARING.........................................................

WITNESSES:


**Plaintiff's Motion to Compel Arbitration:**.................   5
**Defendant's Response:**....................................  20
**Plaintiff's Motion to Dismiss:**..........................  50
**Defendant's Response:**....................................  60
**Plaintiff's Reply:**......................................  62
**Defendant's Response:**....................................  68
**Plaintiff's Reply:**......................................  76


EXHIBITS RECEIVED:

None offered



Certificate of Reporter...................................  85

Detroit, Michigan

December 12, 2023

9:00 a.m.

                              *      *      *

        CASE MANAGER:  All rise

        The United States District Court for the Eastern

District of Michigan is now in session.  The Honorable Matthew

F. Leitman, United States District Judge presiding.

        You may be seated.

        The Court calls Case Number 23-10426, Brian Fisher,

et al., versus FCA US, LLC.

        Counsel, please state your appearances for the

record.

        MS. LAZARZ:  Good morning, Your Honor.  Hannah Lazarz

on behalf of Plaintiffs.

        Mr. CHALOS:  Mark Chalos on behalf of Plaintiffs.

        MR. WILLIAMS:  Mitch Williams on behalf of

Plaintiffs.

        MR. LIENHARDT:  Dennis Lienhardt from the Miller Law

Firm, on behalf of the plaintiffs.

        MR. BARNETT:  Good morning, Your Honor.  Clay Barnett

on behalf of plaintiffs.

        MR. D'AUNOY:  Good morning, Your Honor.  Stephen

D'Aunoy for FCA US LLC.

        MR. EDWARDS:  Good morning, Your Honor.  Ian Edwards

for Defendant FCA US LLC.

THE COURT: Good morning.

MR. D'AUNOY: Good morning.

THE COURT: Welcome to everybody.

We're here for argument this morning on two motions: A motion by FCA to compel arbitration, and a motion by FCA to dismiss.

What I'd like to do is start with the motion to compel arbitration, if I could. So who's going to be arguing that for FCA?

MR. D'AUNOY: Stephen D'Aunoy, Your Honor.

THE COURT: All right. Do you mind coming to the podium?

MR. D'AUNOY: Yeah, no problem.

THE COURT: Mr. D'Aunoy, you've appeared before me several times, so you probably know what I like to do. I like to start with my questions and then open it up to you.

By the way, who's going to be arguing this for the plaintiff, this motion?

MS. LAZARZ: Ms. Lazarz, Your Honor.

THE COURT: All right. Thank you.

**PLAINTIFF'S MOTION TO COMPEL ARBITRATION:**

THE COURT: Mr. D'Aunoy, let me start first with the argument that the plaintiffs make that, on the record before me, I couldn't possibly find that there was actual assent to

the warranty in the arbitration provisions.  At a minimum, I would have to hold an evidentiary hearing under the Sixth Circuit's published case law that I have followed in previous decisions.

Setting aside, for the sake of this question, your estoppel argument, aren't they clearly right on this assent point?

MR. D'AUNOY:  Well, Your Honor, I don't think so.  I mean, I don't think a party is allowed to contradict its own pleading.  So if we look at the first amended complaint here --

THE COURT:  I'm saying totally apart from the estoppel point.

MR. D'AUNOY:  Right.  And I'm not -- I'm not even -- this isn't even estoppel, Your Honor.  What they say -- because their argument is premised on this idea that the agreement doesn't even exist, right?

THE COURT:  It's premised on the idea that the arbitration agreement wasn't entered into.

MR. D'AUNOY:  Well, the -- the arbitration agreement is part and parcel of the vehicle limited warranty.  And they outright admit in their complaint, Your Honor, FCA issue -- FCA issued its limited vehicle warranty for the benefit of Plaintiffs and other class members, and for the purpose of persuading Plaintiffs and other class members to purchase a

class vehicle.

So they admit that the warranty was issued. And I don't think there's any dispute that the arbitration agreement is in the warranty. So this isn't even an estoppel argument, Your Honor. The estoppel argument will build on this, obviously, but they outright admit in their complaint that there is a warranty.

THE COURT: Let me try to ask this question separate and apart from that allegation in the complaint.

MR. D'AUNOY: Okay.

THE COURT: And believe me, I take -- I take your points about what's in the complaint seriously, and I'll have questions for the plaintiffs about that. But what the plaintiffs say happened here, is you stuffed the warranty into the glove compartment.

If there had been no -- if they weren't bringing a claim to enforce the warranty, and the complaint had no allegations about the warranty -- so again, I want this to be separate and apart from the complaint. Under those circumstances, wouldn't I have to hold a hearing about whether the warranty formed a contract?

MR. D'AUNOY: Your Honor, I mean, if that were the world, then yes. I mean, because the record before you, if we set aside all of these other things, it's simply, we say there's a warranty, and they put declarations in the record

saying that, you know, we didn't see it. You know, but I don't think we're in that world.

THE COURT: Why aren't there declarations enough? They say we didn't see the warranty. Some of them say, I think, they still haven't seen the warranty.

MR. D'AUNOY: I mean, that's just an impossibility, Your Honor. I mean, they actually plead that they got the warranty and they plead claims based on the warranty.

THE COURT: Where do you think they -- they plead that the warranty was issued, right?

MR. D'AUNOY: Yes.

And obviously, they had to look at it in order to bring claims under it. So I would -- I mean, so at some point, they saw it if they're going to sue under it. And they actually affirmatively plead certain provisions of the warranty as well.

It makes no sense to me, Your Honor, that you could have a contract and plead claims that you've breached -- or that the other party to that contract is in breach, but then put in a declaration saying I've never seen it. Well, then -- then their allegations, I guess -- we can't presume that their allegations are simply false. I mean, I don't think that's anything that Your Honor or the plaintiffs would want the Court to do because that has much greater implications than, you know, simply trying to contradict oneself.

But the declarations here are completely contradictory to what is affirmatively pleaded in the complaint and how they plead their claims.

THE COURT: All right. Let me turn to the issue, your estoppel arguments. First, just a background question. It seems to me that these estoppel arguments are questions of state law under the laws of each state in which they're bringing claims.

Do you agree with that?

MR. D'AUNOY: I do, Your Honor.

THE COURT: All right.

Is it your position that the laws of the various states here don't differ with respect to recognizing this form of equitable estoppel, and that there are certain general principles that are recognized broadly that I ought to be applying here?

MR. D'AUNOY: Yes, Your Honor. And that's what we've cited in our briefing, and Plaintiffs didn't address this issue at all in their briefing. But yes, Your Honor, I do believe that all of the states at issue recognize the same general principles of estoppel.

THE COURT: All right.

MR. D'AUNOY: Oh, I'll let you --

THE COURT: Go ahead.

MR. D'AUNOY: Oh, no, I was going on to more of my

own general points, so I'll let you continue.

THE COURT: All right. So the plaintiffs cite some cases that seem to reject this theory of estoppel. Their -- the primary case they rely on, and the one they quote is this case called Demidio versus REV Recreation Group, an unpublished District Court case from the Northern District of Indiana. The defendant in that case seemed to make an argument much like the one that FCA makes here, and the District Court seemed to reject it.

Why is Demidio not the right approach here?

MR. D'AUNOY: Well, I think it has to do with the claims. If I remember, right, Your Honor, and I've reviewed a lot of cases, I don't think they were asserting claims under the actual agreement in that case.

THE COURT: Yeah, this is -- so this is -- I certainly checked that because that's important. But, so Demidio is a case -- I know there were a lot of cases cited, but this is the one that they block quote. This is their primary authority on pages 12 and 13. So I'm not pulling this out of thin air here, trying to surprise you with this case.

MR. D'AUNOY: Yes.

THE COURT: This is their main one.

And in Demidio -- do you have the case?

MR. D'AUNOY: I don't.

THE COURT: All right. So in any event, I'll read

it, and I hope you'll trust my reading of this.

MR. D'AUNOY:  Okay.

THE COURT:  The District Judge there, Judge Lee, is giving the factual background, and he says the Demidios sued the company for breach of warranty and/or contract, violation of the Magnuson Moss Warranty Act, and other statutes.

So they bring a claim.  And then, the District Judge there was quoting the defendant's argument.  And what he says is, the defendant argues that the plaintiffs have sued for breach of contract and a breach of the warranty containing the binding arbitration provision.  To establish these claims, they have alleged that they relied upon, and were induced by the written warranty.  However, they now seek to eschew the binding arbitration provisions, while at the same time enforcing those terms beneficial to them.  This, they cannot do.

That was the defendant's argument as --

MR. D'AUNOY:  Right.

THE COURT:  -- described by the District Judge.  That sounds a lot like FCA's argument here.  And Judge Lee said this argument is unavailing, and then he gave his reasons.

Is he wrong?

MR. D'AUNOY:  He is wrong, Your Honor.

THE COURT:  What is wrong with his reasoning in this case?

MR. D'AUNOY:  And, Your Honor, I have to admit, I don't recall all of his reasoning, but we would point Your Honor to -- you know, our best case, Your Honor, is the Vargas-Lopez v. Hyundai case out of California.

And the reasoning in that case -- and again, it just goes to the contract principles, Your Honor.  When there is a contract, it's -- you can't pick and choose what parts of the contract that you want to have enforced.  You know, your -- in this case, in particular, the plaintiffs are claiming that there is a contract, a warranty.  They don't get to ignore the provisions of that warranty that are not beneficial to them.  For instance, they don't get to change the time and mileage limitations.  They might not like that the warranty is limited to three years and 36,000 miles.  They don't get to ignore that provision.  Just like they don't get to ignore the provision that requires arbitration of disputes between FCA US and themselves.  It's a contract as a whole.

And if -- and I wish, Your Honor, I recalled that case.  But it would certainly be an outlier in all of the cases that -- that we've seen and, of course, the cases that we've cited.

THE COURT:  Well, they cite a couple more that, at least to some degree, stand for the same proposition.

MR. D'AUNOY:  Yeah.  And, you know, the other point I would make, Your Honor, is none of our named plaintiffs, and I

was just looking at this, too, purchased vehicles in Indiana. So if that is something unique to Indiana state law, then, you know, certainly, that wouldn't apply to any of our plaintiffs here, would be another point I make, Your Honor.

But we've certainly, cited --

THE COURT:  What's wrong with this picture?

MR. D'AUNOY:  Okay.

THE COURT:  I watch a lot of football and too much ESPN.  And every other commercial -- the commercials that aren't for local personal injury lawyers are for cars from your client and GM.  And a lot of these commercials are touting these great warranties.  So you have this image of the plaintiffs purchasing the car, understanding that from these commercials -- and they don't say this in their declarations, I get it.  But I'm just trying to think of what happens in the real world.

People like, say, dumbassses like me, walk into a dealership, and I think I'm getting, if I'm at a Chrysler dealership, a 3-year, 36,000-mile warranty because I've watched the commercials in between the Michigan-Ohio State football game.  So I know there's a warranty.  I want a warranty, but it turns out that stuffed into my glove compartment is a warranty with a lot of onerous, horrible conditions like arbitration and other stuff.  And I'm not saying unconscionable, but just tough ones that I never really

would have agreed to. I wouldn't have bought the car if I knew they were there, and conditions that are tough.

So my options are, if I want to enforce the warranty and Chrysler doesn't honor it, I've got to eat all these provisions that I had no idea were part of this transaction, that Chrysler touts the warranty. That just doesn't feel right, does it?

MR. D'AUNOY: Well, Your Honor, I will quote from the Gavrilovic v. T-Mobile USA case decided here in the Eastern District in 2022. Failure to read an agreement is not a defense and an action to enforce the terms of a written agreement. And finding --

THE COURT: So, is --

MR. D'AUNOY: -- that the consumer accepted T-Mobile's arbitration provisions simply by using a cellphone.

THE COURT: Is your argument here, that somebody in my position, the person who thinks there's a warranty, if that's an important part of the transaction when I'm signing, I should say, hold on, what is the terms of the warranty? Is that the idea here?

MR. D'AUNOY: Exactly, Your Honor. I mean, it's a contract. And I think the law, for many, many years, has presumed that the parties of the contract read and know the terms of the contract. In particularly, if you're going to sue under that contract.

THE COURT: Let me ask you something.

When I buy a car, or actually I lease, but I assume when people buy, there's a purchase agreement --

MR. D'AUNOY: Yes.

THE COURT: -- and there's a lease agreement. Why isn't the arbitration provision in those documents?

MR. D'AUNOY: Because FCA US is not selling the vehicle, Your Honor. We are not a direct party to that transaction, so --

THE COURT: But I held in Cunningham versus Ford Motor Company, that you can enforce it even if it's between the dealer and the purchaser.

MR. D'AUNOY: Yes, Your Honor. And I'm aware of that. Some of the arbitration provisions with -- between the dealers and vehicle purchasers do have third-party beneficiary, do have references to the vehicle manufacturers as coming within the terms of those warranties. You know, part of the problem is we don't have those purchase contracts. And so, until we get into discovery and until we ask plaintiffs for their purchase contracts -- and they may very well have other arbitration provisions in those purchase contracts that are enforceable. But at this point, FCA US is simply not aware of those because they're between third parties and Plaintiffs.

You know, so we're not saying that that may not be

the case here as well.  We just simply don't have those contracts at this point.

THE COURT:  Didn't most of these folks buy from Chrysler dealerships?

MR. D'AUNOY:  They did, Your Honor.

THE COURT:  Couldn't you guys have gotten these documents from the dealerships?

MR. D'AUNOY:  That is a possibility.  I will tell you, typically with FCA dealers, we have to subpoena those records in order to go get records.  You know, it's a -- they're separate business entities.  We can't just demand that they provide records to us.

So I will tell you, the typical cadence is, we subpoena records from the dealerships.  And if we get those records through responses of subpoenas, that's when we typically would bring them to the Court's attention.

THE COURT:  All right.  What else do you want to tell me about the estoppel argument?

MR. D'AUNOY:  So on the estoppel argument, Your Honor, I'm not even -- well, I won't even say that.  This isn't even an argument for Your Honor, this is an argument for the arbitrator.

And I'm going to read from Blanton v. Domino's Pizza.  That's a case from the Sixth Circuit in 2020.  And it said, estoppel issues are for the arbitrator in a very similar

situation to here. And I'll quote. It says, "Piersing also asked us to vacate the portions of the District Court's opinion that purport to decide whether Domino's can enforce the arbitration agreement under contract law." And it does a parenthetical, specifically, equitable estoppel.

He rightly points out that this case should be decided by an arbitrator, not a Court.

And going along the same lines, Your Honor, it's --

THE COURT: Isn't that a different question, though? This is -- this is an antecedent question, whether there is an agreement at all, right? This is -- this is not who can enforce. This is, is there an agreement.

MR. D'AUNOY: This is -- we got two issues here. We've got the estoppel issue, which ties in their pleading, their claims, and the agreement --

THE COURT: Right. But --

MR. D'AUNOY: -- that has a delegation clause.

THE COURT: But what you want them -- before we even get to the delegation clause, we've got to figure out, is there some binding contract that has a delegation clause. And what you want them to be estoped to deny, is the existence of the contract as a whole. And that seems to be a question for me.

MR. D'AUNOY: Well, and then, Your Honor, if you're viewing it in that lens, you know, then I would quote from a

Sixth Circuit opinion in Swiger v. Rosette, decided in 2021. And there, it says, the FAA, however, allows parties to agree that an arbitrator rather than a Court, will determine gateway questions of arbitrability, such as whether the parties have agreed to arbitrate, or whether the agreement covers a particular controversy.

THE COURT:  This case doesn't involve either of those questions.  This case involves a question you get to before those.  Is there even an agreement between these folks, right?

MR. D'AUNOY:  And I'm going to go on, Your Honor.

THE COURT:  Okay.

MR. D'AUNOY:  Only a specific challenge to a delegation clause brings arbitrability issues back within the Court's province.  And they -- the Sixth Circuit quotes their case, Rent-a-Center.  A party challenges a delegation clause -- a party's challenges the delegation specifically -- I'm sorry, I left out a word.  Unless a party challenges a delegation provision specifically, the Court must, and here's a very important thing from that case, Your Honor, leave any challenge to the validity of the agreement as a whole, to the arbitrator.

Here, they don't challenge the delegation clause saying there's something wrong with the delegation.  They're challenging the agreement as a whole, Your Honor.  They're --

THE COURT:  And they're saying -- they're questioning

whether there is any agreement.

MR. D'AUNOY:  Which is a challenge to the validity of the agreement.  Exactly what the Sixth Circuit said, Your Honor.  That is what their challenging.

THE COURT:  Which case -- it's been a while since I've looked at these, but I looked at them pretty carefully in the Cunningham case.  And my recollection is, is that all of those cases, you start with the premise that there is indisputably, a binding agreement.  And from there, then you have questions about estoppel and delegation and all that other stuff.  Here, at least at the beginning, they have a problem with their pleading, but the estoppel goes to whether there is an agreement at all, right?

MR. D'AUNOY:  The estoppel -- estoppel, Your Honor, just prohibits them from denying the agreement which does exist.  That there is an agreement here, and they prohibit it under estoppel principles from denying that it exists.  Hence, avoiding their obligations to --

THE COURT:  This is kind of like -- your argument, to me, tends to prove too much.  Pretend two parties have never met and you -- and you're the plaintiff and you bring a claim against the defendant.  In the real world, you've never met, and you produce a document that says this is an agreement and it has a delegation provision, and these guys are bound by it.  And they say, we've never seen this damn thing, we don't know

anything about this.  And you say, sorry, the arbitrator has to decide that because there's this contract that has a delegation provision in it.

That can't be the rule, right?

MR. D'AUNOY:  But that is not the exact situation here, Your Honor.  The situation we have here is, Plaintiffs have affirmatively pleaded that there is an agreement.  We show the Court, here's the agreement.  They just didn't want to show the Court the terms of the agreement, so we did.  We put the agreement into the -- into the record.  And now we have the agreement into the record, it's got a delegation clause.  And issues about the validity of whether or not that applies or not go to the arbitrator.  Issues about estoppel go to the arbitrator.  That's what the Sixth Circuit has said in the Blanton v Domino's case and the Swiger v. Rosette case, Your Honor.

THE COURT:  Okay.  Anything else?

MR. D'AUNOY:  No, Your Honor.  I will respond if Plaintiffs have anything else.

THE COURT:  Okay.

MR. D'AUNOY:  But for now, no.

THE COURT:  Thank you for your thoughts.

**DEFENDANT'S RESPONSE:**

MS. LAZARZ:  Good morning, Your Honor.

THE COURT:  Good morning.

What I'd like to do is the same approach I did with Mr. D'Aunoy, and then at -- start with my questions, and then I'd be happy to hear any of your additional thoughts.

Let me start with my basic question.  Do you agree that these questions of estoppel are questions of state law?

MS. LAZARZ:  Well, Your Honor, I think the most important thing to do is step back and understand we don't really need to reach the question of estoppel.  Because as was referenced in this argument, it's a question of contract formation in the first place.  And because as Plaintiffs have set forth in their briefing, there was no mutuality of assent. Plaintiffs never agreed to the terms in this warranty booklet, so we're not even reaching the issue of equital -- equitable estoppel.

THE COURT:  All right. News flash.

My question is about equitable estoppel.  I'm going to reach the question of equitable estoppel.  So now, please answer my question.  Is this a question of state law, the equitable estoppel?

MS. LAZARZ:  Understood.

And yes, Your Honor, I do think state law principles would apply to this question.

THE COURT:  All right.

Are you aware of any variations in the laws of the states that are relevant here, with respect to the equitable

estoppel principles?

MS. LAZARZ:  I'm not aware, Your Honor, but Plaintiffs are happy to provide supplemental briefing on that topic, understanding that we didn't reach that issue in our opposition brief.

THE COURT:  All right.  Is your position that you didn't respond to the equitable estoppel argument in your opposition brief?

MS. LAZARZ:  No, Your Honor.  It's just that we didn't address the issue of whether the state law varies on the topic of equitable estoppel.  However, the Demidio case is exactly on point, and Plaintiffs kind of preemptively addressed that issue in our opposition brief.

THE COURT:  All right.

So is Demidio your best case for why the -- their equitable estoppel arguments lose?

MS. LAZARZ:  Well, as Your Honor is likely aware, this district doesn't appear to have addressed this specific issue, and so based on Plaintiff's research, that's the most similar case we could find on that topic.

THE COURT:  So if I was writing an opinion in your favor and I said FCA makes these equitable estoppel arguments, I'm reaching them, and they lose on the merits, they're just wrong, and that's the exact conclusion that the Court reached in blank, the best case there is Demidio?

MS. LAZARZ:  I think so, Your Honor.  At least in terms of the Court spelling out their reasoning, I think that's the best case to cite.

THE COURT:  So I'm glad you mentioned that.  Let's talk about the reasoning in that case.  So I set forth the argument that the District Court there ascribed to the defendants, and it's basically the exact same argument that FCA is making here.  And the District Court said that the argument is unavailing because it presumes the existence of a valid arbitration agreement.

MS. LAZARZ:  That's right.

THE COURT:  Why isn't that unpersuasive?  In other words, the point of the estoppel is not that it presumes the existence of anything.  The way I understand the estoppel is, if a plaintiff brings a claim under a contract, the -- the plaintiff can't pick and choose which parts of the agreement it wants to enforce.  In other words, that's the theory underlining the argument.  And when the judge in Demidio says the argument fails because it presumes the existence of a valid arbitration agreement, I don't think the argument presumes the existence of a valid arbitration agreement.  That doesn't have anything to do with the reasoning why estoppel would apply.

Isn't that a fair criticism of Demidio?

MS. LAZARZ:  I think I understand your point there,

Your Honor.  However, in this case, it's the exact same facts as that situation, no contract was formed, at all, between plaintiffs and the defendant.

THE COURT:  I get -- I certainly understand why you're relying on it.  I think the facts are similar.  But I'm asking you -- you're saying Demidio is the most persuasive authority in support of your position and why I should reject their position.  And I -- I hear that.  That's a serious argument.

But my question is, the reasoning of Demidio seems, to me, open to a serious criticism here.  Which is, the Judge rejected FCA's argument because he believed, quote, "It presumes the existence of a valid arbitration agreement."

My understanding of the argument is it doesn't presume anything.  It's based on the equitable notion that one who invokes a contract in support of a claim can't pick and choose which provisions it wants to enforce.  If that's the proper theoretical underpinning of FCA's argument, why is Demidio a persuasive rejection of that argument?

MS. LAZARZ:  I think I understand, Your Honor.  And I think the idea in Demidio is that, you know, just because the plaintiff is accepting the benefits of the contract doesn't mean they're agreeing to all the specific terms and conditions.  Because if there was no, you know, mutuality of assent agreement to all the material terms, arbitration being

a material term, then, you know, you can't say that the plaintiffs agreed to that term.  And just because they bring an expressed warranty claim in their complaint doesn't mean they agreed to an arbitration term in this booklet that they never received.

THE COURT:  All right.  So doesn't Mr. D'Aunoy make a fair point?  The plaintiffs here are bringing a claim under the warranty.  The warranty has a lot of different provisions.  Which ones do the plaintiff get to say, we agree to this one, but not to that one?  Why does it make any more sense for them to say they agree to the provision they want to enforce, but not to the arbitration provision?

MS. LAZARZ:  Sure, Your Honor.

And as Your Honor kind of referenced in the previous argument, when someone buys a car, they understand it comes with an expressed warranty.  I mean on the label of the vehicle that's required to be there under Federal law, FCA states, you know, these are the number of years and miles that apply to express warranty.  But they don't include an arbitration provision.  And it's not this stage of the litigation where we're determining the -- this factual issue of what the terms and conditions are.

And Plaintiffs reject the very notion that this is the document in which a plaintiff has agreed to a specific term or condition that would apply.  Plaintiffs generally

bring expressed warranty claims based on the basic notion that, yes, their vehicles were covered by an expressed warranty.

THE COURT: But you attached an exemplar of a warranty to the complaint; isn't that right?

MS. LAZARZ: We did. We attached an exemplar of an expressed warranty to stand for the basic notion that, yes, these vehicles are expressly warranted, these are the general, you know, number of years and miles that apply to that warranty. We're not delving into any specific line items on that contract. That's a contract formation issue. And if this document wasn't even provided to plaintiffs at the time they purchased their vehicles, it would kind of defy the basic principles of contract formation to then bind them to one of the specific terms.

THE COURT: But you're enforcing something. Your express warranty claim is saying there was some promise made. What was the promise? How do I figure out what is the warranty you're suing on from the pleadings?

MS. LAZARZ: Well, absolutely. And under Michigan State contract law, the terms of an agreement are where -- are the terms on which there were a meeting of the minds. And right now, we're focusing specifically on that, whether there was an agreement to arbitrate. Here, Plaintiffs have clearly shown a genuine issue -- a genuine factual issue about whether

that specific term was agreed to.  And what those other -- any other specific terms is a factual issue not to be decided on a motion to compel arbitration.

THE COURT:  How do you distinguish this?  There's a significant body of case law that says that when a plaintiff sues on a contract, a non -- when a non-signatory to a contract brings claims under the contract, it's estopped from denying the terms of the contract, any of the terms of the contract, including an arbitration provision.  There's a number of cases that say that.

The FCA cited one from California, a District Court case.  But there's a number of other cases that stand for that proposition.  Why don't those cases control here?

MS. LAZARZ:  Well, we need to look kind of at the specific factual scenario in that case.  And specifically, whether the contract was even viewable, you know, to the -- to the plaintiff or to the purchaser at the time, just because they were a non-signatory.  Here, the plaintiffs didn't even have the opportunity to review this contract.  And just because they accepted benefits of an express warranty, because there was no ability for them to agree to any of the terms in that warranty information booklet, those cannot be the terms that are enforced here at this stage.

THE COURT:  All right.  But we're at the pleading stage.  You even -- what are the terms of the warranty that

you want to enforce? How many miles?

MS. LAZARZ: Well, understood, Your Honor. We are at the pleading stage in terms of bringing an expressed warranty claim. But on a motion to compel arbitration, we're looking at a Rule 56 standard of whether the defendant can -- can present facts that would allow a jury to find a contract was formed, and whether a specific arbitration agreement was formed.

THE COURT: Maybe I should have made myself clear.

I'm inclined, -- at least my initial inclination is, with you guys on the notion that as a factual matter, sitting here today, I don't think I can find that there was mutual assent at the time of the purchase to the warranty and the arbitration provision. I'm with you on that. Where I think they have a stronger position, for today, is their estoppel argument. And the estoppel argument, at least as I understand it, and feel free to push back on this point, isn't one that hinges at all on whether there was mutual assent at the time. It's a -- it's based on the idea that a plaintiff who brings a claim under a contract can't -- you know, can't pick and choose which provisions it wants.

So isn't it true that there's only one warranty that was offered? So if you're bring a warranty claim, doesn't it have to be under the actual warranty that FCA offered?

MS. LAZARZ: Well, I -- I guess multiple issues

there.  Would be, first, that the defendant doesn't provide facts showing that this was, in fact, the warranty offered to that plaintiff if a plaintiff never received it.  And second, I guess the issue would be, you know, where does the logic end there?  I mean, we can't use equitable estoppel to enforce any term or provision that a car manufacturer wants to put in a warranty that's then stashed in a glove box.

I mean, they could include whatever they wanted in that document, you know.  They could say you have to give your car back a year from now, put that term in there, and stash it in the glove box.  And then, they can't turn around and try to use equitable estoppel to enforce that term that a plaintiff was never even aware about.

THE COURT:  You're saying if the term is -- even if the term is not unconscionable?

MS. LAZARZ:  Unconscionability aside, Your Honor.  It's a question of contract formation.

THE COURT:  Look, I hear your point, and that's what I was pressing Mr. D'Aunoy on.  It's this notion of -- I'm troubled by the point you're making on their point.  I think the point you're making is a serious one, and a hard one for them.

But help me, again, understand how you reconcile that with this line of cases that says a non-signatory, that presumes somebody -- when you say a non-signatory can be

compelled to arbitrate, aren't you starting from the presumption that there wasn't a meeting of the minds, that person who can be compelled to arbitrate didn't see the provisions, didn't agree to them, but they're not being foisted on the person?

MS. LAZARZ:  Sure, Your Honor.

And again, Plaintiffs are happy to address this more specifically with specific cases in supplemental briefing. But the idea here is that that document wasn't even available to the plaintiffs.  And no facts were presented by the defendant showing that, you know, a sales representative even mentioned the warranty, or that it even was in the glove box. For some of the plaintiffs, that wasn't.  And so, for that reason --

THE COURT:  All right, assume all of that.  Today, do you acknowledge that the warranty you're suing on is the one that's in the glove box, but what you think the equitable outcome here is to X out the arbitration provision?

MS. LAZARZ:  We're not asking to X out the arbitration provision, we're asking to, you know -- that Your Honor finds under, you know, the relevant standard for a motion to dismiss, that Plaintiffs have plausibly alleged that the vehicles are covered under a -- under a warranty.

And then, when looking at the motion to compel arbitration, that a factual issue exists as to whether

Plaintiffs agreed to the specific terms in the warranty booklets attached to the defendant's motion.

THE COURT: Just give me one second.

All right. In your nationwide class claims, this is the first point that I'm focusing on where you guys referenced the warranty. You say that FCA's warranties are written warranties within the meaning, I think, of the Magnuson Moss Act; is that correct?

MS. LAZARZ: That's right.

THE COURT: All right. And then, you say FCA breached these express warranties by providing a 3-year, 36,000-mile new-vehicle limited warranty with the purchase or lease of all new class vehicles.

Isn't Mr. D'Aunoy right when he says, look, the warranty you're suing on here, by your own position in the complaint, is the one that they offered, but you don't think you should be bound by the arbitration provision, but you acknowledge that the relevant warranty here is the one they offered, the one in the glove box? Is that not correct?

MS. LAZARZ: Well, Your Honor, I guess I would first mention that that warranty is set forth in multiple places. As -- as you referenced, you know, the defendant advertises a 3-year, 36,000-mile warranty. It's on the window sticker of the vehicle. That doesn't --

THE COURT: Look, my BS about what I saw during the

ESPN halftime show, that's not relevant here. I'm talking about, your complaint pleads that it -- that you're suing on a written warranty. The only written warranty that I'm aware of is the one that, in your view, was stashed in the glove box. Doesn't that's mean by definition, that's the one you're suing on?

MS. LAZARZ: Well, there is a factual question about where all the terms and the conditions of the warranty are set forth. And that's something where the burden is on the defendant to present with its motion to compel arbitration, where the terms are set forth. Now, assuming that that's true, that the only place the terms and conditions are set forth is in that booklet, there is a meeting of the minds. There's mutual assent on the fact that the car comes with a 3-year, 36,000-mile warranty. But there's not a meeting of the minds as to the arbitration provision on page 5 of this booklet, that the plaintiffs didn't have access to. And that -- that's a basic tenet of contract formation, is that the plaintiff has to agree to be bound by an arbitration term.

THE COURT: I agree with you.

My initial inclination is on the question of, was there actual assent at the time of the purchase, and I can't resolve that today so you're not going to lose on that ground.

The one that I'm really struggling with, though, is the estoppel. And what I'm really drilling down here very

narrowly is, you suggested that there's some uncertainty as to which warranty you're seeking to enforce, and what are the terms of it. And I was saying, it seems to me that you're seeking to enforce FCA's written warranty. But what you're arguing is that you can't be bound to the arbitration provision. And you've -- you've countered by saying there's uncertainty, it's not clear that that's exactly what we're seeking to enforce. And I'm coming back to you and I'm saying, hold on, doesn't your complaint indicate, as Mr. D'Aunoy argued, that the only warranty that's at issue in this case, is the one that's stashed in the glove compartment. And the way you get to that is by saying your own allegations are that you're suing on a written warranty. And they've shown this is the only written warranty that's out there. And you even use its proper name in your complaint.

So isn't the right way to think about this, that you acknowledge that the relevant warranty here is the one stashed in the glove compartment? Isn't that right?

MS. LAZARZ: Sure. The -- the fact that a written warranty exists certainly supports the fact that Plaintiffs are able to bring express warranty claims. I guess there's two separate issues. Does an express warranty exist; and should each term and condition --

THE COURT: Okay. So I'm only focusing on the first question here which is, which is the warranty on which you're

suing.  If you're -- I understand that one possible argument is the relevant warranty here is Chrysler's warranty, and they can't make us eat an arbitration provision.  I get that argument.

What I'm focusing on, though, is something that you said earlier, which is, maybe the relevant warranty isn't the one in the glove compartment at all, maybe there's something else.  This is the only thing I want to focus on now.  Isn't it -- by your own pleadings, isn't it clear that what we're talking about when you guys are suing on a warranty, is that warranty?  Separate question whether you're bound by the arbitration provision.

But can't we agree that that's the relevant warranty here?

MS. LAZARZ:  Well, at the pleading stage, I don't think Plaintiffs have -- have a burden of identifying the specific warranty they're suing under.  But assuming -- assuming that it is this --

THE COURT:  Look, I can tell you in the case I had last week, the Sixth Circuit says when you bring a breach of contract claim, you've got to identify the contract and identify the provisions you say were breached.  So that's the law.

But haven't you done that?  Whether or not you're required to, doesn't this complaint say you're suing on a

written warranty?  And in the -- for the purposes of this motion, isn't the written warranty here necessarily the one that was stuffed in the glove box?  If you -- if you say yes, you're not admitting that you're bound to the arbitration provision.  I'm just trying to button down what is the warranty you're suing on, and isn't it FCA's written warranty.

MS. LAZARZ:  Understood, Your Honor.

And -- and assuming that that is the written warranty that applies, I guess there's two issues I would raise. First, as I referenced Plaintiff's unconscionability arguments that, you know --

THE COURT:  But before we -- I just want to answer this really narrow question.  And then, you can come back and say, even if that is the warranty, you win for these reasons. But just on this one question, can we agree that your breach of express warranty claim is based on the FCA warranty that FCA has identified here?

MS. LAZARZ:  I think Mr. Williams was actually prepared to address this topic.

MR. WILLIAMS:  Yes, Your Honor.  My name is Mitch Williams, for the plaintiffs.

I think the express warranty claim in the arbitration provision at issue here, I think our express warranty claim was based on a mistake of fact.  We based that on the 2019 warranty, as Mr. D'Aunoy acknowledged, which doesn't have an

arbitration provision. Upon further investigation, preparation for this hearing, and looking at what they submitted, you know, we concede our express warranty claim at this time, which would also resolve the arbitration issue.

THE COURT: You just agreed to dismiss all of your express warranty claims?

MR. WILLIAMS: I mean, we're -- you know, we look at all the facts and the law and, you know, we relied on the 2019 manual at the time that we formed our complaint --

THE COURT: Hold on. This is -- this is absolutely not what you argued in your motion in response to their motion to dismiss. If you want to say you're conceding your warranty claims to get out from under what looks to be, based on my questions, an argument you're concerned about losing, say that. But the notion that this is something you did in preparation for the hearing, you looked back, that doesn't wash.

You said, in your papers, you took the position -- and Ms. Lazarz's been arguing, doing a hell of a good job arguing that even if it is the right warranty, the -- you guys win today. So what you just stood up and said is the exact opposite of what she's been busting her ass to tell me for the last 45 minutes.

MR. WILLIAMS: Understood, Your Honor.

And we --

THE COURT:  Who speaks for the plaintiff?  Ms. Lazarz is saying, Leitman, if you rule in favor of FCA on this, the Sixth Circuit's going to clock you and you're going to lose. And you just stood up and said, we concede.

MR. WILLIAMS:  Yes, Your Honor.

And I think Ms. Lazarz has made great arguments, and I still think they stand, and I still think we win on them. But from the factual standpoint -- she made the legal arguments, and from a factual standpoint, we concede our express warranty claims.

THE COURT:  Her legal arguments rests on the facts that your concession rests on.  She --

MR. WILLIAMS:  Understood, Your Honor.

THE COURT:  She's assuming that it's the warranty that you say applies.  And she's arguing her butt off, doing a great job, fending off my toughest questions.  And I'm not saying I'm going to rule in favor of her, but has -- why is this coming up now?  Why didn't she stand up at the beginning of this argument and say exactly what you just said?

MR. WILLIAMS:  This was something that I was going to cover.  I'm handling the motion to dismiss.  I'm handling the express warranty motion argument to dismiss, and it was something I was prepared to handle.  And upon consultation with my counsel at the -- my co-counsel at the table, we thought it was appropriate for me to stand up and address it

now.

THE COURT:  Look, coming into this hearing, the position you were going to take at the motion to dismiss, the 12(b)(6), is fundamentally inconsistent with everything Ms. Lazarz has just said now.  She's defending these claims.

Did you guys not talk to each other before you came in here?

MS. LAZARZ:  It's an argument in the alternative, Your Honor.

THE COURT:  No, he just conceded.

MS. LAZARZ:  I understand.

And I think, to put it another way, if Your Honor is inclined to find that if we're bringing express warranty claims, we have to take every term of that warranty information booklet as it is, in that case, we would be inclined to voluntarily dismiss our express warranty claim so that we can proceed in this forum.  And that doesn't mean that, you know, we can't present both arguments to Your Honor, the arguments in the alternative.

THE COURT:  He just stood up and said, we concede.  It's like I'm going back and forth.  I'm playing Whac-A-Mole.  I don't know which lawyer I should be listening to.

He conceded -- he took everything you just said, didn't say I'm offering in the alternative, and said, just ignore what she just said for half an hour.  You've been all

over her, she's done a great job, she's a wonderful lawyer, we give up. And now you're back to saying, we don't really give up, we want to hear what your ruling is first before we decide whether we give up.

MS. LAZARZ: Well, I think it's certainly fair to -- for Plaintiffs to be able to take --

THE COURT: Which one do you want? Do you guys want to vote, the six of you? Because he was unconditional, we concede, and you are suggesting, no, if we lose on the warranty claim, then we want to dismiss it. If you find that the warranty -- if you agree with their estoppel argument, we want it dismissed.

MS. LAZARZ: I think it's certainly not unfair or uncommon to -- to kind of have to investigate. If one ruling goes one way, then how are we going to pivot on these other issues?

THE COURT: That's not what he said. He stood up and conceded.

What do you guys want me to do? You know what? Let's take a 10-minute break. You guys consult with each other and take a vote or however you decide these multi-firm cases, and then we'll come back and finish this. But whatever the decision is, I want to tell you how much I appreciate your arguments here, and putting up with my questions. Even if you concede, it was a privilege for me to be able to explore this

issue with you.  So, thank you.

MS. LAZARZ:  Thank you, Your Honor.

THE COURT:  Come back in 10 minutes.

MS. LAZARZ:  Thank you.

(Recess taken from 9:49 a.m. to 10:02 a.m.)

THE COURT:  All right.  Please be seated.

Ms. Lazarz, you're back?

MS. LAZARZ:  Yes, Your Honor.

THE COURT:  Are you speaking for everybody now?

MS. LAZARZ:  Yes, Your Honor.

THE COURT:  Okay.

MS. LAZARZ:  Plaintiffs' counsel has had the opportunity to confer on this issue.

THE COURT:  Okay.  Where are we at?

MS. LAZARZ:  After further consultation and, you know, based on the points raised by Your Honor in the discussion, Plaintiffs will voluntarily dismiss the express warranty claims.  Although we had a good-faith basis for pleading those claims, based on Your Honor's points raised, we just think it just makes sense to dismiss those claims at this time.

THE COURT:  All right.  Before you do that, though, I assume that Mr. D'Aunoy is going to stand up and say, from his position, it doesn't matter whether you dismiss them, that I should still be looking at the complaint.  And that he's going

to say that the allegations in the complaint are still enough for estoppel.

So do you still want to voluntarily dismiss them?

MS. LAZARZ:  Yes, Your Honor, and two points to mention there.  The warranty that Plaintiffs reference in their complaint doesn't contain an arbitration provision.  And Plaintiffs, by moving to voluntarily dismiss also, you know, don't concede that a contract was formed via the warranty information booklet.

THE COURT:  All right.  So you're agreeing to dismiss those claims with prejudice, the -- all the express warranty claims?

MS. LAZARZ:  Yes, Your Honor.

THE COURT:  All right.  Mr. D'Aunoy, do you want to come up and respond to that?

**DEFENDANT'S RESPONSE:**

MR. D'AUNOY:  A couple initial thoughts, Your Honor. There are still claims left here, that implicate the express warranty.  Cause for example, Your Honor, on the implied warranty claim, Plaintiffs argued in their opposition to the 12(b)(6) motion to dismiss, that the express warranty provides contractual privity between themselves and FCA US for purposes of the implied warranty.

THE COURT:  Hold on.  You say that -- you said that in your reply brief --

MR. D'AUNOY:  Yeah.

THE COURT:  -- in support of your motion to compel arbitration.  It was one of your little points here --

MR. D'AUNOY:  Yeah.

THE COURT:  -- on page one.

MR. D'AUNOY:  Yeah.

THE COURT:  But I didn't see that in your opposition, so can you direct me to what you're citing to?

MR. D'AUNOY:  Yeah.

THE COURT:  So Mr. D'Aunoy, --

MR. D'AUNOY:  Yeah.

THE COURT:  -- let me try to put a finer point on this.

MR. D'AUNOY:  Yeah.

THE COURT:  Do you have your reply brief enough of you?

MR. D'AUNOY:  I've got portions of it, Your Honor, that I --

THE COURT:  All right.  So on page one of your reply brief, you tell me that you win on your estoppel argument, because not only are Plaintiffs asserting claims directly under the express warranty, you have a bunch of lowercase Roman numerals, and you say they rely on the warranty in other ways.  And Roman numeral, small triple I, you say, they proffer the warranty as evidence of an intended direct benefit

to Plaintiffs for the purpose of attempting to invoke a third-party beneficiary exception to the privity requirements.

And then you say, by premising the UCL unlawful claim on the supposed breach of obligations under the warranties. And then you also say they rely on it to refute stuff under Georgia law. And you have a footnote with cites to their brief.

I certainly saw where they were asserting a claim under the warranty, but I didn't see the stuff you're talking about in 3, 4, and 5 on -- this is docket 31, page ID 1139.

MR. D'AUNOY: Yes, Your Honor. And I do, I have those set out here. I'll need to cross reference those if Your Honor --

THE COURT: Please.

MR. D'AUNOY: I apologize for the delay, Your Honor. I was trying to save paper.

THE COURT: All right. I want to modify what I said to you. I found the part about the UCL claim. That's on page 21. But I didn't see the other parts.

MR. D'AUNOY: Okay.

THE COURT: Do you have the plaintiff's response in front of you?

MR. D'AUNOY: Yes.

THE COURT: All right. So the first time you tell me that they rely on the warranty, the first question I had was,

you say they proffered the warranty as evidence of an intended direct benefit. I read that sentence. And your footnote seems to be referring to page 19 of their brief. That's where they discuss this lack of privity point.

So can you go to their Section C on page 19?

MR. D'AUNOY: Yes, I'm here, Your Honor.

THE COURT: There's a passing reference to a warranty on that page. But I don't see that as them relying on the warranty to make the point.

MR. D'AUNOY: Your Honor, there, they are -- yeah, they do just reference the warranties provided with the class vehicles.

THE COURT: But, look --

MR. D'AUNOY: I don't see that. I agree, Your Honor, they are not premising a claim.

THE COURT: Okay. Then, for number five, again, on page ID 1139, you say they use this -- the warranty, to refute the express contract bar to their negligence claim under Georgia law.

Where is that? Did I just miss that?

MR. D'AUNOY: That's in footnote 14, Your Honor, on page 22. I'm trying to put that in context.

THE COURT: All right. So now, I understand this. I think it's Ohio law that they're talking about rather than Georgia law in this section. But in any event, I don't see

this as them invoking the warranty affirmatively for a claim. They're saying if, and to the extent there's a warranty, it doesn't bar their claim because it doesn't apply to the point where the claim is focused.

Do you agree with that?

MR. D'AUNOY:  I do, yes.

THE COURT:  All right.

MR. D'AUNOY:  Yes, Your Honor.

And I think when we set those out, I'm not sure that we -- and again, I don't have the exact wording in front of me.  I think the point there was that they repeatedly cite and rely upon, not necessarily, that they always are invoking the warranty for their claims and their opposition.

THE COURT:  All right.  So assuming they've just agreed to dismiss these claims with prejudice, I assume you -- you're agreeable to that dismissal, the warranty?

MR. D'AUNOY:  I don't know that I have a choice, Your Honor.

THE COURT:  Okay.  So does that get rid of the motion to compel arbitration?  I mean, at least the estoppel argument.

MR. D'AUNOY:  It does deal with the estoppel argument, Your Honor, assuming that they are also dismissing the derivative claim under the UCL that is premised on the supposed breach.  Which I think, by definition, they've

dismissed that as well because it's -- it's derivative.

THE COURT: Well, I'll ask Ms. Lazarz.

Ms. Lazarz, do you want to dismiss the -- so FCA takes the position that you've invoked the warranty affirmatively.

Is Ms. Lazarz not responding to this?

MR. WILLIAMS: I think this implicates the motion to dismiss, so I'll handle it, Your Honor, Mitch Williams.

THE COURT: You can feel free to -- I'm not talking about the substantive 12(b)(6) motion here. This goes to the equitable estoppel argument on the arbitration.

So FCA's position here is, even without the express warranty claims, FCA says you are defending your UCL claim on the basis that FCA breached duties under the warranty. And the specific page they're referring to here, is page 21 of your response to the motion to compel arbitration. This is docket 27, page ID 1042.

You guys write: Plaintiffs' claims under the unlawful prong, that's of the UCL, should not be dismissed because Plaintiffs have pled viable statutory claims. And then you say, see, e.g., paragraph 316 your amended complaint that provides, quote, "FCA committed an unlawful business act or practice in violation of the California Code by systematically breaching its warranty obligations and by violating the Song-Beverly Consumer Warranty Act."

So what FCA says is, is at least with respect to the UCL claim, they would take the position that that estops you from getting out of the warranty.

Do you want to dismiss the UCL claim, or do you want to fight on that?

MR. WILLIAMS:  Yeah, well, we don't want to dismiss that, Your Honor, because it's not just an express warranty under the Song-Beverly.  It's also a CRLA claim which FCA did not move to dismiss.

THE COURT:  What is a -- hold on one sec.

All right.  Well, we'll get to that in a minute.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  BUT you don't want to dismiss the UCL claim?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  All right.

So Mr. D'Aunoy, your position is, is that by asserting a UCL claim, they are estopped from denying the arbitration provision?

MR. D'AUNOY:  Your Honor, and I don't know if he was, perhaps, being more technical.  I think what I heard, Your Honor, is that they would dismiss the UCL claim to the extent that it's based on a supposed breach of an express warranty, but they claim they have other bases for that claim to go forward.

THE COURT:  All right.  Well, let me see if that level of precision helps us.

Mr. Williams, is that what you meant to say?

MR. WILLIAMS:  Yes, Your Honor, I think we would agree with that.

To the extent it's based -- the UCL claim is based on an express warranty, we concede that.  But the UCL claim is valid for other reasons independent of the express warranty, so we don't concede those.

THE COURT:  Okay.  So let me see if I can summarize where we're at.  It seems to me like Plaintiffs have agreed to dismiss with prejudice, all claims based on express warranty and the UCL claim to the extent that it is based on a violation of express warranty.

Is that correct, Mr. Williams?

MR. WILLIAMS:  That's correct, Your Honor.

THE COURT:  Let me just make sure Ms. Lazarz agrees with that.

MS. LAZARZ:  I agree, Your Honor.

THE COURT:  Okay.  All right.

And with those agreements, Mr. D'Aunoy, do you agree that the equitable estoppel theory of compelling arbitration is no longer before me?

MR. D'AUNOY:  I do, Your Honor.

THE COURT:  Okay.  So with respect to the motion to

compel arbitration, the only thing I need to decide is whether to compel arbitration at this point, based on your mutual assent theory, correct? Your mutual assent and delegation theory, right?

MR. D'AUNOY: Yes, Your Honor.

And, you know, given where we're at, I don't think Your Honor needs to decide that. We can withdraw that because we will certainly plan to renew that if we get the agreements. You know, if the case goes under discovery and we get the agreements.

But based on what Your Honor said, and in review of the law, I mean, we're not going to win on that.

THE COURT: You guys --

MR. D'AUNOY: No.

THE COURT: That's fine with me. Okay.

MR. D'AUNOY: And certainly, Your Honor, I came here today believing that we would win on the equitable estoppel. But I don't need Your Honor to go through the trouble of writing an opinion on -- on that.

THE COURT: Okay. So the motion to compel arbitration is -- I'll terminate it for the reasons I just said, because the equitable estoppel theory, you guys have withdrawn, and the -- you've withdrawn both theories based on the plaintiffs' stipulation and your theory you may renew this motion at some later date?

MR. D'AUNOY: Yes, if we -- if we get into discovery and if it shows that they, you know, signed these agreements, that they've sworn in declaration. So far, they have not.

THE COURT: Okay. Thank you.

By the way, as we go forward, you guys shouldn't assume that my questions, no matter how forcefully I ask them or how convinced I am with my own BS here at the hearing, that that's ultimately what I'm thinking or what I'm going to do. These -- I use these oral arguments to really think out loud and test my thinking. And so, I just wanted to share that with you.

All right. Let's get into the motion to dismiss. And I want to note that I'm going to have to take a short break at 10:45 to deal with an emergency status conference on another matter that will not take long.

Okay. The motion to dismiss.

**PLAINTIFF'S MOTION TO DISMISS:**

THE COURT: All right. I don't need argument on certain parts of this, I just have questions on some.

Mr. D'Aunoy, why -- why are these claims mooted by the recall? Plaintiffs, seem to be, to be alleging, and have this expert who seems to indicate, at least at this stage in the case, the recall is not nearly broad enough to resolve the problem here. At least at this stage of the case, how can I conclude this recall is enough?

MR. D'AUNOY:  Okay.  I mean, I think, Your Honor, what I would start with is, you know, what the Sixth Circuit said in Hadley said.  And that is, you know, if a company does a recall that addresses an alleged defect in a product and that recall removes that defect from the product, then the claims are prudentially moot.

THE COURT:  Okay.  It seems to me, I don't think anybody's really disagreeing with that statement of the law.

MR. D'AUNOY:  Okay.

And so then, we go on in Hadley.  And we've got to see, what are Plaintiffs saying here?  Plaintiffs aren't -- Plaintiffs are saying, the defect at issue is the same one that's addressed by the recall.  But what they're saying is, is that the recall doesn't fix the defect.  But they can't just base that on pure speculation.

If you look at what they're -- they're alleging their expert actually says, is that he couldn't replicate the -- recreate the defect.

THE COURT:  Look, don't you guys -- aren't you interpreting that exactly backwards?  In other words, he creates -- your theory of why the recall solves the problem is because you believe you've correctly diagnosed the problem.  Your whole theory of why the recall works is, step one, we've diagnosed the problem.  Step two, we've solved the problem we diagnosed.

Their expert, by saying he couldn't recreate the problem, you guys take that and say, well that means he's worth nothing. Why isn't, at least, it a permissible inference now for mootness purposes, to say what his analysis shows is, if he couldn't recreate the problem in the way you guys say the problem should have manifested, then you could infer that you have misidentified the cause of the problem, meaning your fix isn't the right fix and we're not moot? Why isn't that the right way to think about this?

MR. D'AUNOY: I think, Your Honor, that's too speculative when we're talking about are Plaintiffs injured. Have Plaintiffs been injured by purchasing a defective vehicle when FCA US has acknowledged that your vehicle had a defect and has agreed to fix that defect for free? All he's saying is the defect could be something else. He hasn't identified any other defect. He has --

THE COURT: He's saying what you guys have identified as the cause, he's -- he's at least created reason to believe beyond speculation, that what you say is the cause is not the cause.

MR. D'AUNOY: Well, I don't know if that gets beyond speculation because he has no -- he hasn't identified any other cause. You know, all he's saying is, I couldn't replicate what you did.

THE COURT: If you were right, though -- look, the

recall only moots it if we can be pretty damn confident that you've solved the problem. And isn't it fair to say his findings, beyond speculation, cast real doubt on whether you've solved the problem?

MR. D'AUNOY: I wouldn't agree it cast doubt. And I also wouldn't agree that we have to have that level of certainty, Your Honor. Because we have to remember what happens in the context of a recall. So FCA US submits itself to the oversight of the National Highway Traffic Safety Administration as a part and parcel of that process. So now, we have a court and a branch of the United States Government enforcing FCA US's obligation to provide a fix for those vehicles.

So ultimately, if -- if their expert is right and there's some other issue, FCA is still committed and obligated under -- under the statutes that govern recalls to --

THE COURT: But look, that --

MR. D'AUNOY: -- get these vehicles fixed.

THE COURT: -- what you're saying proves too much.

The Sixth Circuit says, if what you're saying is the law, then as a matter of law, a recall would moot a claim. And what the Sixth Circuit says is, is they don't say that. They say, if a plaintiff comes forward with mere speculation, then the claim is moot.

But if you were right that we -- that declaring a

recall and involving it's 100 percent solved every single problem, then there would be a black-letter rule, wouldn't there?

MR. D'AUNOY: Yeah, and I'll read you just the package from Sharp, Your Honor. While Plaintiffs' trucks may not yet be repaired, they have, in hand, a remedial commitment from FCA US and NHTSA. So that's what the plaintiffs here have in hand. And in that case, the recall remedy hadn't even been put into the field yet. There was nothing to test. The recall had just been announced. So that was a case where Judge Michelson found that the claims were moot because FCA had announced the remedy before the remedy was even in the field.

Because the issue is, Plaintiffs have this commitment from FCA US and from the NHTSA, that their vehicles will be repaired free of charge. And that eliminates any possible benefit of the bargain damages that they may be able to -- it just eliminates benefit of the bargain damages.

And again, in the Pacheco v. Ford case, it was similar. You know, the Court there found mootness over allegations that the remedy was not sufficient, not effective. Because there, Ford had, quote, "subjected itself to the continuing oversight of NHTSA, which monitors each safety recall to make sure owners receive safe, free, and effective remedies from manufacturers according to the Safety Act and

federal regulations."

THE COURT:  Again, aren't you --

MR. D'AUNOY:  So I don't think we're going too far.

THE COURT:  Aren't you essentially -- if your reasoning is a bright line.  Your reasoning here is, if NHTSA involved in recall, moot.

Isn't that what you're saying?

MR. D'AUNOY:  Well, if -- two things.  So if the defect at issue in the case is the same defect that is the subject of the recall, and through the recall process, the manufacturer has promised to remedy that defect for free and has -- has subjected itself to NHTSA's oversight, those are the elements of mootness under Hadley and under Winzler.  I mean, that is what gets us there, Your Honor.

And, you know, a mootness dismissal is a dismissal without prejudice.  So ultimately, if it turns out that the recall, for some reason, is not effective and these vehicle owners' vehicles, at the end of the day, have not been made to be in compliance with, you know -- if the defect has not been fixed, then ultimately, they can bring their claims.  But what the law says is, is we're not going to sit here and do double duty where, you know, NHTSA and that branch of government is overseeing this fix while at the same time, you know, we're in here litigating whether or not these people somehow have benefit of the bargain damages because they had a defect in

their vehicle.

THE COURT: Okay. Let me hear from plaintiffs on this.

**PLAINTIFF'S RESPONSE:**

THE COURT: All right. Mr. Williams, assume that I'm back in my chambers and I've been blown away by your argument on this point, and I'm writing a decision in your favor and I say, of course, these claims aren't moot, that's just like what the Court held in Blank v. Blank, which is just like this, what case am I citing there?

MS. LAZARZ: Sulligan v. Ford, Your Honor. It's the first one.

Sulligan v. Ford was a hardware defect that Ford tried to fix with a software update. In that case, the plaintiffs did not have expert testing. They did not have actual field performance post-recall. But nonetheless, Judge Parker still had held that because a software update was implemented to fix a hardware defect, that Plaintiffs had plausibly alleged that the repair would be inadequate.

Second case I would refer Your Honor to is the Chevy Bolt case, Judge Berg Chevy Bolt case. In that case, Judge Berg held that regardless of the recall, the plaintiffs still alleged overpayment damages. And overpayment damages cannot be mooted by a recall. In that case, Judge Berg said that ultimately, it's for discovery to confirm whether the is

inadequate.

In the Raymo v. FCA case, he took it one step further. And in that case, it was stipulated and agreed to that the recall was adequate. But he, nonetheless, held that the case was not moot because of the overpayment damages for which Plaintiff sought. And I think the -- the underlying reasoning in that, Your Honor, is that it's because the doctrine, the prudential mootness doctrine, is a discretionary doctrine.

THE COURT: Let me ask this. Why is -- by the way, I'm sitting in Judge Berg's courtroom, --

MR. WILLIAMS: Yes, sir.

THE COURT: -- so I've got to ask this question quietly. I'm going to ask this very quietly.

Why is he right? Go to his point about, it is not moot if the plaintiff seeks overpayment damages because the recall doesn't remedy the overpayment. So if I break that down in my own mind, I say, well, the overpayment damages are I didn't get what I paid for, I paid for a fully working car. But if the recall gives you the fully working car, and -- why doesn't that restore you to what you paid for?

MR. WILLIAMS: Yes, Your Honor.

So I think it's a matter of economic principle and economic theory. We don't have an economist in this case yet who can explain it to you, but as it's been explained to me,

I'll explain it to you.  So take this with a grain of salt, and I'll keep it very general.

If -- let's say you bought a defect -- you bought a defective vehicle on day one and on day two, it's fixed, your overpayment damages are zero to -- you know, one to none.  But if you go to the end of the vehicle's life, 10, 15 years, and the damages -- and the defect was not fixed, then you have the greatest amount of overpayment damages because it was never secured.  These cases, however, are more in the middle.  Just because a defect was ultimately fixed, the plaintiff still did not appreciate the full benefit of their bargain and the months to years in the interim before it was fixed.  And so, it's more of a --

THE COURT:  It's not just a resell price question?  It's, you didn't get the value of the full use?

MR. WILLIAMS:  I think the way I understand it, Your Honor, is that the cost of repair comes in as an offset of what the damages ultimately would be, with some fancy economic formula that a portions -- those damages based off of, you know, like I said, the time you used the vehicle before the defect was remedied.

And that -- that's sound lull under the Ninth -- under the Sixth Circuit.  That's the Whirlpool case and the Crawford v. FCA case.

THE COURT:  Whirlpool is not -- isn't the issue in

Whirlpool -- is it this exact issue?

MR. WILLIAMS: That's my understanding, Your Honor. Instead of being a vehicle, though, it was a washing machine. They were both consumer products, and the plaintiff sought point-of-sale damages based off of the overpayment of the defective product.

THE COURT: And there was a recall that fixed it, or there --

MR. WILLIAMS: Oh, no, Your Honor, there was not a recall. I'm just saying Whirlpool stands for the general proposition that overpayment damages are -- you know, a cognizable theory in Sixth Circuit. There wasn't a recall there. It wasn't a mootness case, no, Your Honor.

THE COURT: Oh, I get it. What I'm struggling with here is, if overpayment means I couldn't sell it -- I overpaid because I can't sell it for what I could have sold it for before. In other words, one way to think about this is I paid for a fully functional car, I didn't get a fully functional car, so when I go to resell it, I'm going to take a hit. But if there's a recall that restores it to the perfect condition, then I won't take a hit at time of resale, and the -- I didn't suffer any damages. You're -- I understand you to be saying it's a different kind of economic damages that somehow accrue during the use.

MR. WILLIAMS: Yes, Your Honor. That's -- that's

what the economic theories are looking at, is the loss of use. You didn't appreciate the benefit of your bargain. You bargained for a defective vehicle that you could use reliably a hundred percent of the time, but you didn't get that. And so, even if you sell it for -- it's not going to be the full -- you're never going to recoup that full value. The vehicle depreciates on day one, so you're never going recuperate that full value. There's still some amount of money that you paid that you didn't get the benefit for.

THE COURT:  Okay.  I think I understand.  Thank you.

Mr. D'Aunoy, do you have anything to say in response to that theory of damages?

MR. D'AUNOY:  Yes.

**DEFENDANT'S RESPONSE:**

MR. D'AUNOY:  That was squarely rejected by the Sixth Circuit already in Hadley, Your Honor.  Whereas, in Hadley, if we look at page 378 of that opinion, there is language that, you know, a recall removes the defect upon which, quote, "the diminished value injury claims are based."  So finding why the claims there were subject to being dismissed.

THE COURT:  Okay.  Anything else?

MR. D'AUNOY:  And I would just also point out, Your Honor, to another -- one other case if I can switch tabs here. The Solak v. Ford case, and there, relying on Hadley, relying on Pacheco, relying on Sharp.  You know, the Court there said

that this whole position, you know, because I'm seeking overpayment damages, prudential mootness doesn't apply. There, the Court said that position is difficult to fathom when Ford's recall measures would remediate the very same defect upon which the diminished value claims were based.

And again, going back to Hadley and all the cases since then, that have cited Hadley. And I know my opposing counsel here has brought up Raymo and a couple other cases. Raymo didn't acknowledge that part of Hadley that dealt with this. When Judge Berg found that because there's overpayment damages alleged, that you can't have prudential mootness, Judge Berg didn't do anything with that Hadley language. The Court -- he just ignored it.

All Courts since then, who have actually read Hadley in whole, have found that prudential mootness applies even in situations where there's overpayment damages.

And also, in the Solak case, the Court dealt with, again, this whole idea of just putting in allegations that the recall may not be effective. The Court here says numeral -- numerous courts have declined to adjudicate automotive defect cases based on the mere prospect that a recall proves ineffective, Your Honor.

There are no allegations here that this recall is ineffective. All there are, is allegations that this one expert could not duplicate what FCA US said its recall does.

That is not an allegation that's ineffective.  That's not an allegation that there are still vehicles out there experiencing the same symptoms.

THE COURT:  You said -- were you citing a case called Solak?

MR. D'AUNOY:  Yeah.  S-o-l-a-k v. Ford.  And this was on July 19th of 2023, Your Honor.

THE COURT:  Was it in this court?

MR. D'AUNOY:  Yes, in the Eastern District of Michigan.

What judge was it?

MR. EDWARDS:  Judge Friedman, Your Honor.

MR. D'AUNOY:  Judge Friedman, Your Honor.

And I've got a Lexis cite to that.  It's 2023, Lexis, 124288.

THE COURT:  Okay.

MR. WILLIAMS:  Your Honor, if I may just follow up one thing on the prudential mootness argument?

THE COURT:  Yep.

**PLAINTIFF'S RESPONSE:**

MR.  WILLIAMS:  Well, first of all, Hadley wasn't overpayment damages.  That was --v in Hadley, Plaintiff sought damages for the delayed and repair.  It's a different point in time than the damages Plaintiff seek here.  But opposing counsel said that Judge Berg, in Raymo, didn't address Hadley.

That's not true. It's at page 695 where Judge Berg addressed that in Raymo. And there, he recognized, quoting Hadley, Hadley expressly left open claims like these, quote, "based on allegations that the vehicles were defective from the moment of purchase." That's a Judge Berg direct quote from Hadley.

THE COURT: I --

MR. WILLIAMS: But, Your Honor, ultimately, I don't think you have the --

THE COURT: This is the quote -- I've got Hadley in front of me. And the Sixth Circuit says, quote, "The plaintiffs alleged -- allege a diminished value claim against TRW under the Louisiana civil code, based on the existence of a defective competent from the moment of purchase. Nevertheless, the repair of the ORC module that the plaintiff received, removed the defect upon which Plaintiff's diminished value injury claim is based." Therefore, there's -- you know, that's why they dismiss it.

So I understand you say there's a real question here about whether this got rid of the problem, but it does look like they addressed this -- this theory. In other words, your theory here is, it doesn't matter if the repair ultimately fixes the problem, there's still diminished value damage.

MR. WILLIAMS: Overpayment damage, Your Honor.

THE COURT: Overpayment damage.

MR. WILLIAMS: That's a big distinction from Hadley.

THE COURT: Okay. I see the point. You're talking about diminished value versus overpayment. That's the difference?

MS. LAZARZ: Yes. Yes, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: Subtle, but very important distinction.

THE COURT: Got it.

MR. WILLIAMS: And I think Your Honor was right, ultimately, you don't have to reach that in this case because the recall was inadequate. There was no fix. I think Your Honor hit the points dead on, on that, so I won't regurgitate them today.

THE COURT: Okay. Thank you.

MR. WILLIAMS: Thank you.

THE COURT: All right. Mr. Williams, will you be arguing the presale knowledge? That's the next thing I want to talk about.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And just one question.

Pretend I'm back in chambers writing an opinion in your favor, and I say these allegations of presale knowledge are enough. Indeed, the Court in Blank v. Blank found allegations just like this to be sufficient. What case decided after, underlining this, the Sixth Circuit's decision

in Smith, what would I fill in there?

MS. LAZARZ: Bossart v. General Motors. It's Judge Friedman, from this district. In that case, there were 48 NHTSA complaints, allegations of testing and warranty data. But there were no TSBs and there were no recalls.

And also, one thing I want to point out that we have in this case, Your Honor, is an admission from FCA and its recall. That it knew about this defect in October 2020. We allege that at paragraph 204 in our complaint.

THE COURT: Hold on one sec.

Which paragraph?

MR. WILLIAMS: Paragraph 204, at the end of paragraph 204, right -- the last sentence right above 205. It says FCA admitted it started receiving warranty claims and customer complaints in at least 2020. And that cites Exhibit A, their recall, where they admit to NHTSA that they started receiving warranty claims for this defect in October 2020. Which is one month before Plaintiff -- our first plaintiff purchased their vehicle, or Plaintiff purchased their first vehicle.

THE COURT: But isn't it insufficient that there's some unknown number of warranty claims and unknown number of complaints, and we don't know the specifics of the claims and specifics of the complaints?

MR. WILLIAMS: Yeah, so I don't think it is -- is insufficient under this scenario, Your Honor, because we do

allege that they've received hundreds of thousands of warranty claims by that data. And we don't just put that as speculation. We provide prior FCA recalls where they admit that for -- in one case, three field complaints, they had 1,000 warranty claims. And for six field complaints in another recall, 1,020 warranty claims.

So I think it's very -- it's reasonable to infer, and we've alleged it, that the warranty claims that they started receiving in October 2020 was not just one, was not just two, it was significant. And I think it's also reasonable to infer based off their prior recalls, that it was significant to FCA based off of the small number of -- of field complaints and warranty claims that they received, and prior recalls that also related to stalling.

THE COURT: All right. So let me make sure I understand this. The argument here is, we can infer that the warranty claims and complaints they received pre-recall, or in 2020, were significant because those led to a recall, and we know from other cases that they only do a recall if they get a significant number?

MR. WILLIAMS: Yes, Your Honor.

And it's not just that it led to a recall. It's -- in fact, I've prepared some little chart that's based off of only the allegations in our complaint, if I may.

THE COURT: Sure.

MR. WILLIAMS:  May I approach, Your Honor?

THE COURT:  Sure.

All right.  Let's talk a two-second break here so I can deal with this other matter.  You guys don't need to go anywhere.  I'm going to try and do it right here.

MR. WILLIAMS:  Yes, sir.

(Recess taken from 10:45 a.m. to 10:53 a.m.)

THE COURT:  Was there something else you wanted to tell me on the knowledge issue?

MR. WILLIAMS:  Yes, Your Honor.  Just real quick.

I believe where we left it off was the admission of knowledge supports a reasonable inference of knowledge because of the ultimate recall.  And I prepared the chart that I just passed to Your Honor.  And I think that's a copy for you.  I gave some extra copies.

LAW CLERK:  Oh, okay.  Thank you.

MR. WILLIAMS:  And the point of this chart is just to show, you're right, Your Honor, that not one fact alone supports knowledge.  It's an accretion of knowledge over time, and that's what this chart represents.  It shows how, you know, the pre-released testing, which is -- which is sufficient as we alleged, because we alleged admissions from FCA engineers, and actually their own manual to suppliers where such testing is performed.  The admissions of knowledge, all of that's what led to two TSBs in 2022.  And the failure

of those TSBs is what led to the recall in 2023.

So it's all of the allegations of knowledge when -- as a whole, they build on each other to tell a story, that FCA had knowledge of this defect as it admitted, at least back in October 2020.  And that's the point of this chart.

Unless Your Honor has any other questions on this, we'll rest on our briefs on this point.

THE COURT:  Thank you.  I appreciate that.

**DEFENDANT'S RESPONSE:**

THE COURT:  All right.  Mr. D'Aunoy, why isn't that a super persuasive showing of presale knowledge?

MR. D'AUNOY:  Well, Your Honor, I will start with the chart, which we're just seeing for today.  I don't -- you know, the idea that FCA somehow admitted that it knew of a defect in October of 2020, I think, is not actually pleaded. And if it is, it's conclusory and unsupported because FCA simply didn't know.  But what I think, maybe, they're saying, is maybe the first -- the first warranty claims started coming in in 2020, in October 2020.  But there are no allegations that the warranty claims here -- no factual allegations that the warranty claims here for this component, in this situation, were so overwhelming that FCA must have known there was some defect.

When we go to testing, and I'll read from -- again, Your Honor asked us to keep in mind, the Sixth Circuit's

opinion in Smith. But if we look at what the court there said about testing, --

THE COURT: Look, I know what they said. I found several of these cases for allegations that you're going to tell me are like this.

MR. D'AUNOY: Yeah.

THE COURT: But what about the recall? What about Mr. Williams' argument that this is different because it ends in a recall, recalls result from an accretion of knowledge. We've seen what lead to prior recalls, we can make an inference that the knowledge had to exist here.

What about that point?

MR. D'AUNOY: Well, the recall here dated just about everyone's purchase. So if we actually look at the date, that doesn't help plaintiffs with, you know, quote on quote, presale knowledge. But if we're looking to base this on some accretion of knowledge over time, the Court has to -- to find that Plaintiffs have adequately pleaded that FCA had knowledge at the time these people purchased these vehicles. And it has to be based on something. It can't just be based on an idea, well, FCA must have known at some point before the recall. Well, what is that point, and what facts are pleaded to support that?

You know, and I will acknowledge, other courts have said, well, if you've done a bunch of TSBs, then maybe we can

look back a year.  And, you know, I don't know that -- that the court here has any factual record to even do that, though, because they're simply not facts in terms of what was happening in real-time.

You know, some recalls, you know, result from something that happens one time, but the effects were so disastrous, it's immediately there has to be a recall.  Other recalls result from, you know, a buildup of field complaints, field incidents, ongoing investigations.  So there is no one-size fits all.  We can't make any assumptions or extrapolations from other recalls.  There has to be facts alleged in this case that FCA US knew.

We are talking about fraud here, Your Honor.  And fraud can only be committed if you knowingly do something wrong.  So there has to be facts showing that FCA US knew there was a defect in these vehicles and sold them anyway.  And there are not facts in this complaint that support that inference.

THE COURT:  Can you remind me, the date of the recall?

MR. D'AUNOY:  Yes, Your Honor.

MR. WILLIAMS:  Your Honor, Mitch Williams, if I may.  I just noticed a typo in the chart that I think may have prompted your question.  In the recall column, everything says, you know, issued about two years before purchase, that

should be after purchase.

THE COURT: Okay. That was -- that's an important typo.

MR. WILLIAMS: Yes, sir, very important typo.

THE COURT: Okay. Thank you.

MR. D'AUNOY: And I was going to point that out, Your Honor.

It was April of 2023, Your Honor, was when FCA issued the recall for the competent here at issue in this case.

THE COURT: Okay. All right. I think I understand the presale knowledge point.

I want to go to the implied warranty claim and take these up, two issues together, Mr. D'Aunoy, if I could.

MR. D'AUNOY: Yeah.

THE COURT: First, you suggest these two cars are merchantable. Isn't that at least a question of fact on this record? This is a pretty potentially serious defect in the car. This is -- I just had a case last week with your fine partner, Mr. Azar, where there were some bubbling up of some styling components in the car. And I ruled that wasn't a -- that didn't even rise to an implied warranty. It didn't affect merchantability.

But here, this seems to be on the other side of the line, doesn't it?

MR. D'AUNOY: Your Honor, this is a closer case,

certainly.  I mean, we would still maintain, as we put forth in our briefing, Your Honor, the implied warranty doesn't guarantee perfection.  What we have here, Your Honor, is a component that through issuing a recall, FCA acknowledges that there was a defect, and it's going to take care of that.  So we can't -- you know, we can't take the position that there's no defect here.  But if we look at what that defect is, that defect is one which requires you to get a vehicle repaired.

If the standard were that a vehicle is unmerchantable any time you had to get a repair, then every vehicle, Your Honor, would be unmerchantable.  The standards got to be something that --

THE COURT:  Don't they allege this sometimes causes the car's engine to shut off and/or the emergency brake to engage without notice?

MR. D'AUNOY:  But I think if we look at our actual named Plaintiffs' experiences, those don't bear out where they've been put in any unsafe danger themselves.  They've driven their vehicles for years and thousands of miles, Your Honor.  So I don't think their own factual allegations bear out the idea that this is some, you know, grave safety danger that makes these vehicles -- because the whole reason we talk about that standard is because you can't drive that vehicle.  And then, it's unmerchantable if you can't drive it.

But if you simply have to go get the vehicle repaired

and you, yourself, talking about the individual named plaintiffs here, have never had an issue that put you in any unsafe issue, then --

THE COURT: Mr. D'Aunoy, let me ask you a hypothetical here, that I won't do.

MR. D'AUNOY: Okay.

THE COURT: Let's pretend, for the sake of this question, that I had you raise your right hand and take an oath, okay?

MR. D'AUNOY: Okay. Yeah.

THE COURT: You don't have to. This is a pretend, okay?

MR. D'AUNOY: Yeah.

THE COURT: Okay. Let's say if I say, Mr. D'Aunoy, I have a car bag in St. Louis, where you live, but if you drive it, it has a defect, and here's what happens when the defect manifests: The engine might shut off and the emergency brake might engage without notice. But I want you -- I want to give it to you. And, in fact, I'll trade it to you. This is a really fancy car, and the car your family's driving is not that fancy, so just take this one and drive your family around.

Under oath, are you going to say okay, or are you going to say, no effing way?

MR. D'AUNOY: I'd take that vehicle and go get it

repaired, Your Honor. I mean, that's what people do every day with all cars. I mean, all car -- and I would have to imagine, even in Your Honor's own experience, vehicles need repairs. I mean they've got thousands and thousands of --

THE COURT: But look, again, you seem to be advocating some sort of a bright-line rule, that if any defect in the history of America can be repaired and it hasn't yet manifested in somebody's car, they can't possibly have a breach of implied warranty claim?

MR. D'AUNOY: I'm not advocating for that bright-line rule, Your Honor. What I'm advocating for, is under the facts we have alleged here, where Plaintiffs haven't, themselves, been impacted by a defect and they have to go get their vehicle repaired. Then that is non-a breach of an implied warranty. You know, I don't -- I know, Your Honor, as I've read the case, there is no bright-line rule.

But we are also dealing with the individual facts here. And I want to keep it away from just this general notion that, you know, this is a safety issue and it can have safety implications.

THE COURT: I guess I should have asked my question better. So there's three arguments that you guys make. One is the cars are merchantable. And I was focusing my question on that. The other argument you make is, there's no breach of implied warranty because it wasn't presented for repair and

there wasn't a refusal for repair.

At least as to merchantability, haven't they alleged that, that they have a car with a safety defect?

MR. D'AUNOY: They have -- they have alleged that generally. They haven't alleged that that's impacted them in any way. They haven't alleged that it's caused them to drive their vehicles less, that it's caused them to drive their vehicles differently. They alleged that thousands and hundreds of thousands of vehicles, Your Honor, have an alleged safety defect. That is, in fact, what they allege.

THE COURT: Don't a lot of these people allege that the vehicle -- that the problem actually manifested?

MR. D'AUNOY: Yes. Some of them alleged stalls, some of them alleged going to the dealership, some of them don't allege going to the dealership. I mean, it's all over the place. Some of them alleged that the dealership couldn't find anything. Some of them alleged that the dealership actually provided repairs.

THE COURT: Okay.

MR. D'AUNOY: I'm going through my summary here, Your Honor.

Yes, the allegations, Your Honor, are all over the place.

THE COURT: All right. Anything else you want to tell me on the implied warranty claim?

MR. D'AUNOY:  No, Your Honor.

And I know you've dealt with privity issues before, and those are state by state.  And we've cited cases for the states where we believe the privity requirement is alive and well.

THE COURT:  Okay.

**PLAINTIFF'S REPLY:**

MR. WILLIAMS:  Your Honor, this is Mitch Williams.

THE COURT:  Mr. Williams, let me -- just give me one second.

All right.  What do you want to tell me on the implied warranty claim?

MR. WILLIAMS:  I was just going to talk about the presentment, Your Honor.  Every Plaintiff has presented to their dealership, or at least the one, I guess, outlier is Mr. Vanderberg, the Tennessee plaintiff.  He actually never physically went to the dealership, but that's because he called and e-mailed the dealership multiple times, and they never returned his calls.  So I think he still satisfies the opportunity in the presentment there.

Also, Your Honor, every plaintiff has alleged manifestation.  In fact, some plaintiffs have even alleged, not just a stall, but the emergency brake or the parking brake has automatically engaged.  And so, for the rest of the merchantability analysis, we rely on our briefs.

We think Your Honor correctly got this right in Milisits, and Your Honor's rejected FCA's argument that continued use renders a vehicle un -- or the fact that a plaintiff continues to use their vehicle means that their vehicle is not merchantable. We just defer to our briefs on all of that.

THE COURT: Okay.

MR. WILLIAMS: So unless Your Honor has any questions on that, that's it.

THE COURT: I don't.

All right. I don't think I have any questions on the other stuff, but I'd be pleased to hear if you guys want to talk about any of the remaining claims or anything else.

THE COURT: Mr. D'Aunoy, you can go first since it's your motion.

MR. D'AUNOY: Yeah, Your Honor.

FCA US will rely on its brief for the remaining arguments. And a lot of them turn on, just particulars of state law.

I did just want to talk about the nationwide class actions because I know courts in this district have been coming at this from different directions, differently angles.

THE COURT: Courts in this room have been coming at it from a direction that differs from yours.

MR. D'AUNOY: I just wanted to point Your Honor to --

and I think we cited this in our reply brief.  We believe Judge Michelson's analysis in Harrison is spot on.

THE COURT:  Let me just say this.

MR. D'AUNOY:  Okay.

THE COURT:  There is no other judge on this court that I respect more than the Honorable Laurie J. Michelson.

MR. D'AUNOY:  Okay.

THE COURT:  In fact, yesterday, I had a really hard question in another case, I went upstairs, and I beat down her door and I begged her to share her wisdom with me.  She has a view of this issue that she has set forthwith in Withrow and other cases, and I have a view of this issue that I have set forth in Johnson.  Both of us have said this is a very close issue.  This is a very difficult issue, and she may have it exactly right.  And if anybody would have it exactly right, it would be her because she is such a fine judge.

On this one, we just have a goo-faith disagreement.  She has looked at my opinion in Johnson and she doesn't find that to persuade her.  I respect that.  I took a super hard look at this in Johnson, and I'm reasonably comfortable I got it right.

Is there anything else you want to say other than, she's right?

MR. D'AUNOY:  Yes.  Because I think there is one angle that maybe Your Honor should consider, and that is on

the standing issue.  And that is, the Supreme Court is reminding -- has reminded us numerous times that the standing is not dispensed in gross.  Plaintiffs must demonstrate standing for each claim they press, and they must do that throughout the case.

I think that requires an in-depth analysis at this stage of the litigation.  Because what Plaintiffs are trying to do by their pleading, is they're trying to assert a nation -- a fraud by concealment claim in Hawai'i, in Rhode Island, in Florida.  And I don't think there's any dispute that they do not, themselves, at this stage of the proceedings, have standing to pursue that claim in Hawai'i, Rhode Island, Florida, where they have no connection to those states whatsoever.  So if you look behind what their nationwide claim really is, it is a claim under 50 different claims under 50 different states' laws, and they simply don't have standing for those claims.

THE COURT:  Has any United States Court of Appeals accepted your view of this?

MR. D'AUNOY:  No, Your Honor.  I can't point you to any circuit court that's addressed it -- that has addressed this head on.

THE COURT:  Addressed the issue head on?

MR. D'AUNOY:  Well, from the standpoint, the standing after TransUnion.

THE COURT:  The notion that you have to have standing for each claim, that predated TransUnion.  That's been around for a long time.

MR. D'AUNOY:  Yep.

THE COURT:  That was in a Daimler Chrysler claim in, I think, 2005.

MR. D'AUNOY:  Yep.

THE COURT:  TransUnion was about whether there was an injury.  I mean, does that really impact this?

MR. D'AUNOY:  I mean, it reaffirms that it has to be for every claim at all stages.

The COURT:  How many --

MR. D'AUNOY:  And that's why it can't be deferred.

THE COURT:  How many United States Court of Appeals, from the beginning of the Republic, so including pre-TransUnion, have held -- have reached the same conclusion I did in Johnson?

MR. D'AUNOY:  I can't tell you, Your Honor.

THE COURT:  At least the two I cited in Johnson, right?

MR. D'AUNOY:  Yes.

THE COURT:  Okay.

MR. D'AUNOY:  Thank you.

THE COURT:  Thank you.  You've certainly pressed that position as persuasively as it can be pressed, other than the

way Judge Michelson pressed it, which is super persuasive.  I get that.

MR. WILLIAMS:  Your Honor, I don't have anything on the Article III standing issue.  I think you got it right, so we'll rely on Your Honor's analysis there.

But I do want to pull -- bring up one thing in the Ohio --

THE COURT:  By the way, I want to just share with you a joke that I made with Judge Michelson.  We were joking.  This was a complete joke, and it was me, not her, that the next thing I'm going to go do is buy one share of stock in FCA, GM, and Ford, as a way of recusing myself from these cases because they're so difficult.  That was a joke that I made to her.  So when this goes up to the Sixth Circuit, everybody will understand I'm joking.

MR. WILLIAMS:  And may the record note that he was smiling and everybody in the room laughed.

I wanted to bring up one thing on the Ohio negligence claim.  FCA raised, for the first time in its reply, that the OPLA merges with the Ohio negligence claim.  That's not true.  We -- we didn't get an opportunity to respond to this because they brought it up in their reply, but I have a case.  It's Colfor Manufacturing versus Macrodyne Techs.  It's 2023, West Law 2866028.

And the point of that, Your Honor, is that when it is

a -- the OPLA only subsumes property damage claims, not economic losses. That's what that case stands for. Here, we seek economic losses, so the OPLA doesn't subsume the negligence claim.

That's the only point I have, and unless Your Honor has anything else, we'll rest on our briefs.

THE COURT: Does the agreed dismissal of the expressed warranty claims have any impact on the implied warranty claims?

MR. WILLIAMS: No, Your Honor. The implied warranty is created at the time of sale by law. It's completely independent of an expressed warranty except for when the express warranty may limit the durational limits of the -- of the implied warranty, which isn't an issue here because everybody has manifested or sued within the statute of limitations or the duration of limitations.

THE COURT: Okay.

Mr. D'Aunoy, any last thoughts?

MR. D'AUNOY: No, Your Honor. For the remainder of our arguments, we'll rely on the briefing. Thank you.

THE COURT: Okay. Let me end by thanking you guys for really good briefing and really good argument. These are hard cases. And one of the things I know I'm always going to get is really terrific lawyering, and that was the case today.

Ms. Lazarz, I really especially want to thank you.

You had a tough job here. First, facing me, and then facing your co-counsel. But I very much appreciate your fine work on this today.

MR. CHALOS: And Your Honor, if I may, that was Ms. Lazarz's first argument in a Federal District Court ever.

THE COURT: That was your first argument?

MS. LAZARZ: Yes, Your Honor. So thank you for the opportunity. I appreciate that.

THE COURT: That's terrific. I would have thought -- seriously, I would have thought you had done a lot the way you handled yourself, especially the way I -- sometimes, Ms. Lazarz, I get a little excited with my questions. I interrupt, and if I get a thought, I pop out and I press hard. And I never mean to be offensive or intimidating, but I assume that when I'm going off like that, it can come across that way. And I really appreciate the way you stood in there. You did everything that I hope lawyers will do when they're arguing before me, which is, one, push back when you think I'm wrong. Which is the whole point of being here. Some lawyers don't do that. I thought you did it. You did it with great respect. You did it -- you put forth the absolute strongest points in favor of your position, and I'll -- it was a privilege to have you here today.

And if you have another one of these cases, I know your firm does a lot of these, it will be my privilege to have

another one with you. And you'll know next time you come in, that when I go off like that, you can just ignore me and keep being yourself because you did, really, such a fine job.

One of the things I wish on days like this, when a lawyer like you does such a nice job, and Mr. Williams did a great job, too, is I really wish your clients could be here. Because at these motion hearings, it's just us, but I think it would really be helpful for clients in a lot of cases, to see lawyers fight as hard as you do in such a -- with such civility and a high level of professionalism.

I'm not saying that to Mr. D'Aunoy because he's always done that and he's been with me a million times, and he puts up with me just fine. So he knows not to, you know, take offense when I do that. I hope he does. Because he knows I have great respect for him and Mr. Azar who, somehow, even though they're from St. Louis, have cornered the market on FCA work in this court. So I see them all the time, and they both do a fine job. But it was a privilege to meet both of you.

Mr. Williams, how many of these have you done?

MR. WILLIAMS: This is my second federal motion to dismiss, but I handled all the evidentiary hearings and everything at our trial out in California in a GM class that we recently won.

THE COURT: Who was that in front of?

MR. WILLIAMS: Judge Chen, in Northern District of

California.

THE COURT: Edward Chen?

MR. WILLIAMS: Yes, sir.

THE COURT: I sit next to him sometimes at the MDL conference, and he seems a lot friendlier and more personable than me. He seems to be very brilliant, but probably easier to deal me personally, than me.

MR. WILLIAMS: No comment, Your Honor.

THE COURT: Okay. Thank you, very much.

I will take the motion to dismiss under advisement. We'll terminate the arbitration motion. We'll get a decision out as soon as we can, and go from there.

Thank you, very much. Safe travels, everybody.

MR. WILLIAMS: Thank you, Your Honor.

(The proceeding was adjourned at 11:19 a.m.)

                    *    *    *

                C E R T I F I C A T E

I certify that the foregoing is a correct transcription of the record of proceedings in the above-entitled matter.


S/ Shacara V. Mapp                    12/14/2023

Shacara V. Mapp,                      Date

CSR-9305, RMR, FCRR, CRR

Official Court Reporter