UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN FISHER, *et al.*,

      Plaintiffs,

                              Case No. 23-cv-10426

v.                                Hon. Matthew F. Leitman

FCA US LLC,

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF No. 24)

In this putative class action, Plaintiffs bring a variety of statutory and common-law claims against Defendant FCA US LLC ("FCA") arising out of an alleged defect in the eTorque mild hybrid system of their FCA vehicles. (*See* Frist Am. Compl., ECF No. 20.)  FCA has now moved to dismiss Plaintiffs' claims. (*See* Mot. to Dismiss, ECF No. 24.)  For the reasons that follow, FCA's motion is **GRANTED IN PART AND DENIED IN PART**.

### I

FCA is one of the world's leading automakers.  Plaintiffs are consumers who purchased or leased 2019-2023 model year Ram 1500 trucks and Jeep Wranglers and 2022 model year Jeep Wagoneer vehicles equipped with an eTorque mild hybrid system (the "Class Vehicles"). (*See* First Am. Compl. at ¶ 1, ECF No. 20,

PageID.391.) The "eTorque [system] replaces a conventional alternator with a more robust motor/generator that is water cooled, rather than fan cooled." (*Id.* at ¶ 161, PageID.421.)  It "is intended to improve the Class Vehicles' fuel efficiency without compromising power, torque, and other capabilities." (*Id.* at ¶ 160, PageID.421.)

According to Plaintiffs, the Class Vehicles "suffer from an undisclosed defect" with the eTorque system "that causes the vehicles' engines to turn off, shift the transmission to 'Park,' and/or apply the emergency brake, all spontaneously and without warning" (the "eTorque Defect"). (*Id.* at ¶ 1, PageID.391.)  Plaintiffs say that even though "FCA has known about the eTorque Defect and the risks it poses since at least 2018 [….] FCA never disclosed the [defect] to consumers." (*Id.* at ¶ 6, PageID.393.)  Plaintiffs further allege that "FCA has taken no meaningful action to correct the root cause of the eTorque Defect" and that "[m]any owners and lessees of the Class Vehicles [who] sought repairs for the eTorque Defect [] were often denied [a repair] because the dealership reported that they could not replicate [the defect]." (*Id.* at ¶¶ 7-8, PageID.393.)  Finally, Plaintiffs insist that had they "known about the eTorque Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them." (*Id.* at ¶ 11, PageID.394.)

**II**

Plaintiffs filed their First Amended Class Action Complaint, the operative pleading in this action, on June 13, 2023. (*See* First Am. Compl., ECF No. 20.)  The named Plaintiffs are as follows:

- Brian Fisher, a California resident who "owns a 2021 Ram 1500 V8 with eTorque, which he purchased new on December 16, 2020 from Rydell Chrysler Dodge Jeep Ram in San Fernando, California." (*Id.* at ¶ 18, PageID.396.);

- Arianna Rico, a California resident who "began leasing her new 2021 Ram 1500 5.7L V8 Hemi with eTorque in September 2021 from Crown Dodge in Ventura, California."  (*Id.* at ¶ 32, PageID.398.);

- Eric Lee, an Ohio resident who "owns a 2021 Ram 1500 5.7L Hemi V8 with eTorque, which he purchased new in January 2022 from Performance Dodge Jeep in Columbus, Ohio." (*Id.* at ¶ 41, PageID.399.);

- Jerry Vanderberg, a Tennessee resident who "owns a 2021 Ram 1500 5.7L with eTorque, which he purchased new on December 21, 2020 from Miracle Chrysler-Dodge-Jeep, Inc. in Gallatin, Tennessee." (*Id.* at ¶ 53, PageID.402.);

- Rachel Walkowicz, a Michigan resident who "leases a new 2021 Ram 1500 V8 with eTorque, which she began leasing on April 12, 2021 from Parkway Chrysler Dodge Jeep Ram in Clinton Township, Michigan." (*Id.* at ¶ 66, PageID.404.);

- Daniella Lopez-Hall, a Texas resident who "owns a 2022 Ram 1500 5.7L Hemi V8 with eTorque, which she purchased new in December 2022 from Lithia Chrysler Jeep Dodge of Corpus Christi in Corpus Christi, Texas." (*Id.* at ¶ 80, PageID.407.);

- Tennyson James, a Georgia resident who "purchased his 2022 Ram 1500 3.6L V6 with eTorque new off the showroom floor in September 2022 from Troncalli Chrysler Dodge Jeep Ram in Cumming, Georgia." (*Id.* at ¶ 91, PageID.409);

- Stephen Edgcombe, a Michigan resident who "began leasing his new 2022 Ram 1500 5.7L Hemi V8 with eTorque in 2022 from Randy Wise Chrysler Dodge Jeep Ram of Durand in Durhand, Michigan." (*Id.* at ¶ 103, PageID.411);

- Adam Cartabiano, a Florida resident who "purchased his new 2021 Ram 1500 5.7L V8 HEMI with eTorque in March 2021 from Jerry Ulm Chrysler Dodge Jeep in Tampa, Florida." (*Id.* at ¶ 112, PageID.412);

- James Blyth, a Florida resident who "purchased his 2021 Ram 1500 5.7L HEMI with eTorque as a Certified Used Ram vehicle in December 2022 from Ferman Chrysler Jeep Dodge in Lutz, Florida." (*Id.* at ¶ 121, PageID.414); and

- William Smith, a Florida resident who (1) "purchased a new 2021 Ram 1500 5.7L V8 HEMI with eTorque [] in November 2020 from Napleton Ellwood City Chrysler Dodge Jeep RAM in Ellwood City, Pennsylvania" and (2) "traded in [his 2021 Ram truck] for a 2023 Ram 1500 5.7L V8 HEMI with eTorque at New Smyrna Chrysler Jeep Dodge Ram on April 24, 2023." (*Id.* at ¶¶ 142, 148, PageID.418-419.)

Plaintiffs bring claims against FCA for fraud, breach of implied warranties under state law and under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. (the "MMWA"), and violations of the consumer protection laws of various states.[1]  They seek to represent a class of nationwide plaintiffs and separate state-specific classes.

FCA first moved to dismiss Plaintiffs' claims on April 21, 2023. (*See* Initial Mot. to Dismiss, ECF No. 13.)  On April 24, 2023, the Court granted Plaintiffs leave to file a First Amended Complaint so that Plaintiffs could attempt to remedy the pleading deficiencies identified by FCA. (*See* Order, ECF No. 17.)  In that order, the Court told Plaintiffs that it did "not anticipate allowing Plaintiffs another opportunity to amend to add factual allegations that [they] could now include in [their] First Amended Complaint." (*Id.*, PageID.377-378.)  Instead, that was "Plaintiffs' opportunity to amend [their] allegations to cure the alleged deficiencies in [their] claims." (*Id.*, PageID.378.)

---

[1] Plaintiffs also brought claims for breach of FCA's express warranty and for unjust enrichment.  During the hearing on FCA's motion to dismiss, Plaintiffs agreed to voluntarily dismiss their express warranty claims with prejudice. (*See* 12/12/2023 Mot. Hr'g Tr., ECF No. 36, PageID.1209-1215.) The Court entered an order dismissing those claims on December 13, 2023. (*See* Order, ECF No. 35.)  In addition, in Plaintiffs' response to FCA's motion to dismiss, Plaintiffs "concede[d] their unjust enrichment claims." (Resp. to Mot. to Dismiss, ECF No. 27, PageID.1041.)  The Court therefore **DISMISSES** those claims (Counts 5, 12, 24, 29, and 35 of the First Amended Complaint) with prejudice.

Plaintiffs filed their First Amended Complaint on June 13, 2023. (*See* First Am. Compl., ECF No. 20.)  On July 21, 2023, FCA moved to dismiss that pleading for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (*See* Mot. to Dismiss, ECF No. 24.)  The Court held a hearing on FCA's motion to dismiss on December 12, 2023. (*See* 12/12/2023 Mot. Hr'g Tr., ECF No. 36.)

## III

### A

"Motions to dismiss for lack of subject matter jurisdiction [under Rule 12(b)(1)] fall into two general categories: facial attacks and factual attacks. A facial attack is a challenge to the sufficiency of the pleading itself. On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A factual attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations, see *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990), and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.*

6

**B**

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id*.  When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  Mere "conclusions," however, "are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.  A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**IV**

FCA moves to dismiss Plaintiffs' claims on several different grounds.  The Court will address each of FCA's bases for dismissal separately.

**A**

FCA first argues that "this case should be dismissed" under Rule 12(b)(1) for lack of subject-matter jurisdiction because the claims are "moot." (Mot. to Dismiss, ECF No. 24, PageID.875.)  More specifically, FCA says that it has initiated a recall that will provide the Plaintiffs "a free repair for the [eTorque Defect] and reimbursement for any prior repairs," and it insists that that recall "moots any live controversy that might exist about a vehicle defect." (*Id.*, PageID.873, 875.)  The Court disagrees that dismissal based on FCA's recall is appropriate at this time.

First, the recall that FCA initiated is limited to 131,700 2021 RAM 1500 pickup trucks with a 5.7L eTorque engine that were built between June 3, 2020, and September 12, 2021. (*See* Recall Safety Rpt., ECF No. 24-2, PageID.893.)  Thus, the recall does not apply to all the Class Vehicles, nor does it cover all of the vehicles that the named Plaintiffs purchased.  Therefore, even if the recall mooted *some* of the named Plaintiffs' claims, it would not entitle FCA to dismissal of the entire case.

Second, and more importantly, Plaintiffs have plausibly alleged that the recall is insufficient.  FCA's recall is premised on FCA's belief that the root cause of the eTorque Defect is an "over rich fuel condition" that, "under certain operating conditions," can cause a vehicle's "engine [to] shut down." (*Id.*)  The recall is directed toward fixing that fuel condition. (*See id.*)  But Plaintiffs have plausibly alleged that the problems they experienced with the Class Vehicles were not caused

8

by a rich fuel condition and that the recall will therefore will not solve those problems. For instance, Plaintiffs have alleged that an automotive consultant examined a Class Vehicle that was experiencing the problems typically associated with the eTorque Defect and that the consultant found that "there were no indications of a rich fuel condition." (First Am. Compl. at ¶¶ 187-189, ECF No. 20, PageID.428.) Moreover, Plaintiff James Blyth alleged that he has experienced "two additional stalling incidents" after he received the repair initiated under FCA's recall. (*See id.* at ¶¶ 129-130, PageID.416.) In light of these allegations, "the Court is reluctant to dismiss [this case] as moot without the benefit of any discovery merely because a recall is being conducted." *In re Chevrolet Bolt EV Battery Litigation*, 633 F.Supp.3d 921, 983 (E.D. Mich. 2022) (declining to dismiss claims as moot based on defendant's agreement "to replace [allegedly-defective] batteries in the class vehicles for free"). "Determining the effectiveness of the recall and its effect on Plaintiffs' claims would necessarily be a highly fact-intensive inquiry," especially in light of Plaintiffs' plausible allegations described above. *Id.* Thus, "[o]n this procedural posture and without the benefit of discovery, the Court [is] unable to conduct [the] appropriate mootness analysis." *Id.* The Court therefore declines to dismiss Plaintiffs' claims based on mootness at this time. *See id. See also Sulligan v. Ford Motor Co.*, 2023 WL 5180330, at *6 (E.D. Mich. Aug. 11, 2023) (declining to dismiss claims as moot based on recall where plaintiffs plausibly alleged that

recall did not "actually fix[] the defect").  FCA may re-raise its mootness defense, if appropriate, following discovery.

## B

FCA next argues that the Court should dismiss Plaintiffs' claims for lack of subject-matter jurisdiction to the extent that Plaintiffs bring those claims on behalf of a nationwide class. (*See* Mot. to Dismiss, ECF No. 24, PageID.890.)   FCA contends that while the named Plaintiffs have Article III standing to assert claims under the laws of the states in which they were injured, they "lack [Article III] standing to bring claims on behalf of a nationwide class" because they "do not plead viable claims under the laws of all fifty states." (*Id.*)   The Court disagrees.

## 1

As the Court acknowledged in *Johnson v. FCA*, 555 F.Supp.3d 488 (E.D. Mich. 2021), whether a named plaintiff in an automobile defect action has Article III standing to assert claims arising under different state laws on behalf of a nationwide class "is a difficult and complicated question that has sharply divided courts in this district and across the country." *Johnson*, 555 F.Supp.3d at 494.  *See also Harrison v. General Motors, LLC*, 2023 WL 348962, at ** 3-4 (E.D. Mich. Jan. 19, 2023).   In *Johnson*, the Court explained that it had identified two appellate decisions addressing the question and that both decisions held that whether a named plaintiff may assert such claims on behalf of a nationwide class is not an Article III

standing question but is instead a question to be addressed under Rule 23 during class certification proceedings. *See Johnson*, 555 F.Supp.3d at 494-499.  The Court found especially persuasive, quoted at length, and chose to follow, the analysis of the United States Court of Appeals for the Second Circuit in *Langan v. Johnson & Johnson*, 897 F.3d 88, 92-96 (2d Cir. 2018) (explaining why the question of whether a named plaintiff may assert claims arising under the laws of different states on behalf of a nationwide class is not a question of Article III standing, but, instead, is an issue to be resolved in the context of an analysis under Rule 23).  The Court also found persuasive the decision of the Seventh Circuit to the same effect in *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011).  The Court remains convinced that the approach followed in *Langan* and *Morrison* – treating that question of whether a named plaintiff may assert claims arising under the laws of different states on behalf of a nationwide class as a Rule 23 question and *not* as an Article II issue – is the proper one.

Since the Court issued its opinion in *Johnson*, the consensus on this issue in the Courts of Appeals has grown.  In *In re Zantac (Ranitidine) Products Liability Litigation*, 2022 WL 16729170 (11th Cir. November 7, 2022), for example, the Eleventh Circuit followed *Langan* and *Morrison* and held that whether a named plaintiff in a putative class action could assert on behalf of a nationwide class "causes of action under the dozens of state statutes [he] invoked [was] not a standing question

at all." *In re Zantac*, 2022 WL 16729170 at *5. The Eleventh Circuit highlighted that "all circuits which have addressed whether a plaintiff can represent unnamed class members whose claims fall under different states' laws have concluded that it is a question that concerns Rule 12(b)(6) or Rule 23—not Article III." *Id.* (collecting cases). And it observed that a "leading class action treatise is of the same view." *Id.* (citing 1 Newberg on Class Actions § 2:6 (5th ed. & Dec. 2021 update)). The Eleventh Circuit's analysis further persuades the Court to adhere to its holding in *Johnson*.

**2**

In another recent case, FCA suggested that the Court's analysis and conclusion in *Johnson* has been undermined by the Sixth Circuit's recent decision in *Fox v. Saginaw County*, 67 F.4th 284 (6th Cir. 2023). The Court respectfully disagrees.

In *Fox*, the plaintiff "failed to pay taxes on property that he owned in Gratiot County." *Fox*, 67 F.4th at 290. The Gratiot County Treasurer then seized the plaintiff's property and sold it at auction. *See id.* The plaintiff insisted that the treasurer failed to sell the property for its fair market value and failed to reimburse him for "the difference between his tax delinquency and the sale price at the auction." *Id.* The plaintiff then filed an action against Gratiot County. He claimed that Gratiot County's "practice of keeping all surplus equity in the properties of

delinquent taxpayers amounted to an uncompensated taking in violation of the U.S. and Michigan Constitutions. He also alleged that this practice qualified as an excessive fine, that it violated procedural and substantive due process, and that the Counties had been unjustly enriched." *Id.* at 290-91.

The plaintiff also sought to represent a statewide class of other property owners who had been injured by other Michigan counties in the same way that Gratiot County had injured the plaintiff. The plaintiff named these other counties as defendants even though he had not had any dealings with them and had not been injured by them.

The plaintiff insisted that he had Article III standing to bring claims against the other counties under what is known as "juridical link doctrine." *Id.* at 291. That doctrine permits a plaintiff to bring class claims against several different defendants – even defendants that did not harm him – where the class members "all suffered the same type of injury." *Id. See also Perry v. Allstate Indemnity Co.*, 953 F.3d 417, 420 n.2 (6th Cir. 2020) (explaining that the "[u]nder the juridical-link doctrine, a plaintiff without a cause of action against each defendant in a class action can nevertheless" maintain his action "if the case involves a state statute or uniform policy being applied statewide by the defendants") (internal punctuation omitted)).

13

The Sixth Circuit rejected the plaintiff's reliance on the juridical link doctrine. The Sixth Circuit began its analysis by acknowledging that "a circuit split exists over th[e] doctrine." *Fox*, 67 F.4th at 293.   "The Seventh Circuit has held that named plaintiffs may bring a class action against some defendants who did not injure them if the class members would have standing and if the named plaintiff can meet Rule 23's requirements. The Second Circuit, by contrast, has held that the named plaintiffs must have standing to sue every defendant at the outset, even when they seek to certify a class." *Id.* (citing *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59 (2d Cir. 2012)).   The Sixth Circuit then "side[d] with the Second Circuit in this debate" and held that the "juridical link doctrine [did] not comport with the Supreme Court's standing cases." *Id.* at 294.   The Sixth Circuit rested its holding on the bedrock principle that a plaintiff must always "show that [a defendant] injured him 'personally' to have standing to sue [that defendant]." *Id.*   The Sixth Circuit held that a plaintiff may not avoid that strict requirement by filing claims on behalf of a class. *See id.*

The concern that led the Sixth Circuit to reject the judicial link doctrine in *Fox* is not implicated here because the Plaintiffs here are in a materially different position from the named plaintiff in *Fox*.   As noted above, the plaintiff in *Fox* attempted to assert claims against defendants who were not alleged to have injured him at all.   But the named Plaintiffs here are raising claims against a single defendant (FCA) who is

14

alleged to have injured all of them (and all class members) in the same way through the same general course of conduct.

The Second Circuit explained why this distinction matters in *Langan*, *supra*. As noted above, the issue in *Langan* was whether a named plaintiff in a class action had Article III standing to assert claims arising under the laws of different states on behalf of a nationwide class. The defendant in *Langan* highlighted that the Second Circuit had previously rejected the juridical link doctrine – just like the Sixth Circuit did in *Fox* – and the defendant contended that the rejection of that doctrine compelled the conclusion that the named plaintiff lacked Article III standing to assert the claims on behalf of the nationwide class. The Second Circuit disagreed. That court explained that the rejection of the juridical link doctrine does not shed substantial light on whether a named plaintiff may assert claims arising under the laws of different states on behalf of a nationwide class because the concerns that support rejecting the juridical link doctrine are not implicated by allowing a named plaintiff to assert the claims on behalf of a nationwide class. *See Langan*, 897 F.3d at 98 n.3. In the Second Circuit's words, allowing a plaintiff "to haul a non-injurious defendant into court" through the juridical link doctrine raises "redressability and fundamental fairness concerns" that "are not present when a plaintiff initiates a [nationwide] class action under various state laws prohibiting the similar conduct by the same defendant." *Id.* Therefore, a decision rejecting the juridical link doctrine

"is distinguishable from," and does not control, the question of whether a named plaintiff may pursue a claim on behalf of a nationwide class under different state laws. *Id.* (distinguishing the Second Circuit's earlier decision in *Mahon*, 683 F.3d at 64-66, in which the court rejected the juridical link doctrine).  The Court agrees with *Langan* and concludes for the reasons explained in *Langan* that the Sixth Circuit's rejection the juridical link doctrine in *Fox* does not compel the conclusion that a named plaintiff necessarily lacks Article III standing to assert claims on behalf of a nationwide class that arise under the laws of different states.

For all of these reasons, the Court declines to dismiss Plaintiffs' nationwide class claims for lack of Article III standing.

## C

Next, FCA asserts that the Court should dismiss Plaintiffs' fraud claims[2] because, among other things, Plaintiffs have not sufficiently alleged that FCA "knew of the alleged [eTorque Defect] before Plaintiffs purchased their vehicles." (Mot. to Dismiss, ECF No. 24, PageID.878-880.)  The Court will dismiss the fraud claims brought by Plaintiffs Fisher, Rico, Lee, Vanderberg, Walkowicz, Edgcombe, and Cartabiano.  However, it will allow the fraud claims brought by Plaintiff James, Blyth, Smith, and Lopez-Hall to proceed.

---

[2] *See* Counts 2, 6, 11, 13, 14, 17, 18, 21, 25, 26, 31, 32, and 38 of the First Amended Complaint.

**1**

"Rule 9(b) imposes a heightened pleading requirement for claims alleging fraud." *Smith v. General Motors, LLC*, 988 F.3d 873, 884 (6th Cir. 2021).  Here, "Plaintiffs' fraud claims are based only on FCA's [alleged] omissions and concealment [of the eTorque Defect], not affirmative misrepresentations." (Resp. to Mot. to Dismiss, ECF No. 27, PageID.1028.)  "[P]arties bringing [such] a fraudulent concealment claim must specify the who, what, when, where, and how of the alleged omission." *Smith*, 988 F.3d at 884 (internal quotation marks and citation omitted). In addition, Plaintiffs must, among other things, "state with particularity the factual allegations supporting the assertion that [FCA] knew about the safety implications of the [eTorque Defect]." *Id.*

**2**

Plaintiffs first say that their allegations concerning FCA's "pre-release design and testing" of the Class Vehicles tend to establish FCA's pre-sale knowledge of the eTorque Defect. (Resp. to Mot. to Dismiss, ECF No. 27, PageID.1031.)  These allegations are as follows:

> 196. Pre-release design, engineering, manufacture, and testing of Class Vehicles provided FCA with comprehensive and exclusive knowledge about the eTorque Defect, particularly the functions, uses, and computability of the software, wiring, connectors, and other components, including the expected conditions they may face.

197. FCA knew or should have known about the eTorque Defect from the testing performed on the software and hardware components. Vehicle manufacturers, like FCA and its suppliers, perform various pre-production tests on new vehicle components including, but not limited to, Failure Modes and Effects Analyses ("FMEA").

198. FMEA tests assess methods or modes by which a particular component might fail. It examines the design of each component, the assembly of the part, and whether use in various manners would cause the part or system to fail. For example, in testing the systems at issue here, FMEA testing would explore, among other things, how and under what conditions the software or hardware components could fail, how likely failure was under different conditions, and how likely each condition tested was to occur.

199. FCA and its suppliers also performed computer and real-world simulations of the systems, including in extreme conditions, to confirm they are meeting the design goals.

200. FCA and its suppliers performed these tests, and others, on the Class Vehicles and, if performed with due care, each of these tests demonstrated that the relevant systems or components in the Class Vehicles would lead to failure. In fact, Andrew Simmons, FCA's Powertrain Durability Test Management Engineer confirmed such in an online interview related to testing the eTorque system.

(First Am. Compl. at ¶¶ 196-200, ECF No. 24, PageID.430-431.)

General allegations like these about testing are insufficient to show pre-sale knowledge. *See Smith*, *supra*. In *Smith*, the plaintiffs alleged that the defendant must have learned about an alleged defect in the defendant's vehicles during pre-production testing. *See Smith*, 988 F.3d at 875-876. More specifically, the plaintiffs

claimed that during that testing, the defendant would "have learned that panel cracking could lead to serious hazards for drivers, including adverse deployment of the passenger side airbag and sharp shards of flying debris inside the vehicle. Relying on information and beliefs about automobile industry standards and the requirements of pre-production testing, [p]laintiffs thus assert[ed] that [the defendant] knew of the defective dashboards before [the subject] vehicles hit the market." *Id.* at 876 (internal punctuation and citation omitted).

The Sixth Circuit held that these allegations regarding pre-release testing were insufficient because the plaintiffs made "no specific allegations about the results of the tests, such as data obtained by [the defendant] or documents confirming or suggesting whether the defect became known. And just because plaintiffs plead[ed] testing and the testing could reveal the safety risks alleged, does not make it plausible that [the defendant] knew of the existence of these safety risks." *Id.* at 884. The court then specifically highlighted that the plaintiffs had failed to plead that the "pre-production testing [actually] alerted [the defendant] to the defect." *Id.* Similarly here, Plaintiffs offer no more than "speculation about what testing might have shown." *Id.* at 886. And while Plaintiffs say that an FCA "Powertrain Durability Test Management Engineer" named Andrew Simmons commented on certain pre-release tests (First Am. Compl. at ¶ 200, ECF No. 24, PageID.431), Plaintiffs do not quote directly from Simmons' interview, provide the Court a link to that interview,

or attach a copy of the interview to their First Amended Complaint. Indeed, all Plaintiffs allege is that Simmons commented about testing to the "eTorque system" generally; they do not plead that he spoke about any testing failures related to the Class Vehicles specifically. Nor have Plaintiffs pleaded the results from that pre-release testing or explained how those results would have put FCA on notice of the particular defect alleged here. Thus, as in *Smith*, Plaintiffs' "assertions" that FCA's "routine testing … should have alerted it to a dangerous defect are not enough to meet the 12(b)(6) pleading standard." *Smith*, 988 F.3d at 884.

Next, Plaintiffs allege that FCA had pre-sale knowledge of the eTorque Defect based upon complaints that customers made to FCA directly and to the National Highway Traffic Safety Administration ("NHTSA"). (*See* Resp. to Mot. to Dismiss, ECF No. 24, PageID.1030-1031.) But the complaints identified in the First Amended Complaint do not plausibly establish FCA's *pre-sale* knowledge of the eTorque Defect. Of the nearly sixty complaints quoted in the First Amended Complaint, only eight pre-date all of the purchases made by the named Plaintiffs. (*See* First Am. Compl. at ¶ 202, ECF No. 20, PageID.431-449.) Moreover, Plaintiffs do not plausibly allege that these complaints were "frequent enough" to be more than a "blip on [FCA's] complaints-and-repairs radar considering the millions of [FCA] cars in use." *Smith*, 988 F.3d at 885 (internal quotation marks omitted). Furthermore, Plaintiffs make only a conclusory assertion that "FCA monitors

customer complaints submitted to NHTSA" (First Am. Compl. at ¶ 201, ECF No. 20, PageID.431), and the Sixth Circuit noted in *Smith* that such an allegation "is speculative absent any supporting facts." *Smith*, 988 F.3d at 885.  Finally, Plaintiffs do not include in their First Amended Complaint "supporting facts that [FCA] engaged with" the identified complaints, and that is yet another reason that Plaintiffs' allegations regarding the complaints are insufficient to plausibly establish FCA's pre-sale knowledge of the eTorque Defect. *Smith*, 988 F.3d at 885.

Plaintiffs further assert that FCA was aware of the eTorque Defect through "its warranty data." (Resp. to Mot. to Dismiss, ECF No. 20, PageID.449.)  Plaintiffs say that FCA "tracks vehicle diagnoses and repairs from dealership technicians in a single aggregated database." (First Am. Compl. at ¶ 204, ECF No. 20, PageID.449.) And Plaintiffs claim that "[f]or every one complaint filed with NHTSA, FCA *likely* receive[d] hundreds or thousands of related warranty claims.  Accordingly, FCA has *likely* received thousands of the eTorque Defect warranty claims, starting in late 2018 or early 2019." (*Id.*, PageID.449-450; emphasis added.)  But as with Plaintiffs' allegations concerning customer complaints, these allegations do not show that FCA had *pre-sale* knowledge of the eTorque Defect.  The allegations demonstrate, at most, that at some unidentified point after FCA began selling the Class Vehicles, warranty claims increased.  That says little about when FCA acquired knowledge of the eTorque Defect, and more importantly, whether that knowledge was obtained

prior to any of the named Plaintiffs buying their vehicles.  The Court is not persuaded that an uptick in warranty claims at some unidentified time supports a plausible inference that FCA had pre-sale knowledge of the eTorque Defect.

Finally, and most importantly, Plaintiffs rely primarily on FCA's release of two Technical Service Bulletins (the "TSBs") to dealers about the eTorque Defect in May and July of 2022 to establish FCA's pre-sale knowledge.  FCA issued the first TSB on May 13, 2022. (*See* ECF No. 20-5.)  In that TSB, FCA informed its dealers that 2022 RAM 1500 Pickup Trucks "built on before March 29, 2022 [] equipped with a 5.7L V8 HEMI MDS VVAT eTorque Engine" could experience "a malfunction indicator lamp illumination" arising out of the eTorque system (the "2022 RAM TSB"). (*Id.*, PageID.601.)  FCA also told dealers that customers could experience their transmission going into "limp mode," the "engage[ment]" of their "AutoPark" brake, or the failure of their "autostart" "[d]uring a Engine Stop/Start [] event." (*Id.*)  FCA told dealers that they could fix this defect by installing a software update to the affected vehicles. (*See id.*, PageID.602.)

On July 6, 2022, FCA issued a TSB for 2021 RAM 1500 Pickup "vehicles equipped with a 5.7L Hemi MDS VVT eTorque Engine" (the "2021 RAM TSB"). (2021 RAM TSB, ECF No. 20-6.)  In the 2021 RAM TSB, FCA told dealers that customers with the identified 2021 RAM 1500 trucks could experience "[a]n engine stall at low engine mileage and mostly low vehicle speeds." (*Id.*, PageID.605.)  As

22

with the problems identified with the 2022 RAM 1500 vehicles, FCA told dealers that they could repair a customer's 2021 RAM 1500 vehicle by "[r]eprogramming [it] with the latest software" update. (*Id.*, PageID.606.)

The Court first considers the group of named Plaintiffs who purchased their vehicles before FCA issued the TSBs.  The Court recognizes that in some cases, a plaintiff who purchases a vehicle before a TSB is issued could perhaps rely upon the TSB to support a showing that a manufacturer had pre-sale knowledge of a defect. That is because the issuance of a TSB represents an accumulation of knowledge developed over a period of time, and thus it may be reasonable to conclude that a manufacturer had knowledge of a defect at some point before it issued a TSB. However, the named Plaintiffs here who purchased their vehicles before FCA issued the TSBs cannot rely on the TSBs to support an inference of pre-sale knowledge because they completed their purchases too long before the TSBs were issued.[3]  The TSBs therefore do not say much about whether FCA had pre-sale knowledge of the alleged eTorque Defect in the vehicles of those plaintiffs.  For all of these reasons,

---

[3] As explained above, FCA issued the 2021 RAM TSB on July 6, 2022. (*See* 2021 RAM TSB, ECF No. 20-6.)  The Plaintiff who purchased a 2021 RAM 1500 truck closest in time before FCA issued the 2021 RAM TSB was Eric Lee, who purchased his vehicle in January 2022. (*See* First Am. Compl. at ¶ 41, ECF No. 20, PageID.399.)  That was seven months before FCA issued the 2021 RAM TSB.  No named Plaintiff purchased or began leasing a 2022 RAM 1500 truck before FCA issued the 2022 RAM TSB.  Stephen Edgcombe began leasing a 2022 RAM 1500 truck sometime in 2022, but he did not plead whether he began leasing his vehicle before or after FCA issued the 2022 RAM TSB. (*See id.* at ¶ 103, PageID.411.)

the Court will dismiss the fraud claims brought by the Plaintiffs who bought their cars before the TSBs were issued.

Four named Plaintiffs purchased their vehicles after FCA issued the TSBs: Tennyson James, James Blyth, William Smith, and Danielle Lopez-Hall.   FCA makes no effort to explain why the TSBs are insufficient to establish its pre-sale knowledge with respect to these Plaintiffs.   In FCA's motion to dismiss, FCA presents no argument at all with respect to the TSBs.   And in FCA's reply, FCA argues only that the TSBs do not establish its pre-sale knowledge with respect to the customers who purchased their vehicles *before* the TSBs were issued. (*See* Reply, ECF No. 32, PageID.1153-1154.)   On this record, given the lack of argument presented by FCA, the Court cannot conclude that the four named Plaintiffs who purchased their vehicles after FCA issued the TSBs have failed to plausibly allege FCA's pre-sale knowledge of the eTorque Defect.   Indeed, courts have recognized that under some circumstances, the issuance of a TSB may potentially play an important role in determining whether a plaintiff has plausibly alleged a manufacturer's pre-sale knowledge.   The Court will therefore allow those four Plaintiffs – and those four Plaintiffs only – to proceed with their fraud claims.[4]   The

---

[4] FCA also sought to dismiss Plaintiffs' fraud claims on a separate and independent ground: namely, that there was no duty for FCA to disclose the eTorque Defect to the Plaintiffs. (*See* Mot. to Dismiss, ECF No. 24, PageID.880-881.)   But this

Court will revisit this argument on summary judgment following the development of a full factual record.

### D

The Court next turns to FCA's arguments that the Court should dismiss Plaintiffs' breach of implied warranty claims.[5]   The Court will address each argument in turn.   None of FCA's arguments persuade the Court to dismiss Plaintiffs' implied warranty claims at this time.

### 1

FCA first argues that Plaintiffs cannot maintain a breach of implied warranty claim because "Plaintiffs [have] fail[ed] to plead facts showing their vehicles [were] not merchantable." (Mot. to Dismiss, ECF No. 24, PageID.884-885.)  As support for that argument, FCA highlights that "[n]o plaintiff alleges they stopped driving their vehicle[]." (*Id.*)

The Court is "not persuaded by [FCA's] argument that [the Class Vehicles are] merchantable just because [Plaintiffs] continued to drive [them] despite the [eTorque] Defect." *In re General Motors Air Conditioning Marketing and Sales*

---

argument is not fully developed and is limited to two sentences of analysis.  (*See id.*)  The issue of whether a duty to disclose existed is complex, and the Court declines to dismiss Plaintiffs' fraud claims based on such a cursory analysis at this time.   FCA may re-raise the duty-to-disclose issue on summary judgment where FCA will be able to present a more fulsome analysis of the issue.

[5] *See* Counts 4, 9, 10, 16, 20, 22, 28, 34, 37, and 40 of the First Amended Complaint.

*Practices Litigation*, 406 F.Supp.3d 618, 633 (E.D. Mich. 2019) (declining to dismiss breach of implied warranty claim even though plaintiff continued to drive his allegedly defective vehicle). "For an automobile to be merchantable in the usual sense, the law requires more than that it simply move from point to point under its own power. Ordinary car buyers reasonably expect, and the law allows that they should expect, cars not only to provide transportation, but also do so in a reasonably safe and reliable manner." *Francis v. General Motors, LLC*, 504 F.Supp.3d 659, 675 (E.D. Mich. 2020) (internal quotation marks omitted). This is why "[f]ederal courts considering implied warranty claims in auto defect litigation consistently have held that an automobile is merchantable or fit for its intended purpose only where it is able reliably to operate in a 'safe condition' or to provide 'safe transportation.'" *Id.* at 676 (collecting cases).

Here, Plaintiffs plausibly allege that the Class Vehicles are not merchantable because they do not "operate in a safe condition" and do not "provide safe transportation."  As described above, Plaintiffs allege that the eTorque Defect causes, among other things, their vehicles to stall and/or the emergency brake to engage without warning while Plaintiffs are driving.  Indeed, Plaintiffs cite several specific examples in the First Amended Complaint of their cars stalling and/or their emergency brake engaging while Plaintiffs were driving. (*See*, *e.g.*, First Am. Compl. at ¶¶ 36-37, 45-46, 59, PageID.398-400, 403.)  These alleged defects put the

safety of the driver and passengers in danger. *See, e.g., Matanky v. General Motors LLC*, 370 F.Supp.3d 772, 786 (E.D. Mich. 2019) (concluding that plaintiffs had "adequately plead[ed]" that an alleged defect "seriously impair[ed] the safety, reliability, and operability of their cars" where plaintiffs alleged that defect caused their cars to "lose engine power[ ] and substantially decrease speed unexpectedly"). Plaintiffs therefore plausibly allege that their vehicles were unmerchantable.

## 2

Second, FCA says that "[n]o implied warranty claim can be stated without pleading facts showing that plaintiff actually requested and was refused a repair during the warranty period." (Mot. to Dismiss, ECF No. 24, PageID.885.)  And FCA insists that "has not occurred." (*Id.*)  But Plaintiffs *do* allege that they brought their vehicles to FCA and/or FCA dealers for repair and that FCA has failed to fix the eTorque Defect. (*See*, *e.g.*, First Am. Compl. at ¶¶ 23, 26-27, 59-60, 126, ECF No. 20, PageID.397, 403, 415.)  Based on these, and other similar allegations throughout the First Amended Complaint, the Court declines dismiss Plaintiffs' breach of implied warranty claims on the basis that Plaintiffs did not give FCA an opportunity to repair their vehicles. *See Hall v. General Motors LLC*, 2020 WL 1285636, at * 11 (E.D. Mich. Mar. 18, 2020).  This is a subject for discovery, and FCA may re-raise this argument, if appropriate, on summary judgment.

27

**3**

FCA next argues that Plaintiffs' implied warranty claims under Florida and California law "should be dismissed for lack of privity" because the Florida and California Plaintiffs "purchased or leased their vehicles from third-party dealerships, not FCA US." (Mot. to Dismiss, ECF No. 24, PageID.885.)

In general, "privity of contract is required to maintain an action for breach of an implied warranty" under Florida law. *Ocana v. Ford Motor Co.*, 992 So.2d 319, 325 (Fla. 3d DCA 2008). Plaintiffs insist that this general rule is no bar to their implied warranty claim because "Florida recognize[s] a third-party beneficiary exception to [the] privity requirement." (Resp. to Mot. to Dismiss, ECF No. 27, PageID.1040.)  There appears to be a divide among Florida federal courts with respect to whether Florida recognizes this exception to the privity requirement at all. Compare *Sanchez-Knutson v. Ford Motor Co.*, 52 F.Supp.3d 1223, 1234 (S.D. Fla. 2014) (recognizing third-party beneficiary exception under Florida law) with *Padilla v. Porsche Cars N. Am., Inc.*, 391 F.Supp.3d 1108 (S.D. Fla. 2019) (declining "to follow *Sanchez-Knutson*," and holding that, consistent with "the overwhelming weight of Florida authority, [....] contractual privity [could not] be established through the third-party beneficiary exception"). *See also In re Evenflo Co., Inc., Marketing, Sales Practices & Products Liability Litigation*, --- F.Supp.3d ---, 2023 WL 8810517, at *14 (D. Mass. Dec. 20, 2023) (recognizing split of authority under

Florida law as to whether third-party beneficiary exception to privity requirement exists under Florida law).  Moreover, there is a dispute about whether the third-party beneficiary exception – if it does exist under Florida law – sensibly applies under the circumstances alleged here. *See, e.g., Shearer v. Thor Motor Coach, Inc.*, 470 F.Supp.3d 874, 886 (N.D. Ind. 2020) (applying Florida law and questioning whether automotive purchaser is a third-party beneficiary of the automotive sales contract into which a warranty would be implied) (citing *Fuller v. Marinemax East, Inc.*, 2020 WL 3266195, at *4 (S.D. Fla. Mar. 10, 2020)). *But see Weiss v. General Motors LLC*, 418 F.Supp.3d 1173, 1183 (S.D. Fla. 2019) (explaining that "[t]he Court finds more persuasive the decisions finding the third-party beneficiary exception viable in Florida" and "find[ing] that the Plaintiff ha[d] stated a [viable breach of implied warranty] claim under the third-party beneficiary exception").

The Court declines to resolve these questions now. In total, the parties' briefing on the privity question amounts to little more than a single page, and neither party has wrestled with these complex issues under Florida law. The Court therefore concludes that these questions are more appropriately resolved on summary judgment upon a full record and more detailed briefing from the parties.

For the same reasons, the Court declines to dismiss Plaintiffs' breach of implied warranty claim under California law. The parties dispute whether and to what extent the third-party beneficiary exception applies under California law, and

29

the Court concludes that it requires more extensive briefing from the parties before it can resolve those questions. The Court will turn back to this issue on summary judgment.

### 4

Finally, FCA argues that the breach of implied warranty claims brought by Plaintiffs Walkowicz and Edgcombe under Michigan law, by Cartabiano, Blyth, and Smith under Florida law, and by Lopez-Hall under Texas law all "fail for lack of adequate pre-suit notice." (Mot. to Dismiss, ECF No. 24, PageID.886.)  But FCA has not developed this argument.  FCA's brief addresses the lack-of-notice issue in a single, conclusory sentence followed by a string cite with no explanation as to how the identified cases support FCA's argument. (*See id.*)  And it appears from the allegations in the First Amended Complaint that each of the identified Plaintiffs, at the very least, brought their vehicles to an FCA dealership and put the dealerships on notice that their vehicles suffered from the eTorque Defect. (*See* First Am. Compl. at ¶¶ 72-74, 86, 108, 117, 126, 147, 153 PageID.405-406, 408, 412-413, 415, 418-420.)  At this point, and without a more fulsome set of arguments on the notice issue, the Court declines to dismiss Plaintiffs' breach of implied warranty claims based on a lack of notice.  FCA may conduct discovery on the notice issue and re-raise this issue on summary judgment.

**5**

For all of the reasons explained above, the Court declines to dismiss Plaintiffs' breach of implied warranty claims at this time based on the arguments FCA presented in its motion to dismiss.

**E**

FCA next argues that the Court should dismiss Plaintiffs Fisher's and Rico's claim under California's Unfair Competition Law, Cal. Bus. & Prof. Code Sec. 17200 *et seq* (the "UCL").[6] (*See* Mot. to Dismiss, ECF No. 24, PageID.887-888.) The UCL prohibits "any unlawful, unfair or fraudulent business practice." *Norman v. FCA US, LLC*, --- F.Supp.3d ---, 2023 WL 6388926, at *19 (E.D. Mich. Sept. 30, 2023) (quoting Cal. Bus. & Prof. Code § 17200). "California recognizes three varieties of unfair competition: practices which are unlawful, practices which are unfair, and practices which are fraudulent." *Id.*

To the extent that Plaintiffs premise their UCL claim on FCA's alleged fraud, Plaintiffs fail to state a viable claim. "Unlike common law fraud, a UCL claim based on fraud can be shown even without allegations of actual deception, reasonable reliance, or damage. But it still requires plaintiffs to plausibly plead some sort of duty to disclose. As noted above, Plaintiffs have not adequately pleaded such a duty because they have not plausibly alleged [with respect to Plaintiffs Fisher and Rico]

---

[6] *See* Count 6 of the First Amended Complaint.

that FCA knew about the [eTorque Defect] before they purchased their vehicles." *Id.* (internal citations omitted).  Thus, the Court will not allow Plaintiffs to proceed on a UCL claim premised on alleged fraud.

The Court will, however, allow Plaintiffs to pursue their UCL claim to the extent that it is based on an alleged breach of FCA's implied warranties.  Indeed, as courts have recognized, a UCL claim "based on an unlawful practice […] could conceivably be premised on the breach of an implied warranty." *Id. See also Xu v. Porsche Cars North America, Inc.*, 2020 WL 13892590, at ** 14-15 (N.D. Ga. Nov. 30, 2020) (holding that where plaintiff "adequately plead[ed] facts to satisfy a claim of breach of implied warranty," plaintiff had stated a viable UCL claim "under the UCL's unlawful business practices prong" and "UCL's unfair prong").   On summary judgment, FCA may re-raise its argument that Plaintiffs may not maintain their UCL claim.

## F

Finally, FCA argues that Plaintiff Lee's negligent design and failure-to-warn claim under Ohio law must be dismissed.[7] (*See* Mot. to Dismiss, ECF No. 24, PageID.889.)  The Court disagrees.

First, FCA argues that the existence of a contract – *i.e.*, FCA's express warranty – precludes Lee from bringing a negligence claim. (*See id.*)  But as Lee

---

[7] *See* Count 30 of the First Amended Complaint.

explained in response to FCA's motion, his claim under Ohio law does not rely on the existence of any contract with FCA.  Instead, Lee says that FCA negligently designed the Class Vehicles before any contract with FCA ever existed.  FCA has neither fully developed nor explained why the express warranty bars this theory of relief.  FCA may conduct discovery on this claim and re-raise any arguments with respect to the claim on summary judgment.

FCA next argues that this claim is barred by the economic loss doctrine. (*See id*.)  As the Court has previously explained, "[w]hether the economic loss doctrine" bars a particular claim "is an especially complex issue with seemingly persuasive authority on both sides." *Milisits v. FCA US LLC*, 2021 WL 3145704, at *10 (E.D. Mich. July 26, 2021).  And to resolve that issue, the Court must, among other things, determine whether there was privity between Lee and FCA. (*See* FCA Reply Br., ECF No. 32, PageID.1157.)  That is a complex question that requires a fulsome analysis.  Here, FCA's economic-loss-doctrine argument consists of a single sentence.  The Court declines to hold, based on that limited argument, that the economic-loss-doctrine bars Lee's claim under Ohio law.  The Court will allow FCA to re-raise this issue on summary judgment where it will have a full opportunity to brief the issue for the Court.

Finally, in its reply brief, for the first time, FCA argued that Ohio's Product Liability Act "abrogated" Lee's negligence claim. (*See id.*, PageID.1156.)  But the Court will not consider arguments raised for the first time in a reply brief. *See*, e.*g., Scottsdale Ins. Co. v. Flowers*, 415 F.3d 456, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived") (emphasis in original; internal citation omitted).

The Court therefore declines to dismiss Lee's negligence and failure to warn claim under Ohio law at this time.

## V

For all of the reasons explained above, FCA's motion to dismiss (ECF No. 124) is **GRANTED IN PART AND DENIED IN PART**.

The motion is **GRANTED** with respect to Plaintiffs' fraud claims in Counts 11, 13, 14 (dismissed as to Plaintiff Cartabiano only), 21, 25, 26, 31, 32, and 38 of the First Amended Complaint.  It is further **GRANTED** with respect to Plaintiffs' unjust enrichment claims in Counts 5, 12, 24, 29, and 35 of the First Amended Complaint.  Finally, the motion is **GRANTED** with respect to the fraud component

of Plaintiffs' UCL claim in Count 6 of the First Amended Complaint.  Those claims

are **DISMISSED**.

The motion is **DENIED** in all other respects.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  January 17, 2024


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 17, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126
